TIMOTHY J. McILWAIN
ATTORNEY AT LAW, LLC
89 River Street #1538
Hoboken, New Jersey 07030
Tel: (877) 375-9599
Fax: (609) 450-7017
Email: Attorney@McIlwainLaw.com

JOSEPH C. CANE, JR., ESQ. (CA State Bar No. 173861)
*(Pro Hac Vice Application pending)*
jcane@businesslpc.com
CHRISTIAN S. MOLNAR, ESQ. (CA State Bar No. 177665)
christian@christiansmolnarlaw.com
*(Pro Hac Vice Application pending)*
12400 Wilshire Boulevard, Suite 1180
Los Angeles, California 90025
Tel: (310) 820-9900
Fax: (310) 919-1950

Attorneys for Plaintiffs ASTERO, LLC, a New Jersey limited liability company, and
ANDREA K. TANTAROS, an individual

# THE UNITED STATES DISTRICT COURT,

## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASTERO, LLC,  a New Jersey limited liability company; ANDREA K. TANTAROS, an individual, | Case No.: |
| | [JURY TRIAL DEMANDED] |
| Plaintiffs, | **COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF FOR:** |
| vs. | |
| TALK RADIO NETWORK ENTERTAINMENT, INC., an Oregon corporation, and Does 1 through 10, inclusive, | **(1) Declaratory Relief;** |
| | **(2) Breach of Written Contract;** |
| | **(3) Breach of Implied Covenant of Good-Faith and Fair Dealing;** |
| | **(4) Fraud in the Inducement;** |
| Defendants. | **(5) Fraud (Intentional Misrepresentation);** |
| | **(6) Fraud (Negligent** |

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

Misrepresentation);
(7) **Intentional Interference with Prospective Economic Advantage;**
(8) **Negligent Interference With Prospective Economic Advantage, and**
(9) **Accounting.**

**COME NOW** Plaintiffs ASTERO, LLC, a New Jersey limited liability company (hereinafter referred to as "Plaintiff ASTERO,") and ANDREA K. TANTAROS, an individual, an individual (hereinafter referred to as "Plaintiff TANTAROS,") (hereinafter sometimes collectively referred to as "Plaintiffs,") and allege as follows:

<u>PARTIES</u>

1.      Plaintiff ASTERO is now, and at all times mentioned in this complaint was, a limited liability company duly organized and existing under and by virtue of the laws of the State of New Jersey, with its principal place of business in the City of Linwood, County of Atlantic, State of New Jersey located at 2020 New Road, Linwood, New Jersey 08221.

2.      Plaintiff TANTAROS is now, and at all times mentioned in this complaint was, an individual residing and doing business in the City of New York, County of New York, State of New York and the City of Linwood, County of Atlantic, State of New Jersey located at 2020 New Road, Linwood, New Jersey 08221.

3.      Plaintiffs are informed and believe and based thereon allege that at all times herein mentioned Defendant TALK RADIO NETWORK, INC., an Oregon corporation (hereinafter referred to as "Defendant TRN,") is now, and at all times mentioned in this complaint was, a corporation duly incorporated and existing under and by virtue of the laws of the State of Oregon, with its principal place of business in the City of Grant Pass, County of Josephine, State of Oregon located at 225 N.E. Hillcrest Drive, Grants Pass, Oregon 97526.

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

4.      Plaintiffs do not know the true names of Doe Defendants 1 through 10 inclusive (along with Defendant TRN, the "Defendants,") and therefore sue them by those fictitious names.  Plaintiffs are informed and believe and based thereon allege that each of those Defendants was in some manner legally responsible for the events and happenings alleged in this complaint and for Plaintiffs' damages.  The names, capacities, and relationships of Does 1 through 10 will be alleged by amendment to this complaint when they are known.

5.      Plaintiffs are informed and believe and based thereon allege that at all times mentioned herein, the defendants, and Does 1 through 10, inclusive, and each of them, were the agents and employees of each of the remaining Defendants, and each of them, in doing the acts alleged in this first amended complaint, were acting within the purpose and scope of said agency and employment.

6.      Each Defendant is sued individually and as an agent, conspirator, aider and abettor, employee and/or control person for each of the other Defendants, and the liability of each defendant arises from the fact that it has engaged in all or part of the unlawful acts, plans, schemes, or wrongs complained of herein and was acting within the course and scope of said agency, partnership, conspiracy, and employment.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over Defendants because this is a civil action under the laws of the State of New Jersey.  Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because there is a complete diversity of citizenship between Plaintiffs and Defendant TRN and the amount in controversy exceeds $75,000.00.

8.      This Court also has jurisdiction over each Defendant because each Defendant knowingly and purposefully availed themselves of the privilege of conducting business activities within the State of New Jersey by selling its goods and services, and entered into binding contracts with New Jersey residents.

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, as Defendants each have sufficient minimum contacts for the exercise of personal jurisdiction in this district and many of the acts complained of herein occurred in this district.

## **GENERAL FACTUAL ALLEGATIONS**

10.     Plaintiff TANTAROS is a co-host of a television program entitled "The Five" on the Fox News Channel and has been employed by Fox News since April of 2010, when she joined Fox News as a political contributor.  Plaintiff TANTAROS was also the author of weekly syndicated column for the New York Daily News and Newsmax.  Prior to being recruited by Fox, Plaintiff TANTAROS had started her own company, Andrea Tantaros Media, which specialized in the provision of crisis management and media strategy consulting to Fortune 500 companies and before that was a Vice-President at a public affairs company, Sloane and Co., in New York. Plaintiff TANTAROS also previously held several positions including serving as the Press Secretary to the Republican Leadership of the U.S. House of Representatives, as well as, working on the political campaigns of former Governor of Massachusetts, Bill Weld, District Attorney, Jeannie Piro, and Republican Congressional Committee Chairman, Thomas Reynolds.  Plaintiff TANTAROS also worked for former Reagan pollster, Richard Wirthlin, and as a Deputy Press Secretary to then congressman, and now Senator, Pat Toomey.

11.     In or about the fall of 2012, Plaintiff TANTAROS, was approached by Mark Masters ("Mr. Masters,") the President/Chief Executive Officer of Defendant TRN, regarding recruiting her to host a morning radio show on its radio network in the coveted, prime morning slot of 9 am to noon then held by celebrity conservative commentator, talk show host and Fox contributor, Laura Ingraham ("Ms. Ingraham"). This solicitation began discussions between Plaintiff TANTAROS and Defendant TRN regarding the possibility of her hosting a radio show on Defendant TRN's radio network in replacement of Ms. Ingraham.  In the course of making those overtures to

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

Plaintiff TANTAROS, Mr. Masters, Defendant TRN's agent, made several material misrepresentations to Plaintiff TANTAROS including, but not limited to:

    a. That the previous host of the prime morning timeslot, Laura Ingraham, was a nightmare, difficult to deal with, and an impossible and unfair negotiator and that is why Defendant TRN was planning to part ways with Ms. Ingraham and why her coveted time slot would be available;

    b. That Plaintiff TANTAROS, due to her status as a member of The Five and her ascending national renown, would be a perfect replacement for Ms. Ingraham and Defendant TRN would guarantee, vis-à-vis allocation of marketing dollars, to catapult her to the very top of the radio world, and correspondingly, she would receive substantial revenue sharing;

    c. That Defendant TRN was very well capitalized and possessed the capacity to spend "millions" of dollars to market Plaintiff TANTAROS' show and in the process make Plaintiff TANTAROS a radio star and reward her financially through revenue sharing;

    d. That Defendant TRN had a "robust" sales force in place "to maximize advertising revenue" for the proposed show which would ensure that Plaintiff TANTAROS received the maximum revenue participation possible under the deal that Defendant TRN was proposing to offer Plaintiffs;

    e. That Defendant TRN had syndication deals in place with approximately 300 local stations who would carry Plaintiff TANTAROS' proposed show throughout the country;

    f. That Defendant TRN had solid existing relationships with its affiliates, and

    g. That Defendant TRN had solid existing relationship with its advertising sales syndicators and advertising sales representative firms.

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

12.     Based largely upon these misrepresentations, on or about December 21, 2012, Plaintiff ASTERO, and Defendant TRN entered into a written "HOST AGREEMENT" (hereinafter referred to as "Host Agreement"), whereby Plaintiff ASTERO, as lender, would provide Defendant TRN, as radio network, with the services of Plaintiff TANTAROS, as a host on a morning radio program entitled, "The Andrea Tantaros Show" (hereinafter referred to as the "Tantaros Show").  The Host Agreement provided that Plaintiff ASTERO would receive a fixed annual salary plus a percentage of all annual net revenue related to the Tantaros Show and a percentage of annual user fees with certain guaranteed annual sums for both the net revenue and user fee participation.  The Host Agreement further provided that in the event of a breach or breaches of the Host Agreement, either party thereto could give the other party written notice of the breach (hereinafter referred to as a "Notice of Breach,") and that if the breaching party failed to cure the breach or breaches specified in the Notice of Breach within twenty (20) business days, the non-breaching party could issue a written notice of termination of the Host Agreement to the breaching party (hereinafter referred to as a "Termination Notice").  A true and correct copy of the Host Agreement is attached hereto as Exhibit "A" and is incorporated herein by this reference as though fully set forth.

13.     The Host Agreement specifically acknowledges that it and all of its provisions, terms and conditions are subordinate Plaintiffs' agreements with the Fox News Channel.

14.     On or about December 21, 2012, Plaintiff TANTAROS and Defendant TRN entered into a written "INDUCEMENT LETTER AND GUARANTY," (hereinafter referred to as "Guaranty").  A true and correct copy of the Guaranty is attached hereto as Exhibit "B" and is incorporated herein by this reference as though fully set forth.

15.     Prior to the time of its entering into the Host Agreement with Plaintiff TANTAROS, on August 27, 2012, Defendant TRN, and related entities, filed a lawsuit

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

against one of its largest advertising sales syndicators and sources of revenue related to the shows on its radio network, Dial Global, Inc., and various related entities, in the United States District Court for the Central District of California (USDC-CD-CA Case No. CV12-7370-JFW (PLA) entitled *The Original Talk Radio Network, etc., et al. vs. Dial Global, Inc., etc., et al.*) alleging, *inter alia*, that the defendants therein had improperly withheld monies owed to Defendant TRN or otherwise engaged in other unfair business practices in an effort to deprive the plaintiffs therein, including Defendant TRN herein, of monies that it was entitled to or otherwise would have been entitled to under its agreements with the defendants (hereinafter referred to as the "Dial Global Lawsuit").  Defendant TRN and its related entities further pled in the Dial Global Lawsuit that Defendant Dial Global "controls 95% of the Independent Ad[vertising] Rep[resentative] Market.  As a result…has achieved a stranglehold on the vast majority of Independent Spoken Word Syndicators such as Plaintiffs [including the Defendant TRN herein]."  In other words, months before Defendant TRN approached Plaintiff TANTAROS about doing a radio show on its radio network it had initiated litigation against a company, Dial Global, LLC and its related entities, the "Dial Global Group," which Defendant TRN alleged in the complaint in the Dial Global Lawsuit controlled ninety-five percent (95%) of the advertising revenues for syndicated radio talk shows, such as the show it was touting to Plaintiff TANTAROS, as being the vehicle which would elevate her career and handsomely compensate her through revenue participation.

16.     Thus, at the time Defendant TRN's CEO, Mr. Masters, was wooing and soliciting Plaintiffs to enter into the Host Agreement and the Guaranty with it for the Tantaros Show, Defendant TRN did not disclose the existence of the Dial Global Lawsuit to Plaintiffs and further did not disclose that it was in a dispute with one of the largest advertising sales syndicators in the United States, Dial Global, LLC and its related entities, or the fact that the participation revenues, including advertising, that Plaintiff ASTERO was entitled to under the Host Agreement would be dependent on

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

this same largest advertising syndication network that Defendant TRN was suing. Finally, Defendant TRN did not disclose to Plaintiffs that the revenue participation it was offering to Plaintiffs in connection with the proposed Tantaros Show would be principally dependent upon or coming from Dial Global and the related entities that it was in litigation with since August, 2012.

17.    Due in large part to Plaintiff TANTAROS' known celebrity status, the Tantaros Show was an immediate hit and quickly after its debut was ranked the 7th highest talk radio show in the United States according to TALKERS Magazine.

18.    In or about late August and/or early September 2013 and without any prior discussion with Plaintiffs, Defendant TRN laid off most of its staff and many others simultaneously "resigned" from their positions, including, and critically, most of Defendant TRN's sales team.  In response to Plaintiff TANTAROS expressing her concerns to Defendant TRN about the massive "overnight" loss of most of the sales staff, she was assured by Defendant TRN that the Head of Affiliate Advertising Sales and Chief Operating Officer, Bill Crawford, was still with the company and that the company still had a sufficient sales force to generate advertising sales for the Tantaros Show and make good on the revenue sharing commitments contained in the Host Agreement.

19.    Days later, Bill Crawford, the Chief Operating Officer and Head of Affiliate Ad Sales at Defendant TRN resigned, effective immediately.

20.    In or about early late August and/or early September 2013, the sound effects manager, Matt Fox, resigned from Tantaros Show due to the non-payment of his salary by Defendant TRN.

21.    In or about late August and/or early September 2013, the executive producer of the Tantaros Show, A.J. Rice, was laid off by Defendant TRN and not immediately replaced, although later replaced by Mr. Masters' brother, David Ruben.

**8**

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

22.     In or about late August and/or early September, 2013, the Tantaros Show's call screener was laid and initially replaced by the CEO, Mark Master's son, but currently remains unfulfilled.

23.     As of early September, 2013, Defendant TRN owed Plaintiff ASTERO several payments of both salary and guaranteed revenue participation as well as owed several payments of salary to Plaintiff TANTAROS' assistant, Christopher Coffey, on the Tantaros Show.

24.     As of the second week of September, 2013, and a direct result of the actions of Defendant TRN, Plaintiff TANTAROS found herself in a situation wherein she no longer had a competent executive producer, a full-time call screener, a paid assistant, or a sound effects manager, and further, had either no guests or only decidedly "C-list" quality guests, was provided with no research for the third-rate guests that were booked for the Tantaros Show, a lack of sufficient research for the topics at hand, provided with no editorial guidance, and she was expected by Defendant TRN to basically produce her own show.  In addition, there no longer was any meaningful sales force to sell her program to advertisers or potential advertisers and there was no affiliate relations staff at Defendant TRN to service the needs or the requests of the Tantaros Show's affiliates.  The "overnight" complete deterioration of the quality of the Tantaros Show is, and continues to be, damaging to Plaintiff TANTAROS' brand and her hard-earned professional reputation.  Plaintiff TANTAROS is informed and believes and based therein alleges that as result of the actions and omissions of Defendant TRN, that her nationally-recognized brand and professional reputation have been damaged, perhaps, even permanently.

25.     Plaintiff TANTAROS' chief employer, the Fox News Network, has repeatedly expressed its concern at the implosion of Defendant TRN, according to recent news reports.  Presumably, Fox News Network's concerns emanate from potential damage to Plaintiff TANTAROS' brand and the effect that it may have on its

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

young, previously ascendant, star, Plaintiff TANTAROS, as well as, the potential negative impact on the Fox News Channel.

26. On September 13, 2013, Plaintiffs ASTERO and TANTAROS, through their counsel, and pursuant to the provisions of Section 18.A of the Host Agreement, provided Defendant TRN with a formal, written Notice of Breach in accordance with notice provisions of section 29 of the Host Agreement.

27. The September 13th Notice of Breach delineated the following breaches of the Host Agreement by Defendant TRN and demanded their timely cure:

a. Failing to maintain a sales force capable selling the Tantaros Show to advertisers and potential advertisers as required by section 4.J of the Host Agreement;

b. Failing to nationally syndicate the Tantaros Show as required by section 4.A of the Host Agreement;

c. Failing to facilitate relationships the Tantaros Show's affiliates as required by section 4.B of the Host Agreement;

d. Failing to advertise and market the Tantaros Show as required by section 4.J of the Host Agreement;

e. Effectively precluding Plaintiff ASTERO's ability to achieve revenue participation above its annually guaranteed sum that it was entitled to under Section 5.C of the Host Agreement;

f. Failing to support the full responsibilities of the mobile App for the Tantaros Show and further failing to maintain the Tantaros Show's website, as required by Section 4.K of the Host Agreement;

g. Failing to maintain an affiliate division, as required by section 4.B of the Host Agreement, and

h. Failing to provide a "National Syndication Quality" production for the Tantaros Show as required by section 4.F of the Host Agreement.

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

A true and correct copy of the September 13th Notice of Breach is attached hereto as Exhibit "C" and incorporated herein by this reference as though fully set forth.

28.     More than twenty (20) business days have elapsed since the provision by Plaintiffs to Defendant TRN of the Notice of Breach on September 13, 2013, and Defendant TRN has failed and refused, and continues to fail and to refuse, cure the material breaches specified therein.  Defendant TRN further failed to challenge the existence of any of the material breaches specified in the September 13th Notice of Breach within twenty (20) business days as provided for in section 18.A of the Host Agreement.

29.     On September 24, 2013, as a supplement to the September 13th Notice of Breach, Plaintiffs ASTERO and TANTAROS, through their counsel, provided Defendant TRN with a further formal written Notice of Breach which recited the breaches contained in the September 13th Notice of Breach and additionally advised Defendant TRN that it was delinquent in paying Plaintiff TANTAROS' salary in violation of Sections 5.A and 5.F of the Host Agreement.

30.     The September 24th Notice of Breach demanded that Defendant TRN pay all outstanding amounts due to Plaintiff TANTAROS and further requested that Defendant TRN furnish the following previously requested documents/information:

      a.   List of station affiliates currently carrying the Tantaros Show and any other available syndication metrics;

      b.   List of markets for the Tantaros Show and any related clearance metrics;

      c.   List of current advertisers for the Tantaros Show;

      d.   Total Ad Sales for the Tantaros Show from 1/1/13 to present;

      e.   Total New Show Revenue from 1/1/13 to present;

      f.   Total Cash Compensation received by Defendant TRN concerning the Tantaros Show form 1/1/13 to the present;

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

g.  Total Miscellaneous Revenues received by Defendant TRN concerning the Tantaros Show from 1/1/13 to the present;

h.  Total User Fees received by Defendant TRN concerning the Tantaros Show from 1/1/13 to the present; and

i.  Copies of all Revenue Reports required to be delivered to Lender on a monthly basis, per Section 6/D of the Host Agreement.

A true and correct copy of the September 24th Notice of Breach is attached hereto as Exhibit "D" and incorporated herein by this reference as though fully set forth.

31.     Nonetheless, Defendant TRN has failed and refused, and continues to fail and to refuse, to cure the material breaches specified in the September 24th Notice of Breach, failed and refused, and continues to fail and refuse to pay Plaintiff TANTAROS' salary in violation of Sections 5.A and 5.F of the Host Agreement and further failed and refused, and continues to fail and refuse, to provide Plaintiffs with the requested documents/information discussed hereinabove and demanded in the September 24th Notice of Breach.

32.     On October 9, 2013, pursuant to the provisions of Section 18 of the Host Agreement, Plaintiff ASTERO issued a written notice of termination of the Host Agreement and delivered the same to Defendant TRN pursuant to the notice provisions of Section 29. of the Host Agreement (hereinafter referred to as the "Termination Notice").  A true and correct copy of the Termination Notice is attached hereto as Exhibit "E" and incorporated herein by this reference as though fully set forth.

33.     Plaintiffs are informed and believe and based thereon allege that Defendant TRN and various related entities (hereinafter referred to "the Talk Radio Network Companies") are owned and/or controlled by members of the Masters Family. In addition, Plaintiffs are informed and believe and based thereon allege that the Masters Family owns a "church" called the Foundation for Human Understanding and Growth (hereinafter referred to as the "Foundation").  Plaintiffs are further informed and believe and based therein allege that the masters Family uses the Foundation in order to sell

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

their products, such as, books, meditation tapes and stress relief devices in multiple media venues, but of particular importance herein, on the Tantaros Show, as many of the commercials on the Tantaros Show are sponsored by the Foundation.

34.     Plaintiffs are informed and believe and based thereon allege that the Masters Family through their company, Defendant TRN, have been using the advertising space on the Tantaros Show to peddle their own products and have either not been paying for that advertising or paying significantly less than the fair market value for that advertising space on the Tantaros Show, essentially negotiating with themselves for advertising space and self-dealing their own products for their exclusive gain rather than attempting to seek the highest possible advertising revenues from third-parties which would increase Plaintiff ASTERO's participation revenue under the Host Agreement.  Plaintiffs are informed and believe and based thereon allege that they have been damaged by this intentional course of self-dealing by Defendant TRN and the Masters Family that controls Defendant TRN in the form of lost revenue participation that Plaintiff ASTERO would have received but for their actions.

35.     At no time prior to entering into the Host Agreement with Plaintiff ASTERO or the Guaranty with Plaintiff TANTAROS, or at any time thereafter, did Defendant TRN ever disclose to Plaintiffs that it intended to advertise the products of the Foundation or other companies controlled by the Masters Family on the Tantaros Show and that it either would not pay for that advertising time or would not pay the fair market value for it.

36.     Only after Plaintiffs' counsel sent the aforementioned breach letters to Defendant TRN did Mr. Masters, the CEO of Defendant TRN, inform Plaintiff TANTAROS that Dial Global had not paid Defendant TRN any monies for advertising for the past thirteen (13) months.  This means that at the time the Defendant TRN solicited Plaintiff TANTAROS to host a show on Defendant TRN's network and at the time that it entered into Host Agreement and the Guaranty, Defendant TRN knew that the largest source of advertising revenue for the proposed show was not paying

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

Defendant TRN, and that correspondingly, Plaintiff ASTERO's revenue participation would be negatively impacted.  None of this was ever disclosed to Plaintiffs at any time prior to September, 2013.

## FIRST CAUSE OF ACTION

### (For Declaratory Relief against Defendant TRN, and Does 1 through 10, inclusive)

37.    Plaintiffs repeat, re-plead and re-allege the allegations contained in Paragraphs 1 through 36, inclusive, above, and incorporate the same herein in full.

38.    An actual controversy has arisen and now exists regarding Plaintiffs and Defendant TRN, and Does 1 through 10, inclusive, and each of their, rights and obligations under Host Agreement and Guaranty.

39.    Plaintiffs contend that Defendant TRN committed multiple, material breaches of Host Agreement and that Defendant TRN, after receiving a formal, written Notice of Breach on September 13, 2013, failed to cure any of the material breaches specified in that notice within twenty (20) business days as provided for in the Host Agreement and that therefore, upon the issuance of the Notice of Termination dated October 9, 2013, the Host Agreement and the Guaranty were terminated and that Plaintiffs have no further obligations to Defendant TRN thereunder.

40.    Plaintiffs are informed and believe and based thereon allege that Defendant TRN, and Does 1 through 10, inclusive, and each of them, dispute the contention contained the paragraph immediately above.

41.    A judicial declaration is necessary and appropriate, and Plaintiffs hereby seek the same, at this time under the circumstances in order that Plaintiffs, on the one hand, and Defendant TRN, and Does 1 through 10, inclusive, and each of them, on the other hand, may ascertain their respective legal and equitable rights and obligations under the Host Agreement and the Guaranty.  Plaintiffs are currently suffering financial hardship in that they are suffering damage to Plaintiff TANTAROS' brand and her hard-earned professional reputation as well are potentially prevented from pursuing

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

other professional opportunities and will continue to suffer said financial hardship until such time as the controversy has been adjudicated by this Court.

42.　Plaintiffs have been damaged to date, and will continue to be damaged, until relief is granted, in a sum according to proof at the time of trial.

## SECOND CAUSE OF ACTION

### (For Breach of Written Contract against Defendant TRN, and Does 1 through 10, inclusive)

43.　Plaintiffs repeat, re-plead and re-allege the allegations contained in Paragraphs 1 through 42, inclusive, above and incorporate the same herein in full.

44.　As alleged hereinabove, Plaintiff ASTERO, on the one hand, and Defendant TRN, and Does 1 through 10, inclusive, and each of them, on the other hand, entered into the written Host Agreement.

45.　As further alleged hereinabove, the written Host Agreement provided that:

    a.　Plaintiff ASTERO, as lender, would provide Defendant TRN, as radio network, with the services of Plaintiff TANTAROS, as a host on the Tantaros Show;

    b.　Plaintiff ASTERO would receive a fixed annual salary plus a percentage of all annual net revenue related to the Tantaros Show and a percentage of annual user fees with certain guaranteed annual sums for both the net revenue and user fee participation;

    c.　In the event of a breach or breaches of the Host Agreement, either party thereto could give the other party a Notice of Breach and that if the breaching party failed to cure the breach of breaches within twenty (20) business days, the non-breaching party could issue a Termination Notice;

    d.　Defendant TRN would maintain a sales force capable selling the Tantaros Show to advertisers and potential advertisers as required by section 4.J of the Host Agreement;

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

e.  Defendant TRN would nationally syndicate the Tantaros Show as required by section 4.A of the Host Agreement;

f.  Defendant TRN would facilitate relationships the Tantaros Show's affiliates as required by section 4.B of the Host Agreement;

g.  Defendant TRN would advertise and market the Tantaros Show as required by section 4.J of the Host Agreement;

h.  Defendant TRN would support the full responsibilities of the mobile App for the Tantaros Show and further maintain the Tantaros Show's website, as required by Section 4.K of the Host Agreement;

i.  Defendant TRN would maintain an affiliate division, as required by section 4.B of the Host Agreement, and

j.  Defendant TRN would provide a "National Syndication Quality" production for the Tantaros Show as required by section 4.F of the Host Agreement.

46.  In breach of the written Host Agreement, Defendant TRN, and Does 1 through 10, inclusive, and each of them:

a.  Failed to pay Plaintiff ASTERO its fixed annual salary plus a percentage of all annual net revenue related to the Tantaros Show and a percentage of annual user fees with certain guaranteed annual sums for both the net revenue and user fee participation;

b.  Failed to cure the breaches outlined in the September 13th and September 24th Notices of Breach;

c.  Failed to maintain a sales force capable of selling the Tantaros Show to advertisers and potential advertisers as required by section 4.J of the Host Agreement;

d.  Failed to nationally syndicate the Tantaros Show as required by section 4.A of the Host Agreement;

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

e. Failed to facilitate relationships the Tantaros Show's affiliates as required by section 4.B of the Host Agreement;

f. Failed to advertise and market the Tantaros Show as required by section 4.J of the Host Agreement;

g. Precluded Plaintiff ASTERO's ability to achieve revenue participation above its annually guaranteed sum that it was entitled to under Section 5.C of the Host Agreement;

h. Failed to support the full responsibilities of the mobile App for the Tantaros Show and further failing to maintain the Tantaros Show's website, as required by Section 4.K of the Host Agreement;

i. Failed to maintain an affiliate division, as required by section 4.B of the Host Agreement, and

j. Failed to provide a "National Syndication Quality" production for the Tantaros Show as required by section 4.F of the Host Agreement.

47.     Plaintiff ASTERO has performed all conditions precedent to the performance of Defendant TRN, and Does 1 through 10, inclusive, and each of them, under the written Host Agreement, or have otherwise been excused from any performance not yet completed.

48.     Plaintiff ASTERO has been damaged in a sum according to proof at time of trial, plus interest thereon at the maximum rate permitted by law.

## **THIRD CAUSE OF ACTION**

### **(For Breach of Implied Covenant of Good-Faith and Fair Dealing against Defendant TRN, and Does 1 through 10, inclusive)**

49.     Plaintiffs repeat, re-plead and re-allege the allegations contained in Paragraphs 1 through 48, inclusive, above and incorporate the same herein in full.

50.     As alleged hereinabove, Defendant TRN, and Does 1 through 10, inclusive, and each of them, entered into the written Host Agreement with Plaintiffs in which Defendant TRN, and Does 1 through 10, inclusive, and each of them, agreed to:

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

a.  Pay Plaintiff ASTERO a fixed annual salary plus a percentage of all annual net revenue related to the Tantaros Show and a percentage of annual user fees with certain guaranteed annual sums for both the net revenue and user fee participation;

b.  Maintain a sales force capable selling the Tantaros Show to advertisers and potential advertisers as required by section 4.J of the Host Agreement;

c.  Nationally syndicate the Tantaros Show as required by section 4.A of the Host Agreement;

d.  Facilitate relationships the Tantaros Show's affiliates as required by section 4.B of the Host Agreement;

e.  Advertise and market the Tantaros Show as required by section 4.J of the Host Agreement;

f.  Support the full responsibilities of the mobile App for the Tantaros Show and further maintain the Tantaros Show's website, as required by Section 4.K of the Host Agreement;

g.  Maintain an affiliate division, as required by section 4.B of the Host Agreement, and

h.  Provide a "National Syndication Quality" production for the Tantaros Show as required by section 4.F of the Host Agreement.

51.  The written Host Agreement entered into between Plaintiffs, on the one hand, and Defendant TRN, and Does 1 through 10, inclusive, and each of them, on the other hand, is subject to the covenant of good-faith and fair dealing as implied by law, which prohibits Defendant TRN, and Does 1 through 10, inclusive, and each of them, from engaging in conduct that would injure Plaintiffs or prevent them from receiving the benefits of the written Host Agreement and from engaging in arbitrary and/or unfair acts that would disadvantage and/or unfairly take advantage of its customers.

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

52.     Since in or about December 2012, Defendant TRN, and Does 1 through 10, inclusive, and each of them, have breached the implied covenant of good-faith and fair dealing contained in the written Host Agreement by:

 a.  Failing to maintain a sales force capable selling the Tantaros Show to advertisers and potential advertisers as required by section 4.J of the Host Agreement;

 b.  Failing to nationally syndicate the Tantaros Show as required by section 4.A of the Host Agreement;

 c.  Failing to facilitate relationships the Tantaros Show's affiliates as required by section 4.B of the Host Agreement;

 d.  Failing to advertise and market the Tantaros Show as required by section 4.J of the Host Agreement;

 e.  Effectively precluding Plaintiff ASTERO's ability to achieve revenue participation above its annually guaranteed sum that it was entitled to under Section 5.C of the Host Agreement;

 f.  Failing to support the full responsibilities of the mobile App for the Tantaros Show and further failing to maintain the Tantaros Show's website, as required by Section 4.K of the Host Agreement;

 g.  Failing to maintain an affiliate division, as required by section 4.B of the Host Agreement;

 h.  Failing to provide a "National Syndication Quality" production for the Tantaros Show as required by section 4.F of the Host Agreement, and

 i.  Failing to provide Plaintiffs with the documents/information requested in the September 24th Notice of Breach as alleged hereinabove;

 j.  Failing to pay Plaintiffs' fixed annual salary plus a percentage of all annual net revenue related to the Tantaros Show and a percentage of annual user fees with certain guaranteed annual sums for both the net revenue and user fee participation;

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

k.   Engaging in self dealing and advertising the products of the Foundation or other companies controlled by the Masters Family on the Tantaros show and that it would not pay for that advertising time or not pay the fair market value for it, and

l.   Failing to disclose to Plaintiffs that months before the execution of the Host Agreement, Defendant TRN, and related entities, had filed a lawsuit against one of its largest advertising sales syndicators and sources of revenue related to the shows on its radio network, Dial Global, Inc., and various related entities, who purportedly controlled "(95%) of the advertising revenues for syndicated radio talk shows," such as the show it was touting to Plaintiff TANTAROS, as being the vehicle which would elevate her career.

In doing this, Defendant TRN, and Does 1 through 10, inclusive, and each of them, engaged in arbitrary and unfair acts and practices that disadvantage and unfairly took advantage of Plaintiffs.

53.    As a proximate result of the wrongful conduct of Defendant TRN, and Does 1 through 10, inclusive, and each of them, Plaintiffs have been injured and suffered monetary damages as a result of Defendant TRN, and Does 1 through 10, inclusive, and each of their wrongful conduct in a sum according to proof at time of trial.

54.    The aforementioned conduct of Defendant TRN, and Does 1 through 10, inclusive, and each of them, was done with the specific intention on the part of Defendant TRN, and Does 1 through 10, inclusive, and each of them, of thereby depriving Plaintiffs of receiving the benefit of their legal and equitable rights, and otherwise causing them injury, and was despicable conduct that subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, so as to justify an award of exemplary and punitive damages.

////

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

## FOURTH CAUSE OF ACTION

### (For Fraud in the Inducement against Defendant TRN, and Does 1 through 10, inclusive)

55.     Plaintiffs repeat, re-plead and re-allege the allegations contained in Paragraphs 1 through 54, inclusive, above and incorporate the same herein in full.

56.     As detailed herein, Plaintiffs allege that in or about the fall of 2012, Defendant TRN, and Does 1 through 10, inclusive, and each of them, through its agent Mr. Masters, made false promises in writing and orally, in person and via telephone, that harmed Plaintiffs with false information during the course wooing Plaintiffs to host a morning radio show on its radio network in order to induce Plaintiffs to enter into the Guaranty and Host Agreement whereby Plaintiff ASTERO, as lender, would provide Defendant TRN, as radio network, with the services of Plaintiff TANTAROS, as a host on the Tantaros Show.  These promises and representations include, but are not limited to, promises:

      a.  That the previous host of the prime morning timeslot, Laura Ingraham, was a nightmare, difficult to deal with, and an impossible and unfair negotiator and that is why Defendant TRN was planning to part ways with Ms. Ingraham and her coveted time slot would be available;

      b.  That Plaintiff TANTAROS, due to her status as a member of The Five and her ascending national renown, would be a perfect replacement for Ms. Ingraham and Defendant TRN would guarantee, vis-à-vis allocation of marketing dollars, to catapult her to the very top of the radio world, and correspondingly, she would receive substantial revenue sharing;

      c.  That Defendant TRN was very well capitalized and possessed the capacity to spend "millions" of dollars to market Plaintiff TANTAROS' show and in the process make Plaintiff TANTAROS a radio star and reward her financially through revenue sharing;

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

d.   That Defendant TRN had a "robust" sales force in place "to maximize advertising revenue" for the proposed show which would ensure that Plaintiff TANTAROS received the maximum revenue participation possible under the deal that Defendant TRN was proposing to offer Plaintiffs;

e.   That Defendant TRN had syndication deals in place with approximately 300 local stations who would carry Plaintiff TANTAROS' proposed show throughout the country;

f.   That Defendant TRN had solid existing relationships with its affiliates, and

g.   That Defendant TRN had solid existing relationship with its advertising sales syndicators and advertising sales representative firms.

57.   These promises and representations were material to the transaction and Plaintiffs would not have agreed to enter into the Guaranty and into the Host Agreement, whereby Plaintiff ASTERO, as lender, would provide Defendant TRN, as radio network, with the services of Plaintiff TANTAROS, as a host on the Tantaros Show, if these promises had not been made.  Thus, Plaintiffs were induced to enter into the Guaranty and into the Host Agreement, whereby Plaintiff ASTERO, as lender, would provide Defendant TRN, as radio network, with the services of Plaintiff TANTAROS, as a host on the Tantaros Show by these promises and representations.

58.   Defendant TRN, and Does 1 through 10, inclusive, and each of them, did not intend to perform these promises when it made them.  Defendant TRN, and Does 1 through 10, inclusive, and each of them, knew that these representations were false when they made them.

59.   Defendant TRN, and Does 1 through 10, inclusive, and each of them, intended that Plaintiffs rely on its promises and representations, and Plaintiffs did in fact reasonably rely and justifiably rely on these promises and representations.

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

60.     Plaintiffs' reliance on the representations of Defendant TRN, and Does 1 through 10, inclusive, and each of them, was justified because Defendant TRN, and Does 1 through 10, inclusive, and each of them, had the longest running and most widely known talk radio shows in the country, if not the world, and Plaintiffs did not have any reason or cause to suspect that the representations of Defendant TRN, and Does 1 through 10, inclusive, and each of them, were not true.

61.     Plaintiffs' reliance on Defendant TRN, and Does 1 through 10, inclusive, and each of their promises and representations was a substantial factor in the harm caused to Plaintiffs.

62.     Defendant TRN, and Does 1 through 10, inclusive, and each of them, failed to perform its promises by engaging in acts including, but not limited to:

    a. Failing to maintain a sales force capable selling the Tantaros Show to advertisers and potential advertisers as required by section 4.J of the Host Agreement;

    b. Failing to nationally syndicate the Tantaros Show as required by section 4.A of the Host Agreement;

    c. Failing to facilitate relationships the Tantaros Show's  affiliates as required by section 4.B of the Host Agreement;

    d. Failing to advertise and market the Tantaros Show as required by section 4.J of the Host Agreement;

    e. Effectively precluding Plaintiff ASTERO's ability to achieve revenue participation above its annually guaranteed sum that it was entitled to under Section 5.C of the Host Agreement;

    f. Failing to support the full responsibilities of the mobile App for the Tantaros Show and further failing to maintain the Tantaros Show's website, as required by Section 4.K of the Host Agreement;

    g. Failing to maintain an affiliate division, as required by section 4.B of the Host Agreement;

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

h.  Failing to provide a "National Syndication Quality" production for the Tantaros Show as required by section 4.F of the Host Agreement, and

i.  Failing to provide Plaintiffs with the documents/information requested in the September 24th Notice of Breach as alleged hereinabove;

j.  Failing to pay Plaintiffs' fixed annual salary plus a percentage of all annual net revenue related to the Tantaros Show and a percentage of annual user fees with certain guaranteed annual sums for both the net revenue and user fee participation, and

k.  Failing to disclose to Plaintiffs during the negotiation stage that months before the execution of the Host Agreement, Defendant TRN, and related entities, had filed a lawsuit against one of its largest advertising sales syndicators and sources of revenue related to the shows on its radio network, Dial Global, Inc., and various related entities, who purportedly controlled "(95%) of the advertising revenues for syndicated radio talk shows," such as the show it was touting to Plaintiff TANTAROS, as being the vehicle which would elevate her career.

63.    Plaintiffs have been injured and suffered monetary damages as a result of Defendant TRN, and Does 1 through 10, inclusive, and each of their misrepresentations and failure to perform their promises in sum according to proof at time of trial.

64.    The aforementioned conduct of Defendant TRN, and Does 1 through 10, inclusive, and each of them, was done with the specific intention on the part of Defendant TRN, and Does 1 through 10, inclusive, and each of them, of thereby depriving Plaintiffs of receiving the benefit of their legal and equitable rights, and otherwise causing them injury, and was despicable conduct that subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, so as to justify an award of exemplary and punitive damages.

////

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

**FIFTH CAUSE OF ACTION**

**(For Fraud (Intentional Misrepresentation) against Defendant TRN, and Does 1 through 10, inclusive)**

65.     Plaintiffs repeat, re-plead and re-allege the allegations contained in Paragraphs 1 through 64, inclusive, above and incorporate the same herein in full.

66.     Defendant TRN, and Does 1 through 10, inclusive, and each of them, made material misrepresentations to Plaintiffs, in writing and orally, in person and via telephone, including, but not limited to:

a.  That the previous host of the prime morning timeslot, Laura Ingraham, was a nightmare, difficult to deal with, and an impossible and unfair negotiator and that is why Defendant TRN was planning to part ways with Ms. Ingraham and her coveted time slot would be available;

b.  That Plaintiff TANTAROS, due to her status as a member of The Five and her ascending national renown, would be a perfect replacement for Ms. Ingraham and Defendant TRN would guarantee, vis-à-vis allocation of marketing dollars, to catapult her to the very top of the radio world, and correspondingly, she would receive substantial revenue sharing;

c.  That Defendant TRN was very well capitalized and possessed the capacity to spend "millions" of dollars to market Plaintiff TANTAROS' show and in the process make Plaintiff TANTAROS a radio star and reward her financially through revenue sharing;

d.  That Defendant TRN had a "robust" sales force in place "to maximize advertising revenue" for the proposed show which would ensure that Plaintiff TANTAROS received the maximum revenue participation possible under the deal that Defendant TRN was proposing to offer Plaintiffs;

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

e.  That Defendant TRN had syndication deals in place with approximately 300 local stations who would carry Plaintiff TANTAROS' proposed show throughout the country;

f.  That Defendant TRN had solid existing relationships with its affiliates, and

g.  That Defendant TRN had solid existing relationship with its advertising sales syndicators and advertising sales representative firms.

67.  The representations made by Defendant TRN, and Does 1 through 10, inclusive, and each of them, were in fact false and/or misleading.  The true facts were that:

a.  Defendant TRN was not very well capitalized and did not possess the capacity to spend "millions" of dollars to market Plaintiff TANTAROS' show and in the process make Plaintiff TANTAROS a radio star and reward her financially through revenue sharing;

b.  Defendant TRN did not have a "robust" sales force in place "to maximize advertising revenue" for the proposed show which would ensure that Plaintiff TANTAROS received the maximum revenue participation possible under the deal that Defendant TRN was proposing to offer Plaintiffs;

c.  Defendant TRN did not have syndication deals in place with approximately 300 local stations who would carry Plaintiff TANTAROS' proposed show throughout the country;

d.  Defendant TRN did not have solid existing relationships with its affiliates;

e.  Defendant TRN did not have solid existing relationship with its advertising sales syndicators and advertising sales representative firms;

f.  Defendant TRN had filed a lawsuit against Dial Global, the largest source of advertising revenue for the proposed show;

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

g. Dial Global, the largest source of advertising revenue for the proposed show, had not paid Defendant TRN any monies for advertising for several months prior to Plaintiffs agreeing to host the Tantaros Show and enter into the Host Agreement and Guaranty, and

h. Defendant TRN engaged in self dealing and intended to advertise the products of the Foundation or other companies controlled by the Masters Family on the Tantaros show and that it would not pay for that advertising time or not pay the fair market value for it.

68.    Defendant TRN, and Does 1 through 10, inclusive, and each of them, made these representations knowing them to be false and further made these misrepresentations with the intent to deceive and defraud Plaintiffs and to induce them to act in reliance on these misrepresentations in the manner hereafter alleged, or with the expectation that they would so act.

69.    Plaintiffs at the time these misrepresentations were made by Defendant TRN, and Does 1 through 10, inclusive, and each of them, and at the time that Plaintiffs took the actions, or did not take action, all as herein alleged, were ignorant of the falsity of these representations and believed them to be true.

70.    In reliance on these misrepresentations, Plaintiffs were induced to, and did rely upon the representations of Defendant TRN, and Does 1 through 10, inclusive, and each of them, to enter into the Guaranty and Host Agreement whereby Plaintiff ASTERO, as lender, would provide Defendant TRN, as radio network, with the services of Plaintiff TANTAROS, as a host on the Tantaros Show.

71.    Plaintiffs' reliance on the misrepresentations of Defendant TRN, and Does 1 through 10, inclusive, and each of them, was justified, because Defendant TRN, and Does 1 through 10, inclusive, and each of them, had the longest running and most widely known talk radio shows in the country, if not the world, and Plaintiffs did not have any reason or cause to suspect that the representations were not true.

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

72.     As a proximate result of the fraudulent conduct of Defendant TRN, and Does 1 through 10, inclusive, and each of them, Plaintiffs have been injured and suffered monetary damages as a result of Defendant TRN, and Does 1 through 10, inclusive, and each of their wrongful conduct in a sum according to proof at time of trial.

73.     The aforementioned conduct of Defendant TRN, and Does 1 through 10, inclusive, and each of them, was done with the specific intention on the part of Defendant TRN, and Does 1 through 10, inclusive, and each of them, of thereby depriving Plaintiffs of receiving the benefit of their legal and equitable rights, and otherwise causing them injury, and was despicable conduct that subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, so as to justify an award of exemplary and punitive damages.

## SIXTH CAUSE OF ACTION

### (For Fraud (Negligent Misrepresentation) against Defendant TRN, and Does 1 through 10, inclusive)

74.     Plaintiffs repeat, re-plead and re-allege the allegations contained in Paragraphs 1 through 73, inclusive, above and incorporate the same herein in full.

75.     When Defendant TRN, and Does 1 through 10, inclusive, and each of them, made the material misrepresentations described herein to Plaintiffs, it had no reasonable ground for believing them to be true in that Defendant TRN, and Does 1 through 10, inclusive, and each of them, should have known or knew that:

   a.  Defendant TRN was not very well capitalized and did not possess the capacity to spend "millions" of dollars to market Plaintiff TANTAROS' show and in the process make Plaintiff TANTAROS a radio star and reward her financially through revenue sharing;

   b.  Defendant TRN did not have a "robust" sales force in place "to maximize advertising revenue" for the proposed show which would ensure that Plaintiff TANTAROS received the maximum revenue

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

participation possible under the deal that Defendant TRN was proposing to offer Plaintiffs;

c. Defendant TRN did not have syndication deals in place with approximately 300 local stations who would carry Plaintiff TANTAROS' proposed show throughout the country;

d. Defendant TRN did not have solid existing relationships with its affiliates;

e. Defendant TRN did not have solid existing relationship with its advertising sales syndicators and advertising sales representative firms;

f. Defendant TRN had filed a lawsuit against Dial Global, the largest source of advertising revenue for the proposed show;

g. Dial Global, the largest source of advertising revenue for the proposed show, had not paid Defendant TRN any monies for advertising for several months prior to Plaintiffs agreeing to host the Tantaros Show and enter into the Host Agreement and Guaranty, and

h. Defendant TRN engaged in self dealing and intended to advertise the products of the Foundation or other companies controlled by the Masters Family on the Tantaros show and that it would not pay for that advertising time or not pay the fair market value for it.

76. Defendant TRN, and Does 1 through 10, inclusive, and each of them, made the above-stated misrepresentations with the intention that Plaintiffs would rely upon them, and expecting that Plaintiffs would do so, in order to induce Plaintiff ASTERO to enter into the Guaranty and Host Agreement whereby Plaintiff ASTERO, as lender, would provide Defendant TRN, as radio network, with the services of Plaintiff TANTAROS, as a host on the Tantaros Show.

77. At the time Defendant TRN, and Does 1 through 10, inclusive, and each of them, made the above-referenced misrepresentations and warranties to Plaintiffs, which misrepresentations and warranties were a substantial factor in Plaintiffs decision to host

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

the Tantaros Show and enter into the Host Agreement and Guaranty, Plaintiffs believed the representations of Defendant TRN, and Does 1 through 10, inclusive, and each of them, to be true and correct, and reasonably relied on them when they agreed to enter into the Host Agreement, whereby Plaintiff ASTERO, as lender, would provide Defendant TRN, as radio network, with the services of Plaintiff TANTAROS, as a host on the Tantaros Show.

78.   Had Plaintiffs known all the facts, they would not have agreed to enter into the Host Agreement, whereby Plaintiff ASTERO, as lender, would provide Defendant TRN, as radio network, with the services of Plaintiff TANTAROS, as a host on the Tantaros Show.

79.   As a direct and proximate result of Defendant TRN, and Does 1 through 10, inclusive, and each of their unreasonable actions, and Plaintiffs' good-faith and justifiable reliance thereon, Plaintiff has incurred special and general damages in an amount to be proven at the time of trial.

## SEVENTH CAUSE OF ACTION

### (For Intentional Interference with Prospective Economic Advantage against Defendant TRN, and Does 1 through 10, inclusive)

80.   Plaintiffs repeat, re-plead and re-allege the allegations contained in Paragraphs 1 through 79, inclusive, above and incorporate the same herein in full.

81.   Plaintiff TANTAROS is a nationally recognized celebrity, political contributor who currently has a valid and existing business relationship with Fox News Networks as a co-host of a television program entitled "The Five" on the Fox News Channel and as described hereinabove.  As further described hereinabove Plaintiff TANTAROS has carefully cultivated her celebrity status, her brand and professional reputation in order to maximize the potential to monetize her brand and elevate her celebrity status.  Essentially, the status of Plaintiff TANTAROS' brand, professional reputation and public image is directly correlated with her ability to pursue other professional opportunities and to gain the maximum monetization those opportunities.

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

82.   Defendant TRN, and Does 1 through 10, inclusive, and each of them, knew of the relationships between Plaintiffs and Fox News Networks and further knew of Plaintiff TANTAROS' carefully cultivated celebrity status, professional reputation, brand and public image, which was likely the primary reason that Defendant TRN, and Does 1 through 10, inclusive, solicited Plaintiff TANTATORS to host the Tantaros Show and enter into the Host Agreement and Guaranty.

83.   As further alleged hereinabove, Defendant TRN, and Does 1 through 10, inclusive, and each of them, intentionally disrupted the business relationships between Plaintiffs and the Fox News Network and damaged Plaintiff TANTAROS ascendant star status, public image and brand by putting Plaintiff TANTAROS in a rapidly deteriorating situation wherein she no longer had a competent executive producer, a full-time call screener, a paid assistant, or a sound effects manager, and further, had either no guests or only decidedly "C-list" guests, was provided with no research for the third-rate guests that were booked for the Tantaros Show, a lack of sufficient research for the topics at hand, provided with no editorial guidance, and she was expected by Defendant TRN to basically produce her own show.

84.   As a direct result of the intentional acts of Defendant TRN, and Does 1 through 10, inclusive, and each of them, in failing and refusing to honor the terms of the Host Agreement and Guaranty, the above-described business relationships were disrupted in that Fox News Network has expressed concern regarding Plaintiffs' involvement with Defendant TRN, and Does 1 through 10, inclusive, and Plaintiff TANTAROS' ascendant star status, public image, professional reputation and brand have been damaged and reduced her ability to maximize the monetization of the same or pursue other professional opportunities, and as such have suffered, and continue to suffer, damages in a sum according to proof at the time of trial.

85.   Defendant TRN, and Does 1 through 10, inclusive, and each of their interference with the business relationships between Plaintiffs and Fox News Network and actions which damaged Plaintiff TANTAROS ascendant star status, public image,

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

professional reputation and brand has resulted in damages to Plaintiffs in a sum according to proof at the time of trial.

86.     The aforementioned conduct of Defendant TRN, and Does 1 through 10, inclusive, and each of them, was done with the specific intention on the part of Defendant TRN, and Does 1 through 10, inclusive, and each of them, of thereby depriving Plaintiffs of receiving the benefit of their legal rights, and otherwise causing them injury, and was despicable conduct that subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, so as to justify an award of exemplary and punitive damages.

## EIGHTH CAUSE OF ACTION

### (For Negligent Interference with Prospective Economic Advantage against Defendant TRN, and Does 1 through 10, inclusive)

87.     Plaintiffs repeat, re-plead and re-allege the allegations contained in Paragraphs 1 through 86, inclusive, above and incorporate the same herein in full.

88.     Plaintiff TANTAROS is a nationally recognized celebrity, political contributor who currently has a valid and existing business relationship with Fox News Networks as a co-host of a television program entitled "The Five" on the Fox News Channel and as described hereinabove. As further described hereinabove Plaintiff TANTAROS has carefully cultivated her celebrity status, her brand and professional reputation in order to maximize the potential to monetize her brand and elevate her celebrity status. Essentially, the status of Plaintiff TANTAROS' brand, professional reputation and public image is directly correlated with her ability to pursue other professional opportunities and to gain the maximum monetization of those opportunities.

89.     Defendant TRN, and Does 1 through 10, inclusive, and each of them, were informed and/or knew or should have known of the relationships between Plaintiffs and Fox News Networks and further were informed and/or knew or should have known of of Plaintiff TANTAROS' carefully cultivated celebrity status, professional reputation,

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

brand and public image, which was likely the primary reason that Defendant TRN, and Does 1 through 10, inclusive, solicited Plaintiff TANTATORS to host the Tantaros Show and enter into the Host Agreement and Guaranty.

90.     Defendant TRN, and Does 1 through 10, inclusive, and each of them, negligently disrupted the business relationships between Plaintiffs and the Fox News Network and damaged Plaintiff TANTAROS ascendant star status, public image and brand by putting Plaintiff TANTAROS in a rapidly deteriorating situation wherein she no longer had a competent executive producer, a full-time call screener, a paid assistant, or a sound effects manager, and further, had either no guests or only decidedly "C-list" guests, was provided with no research for the third-rate guests that were booked for the Tantaros Show, a lack of sufficient research for the topics at hand, provided with no editorial guidance, and she was expected by Defendant TRN to basically produce her own show.

91.     As a direct result of the negligent acts of Defendant TRN, and Does 1 through 10, inclusive, and each of them, in failing and refusing to honor the terms of the Host Agreement and Guaranty, the above-described business relationships were disrupted in that Fox News Network has expressed concern regarding Plaintiffs' involvement with Defendant TRN, and Does 1 through 10, inclusive, and Plaintiff TANTAROS' ascendant star status, public image, professional reputation and brand have been damaged and reduced her ability to maximize the monetization of the same or pursue other professional opportunities, and as such have suffered, and continue to suffer, damages in a sum according to proof at the time of trial.

92.     Defendant TRN, and Does 1 through 10, inclusive, and each of their interference with the business relationships between Plaintiffs and the Fox News Network has resulted in damages to Plaintiffs in a sum according to proof at the time of trial.

////

////

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NINTH CAUSE OF ACTION

### (For An Accounting against Defendant TRN, and Does 1 through 10, inclusive)

93.     Plaintiffs repeat, re-plead and re-allege the allegations contained in Paragraphs 1 through 92, inclusive, above and incorporate the same herein in full.

94.     On multiple occasions within the last four (4) years, Plaintiffs have made lawful demands to Defendant TRN, and Does 1 through 10, inclusive, and each of them, from at least September 24, 2013, to the present, for an accounting of the sums due and owing to Plaintiffs pursuant to the Host Agreement, including, but not limited to, its fixed annual salary, its percentage of all annual net revenue related to the Tantaros Show and its percentage of annual user fees.

95.     Defendant TRN, and Does 1 through 10, inclusive, and each of them, failed and refused, and continue to fail and refuse to provide Plaintiffs with an accounting of the sums due and owing to Plaintiffs pursuant to the Host Agreement, including, but not limited to, its fixed annual salary, its percentage of all annual net revenue related to the Tantaros Show and its percentage of annual user fees.

96.     Plaintiffs do not know the true sums of the sums due and owing to Plaintiffs for its fixed annual salary, its percentage of all annual net revenue related to the Tantaros Show and its percentage of annual user fees pursuant to the Host Agreement and an accounting is necessary to determine these sums given that only Defendant TRN, and Does 1 through 10, inclusive, and each of them, have access to the records documenting the sums of the annual net revenue related to the Tantaros show and user participation fees and, Plaintiffs, without the requested accounting, cannot independently determine the sums due and owing to Plaintiffs pursuant to the Host Agreement, including, but not limited to, its fixed annual salary, its percentage of all annual net revenue related to the Tantaros Show and its percentage of annual user fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendant TRN, and Does 1 through 10, inclusive, and each of them, as follows:

## COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF

## As to All Causes of Action

1. For appropriate injunctive relief.

### As to the First Cause of Action

1. For a judgment declaring the respective rights, duties and responsibilities of the parties as described hereinabove;

2. For costs of suit incurred herein, and

3. For such other and further relief as the Court deems just and proper.

## As to the Second, Sixth and Eighth Causes of Action

1. For general, compensatory and consequential damages according to proof;

2. For costs of suit incurred herein;

3. For pre and post-judgment interest according to proof, and

4. For such other and further relief as the Court deems just and proper.

### As to the Third, Fourth, Fifth and Seventh Causes of Action

1. For general, compensatory and consequential damages according to proof;

2. For costs of suit incurred herein;

3. For pre and post-judgment interest according to proof;

4. For exemplary and punitive damages, and

5. For such other and further relief as the Court deems just and proper.

### As to the Ninth Cause of Action

1. For an accounting;

2. For costs of suit incurred herein, and

3. For such other and further relief as the Court deems just and proper.

////
////
////
////
////

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

1

## <u>JURY DEMAND</u>

2

Plaintiffs hereby demand a trial by Jury on all claims at issue.

3

Dated: October 9, 2013                    **TIMOTHY J. McILWAIN**

4

5

/s/Timothy J. McIlwain_____

6

Timothy J. McIlwain, counsel for Plaintiffs
ASTERO, LLC, a New Jersey limited

7

liability company and ANDREA
TANTAROS, an individual

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

# Exhibit "A"

## HOST AGREEMENT

This HOST AGREEMENT (this "**Agreement**"), dated as of December 13, 2012, is entered into by and between TALK RADIO NETWORK ENTERTAINMENT, INC, an Oregon corporation ("**Network**") and ASTERO, LLC, a New Jersey Limited Liability Company ("**Lender**") for the services of ANDREA K. TANTAROS ("**Host**"), who hereby agree as follows:

1.   Purpose/Representations:

   A.   Purpose.   Pursuant to this Agreement, Network is contracting with Lender, as an independent vendor, to secure the personal services of Host as the host of a radio program having the format of a weekday long-form feature, of three (3) hours in length, which is to be produced and syndicated by Network, currently known as "The Untitled Andrea Tantaros Show with Jason Mattera" (the "**Show**"). Network and Lender on behalf of Host (individually, "**Party**", and, plural or collectively, "**Parties**") desire to have this Agreement supersede all prior and existing written and/or oral agreements by and between the Parties concerning the Show and Host's services in connection therewith, such that any and all agreements by and between the Parties concerning the Show and Host's services in connection therewith shall be exclusively set forth in this Agreement.

   B.   Lender Representations & Warranties.   Lender represents and warrants to Network that:

      i.   Lender is a limited liability company which provides the personal services of Host to various third parties pursuant to separate contracts between Lender and Host (the "Lender/Host Agreements");

      ii.   Pursuant to the Lender/Host Agreements, Lender has the legal right and authority to enter into this Agreement and to contract for Host to provide, and to commit Host to the performance of, the personal services of Host specified in, and the other personal obligations and commitments of Host required by, this Agreement;

      iii.   Host is and shall be compensated for Host's services to Network under this Agreement in accordance with the Lender/Host Agreements, the terms of which are confidential to Lender and Host;

      iv.   The Lender/Host Agreements are bona fide business agreements;

      v.   Payments by Network to Lender pursuant to this Agreement fully satisfy all obligations of Network for the personal services and other commitments and/or requirements of Host pursuant to this Agreement; and

      vi.   Lender shall be solely responsible for, and shall comply with, any federal and state requirements applicable to reporting of income received and/or payments made for the personal services of Host, including without limitation any applicable tax payments and/or withholdings and/or any and all worker's compensation insurance or similar requirements, if and to the extent applicable to services rendered by

Host, and/or payments made to Lender by Network, and/or to Host by Lender, in connection with this Agreement.

2.   Term:

   A.   Effective Date: This Agreement shall be effective upon the date that this Agreement is fully executed and exchanged by and between the Parties (the "**Effective Date**").

   B.   Commencement Date.  The term of this Agreement (the "**Term**") shall commence on Tuesday, December 18, 2012 (the "**Commencement Date**").

   C.   Term.  The Term shall consist of a partial month commencing on the Commencement Date and continuing through the end of the calendar month in which the Commencement Date occurs (the "**Partial Month**"), plus the four (4) years immediately following the Partial Month.

   D.   First Contract Year.  The first year of the Term (the "**First Contract Year**") shall be deemed to consist of the Partial Month, plus the twelve (12) full calendar months immediately following the Partial Month.

   E.   Subsequent Contract Years.  Each subsequent year of the Term ("**Subsequent Contract Year**") shall be deemed to consist of the twelve (12) full calendar months immediately following the First Contract Year or the preceding Subsequent Contract Year, as applicable.

3.   Host Services: Network hereby retains Lender to provide the personal services of Host, and as required by this Agreement ("**Host's Services**"), including performing as an on-air personality for, and host, of the Show, as follows:

   a.   Broadcast Services.  Host shall provide such personal services to Network, as on-air personality and host for and during live broadcasts of the Show, for three (3) consecutive hours per day, Monday through Friday, during the hours of 9:00 a.m. to 12:00 noon, Eastern Time, or during such other three (3) hour weekday time block, starting no earlier than 9:00 a.m., Eastern Time, and ending no later than 9:00 p.m., Eastern Time, as Network may reasonably specify upon giving no less than ten (10) business days prior written notice to Lender; provided, however, that any such time change shall be subject to Host's professional availability, at the time of such change, recognizing that Host's principal employer is the Fox News Network, LLC (the "**Fox Network**"), pursuant to her employment agreement with the Fox Network, dated as of September 30, 2011 (the "**Fox Agreement**"), and that, in connection therewith, Host shall be unavailable to accept a new time commitment for the Show which conflicts with Host's then existing schedule under the Fox Agreement.

   b.   Other Host Services.  Host's Services shall include the following solely in connection with and to promote the Show: Show preparation, announcing, hosting the Show, whether as a

sole host or with the assistance of a supporting co-host, performing and reading commercial advertisements in Host's voice, performing commercial endorsements (subject to Lender's approval rights herein in this Agreement), engaging in programming, production, promotion and conferences, performing a reasonable number of advertiser/affiliate telephone or Internet conferences, or meetings in New York City or other location acceptable to Host, publicity and photographic sessions and press interviews, paperwork, and staff and program meetings, and Network consultations, as Network may reasonably request.  At Network's request, Host shall also participate in commercial announcements for Network and the separate three hour daily installments of the Show (individually, **"Program"**, and, plural or collectively, **"Programs"**), leads into and leads out of commercial announcements and Programs, previews, warm-ups and after-shows.  Host shall not be required to read any live spots without Lender's prior written consent, and Host shall not be required to read any endorsement which, in Lender's reasonable judgment, Lender deems to be unethical or immoral or which Lender reasonably believes would reflect badly on Host's career.  Independent services (in contrast to Host's services to Network in the field of talk radio which are the subject of this Agreement) which Host is entitled to perform for third parties under the terms of this Agreement are not, and shall not be deemed to be, part of the services to be performed by Host for Network under this Agreement. Any promotional services shall be subject to Host's availability.  Host will not be required to travel for promotions or remote purposes without Lender's prior written consent, and any services requiring Host to travel to a location other than a performance location specified in subparagraph 3.c below shall be subject to Lender's prior written approval in each instance, which shall not be unreasonably delayed, conditioned or withheld.  Services by Host outside of the three hour live performance times for the Show shall be scheduled to avoid conflicting with Host's time commitments to the Fox Network pursuant to the Fox Agreement.

c. <u>Personal Appearances</u>.  In connection with the Show, Lender shall cause Host to perform up to a maximum of ten (10) personal appearances, remotes, or advertiser/affiliate meetings each year during the Term at no cost to Network.  Lender shall receive a flat rate of $500 per hour (with a minimum of $1,000 per appearance) after the initial ten (10) appearances.  Network shall be solely responsible for obtaining payments from third parties in relation to these Host Services and otherwise coordinating such appearances and services taking into consideration Host's prior commitments.

d. <u>Performance Location.</u>  On a day to day basis, Host's Services in connection with the Show will be performed in studio facilities erected in Host's personal residence or otherwise provided by Network (**"Network's Facility"**), at a location mutually agreeable to Network and the Lender in the New York, NY metropolitan area (the **"NY Area"**).  Lender shall have prior written approval over any location changes for Host's services.  If Host shall change Host's personal residence during the Term, Network shall relocate such studio facilities to Host's new residence at Network's expense; provided, however, that if Host shall relocate Host's residence more than three (3) times during the Term, Lender shall be responsible for any such relocation costs after the third (3rd) relocation.

e. <u>Performance Standards.</u> Lender warrants that Host's Services shall be performed in a competent artistic and professional manner, and in a commercially reasonable manner, and Host shall devote the time reasonably necessary to prepare for and professionally maintain the Show consistent with the terms of this Agreement throughout the Term. Host's Services and the materials (if any) furnished by Host shall materially comply with all of Network's policies and with the rules and regulations of the Federal Communications Commission (the "FCC"), the Federal Trade Commission (the "FTC"), and any other governmental body having jurisdiction. Host's Services with respect to commercial announcements and endorsements shall be performed at broadcast level quality reasonably acceptable to the sponsor and/or other advertiser contracting for such announcement or endorsement.

f. <u>Autographed Pictures.</u> Host shall provide up to a maximum of one hundred (100) autographed pictures of Host during each year of the Term, solely as promotional materials to be provided to radio station personnel, and current and/or prospective advertisers and/or sponsors for the Show.

g. <u>Conferences.</u> Network shall pay for the costs associated with a maximum of two (2) radio-industry related conferences, to be mutually selected by Network and Lender, for attendance by Host each year of the Term, for the purpose of promoting the Show, Host as the host or primary host of the Show, and Network. Such costs shall include registration fees, first-class hotel accommodations, business class travel (or best class available if business class is not available), mid-sized car rental and $150 cash per diem for meals, entertainment and gas. Lender shall utilize Network's travel agent to make the requisite travel arrangements. Attendance by Host at radio industry conferences pursuant to this subparagraph 3.g shall not be deemed to be, or regarded as, personal appearances, remotes or meetings pursuant to subparagraph 3.c above, regardless of whether Host performs the Show remotely while attending a conference pursuant to this subparagraph 3.g.

h. <u>Show Approvals.</u> Lender shall have the right to approve the concept for the Show, co-hosts or other on-air personalities, and key creative elements, Show title (which may have Host's name included, but Lender may not require Network to use Host's name; provided, however, if the name of any talent appears in the Show title, including with respect to distribution of the Show via any format or means in addition to Radio, Host's name shall be featured in first position followed by the word "with"). Once the Show commences production, with respect to any changes to any of the above approved elements: (i) changes to co-hosts and other on air personalities Host will be interacting with on-air will remain subject to Lender's consent; and (ii) choices of producers, and guest hosts to substitute for Host if Host is off air, shall be subject to the mutual approval of Network and Lender, which approval shall not be unreasonably withheld, conditioned or delayed; provided, however, that if the Parties cannot agree as to a particular issue after a reasonable period of good faith discussion, or if time constraints prior to broadcast time do not allow adequate time for discussion, Network's decision shall be final. Notwithstanding the foregoing, no guest host shall be permitted to substitute for Host more than seven (7)

times per annum without Lender's prior approval, which may be granted or denied in Lender's sole and absolute discretion. Network shall not materially deviate from the approved concept, Show Title or the approved creative elements without Lender's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed.

i.  Photo Approval.  Network shall submit to Lender for Lender's review and approval, all photos of Host that Network proposes to use in connection with the publicity, advertising and/or promotion of the Show.  Lender shall have five (5) business days from receipt of such photos within which to disapprove of such photos; provided, however, that Lender must approve at least fifty percent (50%) of all submitted photos in which Host appears along with any other individual and seventy-five percent (75%) of all photos in which Host appears alone.  Network shall endeavor to submit photos in batches of reasonable numbers.  Once a photo is approved pursuant to the foregoing process, the photo shall be deemed approved for all purposes allowed hereunder.  If the five (5) day period lapses without a response from Lender, all photos submitted shall be deemed approved.

j.  Bloopers, Outtakes & Behind the Scenes Footage.  In the event the Show is distributed in any video format via any mode of transmission, such distributions shall not include Host in any "bloopers", outtakes and/or behind-the-scenes footage in connection with the Show without Host's prior approval.

4.  Network Actions:

A.  National Syndication.  Network shall promote and market the national syndication of the Show throughout the radio industry, and in other media if deemed advisable by Network, in such commercially reasonable manner as Network determines to be appropriate, and consistent with the level of promotion and marketing devoted by Network to Network's other premier weekday programming.

B.  Show Affiliates.  Network will contact radio stations, and may contact prospective affiliates in other media, throughout the United States in an effort to secure their affiliation to the Show, with financial terms based upon, but not limited to: (a) the barter trade of stations or other affiliates  making commercial advertising time available for sale for Network's account in return for the Show ("Advertising Time"), which may include, without limitation, advertising inventory to be embedded in the Show by Network ("Embedded Inventory"), and/or advertising inventory which is not embedded in the Show ("Non-Embedded Inventory"); and/or; (b) cash payments, whether in addition to and/or in lieu of Advertising Time ("Cash Compensation"). Any Non-Embedded Inventory procured by Network as consideration for the right of a station or other broadcaster to broadcast the Show may be run, in Network's discretion, in Network's own business judgment: (i) outside of the Show, during other day parts on the stations or other broadcasters authorized to broadcast the Show ("Show Affiliate" or "Show Affiliates"); (ii) during the Show on the Show Affiliates; or (iii) on a station or other broadcaster which is not then a Show Affiliate.

C. <u>Affiliate Agreements</u>.  Network will enter into separate affiliation agreements for the Show between Network and such Show Affiliates ("**Show Affiliate Agreements**"), to include the financial terms under which such Show Affiliates are authorized to broadcast the Show.

D. <u>Production Costs</u>.  Network will be responsible for all of Network's production costs with respect to the Show (including computers, office equipment, audio and video equipment and research materials and subscriptions), including without limitation production costs incurred by Lender, at Network's request, provided that they have been pre-approved by an authorized officer of Network in writing, which approval shall not be unreasonably withheld, conditioned or delayed.

E. <u>Equipment</u>.  Network will provide, at Network's Facilities, such equipment as Network, in its business judgment, determines to be necessary to allow Host to perform the Show from Network's Facilities at national syndication quality levels ("**National Syndication Quality**"), subject to such substitutions and/or replacements of the Equipment as Network determines to be appropriate.  Network shall provide for all necessary maintenance and/or repair and/or replacement of the Equipment as may be necessary during the Term, at Network's expense, except for such costs, if any, as shall result from intentionally improper handling and/or abuse of the Equipment attributable to Host or Lender (in which event Lender shall be responsible for any resulting costs); provided, however, that Lender shall not in any event be responsible for any repair and/or replacement and/or any other equipment costs resulting from ordinary wear and tear.

F. <u>Technical Support</u>.  Network will provide such engineering and production support for the Show, from such facilities as Network determines to be appropriate, as Network in its business judgment determines to be necessary and appropriate to broadcasting the Show at National Syndication Quality.

G. <u>Telephones.</u>  Network will be responsible for all telephone and ISDN expenses for the Show, through telephone facilities provided by Network, or pursuant to such other arrangements as Network determines to be appropriate.

H. <u>Show Prep Support</u>.  Network will provide access to its national production group, including providing Host with available news articles, sound bites, and assistance in guest bookings.

I. <u>Distribution</u>.  Network will provide national distribution of the Show to Show Affiliates via satellite distribution or other distribution technology or technologies utilized by Network for transmitting its premier weekday programming to Show Affiliates.

J. <u>Advertising</u>.  Network will arrange for the sale of the commercial advertising inventory for the Show and provide production, as Network determines to be necessary, for commercials sold.

K. <u>Show Website</u>.  Network will own and maintain the Internet website for the Show (the "**Show Website**").  Absent Network's contrary consent, the Show Website shall be the sole website for the Show, and for all Internet postings by Host solely with respect to subject matter that solely

concerns the Show.  For the purposes of additional clarification, Host shall permitted hereunder to blog, write articles or post content concerning general news and political matters in accordance Host's obligations to the Fox Network, per the Fox Agreement, as well as on her own website located at the URL: www.andreatantaros.com.  Network shall have the sole right to sell all advertising for the Show Website ("**Web Inventory**"), and to collect all advertising revenues for Web Inventory, through Network's designated rep firm(s).  All revenues, net of bona fide third party agency fees, actually received by Network with respect to the Show Website, however characterized, shall be subject to revenue sharing in accordance with the provisions of Paragraph 5 below.

L.  "Big Mouth" Coverage.  Network will cause Host to be named as an additional insured on Network's media special perils liability insurance policy and any successor policy thereto ("**Network's Big Mouth Policy**") during the Term.  Network shall provide a copy of Network's Big Mouth Policy and/or the declaration pages for such policy to Lender during the Term.

M.  [Reserved].

N.  [Reserved].

O.  Transportation and Expenses:  Lender and Host represent and warrant that Host's place of residence is New York, New York.  If Host's services are required by Network at a "Distant Location" more than fifty (50) miles from Host's said place of residence without a case by case agreement on the approved travel costs, then Lender shall be entitled to the following in connection with Host's services at such Distant Location(s):

   a.  Air Transportation.  Host shall be furnished with one (1) business class, if available (and if not available, then Host shall be furnished with the best available class), roundtrip transportation for Host to and from the Distant Location and Host's residence, or wherever Host may be at the time, if closer.  If Host is required at a Distant Location for fourteen (14) consecutive days or more, if requested, Host shall be furnished with one (1) additional coach class (if available and if used) roundtrip transportation (by air if appropriate and available) to and from Host's residence (or wherever such non-business related companion(s) may be at the time, if closer) and such Distant Location for Host's non-business-related companion.

   b.  Ground Transportation.  Host shall be furnished with exclusive (i.e. sole occupancy, not sole use) first class transportation to and from airports, Host's residence, the hotel and the set or location.

   c.  Living Accommodations/Living Allowance.   Lender shall be entitled to: (i) reasonable first class (or best available) hotel accommodations for Host's use (provided that if Host is required by Network to render host services at a Distant Location or, at Host's election, Host shall be entitled to receive an all-inclusive housing allowance of Five Thousand Dollars ($5,000) per month [prorated at 1/30th

thereof per day]) if Host is required at a Distant Location for fourteen (14) consecutive days or more; and (ii) solely in connection with host services rendered at a Distant Location for non-production related Network requests (e.g., promotion services rendered outside of the NY Area) an all-inclusive non-accountable allowance in the amount of One Hundred and Fifty Dollars ($150.00) per day to cover all of Host's meals and incidental expenses of Host at such Distant Location(s).

    d.   <u>General</u>.  Except as otherwise expressly provided in this Agreement, Network shall not be responsible for any other travel related expenses or prerequisites of Host. All travel arrangements, including, but not limited to the acquisition of airline tickets, booking of accommodations, etc. shall be made through Network's location or travel department.

   P.   <u>Personal Assistant</u>.  Network shall provide, at Network's expense, on terms deemed by Network to be commercially reasonable, a personal assistant to serve for approximately four (4) hours per Host live broadcast day to provide miscellaneous personal support services to Host with respect to the Show, as Network determines to be appropriate.  Host shall have final approval as to the selection and continued services of such assistant from candidates acceptable to Network.

5.   <u>Compensation</u>:

   A.   <u>Base Fees.</u>  In exchange for the provision of Host's services as contemplated herein, Lender shall receive base fees ("**Base Fees**"), in the amount of Two Hundred Thousand Dollars ($200,000.00) per year, during the Term, commencing on the first day of the first full calendar month of the First Contract Year, plus a pro-rata allocation for the Partial Month, if applicable, at the rate of $547.95 per calendar day ($200,000.00 annualized, divided by 365), payable pro rata in arrears on the 20th day of each calendar month for the 1st through the 15th days of that month, and on the 5th day of the following month, for the 16th through the end of a calendar month.  Base Fees for any partial calendar month during the Term shall be prorated.

   B.   <u>Net Show Revenue Defined</u>. For the purposes of this Agreement, the term "**Net Show Revenue**" shall be defined as the amount of revenues derived by Network with respect to the Show by application of the following formula for any applicable calculation period ("**Subject Period**"):

      i.   <u>Ad Sales</u> - The amounts, net of any third party agency fees actually retained by and/or paid to any third party ad agency for an advertiser, if applicable (not to exceed industry standard agency fee levels, currently fifteen percent of gross revenue), actually received and collected by Network, or any rep firm retained by Network from time to time with respect to the Show, from the sale of Advertising Time, Web Inventory and/or other advertising sales with respect to the Show during the Subject Period (collectively, "**Ad Sales**"); <u>less</u>

ii. <u>Commission Allocation</u> - An amount equal to that percentage of any such Ad Sales equal to the commission rate actually payable to Network's principal rep firm for the Show at the time of the applicable Ad Sales, whether the Ad Sales are made, in whole or in part, by Network directly or by Network's rep firm, not to exceed a maximum of twenty-five percent (25%) of such Ad Sales through the calendar month in which total Ad Sales reach One Million Five Hundred Thousand Dollars ($1,500,000.00) for any Contract Year, and twenty percent (20%) of Ad Sales for each calendar month thereafter (the "**Commission Allocation**"); <u>plus</u>

iii. <u>Cash Compensation</u> - Any amounts actually received by Network for Cash Compensation during such Subject Period; <u>plus</u>

iv. <u>Miscellaneous Revenues.</u> All revenues actually received by Network during such Subject Period from sales of any other products related to the Show and/or other revenues not otherwise specified in this subparagraph 5.A, less all actual and verifiable expenses incurred by Network in the production and generation of any such revenues ("**Miscellaneous Revenues**"); but <u>excluding</u>

v. <u>User Fees.</u> Any amounts actually received by or credited to Network during such Subject Period with respect to the Show for web streaming, Internet membership fees, subscriptions, licensing and/or other forms of revenues generated for Internet access, streaming, podcasting and other forms of actual user fees, including without limitation video streaming, net of any actual and verifiable fees, commissions and/or other charges payable to Internet/Web service providers, or other providers, in the generation of such revenues ("**User Fees**").

C.   <u>Revenue Participation.</u>  Lender shall receive additional payments in amounts corresponding to the following percentages of the Net Show Revenue ("**Revenue Participation**"), for the First Contract Year and each Subsequent Contract Year (individually, "**Contract Year**" and, plural or collectively, "**Contract Years**"):

i. Zero percent (0.0%) of the Net Show Revenue for such Contract Year through and including $1,000,000.00 (the "**Annual Threshold**").  The Parties expressly confirm that Revenue Participation does not begin for any Contract Year unless and until the Annual Threshold for that Contract Year has been reached.

ii. Twenty-two and one-half percent (22.5%) of the Net Show Revenue for such Contract Year in excess of $1,000,000.00, and not exceeding $2,000,000.00.

iii. Twenty-five percent (25%) of the Net Show Revenue for such Contract Year in excess of $2,000,000.00, and not exceeding $3,000,000.00.

iv. Thirty percent (30%) of the Net Show Revenue for such Contract Year in excess of $3,000,000.00, and not exceeding $4,000,000.00.

    v.   Forty percent (40%) of the Net Show Revenue for such Contract Year in excess of $4,000,000.00, and not exceeding $5,000,000.00.

    vi.   Fifty percent (50%) of the Net Show Revenue for such Contract Year in excess of $5,000,000.00.

To illustrate the application of the foregoing provisions of this subparagraph 5.C (i.e., for example), and solely for purposes of illustration, if, for a specific Contract Year following a Contract Year generating not less than $1,500,000.00 in Ad Sales, Ad Sales total Four Million Dollars ($4,000,000.00), Cash Compensation totals Eighty Thousand Dollars ($80,000.00), and Miscellaneous Revenues were Twenty Thousand Dollars ($20,000.00), then the Net Show Revenue for such Contract Year would be $3,300,000.00, consisting of: (i) the Ad Sales of $4,000,000.00; less (ii) the Commission Allocation of $800,000.00 (20% of the $4,000,000.00 in Ad Sales); plus (iii) the $80,000.00 in Cash Compensation; plus (iv) the $20,000.00 in Miscellaneous Revenues [$4,000,000.00, less $80,000.00, plus $80,000.00, plus $20,000.00]. In such event, based on Net Show Revenue of Three Million Three Hundred Thousand Dollars ($3,300,000.00), Lender would receive Revenue Participation for such Contract Year (over and above Base Fees pursuant to subparagraph 5.A above and User Fee Participation pursuant to subparagraph 5.D below) in the amount of $565,000.00, consisting of: (i) Zero Dollars ($0.00) for the first $1,000,000.00 in Net Show Revenue (i.e., within the Annual Threshold); (ii) 22.5% of the next $1,000,000.00 in Net Show Revenue ($1,000,000.00 x .225 = $225,000.00); (iii) 25% of the next $1,000,000.00 in Net Show Revenue ($1,000,000.00 x .25 = $250,000.00); and 30% of the remaining $300,000.00 in Net Show Revenue ($300,000.00 x .30 = $90,000.00).

    D.    User Fees. Pursuant to subparagraph 5.B.(v) above, User Fees shall not be included in Net Show Revenue, and shall not be a factor in the calculation of Revenue Participation payments to Lender pursuant to subparagraph 5.C above. Instead, Network shall pay an amount equal to thirty percent (30%) of all User Fees actually collected by Network during each calendar month during the Term to Lender ("**User Fee Participation**"); provided, however, that if it is not possible to determine whether particular revenues constitute User Fees or Net Show Revenue, or to segregate any particular revenue amounts between User Fees and Net Show Revenue, such revenues shall be deemed to be Net Show Revenue, and shall be included in calculations of Net Show Revenue pursuant to subparagraphs 5.B and 5.C above, rather than being included within User Fees, for purposes of this subparagraph 5.D.

    E.    Revenue Based Compensation. In order to confirm the mutual understandings and agreements of the Parties, all revenues, from any and all sources, whether in cash or in kind, derived by Network with respect to the Show, including without limitation any cash license fees payable by any satellite radio company for the right to broadcast the Show via satellite radio (which shall be deemed to be Cash Compensation pursuant to subparagraphs 4.B and 5.B.iii above), shall be allocated either to Net Show Revenue pursuant to subparagraph 5.B above, for which Revenue Participation is payable pursuant to subparagraph 5.C above, or to User Fees, as defined by subparagraph 5.B.v above, for which User Fee Participation is payable pursuant to subparagraph 5.D above.

F. <u>Guaranteed Revenue Participation and User Fee Participation</u>. Lender shall receive guaranteed compensation in the amount of One Hundred Thousand Dollars ($100,000.00) per year through the expiration of the First Contract Year, and Two Hundred Thousand Dollars ($200,000.00) per year for each Subsequent Contract Year thereafter, payable as an advance against Revenue Participation payable pursuant to subparagraph 5.C above and User Fee Participation payable pursuant to subparagraph 5.D above ("**Guaranteed Compensation**"), without any repayment obligation should any portion of such Guaranteed Compensation advances not be fully recoverable from future Revenue Participation and User Fee Participation. For purposes of clarification, Base Fees pursuant to subparagraph 5.A above are not, and shall not be, recoupable from Revenue Participation payable pursuant to subparagraph 5.C above or User Fee Participation payable pursuant to subparagraph 5.D above.

G. <u>Signing Bonus</u>. Network shall pay to Lender a one-time signing bonus of One Thousand Dollars ($1,000.00) within five (5) business days after the Effective Date.

H. <u>Highest Compensation</u>. During the Term of this Agreement, Network warrants, covenants and represents that Lender's total compensation for Host's services shall be higher than the total compensation, however characterized, of any vendor for and/or employee of Network providing host and/or producer services for the Show.

I. <u>Total Compensation</u>. The compensation payable to Lender in accordance with the provisions of this Paragraph 5 shall be the full and total compensation payable by Network to Lender for all services of Host, and all rights of Network, under this Agreement and/or with respect to the Show.

6. <u>Supplemental Compensation Provisions</u>:

A. <u>Sole Payee</u>. All compensation under this Agreement for Host's Services shall be paid to Lender, as the Party providing Host's Services to Network.

B. <u>Revenue Participation and User Fee Participation Computations/Payments.</u> Revenue Participation payments due under subparagraph 5.C above shall be computed monthly, and, once payable for any Contract Year, shall be paid on or before the last day of the following calendar month. User Fee Participation payments due under subparagraph 5.D above shall be computed monthly and shall be paid on or before the last day of the following calendar month.

C. <u>Trailing Revenue</u>. During the Term, all Net Show Revenue shall be allocated to the calendar month and Contract Year in which it is received. Any Net Show Revenue received after the expiration or other termination of this Agreement shall be allocated to the final Contract Year of the Term for the purpose of determining Revenue Participation payments pursuant to subparagraph 5.C above, but shall be deemed received, for purposes of the timing of Revenue Participation payments pursuant to subparagraph 6.B above, in the calendar month in which the applicable Net Show Revenue is actually collected.

D.   Revenue Reports.  For each month in which Revenue Participation and/or User Fee Participation payments ("**Participation Payment**", and, plural or collectively, "**Participation Payments**") are due to Lender pursuant to subparagraphs 5.C, 5.D and 6.B above, Network shall issue to Lender, on or before the date on which any such Participation Payments are due pursuant to subparagraph 6.B above, a compiled report of revenues received under subparagraphs 5.B, 5.C and 5.D above for the Subject Period, and any Participation Payments payable and paid thereunder ("**Revenue Report**").

E.   Unsold Inventory/In-Kind Sales.  Nothing contained in this Agreement shall prevent or prohibit the use by Network of any unbooked commercial inventory for Network's own use, or that of any of Network's affiliates or their principals, or other third parties selected by Network, without cost to Network, its affiliates or their principals, or any such third parties; provided, however, that Network may not use any commercial inventory for any such purposes without compensation credited to Ad Sales (at the then scheduled rate for such inventory) unless the inventory remains unbooked seventy-two (72) hours before the close of the advertising schedule for the following broadcast week. If Network shall agree to accept any products or services as in-kind consideration, in lieu of cash, for the sale of any commercial inventory ("**In-Kind Sales**"), there shall be allocated to the Ad Sales, for the Contract Year of any such In-Kind Sales, the actual value, as of the dates any such In-Kind Sales are accepted by Network, of the in-kind consideration accepted by Network; provided, however, that the value of such In-Kind Sales shall not exceed one percent (1%) of the Ad Sales for any Contract Year except for advertising inventory sold within seventy-two (72) hours before the close of the advertising schedule for the following broadcast week (i.e., if In-Kind Sales are utilized at all, with rare exceptions, they would be utilized to fill unsold advertising slots which are nearing the point of inserting "fill" to avoid dead air time).

F.   Audits.  Lender shall have the right to audit Network's records pertaining to Net Show Revenue and/or User Fees, for each Contract Year, at Lender's own expense; provided, however, that: (i) such right may not be exercised more than two (2) times in any Contract Year; (ii) Lender must notify Network in writing within six (6) months after the close of a Contract Year of Lender's intention to conduct an audit with respect to the applicable Contract Year which is to be the subject of such audit (the "**Subject Year**"), and shall conclude any such audit prior to the close of the Contract Year following the Subject Year; and (iii) the representative or representatives of Lender conducting any such audit shall sign a confidentiality agreement with Network to limit discussion and/or disclosure of the applicable financial information to Lender and the senior management and professional advisers of Lender participating in a review with respect to the Subject Year who agree to retain the confidentiality of the applicable information.  If any such audit reveals a discrepancy of five percent (5%) or more in the aggregate total of the Annual Net Show Revenue and/or User Fees reported to Lender by Network for the Subject Year, Network shall reimburse Lender for the reasonable costs of the audit, as well as, any underpayment amounts.

G.    Projection of Revenues.  Lender understands and acknowledges that Network makes no representation as to the level of Net Show Revenue and User Fees to be generated with respect to the Show, or as to any future mix or amount of revenue components for the Show.

H.    Annual Threshold:  Lender understands and acknowledges that the Annual Threshold of One Million Dollars ($1,000,000.00) in Net Show Revenue per Contract Year, as specified in subparagraph 5.C above, prior to any Revenue Participation amounts being payable to Lender, is designed to provide to Network an initial annual recovery in recognition that Network is responsible for payment of Base Fees to Lender, as specified in subparagraph 5.A above, as well as amounts payable for producers or other staff for the Show, as well as other annual production, marketing and other expenses for the Show, without regard to the level of Net Show Revenue for any such Contract Year, and without cost to Lender for any such expenses.  It is further understood and acknowledged by each Party that the Annual Threshold shall remain One Million Dollars ($1,000,000.00) in Net Show Revenue per Contract Year, whether Network's expenses under this Agreement for any such Contract Year are more or less than such amount.

I.    Reporting Number/Representations & Indemnities re Compensation:  Lender shall provide to Network, promptly following the Effective Date, the Federal Employer Identification Number or Social Security Number lawfully assigned to, and properly used by, Lender for tax reporting purposes ("Lender's Federal Reporting Number"), on such reporting form as Network may reasonably request, and which shall be duly signed on behalf of Lender to certify the accuracy of such information.  Network shall not be required to pay any amounts to Lender under and/or pursuant to this Agreement prior to the business day following Network's receipt of such information, as specified above in this subparagraph 6.I, and any other tax reporting information which Network is required by law to obtain from Lender.  By execution of this Agreement, Lender represents and warrants to Network that Lender shall be solely responsible for, and will comply with, any federal and state requirements applicable to reporting of income received and/or payments made for the personal services of Lender, including without limitation any applicable tax payments and/or withholdings, and that Lender's Federal Reporting Number and such other tax reporting information as Lender provides to Network under this Agreement and/or applicable law is true and complete. Lender shall indemnify and defend Network against, and shall hold Network harmless from, any and all claims, losses, liabilities, damages, awards, penalty assessments or costs, including without limitation attorneys' fees, paid or incurred by, or assessed or otherwise awarded or imposed against, Network as a result of any claim and/or determination that any of the foregoing representations and warranties in this subparagraph 6.I are, or shall later be, incorrect or untrue in any respect.

J.    Payments Based On User Fees.  If User Fee Participation is payable to Lender under subparagraph 5.D above based upon User Fees collected by Network for any calendar quarter during the Term, such amounts shall be payable to Lender on or before the last day of the calendar month following such calendar quarter, and Network shall deliver

to Lender a compiled report of any User Fees received for such calendar quarter, and the User Fee Participation payable to Lender therefor on or before the last day of the calendar month following such calendar quarter.

K.   <u>Representations & Indemnities re Compensation.</u>  In order to induce Network to enter into this Agreement, and to promote Host and provide the consideration specified in Paragraph 5 of this Agreement to Lender for the services of Host, Lender expressly and specifically represents and warrants to Network that Network is contracting with Lender and its members in their capacity as independent contractors; (ii) Payments by Network to Lender fully satisfy all obligations of Network for the personal services of Host, and all other services and/or obligations of Host pursuant to this Agreement; and (iii) Lender shall be solely responsible for, and shall comply with, any federal and state requirements applicable to reporting of income received and/or payments made for the personal services of Host, including without limitation any applicable tax payments and/or withholdings.  Lender shall indemnify and defend Network against, and shall hold Network harmless from, any and all claims, losses, liabilities, damages, awards, penalty assessments or costs, including without limitation attorneys' fees, paid or incurred by, or assessed or otherwise awarded or imposed against, Network if any of the foregoing representations and warranties in this subparagraph 6.K are, or shall later be, incorrect or untrue in any respect.

L.   <u>Payment Dates.</u>  If the payment date for any payment ends on a weekend, a holiday, or another non-business or non-banking day, such payment shall be issued on or before the first business day thereafter.

M.   <u>Guaranteed Compensation Payment Deductions.</u>  Guaranteed Compensation payments shall be payable to Lender on a monthly basis, on the last day of each calendar month, as an advance against current or future Participation Payments payable to Company under this Agreement, at the rate of Eight Thousand Three Hundred Thirty Three Dollars and Thirty Three Cents ($8,333.33) per month during the First Contract Year (plus the applicable pro rata allocation for the Partial Month) and Sixteen Thousand Six Hundred Sixty Six Dollars and Sixty Seven Cents ($16,666.67) for each Subsequent Contract Year.  Such Guaranteed Compensation payments shall be fully recoverable by Network from any such current or future Participation Payments, but Network shall have no entitlement or recourse to recoup Guaranteed Compensation paid to Company from any source other than current or future Participation Payments.

7.   [Reserved].

8.   <u>Network's Rights:</u>

A.   <u>Network's Rights.</u> During the Term, Network shall have the exclusive rights to the services of Host in the area of terrestrial radio and/or subscription-based "satellite talk radio", whether syndicated, national or local (collectively, "**Radio**").  Host's name, voice or likeness, or any combination of them, shall not be used as a commercial

announcement or endorsement for any product or service distributed via Radio except pursuant to this Agreement. With the exception of Host's services for the Fox Network pursuant to the Fox Agreement, which shall not be restricted by this Agreement beyond Host's obligations to be available to serve as host of the Show during Host's live performance hours for the Show specified in subparagraph 3.b above, Host shall not host, or enter into a contract for Host to host, a television, cable, Internet or other talk show which, in combination with Host's duties under the Fox Agreement, would materially and negatively impact Host's ability to meet the performance standards set forth in subparagraph 3.e above. In no event shall Host render services for anyone else other than the Fox Network that would create an actual or apparent commercial conflict for Network. In addition, Host agrees to use commercially reasonable efforts to ensure that Host's professional commitments to the Fox Network and other professional and/or business interests shall not unreasonably interfere with Host's Services under this Agreement. During the Term, subject to the rights retained by Host pursuant to Paragraph 12 below and to those uses expressly specified below in this subparagraph 8.A which require the mutual consent of Network and Host, or other express provisions of this Agreement, Network shall also have the exclusive rights to the Show, including all copyrights therein, and to the Show Website, including all copyrights therein (except with respect to any articles, blog posts or other written commentary authored by Host which were not specifically prepared by Host for exclusive and primary distribution via the Show Website, in which case Host shall retain all copyrights with respect to such articles, blog posts or other written commentary and they shall not be deemed to be work-for-hire commissioned for the benefit of the Network), and to distribute or otherwise broadcast or publish the Show, whether in audio, video, audiovisual, digital or other form whatsoever, whether now known or hereafter devised, which rights shall extend to simulcasts and/or delayed broadcasts, streaming, videostreaming, podcasting, tapes, cds and Internet streaming, as well as to live broadcasts, rebroadcasts and simulcasts of the Show via terrestrial radio, the Internet, television, cable, subscription-based "satellite radio" and/or any other present or future broadcast technologies whatsoever, whether presently known or unknown.

B. <u>Revenue Allocation.</u> All revenues generated by any broadcasting technologies subject to the provisions of subparagraph 8.A above will be credited (after actual and verifiable costs are deducted) to Net Show Revenue or User Fees, as applicable, for the Contract Year in which such revenues are actually collected by Network, and all such amounts shall be deemed to be part of the Net Show Revenue or User Fees, as applicable, for any such Contract Year, and qualify for Revenue Participation under subparagraph 5.C above, or User Fee Participation under subparagraph 5.D above, for such Contract Year.

C. <u>Host's Independent Activities.</u> Network acknowledges that Host's primary employer is the Fox Network and that Host currently engages in various independent non-radio professional activities, including without limitation appearing as a commentator or panelist on television or cable programming (including on the Fox Network), blogging, and authoring articles and/or books for publication (collectively, the "**Non-Radio Activities**"). Network specifically consents to Host continuing to engage in the Non-

Radio Activities; provided, however, that (except with respect to Host's obligations to Host's primary employer, the Fox Network) Host's other professional and/or business interests shall not unreasonably interfere with Host's Services, and Host shall not render services for any third party (apart from the Fox Network) that would create an actual or apparent commercial conflict for Network.   During the Term Host shall not perform any services for hire in Radio without the express written consent of Network; provided, however, that the foregoing provision shall not preclude Host from making incidental guest appearances in Radio for the purpose of promoting Host's activities for the Fox Network or otherwise performing Host's services for the Fox Network, or for the purpose of promoting Host's publications, the Show, and/or any television or cable show for which Host is an on-air personality.

9.   <u>Negotiation/Right to Match</u>:  During the Term (except with respect to incidental guest appearance services in Radio in connection with Host's obligations to Host's primary employer, the Fox Network), Network shall have the right to negotiate with Lender concerning Host's services as a personality/host in the field of Radio, and Lender shall neither entertain nor accept any proposals for Host's services in Radio from third parties during the period in which Lender is obligated  under this Agreement to provide Host's services in the field of Radio to Network.  From the expiration of the Term onward, Lender may entertain, solicit and negotiate with respect to offers from third parties for Host's services as a personality/host in the field of Radio; provided, however, that, for a period of three (3) months following any expiration and/or termination of this Agreement (the "**Right to Match Period**"), Network shall have the right to match the financial terms and conditions of any third party offers for Host's services as a personality/host in the field of Radio.  Lender shall forward any such offer which Lender is willing to accept that is generated and/or received prior to or during the Right to Match Period to Network, immediately, and Network shall have ten (10) business days from the last to occur of the first day of the Right to Match Period or Network's receipt of any such offer to match the offer, by giving written notice to such effect to Lender.  If Network fails to do so, Lender will have the right to accept the specific offer from a bona fide third party syndicator which Network declined to match and to contract with any such bona fide third party syndicator on financial terms and conditions no less favorable to Lender than those contained in any such offer.  If Network does match any such offer (and subject to any rights the Fox Network possesses pursuant to the Fox Agreement), this Agreement shall be deemed to be amended to incorporate and/or substitute, as applicable, all provisions of any such offer capable of being matched by Network, subject to commercially reasonable equivalents wherever necessary or appropriate, effective as of the date of Network's match, or the expiration of the Term, whichever shall last occur.  The foregoing provisions of this Paragraph 9 shall not be deemed or construed to apply to incidental services by Host as a commentator, or other guest appearances by Host, pursuant to any existing rights of the Fox Network as a result of Host's obligations under the Fox Agreement.

10.   <u>Non-Performance Days</u>:  Lender may designate up to twenty-two (22) days during each Contract Year on which Host may decline to perform Host's on-air duties under this Agreement, in order to enable Host to schedule vacations or other personal business ("**Variable Non-Performance Days**"), plus the six major holidays (Christmas Day, New Years

Day, Fourth of July, Thanksgiving Day, Memorial Day and Labor Day), whenever such days fall on a weekday, plus such additional days, if any, not exceeding six, during any Contract Year in which Host is unable to perform due to bona fide illness and/or family emergency, without reduction or offset from the compensation payable to Host under this Agreement; provided, however, that Host shall consult with Network sufficiently in advance of any such Variable Non-Performance Days and/or holidays, and as soon as Host is aware of any bona fide illness or family emergency which may impact Host's ability to perform as host or co-host of the Show, to allow for scheduling of replacement hosts and/or other replacement programming by Network, and provided, further, that Lender shall refrain from designating Variable Non-Performance Days which Network has reasonably objected to as a result of key ratings periods, special marketing activities or similar factors.  Projects sponsored by Network as to which Network has confirmed in writing that the facilities or timing thereof will preclude Host from performing the Show live shall not be counted as Variable Non-Performance Days, and shall not result in any reduction or offset from the compensation payable to Host under this Agreement.

11.   <u>Publications:</u>  In connection with Host's professional activities, or otherwise, Host shall have the right to publish books, pamphlets, articles and/or other commentaries, except to the extent that any such publication would knowingly violate Network's copyright in one or more Programs, or knowingly violate the provisions of Paragraph 30 below, and  provided, however, that if any such books, pamphlets, articles or other commentaries materially relate to the Show and contain substantial and readily identifiable material taken from the Show, or are published by Network, then ten percent (10%) of any and all resulting revenues shall be paid to Network, and shall not be included in Net Show Revenue for purposes of Revenue Participation payments under this Agreement.

12.   <u>Rights to the Show/Programs:</u>  Network is the owner of the Show and shall have the right to change the name of the Show to such name as Network shall select, subject, however, to Lender's prior written consent, which shall not be unreasonably withheld, conditioned or delayed, as to any name including the name of Host.  The Show, and all Programs and recordings of Host's performances, including without limitation the copyrights thereto, and all rights therein, shall be the sole and absolute property of Network.  All rights in and to the format of Network and the Show, and all Program titles and pseudonyms used by Host in the course of performing Host's services for Network (other than Host's name), shall be the sole and absolute property of Network; provided, however, that: (i) the foregoing provision shall not preclude Host from using Host's name in Host's other business and/or professional activities; (ii) Network's rights in and to the format of the Show shall not be deemed to restrict Host from fulfilling her duties to the Fox Network pursuant to the Fox Agreement during or after the Term, whether or not any such services rendered to the Fox Network uses the same or similar formats as the Show; and (iii) the provisions of this Paragraph 12 and/or the other provisions of this Agreement shall not extend to the underlying political, philosophical or other opinions of Host on which Host depends in performing services under this Agreement, and Host may refer to Host's working papers and materials prepared by Host in connection with the Show, without restriction, in formulating Host's independent work product (subject solely to Network's copyrights with respect to the recorded elements of the Show).  To the extent, if

any, that Host retains any right, title or interest in or to any of the recorded results of Host's services under or with respect to this Agreement, Host shall, and hereby does, assign all of such right, title and interest to Network.  Network shall have the broadest possible right to cut, edit, change, add to or subtract from any Network recordings or other Network materials which include the results of Host's Services, and to combine one Program with another or other Programs, and Host hereby waives all so-called "author's rights" and rights of "droit moral," solely with respect to any recordation of the Show as contemplated herein.  With respect to any of Host's Non-Radio Activities, including without limitation Host's activities for the Fox Network pursuant to the Fox Agreement, Lender and Host shall collectively retain all rights with respect thereto and specifically reserve all such rights herein.  The exact time placement and airing of pre-feeds and re-feeds of the Show will be at Network's sole discretion.  Network may exploit and turn to its account any and all such rights granted to it, and the Programs and recordings of Host's performances, throughout the universe, in any manner and by any means whatsoever, now or hereafter known or devised, including, but not limited to, by broadcast and/or rebroadcast by and/or through Network and/or any other Host, whether on a sustaining or commercial sponsored basis.  For the purposes of this Agreement, the terms "recording" and "recordings" include any audio, video and/or audio visual recording or recordings made (whether before, during or after broadcast transmission), by tape, digital medium, film, disc or any other similar or dissimilar methods of recording audio and/or visual portions of Programs, whether now or hereafter known or devised.  Network may, at its discretion, record all communications with Host throughout the three (3) hour performance period for Host's broadcast services under subparagraph 3.a above. Network is under no obligation actually to use Host's Services or broadcast any Program, and may fully satisfy its obligations to Lender by paying to Lender the compensation specified in Paragraph 5 above.

13.   Program Content:   Lender shall use commercially reasonable efforts to ensure that neither Host nor any content of the Show shall denigrate or otherwise disparage Network, its management, employees, vendors, business or station affiliates, advertisers, sponsors or other hosts, or any parent or subsidiary entities of Network or other companies under common control with any of the foregoing, the Show, or any programming or hosts, co-hosts or other on-air personalities of any of the foregoing (collectively, **"Protected Parties"**), violate the rules and regulations of the FCC and/or the FTC, and/or any other applicable state or federal laws or regulations, or otherwise create or threaten actual or potential legal liability or financial damage for Network or any other Protected Parties and/or violate any written policies and/or parameters provided to Host by Network concerning acceptable and/or unacceptable on air content.  If Host fails to comply with any such obligations, Network, in its sole discretion, reserves, and shall have, the right to take all measures deemed by Network to be necessary or appropriate regarding content to protect the Show, and/or Network and/or any other Protected Parties, from financial damage or legal liability of any kind.  Any issues where Network reasonably, and in good faith, acts to protect the Show, Network and/or other Protected Parties from legal liability or financial damage will not be considered to be a violation of any commitment or obligation of Network to Lender, whether under this Agreement or otherwise.  Network's assistance to Host in the form of call screening, show prep, audio clip preparation and the standard screening for offensive language (use of

dump/delay equipment during a broadcast) will not be deemed to be a breach of any actual or alleged obligations of Network to Host.

14. <u>Host's Name and Likeness:</u>  Network, Network's vendors, the sponsors of the Programs, if any, and their advertising agencies, if any, shall have, and may grant to others, including without limitation Network's station affiliates, the right to use Host's name, pseudonyms, approved likeness, and voice, and any approved biographical material concerning Host, for advertising and publicity for, and promotion of, the Show and/or particular Programs, and in connection with the business of Network and the exercise of any rights granted to Network under or pursuant to this Agreement, including, but not limited to, subsidiary rights in Programs, provided that Host's name or likeness shall not be used as an endorsement of any product or service without Lender's consent, which shall not be unreasonably withheld.  Network, Network's vendors, the sponsors of the Programs, if any, and their advertising agencies, if any, shall not use or license others the right to use Host's name, voice and/or approved likeness in connection with the following categories of commercial tie-ins:  firearms, alcoholic beverages, tobacco, personal hygiene products, political products and/or religious items without first obtaining Lender's prior written approval in each instance.  The rights set forth in this Paragraph 14 shall continue during the Term (including all extensions thereof), and for 60 days thereafter, and, in connection with Programs and recordings of Host's performances on the Show, for as long a period as Network has any rights to use any such Programs and recordings.

15. <u>Correspondence:</u>  Network, advertising sponsors, if any, and their advertising agencies, if any, may open all correspondence intended for Host which any of them receives, and may answer or cause to be answered any correspondence relating to Host's Services, and may affix Host's specimen signature to any such correspondence and to publicity photos of Host. Network shall use commercially reasonable efforts to forward to Lender any mail for Host marked "Personal" that is received by Network.

16. [Reserved].

17. <u>Expenses:</u>  Provided that an officer of Network approves of an expense request in writing and in advance (recognizing that any such approval shall not be unreasonably withheld, conditioned or delayed), Network will reimburse Lender for duly approved expenses, including without limitation customary and reasonable travel expenses incurred by Host, including round-trip "business class" (or such other class as may be required above) transportation expenses, while Host is complying on a temporary basis with a request by Network to render Host's Services anywhere outside of the NY Area (or such other area which Host may designate as Host's residence and primary performance location) within thirty (30) days after Lender's submission of proper sustaining vouchers, and in accordance with Network's standard policies.

18. <u>Termination:</u>

   A. <u>Breach.</u>  This Agreement shall terminate immediately, upon written notice by the Party asserting the existence of a breach (the "**Complaining Party**"), to the Party alleged to be in breach of this Agreement (the "**Challenged Party**"), of an election by the Complaining

Party to terminate this Agreement due to a failure or refusal of the Challenged Party to cure a curable material breach of an express term of this Agreement. For purposes of this Agreement, failure to cure a curable material breach occurs when a written notice identifying both the specifics of an actual material breach of an express term of this Agreement and the specific action(s) legitimately required under the provisions of this Agreement to cure such breach ("**Breach Notice**") is given within twenty (20) business days of the actual  material breach described in such Breach Notice ("**Cited Breach**"), and the Challenged Party fails to cure the Cited Breach within twenty (20) business days thereafter, and provided, further, that, after such twenty (20) business days have expired, the Challenged Party fails to cure the Cited Breach prior to the proper issuance of a written termination notice based upon such Breach Notice by the Complaining Party. For purposes of this Agreement, a business day is a day on which commercial banks are required to be open under the laws of Oregon. A breach which is timely cured is not grounds for termination, and an alleged breach which is not capable of being cured by responsive action upon receipt of a written notice designating the required performance or other action necessary to cure such breach, or is of such a nature as to not be capable of correction by diligent action within twenty (20) business days of receipt of a Breach Notice, may not be the subject of a Breach Notice under this subparagraph 18.A.  If the recipient of a Breach Notice, in response to any such Breach Notice, shall issue a written reply which challenges the existence of any Cited Breach, and/or the specific action(s) required to cure any such Cited Breach, and/or the propriety of any such Breach Notice, and shall perform the specified action or actions, if any, required to resolve any claimed material breach and required cure step(s) asserted in any such proper Breach Notice which is/are not challenged, no termination notice may issue under this subparagraph 18.A unless the existence of any such Cited Breach and/or the required cure action(s) is/are finally decided in an arbitration or judicial proceeding, and the Challenged Party then fails to cure any such adjudicated Cited Breach within twenty (20) business days after receiving the final adjudication establishing the existence and nature of any such Cited Breach and the specific required cure action(s).

B.  <u>Other Cause</u>.  This Agreement shall terminate immediately upon written notice from Network to Lender, if, in the commercially reasonable business judgment of Network's management: (i) Host is unable to perform fully all of Host's Services because of any physical or mental disability or other limitation, despite reasonable accommodation, for a period of thirty (30) or more consecutive broadcast days, or forty-five (45) broadcast days in the aggregate during any year (<u>i.e.</u>, any consecutive period of 365 days); (ii) Host commits any act in the course of Host's Services that constitutes fraud or substantial and deliberate dishonesty; (iii) Host engages in a pattern of non-performance of Host's principal duties under this Agreement (<u>e.g.</u>, continues to fail to produce or provide Host's Services, appears significantly late or unprepared to host the Show without reasonable justification  five (5) or more times, or otherwise demonstrates repeated unwillingness to perform in a professional manner); or (iv) Host engages in conduct which results in a public scandal that the Network, in its commercially reasonable business judgment determines reflects unfavorably on Network and has or is

reasonably likely to cause financial harm to the Network; provided, further, however, that the foregoing provisions shall not apply to any reasonable political commentary of any kind or nature. In lieu of termination of this Agreement, Network may suspend live broadcasts of the Show, as well as payment of compensation to Lender, as a result of the occurrence of any of the events specified above in this subparagraph 18.B, until such time as Network, in the exercise of Network's commercially reasonable business judgment, shall conclude that all problems or other factors giving rise to such events have been resolved and that such events are not likely to recur.

C.  Force Majeure Termination.  This Agreement shall terminate immediately, upon written notice from any Party to the other Party, if Network has been unable to engage in its regular broadcasting activities for a period of sixty (60) or more consecutive days by reason of an act of God, fire, or other casualty, a strike or other labor dispute, government action, order or decree, armed conflict, or other causes outside of Network's control, provided that any such termination notice shall be duly issued before Network shall resume broadcasting activities.

D.  Discretionary Termination By Network.  Notwithstanding any other provision of this Agreement, Network shall have the right to terminate this Agreement, with or without cause, in Network's sole discretion (in such case, a "**Termination for Convenience**"), on giving advance written notice to such effect to Lender, provided that any such notice may be issued by Network solely during the First Contract Year, and provided further that if Network elects to exercise a Termination For Convenience, notwithstanding any other rights Lender or Host may possess under this Agreement, Network shall continue to pay Base Fees and Guaranteed Compensation for a period of six (6) months following the date of any Termination for Convenience.

E.  Death of Host.  Immediately, without notice or other act, upon Host's death.

F.  Lender Threshold Termination.  On or before the last day of the first calendar month following the second Contract Year and the third Contract Year (i.e., on or before January 31, 2015 and January 31, 2016), Network shall provide to Lender a written report of all Net Show Revenue and all User Fees received by Network during the prior Contract Year (the "**Prior Year Revenues**"). If the Prior Year Revenues are less than Two Million Dollars ($2,000,000.00), in the aggregate, Lender shall have the right, but not the obligation, for a period of forty-five (45) days following the issuance of Network's written report of the Prior Year Revenues for the applicable Contract Year, to terminate this Agreement by giving thirty (30) days' written notice of termination to Network.

19.   Post-Termination Provisions:

A.  Termination for Cause.  In the event of a termination of this Agreement pursuant to the terms of subparagraphs 18.B(ii), 18.B(iii) or 18.B(iv) above, Host shall not perform for or during, or broadcast or produce, any radio program of any type for a period of ninety (90) days, and shall not perform for or during, or broadcast or produce, any syndicated radio

program for one year, within any geographical area in the United States where the broadcast of the Show was available to the general public through radio broadcast. Lender specifically acknowledges that this provision is reasonable in time and geographic limitations.

B. <u>Termination for Health</u>. If the reason for early termination of this Agreement is the health of Host, and Host later returns to Host's broadcasting career, Network shall retain the option to reinstate this Agreement for the time equivalent to the remainder of the Term as of the date of termination.

C. <u>"Equity" Equivalents</u>. Lender acknowledges that Network will expend substantial sums in promoting Host as a national radio personality, and that Host's utilization of Network's goodwill and marketing efforts on behalf of another network or syndicator would not be readily compensable to Network. In executing this Agreement, Lender agrees that the Revenue Participation specified in subparagraph 5.C above and User Fee Participation payments under subparagraph 5.D above provide a form of equity interest in the Show to Lender and are being paid to Lender as compensation for Network's right to be the sole syndicator and broadcast distributor of any radio show hosted, and/or co-hosted, and/or guest hosted, by Host for the duration of the Term.

D. <u>Post-Termination Payments</u>. In the event of any termination pursuant to Paragraph 18 above and/or the expiration of the Term: (i) Base Fees and Guaranteed Compensation will be prorated through the date of termination and/or expiration and paid to Lender (except in the case of any Discretionary Termination in accordance with Paragraph 18.D above, with respect to which Network shall be obligated to pay Base Fees and Guaranteed Compensation for a period of six (6) months post date of termination); (ii) any Revenue Participation specified in subparagraph 5.C above, and/or payments based on User Fees under subparagraph 5.D above, resulting from revenues received by Network after the date of termination and/or expiration shall continue to be paid to Lender according to the provisions of subparagraphs 6.B, 6.C and 6.J above; (iii) Lender shall not be entitled to any other compensation or benefits which would otherwise be payable or deemed to be earned after the date of termination; and (iv) neither Lender nor Network shall have any further obligation to the other, except for those obligations which survive the expiration or termination of this Agreement pursuant to the provisions of subparagraph 19.E below.

E. <u>Continuing Effect</u>. Notwithstanding any termination or expiration of this Agreement, those provisions of this Agreement that reasonably and/or expressly would survive termination shall continue in effect following any such termination or expiration, including without limitation the terms of Paragraphs 9, 12, 19, 21, 23, 24, 26, 30 and 31 of this Agreement.

20. <u>Payola</u>:  Lender has been advised of the provisions of Sections 317 and 508 of the Federal Communications Act, and/or the regulations adopted by the FCC implementing these sections. Lender warrants and represents to Network that, in connection with any services or materials furnished to Network, Host has not accepted or agreed to accept, or paid or agreed to pay, any money, service or other valuable consideration for the inclusion

in any Program of any matter contemplated by such sections and regulations.  Lender further warrants and represents to Network that Host has not accepted, and will not accept or agree to accept, or paid or agree to pay, any money, service or other valuable consideration for the inclusion of any such matter in the Programs, and Host shall give to Network forthwith any information Host acquires which might alert Network that an announcement was required pursuant to the above statutes and/or regulations.  In addition, Lender represents and warrants to Network that Host (and/or Host's immediate family) do not have, and will not acquire, a hidden financial interest in the sale to the public of any service or commodity which is subject to the above statutes and regulations.  If Host (and/or Host's immediate family) do acquire any such hidden financial interest, Lender represents and warrants to Network that Host will immediately give Network notice of any information to that effect so that an appropriate announcement may be made.

21.   Indemnification:

A.  Lender Indemnity.  Lender shall indemnify and hold harmless Network and all other Protected Parties from and against any and actual loss, liability, claims, damage, penalty and other expense, including without limitation reasonable attorneys' fees, in excess of, or not covered by, Network's Big Mouth Policy, resulting from an adverse final judgment, order, decree, or other adverse final determination of any court of competent jurisdiction finding liability arising from: (i) any performance or utterance (ad lib or otherwise) made by Host in or in connection with any Program which is found to be the result of actual tortious or otherwise legally actionable conduct on the part of Host; or (ii) the use of any other material furnished by Host hereunder; or (iii) the uncured, material breach of any term or condition of this Agreement by Host or Lender; or (iv) the uncured, material breach of any representation, warranty or covenant of Lender under this Agreement; or (v) the uncured, material breach of any representation, warranty, covenant or agreement of Host in that certain Inducement Letter and Guaranty agreement relating to this Agreement, of even date herewith, by and between Network and Host.  Network's approval of any material furnished by Host shall not constitute a waiver of Host's indemnity with regard thereto.

B.  Network Indemnity.  Network will similarly indemnify and hold harmless Host from and against any and all actual loss, liability, claims, damage, penalty and other expense, including reasonable attorney's fees, caused by or arising out of (i) the Show and/or Host's broadcasting any material supplied by Network (which includes news received from wire services) and/or arising from or relating to (ii) the performance by Network of its duties under this Agreement (other than matters as to which Lender's indemnity under subparagraph 21.A above applies) or (iii) Network's breach of any representation, warranty or covenant of Network contained in this Agreement; provided, however, that Lender shall promptly notify Network of any such claim or threatened litigation.  Network will assume the defense of any such claim or litigation.

C.  Continuing Effect.  The expiration or termination of this Agreement will not affect these continuing indemnity obligations.

22.    [Reserved].

23.    <u>Remedies</u>:  Host's Services, and the rights to the results and proceeds of Host's Services granted to Network, are of a special, unique, unusual, extraordinary and intellectual character, which gives them a peculiar value, the loss of which would cause Network irreparable injury and damage, and Lender acknowledges that it would be difficult to determine and measure the damages suffered by Network in the event of a breach by Lender resulting from Host's undertaking the obligations of a live on-air radio host for any third party in violation of the provisions of this Agreement.  Accordingly, injunctive and other equitable relief against Lender any will be an appropriate remedy to enforce Network's rights under this Agreement.  This does not, however, in any way constitute a waiver by Network of its right to seek damages or other remedies, and Network shall retain the right to seek an action for specific performance and/or injunctive relief to enforce Lender's obligations under this Agreement, in addition to any other remedies at law or in equity which are otherwise appropriate.

24.    <u>Dispute Resolution</u>:   In the event of any dispute between the Parties relating to this Agreement and/or the obligations and/or entitlements of any Party under this Agreement, the Parties shall continue with and complete all undisputed performance capable of completion prior to resolution of the dispute, and the dispute and/or disputes shall be subject thereafter to resolution by mediation and/or arbitration and/or civil litigation, as follows:

   a.   <u>Meet and Confer</u>.  The Parties shall endeavor in good faith to meet and confer with each other on a confidential basis in an effort to resolve any such dispute or disputes.

   b.   <u>Mediation</u>.  At the request of any Party following unsuccessful good faith efforts of such Party to resolve their claim(s) through direct meet and confer efforts, the Parties shall endeavor to mediate any such claim(s) confidentially and in good faith.  If the Parties are unable to agree on the specific mediation procedures to be used, at the written request of any Party, the mediation shall proceed on a confidential basis in accordance with the commercial mediation rules of the Judicial Arbitration and Mediation Service ("**JAMS**") currently in effect, with Network and Lender each advancing one-half of any filing, administrative and/or mediator fees, and with the mediation to occur at a location selected by the mediator(s) in New York County, New York unless the Parties agree on another location, at a date and time selected by the mediator(s) if not otherwise agreed to by the Parties.

   c.   <u>Arbitration</u>.  If the Parties are unable to resolve the dispute(s) by mediation after good faith participation in not less than one full mediation session, then, upon the written request of any Party, such dispute(s) shall be subject to non-binding and confidential arbitration.  If the Parties are unable to agree on the specific arbitration rules and procedures to be used, the arbitration shall be conducted on a confidential basis in accordance with the commercial arbitration rules of JAMS then in effect, including without limitation all rules as to payment of filing, administrative and/or arbitrator fees. Unless the Parties shall otherwise agree, the arbitration shall occur in Oregon, at a location, date and

time specified by the arbitrator(s). Unless any Party shall reject, in a writing delivered to the other Parties and the arbitrator(s), any arbitration award requiring payment of any money or performance of any action as to the substantive issue(s) in dispute between the Parties, within twenty (20) days after the date such award is duly served upon the Parties, such arbitration award shall be binding on the Parties and duly enforceable. Arbitration awards concerning procedural issues relating to payment of fees and/or costs of the arbitration, and/or relating to the procedural aspects of the arbitration, shall be binding and enforceable between the Parties, subject to any procedural rules in effect in such arbitration for reconsideration of any such rulings by the arbitrator(s).

d.  <u>Litigation</u>.   If any of the Parties shall timely reject any substantive arbitration award as specified in subparagraph 24.c above, the arbitration process shall terminate, and the dispute(s) shall then be subject to resolution by civil action, in Oregon. In addition, and notwithstanding any provision to the contrary in this Paragraph 24, Network, at Network's sole discretion, may proceed immediately to civil action, in Oregon, without first pursuing either mediation or arbitration, in the event of any actual or claimed violation of any provisions of subparagraph 8.A or Paragraphs 3, 9, 30 or 31 of this Agreement, should Network seek to obtain a restraining order, a preliminary or permanent injunction, declaratory relief and/or other equitable relief whatsoever, whether exclusively and/or in combination with any other request for relief, with respect to any such claimed violation of the provisions of subparagraph 8.A or Paragraphs 3, 9, 30 or 31 of this Agreement.

e.  <u>All Current Claims At Issue</u>.   In order to minimize the prospect for a multiplicity of proceedings, any demand for mediation and/or arbitration, and any complaint and/or other pleading commencing any civil litigation, by any Party pursuant to this Paragraph 24, shall specify and include all claims asserted and/or assertable by the Party initiating such action, to the point of initiating such action, and any counterclaims then asserted and/or assertable by the other Party or Parties shall be asserted as cross-claims in any such mediation, arbitration and/or civil litigation, or shall thereafter be barred.

f.  <u>Applicable Laws</u>. Except, if at all, as expressly altered by the provisions of this Agreement, any such mediation, arbitration and/or civil action shall be subject to all applicable laws of Oregon, without regard to Oregon's choice of law principles.

g.  <u>General Provisions</u>. The final ruling, award, order and/or judgment in any such proceeding ("**Determination**") shall establish the specific obligation and/or performance required to comply with this Agreement, and/or resolve any ambiguity or other question arising or asserted with respect to this Agreement, and the Parties shall then each perform their respective obligations under this Agreement in accordance with such Determination. However, in no event shall any such Determination result in termination of this Agreement, and termination of this Agreement shall not be available as a remedy in any such proceeding.

25. <u>Assignment/Sale:</u>

    A. <u>Host.</u> Because this Agreement involves Host's personal services, Lender may not assign and/or delegate Host's obligations under this Agreement at any time, and the rights of Lender under this Agreement may not be assigned and/or delegated to any other person or entity; provided, however, that the rights of Lender to receipt of compensation under this Agreement may be assigned, with Host's consent, to any entity owned by Host, and/or in which Host actively serves as a principal officer, member and/or manager, and which shall have the right to contract for the personal services of Host.

    B. <u>Network.</u> Network may assign its rights and/or delegate its duties hereunder at any time to any person, firm or corporation that acquires all or a substantial part of Network's syndication business, and/or to any parent or subsidiary of Network, or any entity under common ownership with Network, and this Agreement may be so assigned and/or delegated by any such assignee; provided, however, that any such assignment and/or delegation will relieve the assignor and/or delegator of liability only for obligations arising after the date of assignment and only if such obligations are assumed by the assignee and/or delegee.

26. <u>Governing Law:</u> This Agreement shall be construed according to the laws of Oregon applicable to agreements which are executed and fully performed within said State, and without giving effect to Oregon's choice of law principles.

27. <u>Representation by Counsel:</u> This Agreement has been prepared by counsel for Network, who in connection therewith is representing only Network. Lender acknowledges that: (i) the Host Group has been advised to seek Lender's own counsel in connection with the negotiation and preparation of this Agreement and the consequences of the transactions contemplated by this Agreement; and (ii) Lender has either been so advised by Lender's own separate counsel or has waived such rights. In no event is Lender relying on Network's counsel to protect Host's rights, or to advise Host as to any conclusion of law or fact. Notwithstanding the foregoing, all Parties acknowledge that the provisions of this Agreement have been fully negotiated, and that no provision shall be construed against any Party because that Party has prepared such provision.

28. <u>General:</u> If any provision of this Agreement is held to be invalid, illegal, overbroad or unenforceable in any respect, such provision shall be construed and interpreted in such manner as to give effect to and/or restrict such provision to render it valid, legal and enforceable to the extent a valid, legal and enforceable construction is possible, and to exclude any interpretation or construction which would render such provision invalid, illegal, overbroad or unenforceable. To the extent that any provision or clause of this Agreement cannot be construed in such a manner as to render it legal, valid and enforceable, this Agreement shall be construed as if such invalid, illegal or unenforceable provision or clause had never been contained in this Agreement, and such provision or clause shall not affect any other provision or clause of this Agreement. A waiver by any Party of any of the terms and conditions of this Agreement in any one case shall not constitute a waiver of such term or

condition for the future, or as to any subsequent breach. All remedies, rights, undertakings, obligations, and agreements with respect to this Agreement, the Show and/or Host's Services shall be cumulative, and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement any Party. This Agreement sets forth the entire agreement of the Parties with respect to the subject matter of this Agreement, and replaces and supersedes all prior agreements, representations and/or understandings, whether written or oral, by and between the Parties. Any amendment to this Agreement must be in writing and be signed by each Party in order to be effective. This Agreement may be executed in counterparts, and signatures transmitted via e-mail and/or facsimile shall be given the same effect as original signatures.

29.   <u>Notices:</u>   Any notice which any Party desires, or is  required, to issue pursuant to this Agreement must be issued in writing and delivered either personally, by US Mail certified with return receipt, by commercial overnight delivery service (e.g. Federal Express), or via facsimile or e-mail with confirming copy delivered within 48 business hours by US mail (either first class or certified) or commercial overnight delivery service, to the other Party at the respective addresses/facsimile numbers set forth below, or to such other address/number as any such Party may designate by such written.

        If to Lender:              Astero, LLC
                                   2020 New Road
                                   Linwood, NJ 08221
                                   E-mail: <u>atantaros@gmail.com</u>


        with a copy (which shall not constitute notice) to:

                                   Business Law Professional Corporation
                                   9300 Wilshire Blvd., Suite 508
                                   Los Angeles, CA 90212
                                   Facsimile:     (310) 919-1950
                                   Attention:     Joseph C. Cane, Jr.
                                   E-mail: jcane@businesslpc.com

        If to Network:             Talk Radio Network Entertainment, Inc.
                                   225 NE Hillcrest Dr.
                                   Grants Pass, OR 97526
                                    Attn: Business Affairs
                                   Facsimile: (541) 471-1663

Notice issued by certified mail or commercial overnight delivery service shall be deemed issued on the date of mailing, or on the date of delivery to the delivery service, as applicable.  Notices issued by facsimile or e-mail and confirming mail or overnight delivery shall be deemed issued on the date such telefax or e-mail has been sent, provided that the notice is deposited in the United States mail or with the overnight carrier, for delivery, within 48 business hours.  Any charges are to be billed to and/or paid in advance by the sender.

30.   Confidentiality/Non-Disclosure:

A.   This Agreement. No party to this Agreement (as well as Host) shall disclose the terms and conditions of this Agreement, or cause such terms and conditions to be disclosed, to any person or persons other than Lender's, Host's and Network's respective agents, employees, attorneys and/or accountants who have a need to know, and who are legally required to refrain from further disclosing, the terms and conditions of this Agreement.

B.   Generally. No party to this Agreement (as well as Host) shall disclose, or cause to be disseminated, to any person or persons other than Lender's, Host's and Network's respective agents, employees, attorneys and/or accountants who have a need to know, and who are legally required to refrain from further disclosing, the terms and conditions of this Agreement and/or the particulars of communications by and between Lender and/or Host, on the one hand, and Network, on the other hand, and/or other personal, financial, business and/or professional information which Lender and/or Host may learn, prepare or otherwise be privy to concerning the Show and/or Network and/or any other Protected Parties, except as specifically required by law. Lender acknowledges and agrees that all such information, including without limitation any and all work product of Host with respect to the Show and/or Network ("**Work Product**"), constitutes confidential and/or proprietary business information and/or proprietary intellectual property of Network and/or other of the Protected Parties ("**Proprietary Information**"), and may be damaging to and/or harm the professional reputations and/or careers and/or businesses of the Protected Parties, and/or certain of the Protected Parties, and could cause substantial damages to the Protected Parties, or certain of them, if disclosed.

C.   Right to Contest. Prior to making any such disclosure required by law, Lender shall notify Network of, and shall provide to Network copies, and any additional specifics, of any disclosure demand purportedly issued under color of law, and shall afford Network a reasonable opportunity to contest, or to obtain a protective order with respect to, any such disclosure.

D.   [Reserved].

E.   Obligations on Termination. Upon any termination of this Agreement, Host shall not retain any Work Product or other Proprietary Information, or copies thereof, in any form, and Host shall deliver any and all such Work Product or other Proprietary Information, or copies thereof, under the possession, custody or control of Host to Network immediately upon any such termination. In addition, for a period of one (1) year following any termination or expiration of this Agreement, Host shall not hire, retain, solicit or otherwise contact any other persons or entities with access to any Proprietary Information of Network, including without limitation any of the Protected Parties, any employees, hosts, producers, vendors, subcontractors, officers, directors, managers, executives or other agents or representatives of Network and/or any other Protected Parties, including

without limitation any vendors which provide services with respect to Network's production of the Show, whether as contractors and/or subcontractors for Network, and shall refrain from causing any such persons or entities to terminate or otherwise alter their business relationship with Network, or any of the rest of the Protected Parties, unless Network shall first provide written confirmation to Host that any such intended action, as expressly described in writing by Host to Network, shall not jeopardize any Proprietary Information.

31.    <u>Non-Disparagement</u>:  Lender and Host shall not disparage any of the Protected Parties, and/or any of the radio programming or other activities, hosts, co-hosts, other on-air personalities, personnel or vendors of Network and/or any other Protected Parties, and Network shall not disparage Lender or Host.  Lender shall secure the advance consent of Network with respect to any press releases or other statements by Lender and/or Host to the press, reporters or other media personnel concerning Network and/or the Show.

32.    <u>Conflict/Approval</u>.   The Parties acknowledge that, subject to a mutually agreeable nondisclosure agreement, the Fox Network shall be entitled to review and approve the terms of this Agreement relevant to Host's obligations to the Fox Network, provided its approval thereof shall not be unreasonably withheld, conditioned or delayed.

33.    <u>Initial Press Release</u>.  Lender and Network shall jointly approve the press release announcing the launch of the Show and Host's retention as the principal host.  Given the importance of timely issuance of such release, Lender will use best efforts, subject only to Host's existing obligations to the Fox Network, to respond immediately to any proposed press release submitted by Network, and will be deemed to have approved the terms of a proposed release if Lender fails to provide Lender's response to a proposed press release within four (4) working hours of submission by Network.

        IN WITNESS WHEREOF, the undersigned have executed this Agreement on the dates specified below.


**TALK RADIO NETWORK
ENTERTAINMENT, INC.**
an Oregon corporation


By _____
        Mark Masters, CEO


Date: December 21ˢᵗ, 2012


ASTERO, LLC, a New Jersey
limited liability company


By _____
        ANDREA K. TANTAROS, President


Date: December 17, 2012

# Exhibit "B"

INDUCEMENT LETTER
AND GUARANTY


Dated: December 13, 2012


Talk Radio Network Entertainment, Inc.
225 N.E. Hillcrest Drive
Grants Pass, OR 97526
  Attn:  Mark Masters, CEO


Re:  <u>Attached Host Agreement</u>

Dear Network:

As an inducement to Talk Radio Network Entertainment, Inc., an Oregon corporation ("**Network**") to enter into that certain Host Agreement of even date herewith to which this Inducement Letter and Guaranty is attached (the "**Agreement**"), by and between ASTERO, LLC, a New Jersey limited liability company ("**Lender**") and Network, and which is being executed and delivered concurrently herewith, with respect to my services in performing as a talk radio host for that certain talk radio show which is to be produced and syndicated by Network, as is more specifically set forth in the Agreement (the "**Show**"),  I hereby represent and warrant to Network, and agree, as follows:

1.      I have read and understand the Agreement and all terms and conditions of the Agreement requiring that the personal services of Andrea K. Tantaros ("**Host**") be provided to Network and further requiring that Host individually undertake or refrain from taking certain actions, including without limitation confidentiality obligations and the grant of certain rights of exclusive negotiation and rights to match in favor of Network with respect to certain future services of Host (collectively, as to all such commitments and/or obligations, however characterized, "**Host Obligations**"), and I am the officer of Lender who is executing the Agreement on behalf of Lender concurrently with my execution of this Inducement Letter and Guaranty (this "**Inducement and Guaranty**").

Talk Radio Network Entertainment, Inc.
December 13, 2012                                                                                   Page 3

7.     Network shall be entitled to apply for equitable relief by injunction or other remedies to prevent a breach of the Agreement or of my agreements hereunder.

8.     I will look solely to Lender for all compensation for my services under the Agreement, and Network shall have no obligation to compensate me for any services to be performed by me or for any rights granted to Network thereunder or hereunder, and the sole obligations of Network with respect thereto shall be to pay to Lender the agreed compensation payable to Lender under and pursuant to the Agreement.  The foregoing provisions are without prejudice to all rights of Lender to enforce any and all obligations of Network to Lender under the Agreement, or to any defenses of Network with respect to any claims of Lender.

9.     I hereby confirm and join in the grant to Network, under the Agreement, of all rights specified therein, including, but not limited to, all rights granted in and to the results and proceeds of my personal services, the right to use my name and likeness as set forth therein, and all other Host Obligations, and expressly and fully guaranty to Network due and full performance of all obligations and commitments of Lender under the Agreement, including without limitation and in particular the obligation for full and proper performance of the Host Obligations, whether or not the Lender/Host Agreements should expire or be terminated for any reason.

10.     All notices served on Lender in accordance with the provisions of the Agreement shall be deemed to be notices to me of the contents thereof.

11.     I shall indemnify and hold Network harmless from and against all liabilities, penalties, losses or expenses, including reasonable attorneys' fees imposed upon, and/or sustained or incurred by, Network by reason of Network's failure to deduct or withhold from the compensation payable to Lender under the Agreement any amounts required, and/or determined or claimed to be required, to be deducted or withheld by Network under the provisions of any law, regulation or collective bargaining agreement now or hereafter existing.

12.     For purposes of any and all workers' compensation statutes, laws or regulations ("**Workers' Compensation**"), I acknowledge that an employment relationship exists between Lender and me, with Lender being my special employer with respect to the Agreement.  Accordingly, I acknowledge that in the event of my injury, illness, disability, or death falling within the purview of Workers' Compensation (and not as a consequence of any gross recklessness or intentionally tortious conduct of Network or its employees, officers, directors or invitees), my rights and remedies (and those of my heirs, executors, administrators, successors, and assigns) against Network or its affiliated companies, and their respective officers, agents, and employees (including,

3

Talk Radio Network Entertainment, Inc.
December 13, 2012                           Page 4

without limitation, any other special employee and any corporation or other entity furnishing to Network or an affiliate company the services of any such other special employee) and/or Lender shall be governed by, and limited to, those provided by Workers' Compensation, that I am duly employed by Lender under and pursuant to the Lender/Host Agreements, that I shall look solely to Lender for any such compensation or other remedies, and that I shall indemnify and hold Network harmless pursuant to Paragraph 11 above for any contrary claims, demands or liabilities.

Please sign and return one copy of this Inducement and Guaranty in the signature block below to confirm our agreement with respect to each of the terms and provisions of this Inducement and Guaranty as set forth above.

Very truly yours,

Andrea K. Tantaros

AGREED AND ACCEPTED
THIS 21st DAY OF DECEMBER, 2012:

TALK RADIO NETWORK ENTERTAINMENT, INC.
an Oregon corporation

By_____
Mark Masters, CEO

4

# Exhibit "C"

# BUSINESS LAW PROFESSIONAL CORPORATION

9300 Wilshire Boulevard, Suite 550
Beverly Hills, California 90212
Telephone (310) 470-8855
Fax (310) 919-1950

**Direct Dial:** Joseph C. Cane, Jr.
(310) 470-8855 x. 205

**Email:** jcane@businesslpc.com

September 13, 2013

VIA E-MAIL AND U.S. MAIL

Ron Severaid, Esq.
Executive Vice President & General Counsel
Talk Radio Network Entertainment, Inc.
225 N.E. Hillcrest Drive
Grand Pass, Oregon 97526

Re:    Andrea Tantaros Host Agreement

Dear Ron:

I am sending this letter to you in follow-up to the events that have affected my client, Ms. Andrea Tantaros ("Andrea" or "my client"),  and have been reported in the media over the past week concerning Talk Radio Network Entertainment, Inc. ("TRN") and the conversations we have had relating thereto.

As an initial matter, while we are relieved to finally receive payment from TRN after over almost two (2) weeks of uncertainty and conflicting accounts from both you and Mark Masters, many questions remain about the ability of TRN to uphold its contractual obligations contained in the Host Agreement between TRN and my client, dated as of December 13, 2012 (the "Host Agreement").

While Andrea has always been and currently remains committed to fulfilling her contractual obligations and being supportive of Mark Masters and TRN, on a macro level, we are very concerned about TRN's current legal battles and related "war-of-words" being waged in the media, and the sudden and seemingly secretive downsizing and restructuring of the company.

In particular, we are concerned about the overall negative impact that these events have been having on TRN's business generally, and are especially concerned about the future viability of Andrea's radio show (the "Show"). Most importantly, we are deeply concerned that Andrea's marquee and nationally-recognized brand and reputation, are being placed in jeopardy by TRN.

In this regard, while we did not elect to formally notice TRN of the first breach of its payment obligations as a courtesy to Mark Masters, we, nonetheless, still remain concerned about the path TRN is headed down, and its ability to sustain the viability of Andrea's Show.  Though the three (3) breaches of TRN's payment obligations to my client have been cured, and we are

appreciative that they have been remedied, among other things, given the current status of TRN's affairs, we are especially concerned that:

(1) TRN does not possess a sales force capable of selling the Show to advertisers (we have heard that Bill Crawford has resigned and most (if not all) of the remaining sales staff have been released), and consequently, due to TRN's conduct in this regard, (a) TRN is in violation of its obligation to nationally-syndicate the Show, facilitate relationships with the Show's affiliates and to advertise and market the Show, as set forth in §§ 4.A, 4.B and 4.J, respectively, of the Host Agreement, and (b) Andrea is effectively being precluded from her ability to achieve revenue participation, as she is entitled to receive pursuant to §5.C of the Host Agreement, based upon the "Net Show Revenue" generated from the Show, which is a fundamental tenet of the deal and one of, if not the most important, reasons Andrea agreed to host the Show;

(2) TRN appears now wholly incapable of being able to conduct business with the largest U.S. syndicator, now that Cumulus has acquired Dial Global, due to TRN's pending litigation with Dial Global, which in turn, necessarily means TRN cannot fulfill its obligations to nationally-syndicate the Show pursuant to §§ 4.A and 4.J of the Host Agreement, and of course, less potential market share for the Show, particularly in the top 25 key U.S. markets;

(3) TRN lacks any digital media strategy or capabilities in light of Eric Richey's termination, and is no longer supporting the full responsibilities of the app for the Show or maintaining the Show's website, which of course, is essential for maintaining interconnectivity with the Show's viewers, particularly, key 18-34 year old listeners, which is a requirement of the Host Agreement as set forth in §4.K therein;

(4) TRN is no longer maintaining an affiliate division, as is required by §4.B of the Host Agreement, thereby making it impossible for Andrea to communicate with her affiliates or to respond to, or fulfill their, requests for ad reads and liners, which certainly will impact such relationships to the detriment of TRN, the Show and her brand and reputation;

(5) TRN's production capabilities are currently, virtually non-existence, and are certainly not commensurate with "National Syndication Quality," as is required pursuant to §4.F of the Host Agreement, so that Andrea is now finding it exceedingly difficult, if not impossible, to host the Show - Specifically, (a) there are no commensurate sound effects due to Matt Fox's resignation due to non-payment of his salary; (b) the Show's executive producer, AJ Rice, whose involvement with the Show was a cornerstone of Andrea's agreeing to host, was also terminated (in violation of §3(h) of the Host Agreement) and has yet to be replaced, forcing Andrea effectively to be producing the Show herself; (c) TRN has not furnished Andrea with guests or research over the past several days, which is certainly damaging to the Show's overall flow and entertainment value (not to mention violative of §4.H of the Host Agreement), and (d) the Show's call screener was fired and replaced by Mark Master's son, who with all due respect, is a nice, young gentlemen, but does not possess the requisite skill-set to fulfill this role on a long-term basis.

While you should consider this letter to constitute formal, written notice from Lender (as defined in the Host Agreement), in accordance with §29 of the Host Agreement, of multiple breaches of the Host Agreement, each as set forth above, which we hope will be remedied forthwith, you should also know that Andrea remains, at present, committed to fulfilling her contractual obligations to TRN, provided: (1) the aforementioned breaches are immediately

rectified and (2) TRN provides Andrea with clear insight into how it intends put both TRN and the Show back on solid-footing, so that no further harm comes to Andrea's brand or reputation.

Further, although TRN made good yesterday on its commitment to pay Andrea the outstanding payments owed to her pursuant to her Host Agreement, totaling $19,416.66 (representing $8,333.33 for her guarantee payment due on 8/31; $8,333.33 for her base salary payment due on 9/5/13; and $2750.00 for her rent-subsidy payment due on 9/5/13), we still remain extremely concerned as to whether or not TRN will be able to continue making such payments and as to whether the issues detailed hereinabove can be rectified in a timely manner in accordance with TRN's contractual obligations.

To this end, you mentioned, during our call yesterday, that you and Mark are working on a restructuring proposal, whereby the Show and its assets would be "contributed" to a new, to-be-formed, limited liability company, which would be sufficiently capitalized in order to ensure that all of the aforementioned concerns and breaches are rectified. We certainly look forward to receiving the details of such plans, in writing, so that we may assess them, bearing in mind, that depending on the nature of the restructuring you are proposing, certain approvals of the Fox News Network, LLC and the Lender may also be required.

Please also recognize that despite our aforementioned concerns, we do, nonetheless, remain interested in sustaining the Show and, hopefully, having it grow even more successful. That being said, while Andrea has been a "trooper" to date, and intends to continue to be reasonably supportive of Mark, TRN, and her affiliates, despite multiple financial, logistical and public relations hurdles, we do not think it is fair, nor do we feel she signed on to perform services for a network that is wholly incapable of providing adequate resources to produce, market and syndicate a high-quality entertainment product, as appears is currently the situation with TRN. While we hope this situation can be immediately reversed, you should also know that we simply cannot, and will not, allow TRN's current problems to cause unwarranted and irreversible, material damage to Andrea's brand and reputation.

We hope you can understand our position; we do truly look forward to hearing from you in a timely, candid and consistent fashion on these fronts and to cooperating to achieve a positive path forward for all involved stakeholders, in the immediate near term.

Nothing contained herein should be interpreted as waiving any of my client's right and remedies, whether in equity, or at law, all of which are hereby expressly reserved.

Best regards,

Joseph C. Cane, Jr.

cc:     Andrea Tantaros
        Timothy J. McIlwain, Esq.

# Exhibit "D"

# BUSINESS LAW PROFESSIONAL CORPORATION

9300 Wilshire Boulevard, Suite 550
Beverly Hills, California 90212
Telephone (310) 470-8855
Fax (310) 919-1950

**Direct Dial:** Joseph C. Cane, Jr.
          (310) 470-8855 x. 205

**Email:** jcane@businesslpc.com

September 24, 2013

CONFIDENTIAL COMMUNICATION
VIA E-MAIL AND U.S. MAIL

Ron Severaid, Esq.
Executive Vice President & General Counsel
TALK RADIO NETWORK ENTERTAINMENT, INC.
225 N.E. Hillcrest Drive
Grand Pass, Oregon 97526

        Re:     Andrea Tantaros Host Agreement

Dear Ron:

I am sending this letter to you in reference to further events which continue to adversely affect my client, Ms. Andrea Tantaros ("Andrea" or "my client") and which also constitute further breaches of that certain Host Agreement between Talk Radio Network Entertainment, Inc. ("TRN") and my client, dated as of December 13, 2012 (the "Host Agreement"). To be clear, we view the items referenced herein, *to be supplemental to the breaches referenced in my September 13th letter to you.* (Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Host Agreement).

As an initial matter, my client has yet to receive payment of her Base Fees which were due on Friday, September 20th, in accordance with Section 5.A of the Host Agreement. As you know, in the past, we accommodated TRN when it was late in tendering payment for Base Fees and Guaranteed Compensation, in accordance with Sections 5.A and 5.F of the Host Agreement, respectively. Due to TRN's failure to rectify the breaches outlined in my September 13th letter and the additional breaches reflected herein, we are no longer agreeable to making similar, voluntary concessions. As such, we strongly encourage you to immediately tender payment to Andrea for all outstanding Base Fees.

In addition, we were very disheartened to learn, despite the contents of my September 18th letter to you and the stress we indicated that the current situation at TRN has been causing Andrea, that upon Andrea's return to work this morning: (i) no guests were booked for the Show; (ii) no research had been provided to her; (iii) there was no in-studio producer or production team working (apart from 1 person), and (iv) an David Ruben-- who we were told by Marcel Corona a week ago, was being added to the Show as its Sr. Producer (in violation of Section 3(h) of the Host Agreement)--showed up approximately 15 minutes before the Show, told Andrea 8 minutes

Page | 1

before going live that no guests had been booked, blamed his tardiness on the fact that "we didn't expect you [our client] to show up," despite my letter to you of September 18th, indicating that Andrea would be out until September 24th, and then proposed to "recycle" guests who had appeared on the Show over the past few days. As you know, instead of proceeding with the Show under such circumstances, Mr. Ruben suggested that TRN run a "Best of" show, rather than proceeding with the Show in a wholly-owned prepared and unprofessional manner.

Additionally and for the record, last week no efforts were made by TRN to book guests for the Show, sound clips for the Show were minimal and of poor quality, there appeared to be few advertisers procured, apart from those with affiliations to Mark Master's family, and Andrea was given insufficient preparation, feedback and editorial guidance from Mr. Ruben. In sum, we felt the overall production quality of the Show last week was well beneath the standards Andrea has been accustomed to prior to our letter of September 13th, and certainly not commensurate with "National Syndication Quality," as is required pursuant to §4.F of the Host Agreement.

Although I wish I did not have to remind you, Section 3(h) of the Host Agreement provides that TRN may not "materially deviate from the approved concept, Show Title or the approved creative elements without Lender's prior written approval…" Suffice it to say that that neither Andrea, nor Lender, approves of any of the aforementioned production changes to the Show. Further, we are a total loss of comprehension as to how TRN still reasonably expects Andrea to host the Show, given the lack of overall resources available to her, without causing further serious damage to her brand and reputation.

Concerning this last point, I truly hope TRN changes course and seriously considers the adverse implications producing and delivering the Show in the manner that has transpired in recent days is having, and will continue to have, on my client, her brand and her reputation. To this end, we request that you promptly rectify the aforementioned breaches, as well as, those referenced in my September 13th letter, and in particular, immediately remit all outstanding compensation owed to Andrea.

Alternatively, if TRN does not realistically believe it will be able to overcome its current business and financial problems in the short-term, so that it will be able to remedy the aforementioned breaches and put the Show back on solid footing, we would ask that the parties simply agree to part ways on a (to be agreed upon) date certain. In the interim, this letter confirms that Andrea does intend to work tomorrow and for the foreseeable future, despite TRN's ongoing breaches and the associated risk to her brand and reputation.

Lastly, prior to discussing any alternatives to the foregoing, we request that TRN pay all outstanding amounts due to Andrea, as well as, immediately furnish the following documents/information (as previously requested):

1. List of station affiliates currently carrying the Show and any other available syndication metrics;
2. List of markets for the Show and any related clearance metrics;
3. List of current advertisers for the Show;
4. Total Ad Sales for the Show from 1/1/13 to present;
5. Total New Show Revenue from 1/1/13 to present;
6. Total Cash Compensation received by TRN concerning the Show from 1/1/13 to the present;
7. Total Miscellaneous Revenues received by TRN concerning the Show from 1/1/13 to present;
8. Total User Fees received by TRN concerning the Show from 1/1/13 to the present; and

9.  Copies of all Revenue Reports required to be delivered to Lender on a monthly basis, per Section 6.D of the Host Agreement.

We look forward to your immediate courtesy and cooperation regarding the foregoing.

Nothing contained herein should be interpreted or misinterpreted as waiving any of my client's rights or remedies, whether at law or in equity, all of which are hereby reserved.

Very truly yours,

Joseph C. Cane, Jr.

cc:     Andrea Tantaros
        Timothy J. McIlwain, Esq.

# Exhibit "E"

# BUSINESS LAW PROFESSIONAL CORPORATION

9300 Wilshire Boulevard, Suite 550
Beverly Hills, California 90212
Telephone (310) 470-8855
Fax (310) 919-1950

**Direct Dial:** Joseph C. Cane, Jr.
          (310) 470-8855 x. 205

**Email:** jcane@businesslpc.com

October 9, 2013

CONFIDENTIAL COMMUNICATION
VIA E-MAIL AND U.S. MAIL

Ron Severaid, Esq.
Executive Vice President & General Counsel
Talk Radio Network Entertainment, Inc.
225 N.E. Hillcrest Drive
Grand Pass, Oregon 97526

          Re:    Andrea Tantaros

Dear Ron:

This letter comes in follow-up to my letters of September 13th and September 24th, and my e-mails subsequently thereto, none of which have been substantively responded to, in any regard. In particular, TRN has not paid Andrea any Base Fees or Guaranteed Compensation, owed to her in accordance with Sections 5.A and 5.F of her Host Agreement, for more than a month. In fact, the only feed-back we have received from TRN (apart from self-serving comments and pontifications) are e-mails from Jim Watkins, regarding reading copy for an Atlanta affiliate. Interestingly, this matter apparently not initially not to have been properly handled by TRN, and as such, now appears to require Andrea's immediate attention, even though I previously explained her travel commitments and indicated it would be addressed when she returns from Washington, DC.

As you know, on September 20th you sent me an e-mail indicating that you would be circulating a proposal to address the issues between TRN and Andrea and provided an NDA. I advised you that I did not understand why a further NDA was required in this instance, given the existing confidentiality provisions in her Host Agreement and NDA, and requested in a letter of September 24th that prior to prior to discussing any alternatives to her existing Host Agreement, we would like to receive the documents/information listed below, so as to be in a position to make an informed decision.

1. List of station affiliates currently carrying the Show and any other available syndication metrics;
2. List of markets for the Show and any related clearance metrics;

Ron Severaid, Esq.
October 9, 2013

3. List of current advertisers for the Show;
4. Total Ad Sales for the Show from 1/1/13 to present;
5. Total New Show Revenue from 1/1/13 to present;
6. Total Cash Compensation received by TRN concerning the Show from 1/1/13 to the present;
7. Total Miscellaneous Revenues received by TRN concerning the Show from 1/1/13 to the present;
8. Total User Fees received by TRN concerning the Show from 1/1/13 to the present; and
9. Copies of all Revenue Reports required to be delivered to Lender on a monthly basis, per Section 6.D of the Host Agreement.

However, none of the foregoing was provided. In fact, rather that attempting to facilitate a resolution of the issues at hand, it simply appears that TRN prefers to do nothing, including not pay its talent. This is indeed unfortunate.

Accordingly, you are hereby notified that that the cure period for the breaches referenced in my letter of September 13th has lapsed, and as a result thereof, we are electing to immediately terminate her Host Agreement, in accordance with Section 18A therein.

Lastly, this correspondence is not intended, and shall not be construed, as a full recitations of all facts concerning the subject matter hereof or in any way be deemed to limit, waive or prejudice any rights or remedies which Astero, LLC or Ms. Tantaros may have at law, in equity or otherwise. Any and all such rights and remedies are expressly reserved.

Very truly yours,

Joseph C. Cane, Jr.

cc:      Andrea Tantaros
         Timothy J. McIlwain, Esq.