TIMOTHY J. McILWAIN
ATTORNEY AT LAW, LLC
89 River Street #1538
Hoboken, New Jersey 07030
Tel: (877) 375-9599
Fax: (609) 450-7017
Email: Attorney@McIlwainLaw.com

JOSEPH C. CANE, JR., ESQ. (CA State Bar No. 173861)
BUSINESS LAW CORPORATION
*(Pro Hac Vice Application pending)*
Email: jcane@businesslpc.com
CHRISTIAN S. MOLNAR, ESQ. (CA State Bar No. 177665)
CHRISTIAN S. MOLNAR LAW CORPORATION
Email: christian@christiansmolnarlaw.com
*(Pro Hac Vice Application pending)*
12400 Wilshire Boulevard, Suite 1180
Los Angeles, California 90025
Tel: (310) 820-9900
Fax: (310) 919-1950

Attorneys for Plaintiffs ASTERO, LLC, a New Jersey limited liability company, and
ANDREA K. TANTAROS, an individual

# THE UNITED STATES DISTRICT COURT,

## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASTERO, LLC,  a New Jersey limited liability company; ANDREA K. TANTAROS, an individual, | Case No.: 1:13-cv-06005-NLH-JS |
| | ***[JURY TRIAL DEMANDED]*** |
| Plaintiffs, | |
| vs. | **FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF FOR:** |
| TALK RADIO NETWORK ENTERTAINMENT, INC., an Oregon corporation, MARK MASTERS, an individual, and Does 1 through 10, inclusive, | **(1) Declaratory Relief;** |
| | **(2) Breach of Written Contract;** |
| | **(3) Breach of Implied Covenant of Good-Faith and Fair Dealing;** |
| Defendants. | **(4) Fraud in the Inducement;** |
| | **(5) Fraud (Intentional** |

---

**1**

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

Misrepresentation);
**(6)** **Fraud (Negligent Misrepresentation);**
**(7)** **Intentional Interference with Prospective Economic Advantage;**
**(8)** **Negligent Interference With Prospective Economic Advantage;**
**(9)** **Accounting, and**
**(10) Violation of the State of New Jersey Law Against Discrimination (N.J. Stat. Ann. §10:5-1 *et seq.*)**

**COME NOW** Plaintiffs ASTERO, LLC, a New Jersey limited liability company (hereinafter referred to as "Plaintiff ASTERO,") and ANDREA K. TANTAROS, an individual, an individual (hereinafter referred to as "Plaintiff TANTAROS,") (hereinafter sometimes collectively referred to as "Plaintiffs,") and allege as follows:

## PARTIES

1.      Plaintiff ASTERO is now, and at all times mentioned in this complaint was, a limited liability company duly organized and existing under and by virtue of the laws of the State of New Jersey, with its principal place of business in the City of Linwood, County of Atlantic, State of New Jersey located at 2020 New Road, Linwood, New Jersey 08221.

2.      Plaintiff TANTAROS is now, and at all times mentioned in this complaint was, an individual residing and doing business in the City of New York, County of New York, State of New York and the City of Linwood, County of Atlantic, State of New Jersey located at 2020 New Road, Linwood, New Jersey 08221.

3.      Plaintiffs are informed and believe and based thereon allege that at all times herein mentioned Defendant TALK RADIO NETWORK, INC., an Oregon corporation (hereinafter referred to as "Defendant TRN,") is now, and at all times mentioned in this complaint was, a corporation duly incorporated and existing under

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

and by virtue of the laws of the State of Oregon, with its principal place of business in the City of Grant Pass, County of Josephine, State of Oregon located at 225 N.E. Hillcrest Drive, Grants Pass, Oregon 97526.

4.   Plaintiffs are informed and believe and based thereon allege that at all times herein mentioned Defendant MARK MASTERS, an individual (hereinafter referred to as "Defendant MASTERS,") is now, and at all times mentioned in this complaint was, an individual residing and doing business in the City of Grant Pass, County of Josephine, State of Oregon located at 225 N.E. Hillcrest Drive, Grants Pass, Oregon 97526.

5.   Plaintiffs do not know the true names of Doe Defendants 1 through 10 inclusive (along with Defendant TRN, the "Defendants,") and therefore sue them by those fictitious names.  Plaintiffs are informed and believe and based thereon allege that each of those Defendants was in some manner legally responsible for the events and happenings alleged in this complaint and for Plaintiffs' damages.  The names, capacities, and relationships of Does 1 through 10 will be alleged by amendment to this complaint when they are known.

6.   Plaintiffs are informed and believe and based thereon allege that at all times mentioned herein, the defendants, and Does 1 through 10, inclusive, and each of them, were the agents and employees of each of the remaining Defendants, and each of them, in doing the acts alleged in this first amended complaint, were acting within the purpose and scope of said agency and employment.

7.   Each Defendant is sued individually and as an agent, conspirator, aider and abettor, employee and/or control person for each of the other Defendants, and the liability of each defendant arises from the fact that it has engaged in all or part of the unlawful acts, plans, schemes, or wrongs complained of herein and was acting within the course and scope of said agency, partnership, conspiracy, and employment.

////

////

**3**

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

## JURISDICTION AND VENUE

8.     Jurisdiction is proper in this Court and this action is brought pursuant to the diversity jurisdiction provisions of 28 U.S.C. § 1332(a) because the amount in controversy exceeds Seventy-Five Thousand and No/100 Dollars ($75,000.00) and Plaintiff TANTAROS, a citizen of the States of New Jersey and New York, and Plaintiff ASTERO, a corporate citizen of the State of New Jersey, on the one hand, and Defendant TRN, a corporate citizen of the State of Oregon, and Defendant MASTERS, a citizen of the State of Oregon, on the other hand, are citizens of a different states, and, accordingly, there is complete diversity between all defendants and both Plaintiff TANTAROS and Plaintiff ASTERO.

9.     The Court also has supplemental jurisdiction over this matter pursuant to 28 U.S.C. § 1367, as it involves Plaintiff TANTAROS' right under New Jersey Law Against Discrimination ("NJLAD,") N.J. Stat. Ann. §10:5-1 *et seq.* to be free of from discrimination.

10.     The Court also has jurisdiction over the Tenth Cause of Action which alleges a violation of the NJLAD pursuant to both 28 U.S.C. § 1332 and 28 U.S.C. § 1367.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, as Plaintiff ASTERO, a New Jersey limited liability company, is a resident within the meaning of that statute, and/or a substantial part of the events and/or omissions giving rise to the claims contained herein occurred in the District of New Jersey.   Venue is also proper in this District pursuant to 28 U.S.C. § 1391, as Defendants each have sufficient minimum contacts for the exercise of personal jurisdiction in this district as Defendants, and each of them, have had purposeful, continuous and systematic contacts in or affecting the State of New Jersey, and many of the acts complained of herein occurred in this District.

////

////

**4**

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

## **GENERAL FACTUAL ALLEGATIONS**

12.     Plaintiff TANTAROS is a co-host of a television program entitled "The Five" on the Fox News Channel and has been employed by Fox News since April of 2010, when she joined Fox News as a political contributor.  Plaintiff TANTAROS was also the author of a weekly syndicated column for the New York Daily News and Newsmax.  Prior to being recruited by Fox, Plaintiff TANTAROS had started her own company, Andrea Tantaros Media, which specialized in the provision of crisis management and media strategy consulting to Fortune 500 companies, and before that was a Vice-President at the public affairs company, Sloane and Co., in New York. Plaintiff TANTAROS also previously held several positions including serving as the Press Secretary to the Republican Leadership of the U.S. House of Representatives, as well as working on the political campaigns of former Governor of Massachusetts, Bill Weld, District Attorney, Jeannie Piro, and Republican Congressional Committee Chairman, Thomas Reynolds.  Plaintiff TANTAROS also worked for former Reagan pollster, Richard Wirthlin, and as a Deputy Press Secretary to then congressman, and now Senator, Pat Toomey.

13.     In or about the fall of 2012, Plaintiff TANTAROS, was approached by Defendant MASTERS, the President/Chief Executive Officer of Defendant TRN, regarding recruiting her to host a morning radio show on its radio network in the coveted, prime morning slot of 9 am to noon, then held by celebrity conservative commentator, talk show host and Fox contributor, Laura Ingraham ("Ms. Ingraham"). This solicitation began discussions between Plaintiff TANTAROS and Defendant TRN regarding the possibility of her hosting a radio show on Defendant TRN's radio network in replacement of Ms. Ingraham.  In the course of making those overtures to Plaintiff TANTAROS, Defendant MASTERS, Defendant TRN's agent, made several material misrepresentations to Plaintiff TANTAROS including, but not limited to:

        a.  The previous host of the prime morning timeslot, Laura Ingraham, was a nightmare, difficult to deal with, and an impossible and unfair

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

negotiator and that is why Defendant TRN was planning to part ways with Ms. Ingraham and why her coveted time slot would be available;

b. Plaintiff TANTAROS, due to her status as a member of The Five and her ascending national renown, would be a perfect replacement for Ms. Ingraham and Defendant TRN would guarantee, vis-à-vis allocation of marketing dollars, to catapult her to the very top of the radio world, and correspondingly, she would receive substantial revenue sharing;

c. Defendant TRN was very well capitalized and possessed the capacity to spend "millions" of dollars to market Plaintiff TANTAROS' show and, in the process, make Plaintiff TANTAROS a radio star and reward her financially through revenue sharing;

d. Defendant TRN had a "robust" sales force in place "to maximize advertising revenue" for the proposed show which would ensure Plaintiff TANTAROS received the maximum revenue participation possible under the deal Defendant TRN was proposing to offer Plaintiffs;

e. Defendant TRN had syndication deals in place with approximately three hundred (300) local stations who would carry Plaintiff TANTAROS' proposed show throughout the country;

f. Defendant TRN had solid existing relationships with its affiliates, and

g. Defendant TRN had solid existing relationship with its advertising sales syndicators and advertising sales representative firms.

14.     Based largely upon these misrepresentations, on or about December 21, 2012, Plaintiff ASTERO, and Defendant TRN entered into a written "HOST AGREEMENT" (hereinafter referred to as "Host Agreement"), whereby Plaintiff ASTERO, as lender, would provide Defendant TRN, as radio network, with the services of Plaintiff TANTAROS, as a host on a morning radio program entitled, "The Andrea Tantaros Show" (hereinafter referred to as the "Tantaros Show").  The Host Agreement

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

provided that Plaintiff ASTERO would receive a fixed annual salary plus a percentage of all annual net revenue related to the Tantaros Show and a percentage of annual user fees with certain guaranteed annual sums for both the net revenue and user fee participation.  The Host Agreement further provided that in the event of a breach or breaches of the Host Agreement, either party thereto could give the other party written notice of the breach (hereinafter referred to as a "Notice of Breach,") and that if the breaching party failed to cure the breach or breaches specified in the Notice of Breach within twenty (20) business days, the non-breaching party could issue a written notice of termination of the Host Agreement to the breaching party (hereinafter referred to as a "Termination Notice").  A true and correct copy of the Host Agreement is attached hereto as Exhibit "A" and is incorporated herein by this reference as though fully set forth.

15.     The Host Agreement specifically acknowledges that it and all of its provisions, terms and conditions are subordinate to Plaintiffs' agreements with the Fox News Channel.

16.     On or about December 21, 2012, Plaintiff TANTAROS and Defendant TRN entered into a written "INDUCEMENT LETTER AND GUARANTY," (hereinafter referred to as "Guaranty").  A true and correct copy of the Guaranty is attached hereto as Exhibit "B" and is incorporated herein by this reference as though fully set forth.

17.     Prior to the time of its entering into the Host Agreement with Plaintiff TANTAROS, on August 27, 2012, Defendant TRN, and related entities, filed a lawsuit against one of its largest advertising sales syndicators and sources of revenue related to the shows on its radio network, Dial Global, Inc., and various related entities, in the United States District Court for the Central District of California (USDC-CD-CA Case No. CV12-7370-JFW (PLA) entitled *The Original Talk Radio Network, etc., et al. vs. Dial Global, Inc., etc., et al.*) alleging, *inter alia*, that the defendants therein had improperly withheld monies owed to Defendant TRN or otherwise engaged in other

---

**7**

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

unfair business practices in an effort to deprive the plaintiffs therein, including Defendant TRN herein, of monies that it was entitled to or otherwise would have been entitled to under its agreements with the defendants (hereinafter referred to as the "Dial Global Lawsuit").  Defendant TRN and its related entities further pled in the Dial Global Lawsuit that Defendant Dial Global "controls 95% of the Independent Ad[vertising] Rep[resentative] Market.  As a result…has achieved a stranglehold on the vast majority of Independent Spoken Word Syndicators such as Plaintiffs [including the Defendant TRN herein]."  In other words, months before Defendant TRN approached Plaintiff TANTAROS about doing a radio show on its radio network it had initiated litigation against a company, Dial Global, LLC and its related entities, the "Dial Global Group," which Defendant TRN alleged in the complaint in the Dial Global Lawsuit controlled ninety-five percent (95%) of the advertising revenues for syndicated radio talk shows, such as the show it was touting to Plaintiff TANTAROS, as being the vehicle which would elevate her career and handsomely compensate her through revenue participation.

18.    Thus, at the time Defendant TRN's CEO, Defendant MASTERS, was wooing and soliciting Plaintiffs to enter into the Host Agreement and the Guaranty with it for the Tantaros Show, neither Defendant TRN, or Defendant MASTERS did not disclose the existence of the Dial Global Lawsuit to Plaintiffs and further did not disclose that it was in a dispute with one of the largest advertising sales syndicators in the United States, Dial Global, LLC and its related entities, or the fact that the participation revenues, including advertising, that Plaintiff ASTERO was entitled to under the Host Agreement would be dependent on this same largest advertising syndication network that Defendant TRN was suing.  Finally, Defendant TRN did not disclose to Plaintiffs that the revenue participation it was offering to Plaintiffs in connection with the proposed Tantaros Show would be principally dependent upon or coming from Dial Global and the related entities that it was in litigation with since August, 2012.

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

19.     Due in large part to Plaintiff TANTAROS' known celebrity status, the Tantaros Show was an immediate hit and quickly after its debut was ranked the 7th highest rated talk radio show in the United States according to TALKERS Magazine.

20.     In or about late August and/or early September 2013, and without any prior discussion with Plaintiffs, Defendant TRN laid off most of its staff, and many others simultaneously "resigned" from their positions, including, critically, most of Defendant TRN's sales team.  In response to Plaintiff TANTAROS expressing her concerns to Defendant TRN about the massive "overnight" loss of most of the sales staff, she was assured by Defendant TRN that the Head of Affiliate Advertising Sales and Chief Operating Officer, Bill Crawford, was still with the company and that the company still had a sufficient sales force to generate advertising sales for the Tantaros Show and would make good on the revenue sharing commitments contained in the Host Agreement.

21.     Days later, Bill Crawford, the Chief Operating Officer and Head of Affiliate Ad Sales at Defendant TRN resigned, effective immediately.

22.     In or about early late August and/or early September 2013, the sound effects manager, Matt Fox, resigned from Tantaros Show due to the non-payment of his salary by Defendant TRN.

23.     In or about late August and/or early September 2013, the executive producer of the Tantaros Show, A.J. Rice, was laid off by Defendant TRN and not immediately replaced, although later replaced by Defendant TANTAROS' brother, David Ruben.

24.     In or about late August and/or early September, 2013, the Tantaros Show's call screener was laid-off and initially replaced by the CEO, Defendant MASTERS' son, but currently remains unfulfilled.

25.     As of early September, 2013, Defendant TRN owed Plaintiff ASTERO several payments of both salary, and guaranteed revenue participation, as well as

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

several payments of salary to Plaintiff TANTAROS' assistant, Christopher Coffey, on the Tantaros Show.

26.     As of the second week of September, 2013, and a direct result of the actions of Defendant TRN, Plaintiff TANTAROS found herself in a situation wherein she no longer had a competent executive producer, a full-time call screener, a paid assistant, or a sound effects manager; and, further, had either no guests or only decidedly "C-list" quality guests; was provided with no research for the third-rate guests that were booked for the Tantaros Show, insufficient research for the topics at hand, no editorial guidance, and was basically expected by Defendant TRN to produce her own show.  In addition, there no longer was any meaningful sales force to sell her program to advertisers, or potential advertisers, and there was no affiliate relations staff at Defendant TRN to service the needs or the requests of the Tantaros Show's affiliates. The "overnight" complete deterioration of the quality of the Tantaros Show is, and continues to be, damaging to Plaintiff TANTAROS' brand and her hard-earned professional reputation.  Plaintiff TANTAROS is informed and believes and based therein alleges that as result of the actions and omissions of Defendant TRN, that her nationally-recognized brand and professional reputation have been damaged, perhaps, even permanently.

27.     Plaintiff TANTAROS' chief employer, the Fox News Network, has repeatedly expressed its concern at the implosion of Defendant TRN, according to recent news reports.  Presumably, Fox News Network's concerns emanate from potential damage to Plaintiff TANTAROS' brand and the effect that it may have on its young, previously ascendant, star, Plaintiff TANTAROS, as well as, the potential negative impact on the Fox News Channel.

28.     On September 13, 2013, Plaintiffs ASTERO and TANTAROS, through their counsel, and pursuant to the provisions of Section 18.A of the Host Agreement, provided Defendant TRN with a formal, written Notice of Breach in accordance with notice provisions of section 29 of the Host Agreement.

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

29.     The September 13th Notice of Breach delineated the following breaches of the Host Agreement by Defendant TRN and demanded their timely cure:

    a.  Failing to maintain a sales force capable selling the Tantaros Show to advertisers and potential advertisers as required by section 4.J of the Host Agreement;

    b.  Failing to nationally syndicate the Tantaros Show as required by section 4.A of the Host Agreement;

    c.  Failing to facilitate relationships the Tantaros Show's  affiliates as required by section 4.B of the Host Agreement;

    d.  Failing to advertise and market the Tantaros Show as required by section 4.J of the Host Agreement;

    e.  Effectively precluding Plaintiff ASTERO's ability to achieve revenue participation above its annually guaranteed sum that it was entitled to under Section 5.C of the Host Agreement;

    f.  Failing to support the full responsibilities of the mobile App for the Tantaros Show and further failing to maintain the Tantaros Show's website, as required by Section 4.K of the Host Agreement;

    g.  Failing to maintain an affiliate division, as required by section 4.B of the Host Agreement, and

    h.  Failing to provide a "National Syndication Quality" production for the Tantaros Show as required by section 4.F of the Host Agreement.

A true and correct copy of the September 13th Notice of Breach is attached hereto as Exhibit "C" and incorporated herein by this reference as though fully set forth.

30.     More than twenty (20) business days have elapsed since the provision by Plaintiffs to Defendant TRN of the Notice of Breach on September 13, 2013, and Defendant TRN has failed and refused, and continues to fail and to refuse, cure the material breaches specified therein.  Defendant TRN further failed to meaningfully challenge the existence of any of the material breaches specified in the September 13th

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

Notice of Breach within twenty (20) business days as provided for in section 18.A of the Host Agreement.

31.   On September 24, 2013, as a supplement to the September 13th Notice of Breach, Plaintiffs ASTERO and TANTAROS, through their counsel, provided Defendant TRN with a further formal written Notice of Breach which recited the breaches contained in the September 13th Notice of Breach and additionally advised Defendant TRN that it was delinquent in paying Plaintiff TANTAROS' salary in violation of Sections 5.A and 5.F of the Host Agreement.

32.   The September 24th Notice of Breach demanded that Defendant TRN pay all outstanding amounts due to Plaintiff TANTAROS and further requested that Defendant TRN furnish the following previously requested documents/information:

    a.   List of station affiliates currently carrying the Tantaros Show and any other available syndication metrics;

    b.   List of markets for the Tantaros Show and any related clearance metrics;

    c.   List of current advertisers for the Tantaros Show;

    d.   Total Ad Sales for the Tantaros Show from 1/1/13 to present;

    e.   Total New Show Revenue from 1/1/13 to present;

    f.   Total Cash Compensation received by Defendant TRN concerning the Tantaros Show form 1/1/13 to the present;

    g.   Total Miscellaneous Revenues received by Defendant TRN concerning the Tantaros Show from 1/1/13 to the present;

    h.   Total User Fees received by Defendant TRN concerning the Tantaros Show from 1/1/13 to the present; and

    i.   Copies of all Revenue Reports required to be delivered to Lender on a monthly basis, per Section 6/D of the Host Agreement.

A true and correct copy of the September 24th Notice of Breach is attached hereto as Exhibit "D" and incorporated herein by this reference as though fully set forth.

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

33.    Nonetheless, Defendant TRN has failed and refused, and continues to fail and to refuse, to cure the material breaches specified in the September 24th Notice of Breach, and although on or about October 10, 2013, Defendant TRN paid some portion of Plaintiff TANTAROS' salary to her, it has failed and refused, and continues to fail and refuse to pay all of the compensation due and owing to Plaintiff TANTAROS' in violation of Sections 5.A and 5.F of the Host Agreement and further failed and refused, and continues to fail and refuse, to provide Plaintiffs with the requested documents/information discussed hereinabove and demanded in the September 24th Notice of Breach.

34.    On October 14, 2013, pursuant to the provisions of Section 18 of the Host Agreement, Plaintiff ASTERO issued a written notice of termination of the Host Agreement and delivered the same to Defendant TRN pursuant to the notice provisions of Section 29 of the Host Agreement (hereinafter referred to as the "Termination Notice").  A true and correct copy of the Termination Notice is attached hereto as Exhibit "E" and incorporated herein by this reference as though fully set forth.

35.    Plaintiffs are informed and believe and based thereon allege that Defendant TRN and various related entities (hereinafter referred to "the Talk Radio Network Companies") are owned and/or controlled by members of the Masters Family. In addition, Plaintiffs are informed and believe and based thereon allege that the Masters Family owns a "church" called the Foundation for Human Understanding and Growth (hereinafter referred to as the "Foundation").  Plaintiffs are further informed and believe and based therein allege that the masters Family uses the Foundation in order to sell their products, such as, books, meditation tapes and stress relief devices in multiple media venues, but of particular importance herein, on the Tantaros Show, as many of the commercials on the Tantaros Show are sponsored by the Foundation.

36.    Plaintiffs are informed and believe and based thereon allege that the Masters Family through their company, Defendant TRN, have been using the advertising space on the Tantaros Show to peddle their own products and have either

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

not been paying for that advertising or paying significantly less than the fair market value for that advertising space on the Tantaros Show, essentially negotiating with themselves for advertising space and self-dealing their own products for their exclusive gain rather than attempting to seek the highest  possible advertising revenues from third-parties which would increase Plaintiff ASTERO's participation revenue under the Host Agreement.  Plaintiffs are informed and believe and based thereon allege that they have been damaged by this intentional course of self-dealing by Defendant TRN and the Masters Family that controls Defendant TRN in the form of lost revenue participation that Plaintiff ASTERO would have received but for their actions.

37.    At no time prior to entering into the Host Agreement with Plaintiff ASTERO or the Guaranty with Plaintiff TANTAROS, or at any time thereafter, did Defendant TRN ever disclose to Plaintiffs that it intended to advertise the products of the Foundation or other companies controlled by the Masters Family on the Tantaros Show and that it either would not pay for that advertising time or would not pay the fair market value for it.

38.    Only after Plaintiffs' counsel sent the aforementioned breach letters to Defendant TRN, did Defendant MASTERS, the CEO of Defendant TRN, inform Plaintiff TANTAROS that Dial Global had not paid Defendant TRN any monies for advertising for the past thirteen (13) months.  This means that at the time the Defendant TRN solicited Plaintiff TANTAROS to host a show on Defendant TRN's network and at the time that it entered into Host Agreement and the Guaranty, Defendant TRN knew that the largest source of advertising revenue for the proposed show was not paying Defendant TRN, and that correspondingly, Plaintiff ASTERO's revenue participation would be negatively impacted.  None of this was ever disclosed to Plaintiffs at any time prior to September, 2013.

////

////

////

---

**14**

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

**FIRST CAUSE OF ACTION**

**(For Declaratory Relief against Defendant TRN, and Does 1 through 10, inclusive)**

39.     Plaintiffs repeat, re-plead and re-allege the allegations contained in Paragraphs 1 through 38, inclusive, above, and incorporate the same herein in full.

40.     An actual controversy has arisen and now exists regarding Plaintiffs and Defendant TRN, and Does 1 through 10, inclusive, and each of their, rights and obligations under Host Agreement and Guaranty.

41.     Plaintiffs contend that Defendant TRN committed multiple, material breaches of Host Agreement and that Defendant TRN, after receiving a formal, written Notice of Breach on September 13, 2013, failed to cure any of the material breaches specified in that notice within twenty (20) business days as provided for in the Host Agreement and that therefore, upon the issuance of the Notice of Termination dated October 9, 2013, the Host Agreement and the Guaranty were terminated and that Plaintiffs have no further obligations to Defendant TRN thereunder.

42.     Plaintiffs are informed and believe and based thereon allege that Defendant TRN, and Does 1 through 10, inclusive, and each of them, dispute the contention contained in the paragraph immediately above.

43.     A judicial declaration is necessary and appropriate, and Plaintiffs hereby seek the same at this time under the circumstances in order that Plaintiffs, on the one hand, and Defendant TRN, and Does 1 through 10, inclusive, and each of them, on the other hand, may ascertain their respective legal and equitable rights and obligations under the Host Agreement and the Guaranty.  Plaintiffs are currently suffering financial hardship in that they are suffering damage to Plaintiff TANTAROS' brand and her hard-earned professional reputation.  Plaintiffs are further suffering financial hardship in that they are potentially prevented from pursuing other professional opportunities. Plaintiffs will continue to suffer the aforementioned financial hardships until such time as the controversy has been adjudicated by this Court.

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

44.     Plaintiffs have been damaged to date, and will continue to be damaged, until relief is granted, in a sum according to proof at the time of trial.

## SECOND CAUSE OF ACTION

**(For Breach of Written Contract against Defendant TRN, and Does 1 through 10, inclusive)**

45.     Plaintiffs repeat, re-plead and re-allege the allegations contained in Paragraphs 1 through 44, inclusive, above and incorporate the same herein in full.

46.     As alleged hereinabove, Plaintiff ASTERO, on the one hand, and Defendant TRN, and Does 1 through 10, inclusive, and each of them, on the other hand, entered into the written Host Agreement.

47.     As further alleged hereinabove, the written Host Agreement provided that:

    a.   Plaintiff ASTERO, as lender, would provide Defendant TRN, as radio network, with the services of Plaintiff TANTAROS, as a host on the Tantaros Show;

    b.   Plaintiff ASTERO would receive a fixed annual salary plus a percentage of all annual net revenue related to the Tantaros Show and a percentage of annual user fees with certain guaranteed annual sums for both the net revenue and user fee participation;

    c.   In the event of a breach or breaches of the Host Agreement, either party thereto could give the other party a Notice of Breach and that if the breaching party failed to cure the breach of breaches within twenty (20) business days, the non-breaching party could issue a Termination Notice;

    d.   Defendant TRN would maintain a sales force capable selling the Tantaros Show to advertisers and potential advertisers as required by section 4.J of the Host Agreement;

    e.   Defendant TRN would nationally syndicate the Tantaros Show as required by section 4.A of the Host Agreement;

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

    f.  Defendant TRN would facilitate relationships the Tantaros Show's affiliates as required by section 4.B of the Host Agreement;

    g.  Defendant TRN would advertise and market the Tantaros Show as required by section 4.J of the Host Agreement;

    h.  Defendant TRN would support the full responsibilities of the mobile App for the Tantaros Show and further maintain the Tantaros Show's website, as required by Section 4.K of the Host Agreement;

    i.  Defendant TRN would maintain an affiliate division, as required by section 4.B of the Host Agreement, and

    j.  Defendant TRN would provide a "National Syndication Quality" production for the Tantaros Show as required by section 4.F of the Host Agreement.

48.    In breach of the written Host Agreement, Defendant TRN, and Does 1 through 10, inclusive, and each of them:

    a.  Failed to pay Plaintiff ASTERO its fixed annual salary plus a percentage of all annual net revenue related to the Tantaros Show and a percentage of annual user fees with certain guaranteed annual sums for both the net revenue and user fee participation;

    b.  Failed to cure the breaches outlined in the September 13th and September 24th Notices of Breach;

    c.  Failed to maintain a sales force capable of selling the Tantaros Show to advertisers and potential advertisers as required by section 4.J of the Host Agreement;

    d.  Failed to nationally syndicate the Tantaros Show as required by section 4.A of the Host Agreement;

    e.  Failed to facilitate relationships the Tantaros Show's affiliates as required by section 4.B of the Host Agreement;

---

**17**

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

f.   Failed to advertise and market the Tantaros Show as required by section 4.J of the Host Agreement;

g.   Precluded Plaintiff ASTERO's ability to achieve revenue participation above its annually guaranteed sum that it was entitled to under Section 5.C of the Host Agreement;

h.   Failed to support the full responsibilities of the mobile App for the Tantaros Show and further failing to maintain the Tantaros Show's website, as required by Section 4.K of the Host Agreement;

i.   Failed to maintain an affiliate division, as required by section 4.B of the Host Agreement, and

j.   Failed to provide a "National Syndication Quality" production for the Tantaros Show as required by section 4.F of the Host Agreement.

49.   Plaintiff ASTERO has performed all conditions precedent to the performance of Defendant TRN, and Does 1 through 10, inclusive, and each of them, under the written Host Agreement, or have otherwise been excused from any performance not yet completed.

50.   Plaintiff ASTERO has been damaged in a sum according to proof at time of trial, plus interest thereon at the maximum rate permitted by law.

**THIRD CAUSE OF ACTION**

**(For Breach of Implied Covenant of Good-Faith and Fair Dealing against Defendant TRN, and Does 1 through 10, inclusive)**

51.   Plaintiffs repeat, re-plead and re-allege the allegations contained in Paragraphs 1 through 50, inclusive, above and incorporate the same herein in full.

52.   As alleged hereinabove, Defendant TRN, and Does 1 through 10, inclusive, and each of them, entered into the written Host Agreement with Plaintiffs in which Defendant TRN, and Does 1 through 10, inclusive, and each of them, agreed to:

a.   Pay Plaintiff ASTERO a fixed annual salary plus a percentage of all annual net revenue related to the Tantaros Show and a percentage of

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

annual user fees with certain guaranteed annual sums for both the net revenue and user fee participation;

b. Maintain a sales force capable selling the Tantaros Show to advertisers and potential advertisers as required by section 4.J of the Host Agreement;

c. Nationally syndicate the Tantaros Show as required by section 4.A of the Host Agreement;

d. Facilitate relationships the Tantaros Show's affiliates as required by section 4.B of the Host Agreement;

e. Advertise and market the Tantaros Show as required by section 4.J of the Host Agreement;

f. Support the full responsibilities of the mobile App for the Tantaros Show and further maintain the Tantaros Show's website, as required by Section 4.K of the Host Agreement;

g. Maintain an affiliate division, as required by section 4.B of the Host Agreement, and

h. Provide a "National Syndication Quality" production for the Tantaros Show as required by section 4.F of the Host Agreement.

53.     The written Host Agreement entered into between Plaintiffs, on the one hand, and Defendant TRN, and Does 1 through 10, inclusive, and each of them, on the other hand, is subject to the covenant of good-faith and fair dealing as implied by law, which prohibits Defendant TRN, and Does 1 through 10, inclusive, and each of them, from engaging in conduct that would injure Plaintiffs or prevent them from receiving the benefits of the written Host Agreement and from engaging in arbitrary and/or unfair acts that would disadvantage and/or unfairly take advantage of its customers.

54.     Since in or about December 2012, Defendant TRN, and Does 1 through 10, inclusive, and each of them, have breached the implied covenant of good-faith and fair dealing contained in the written Host Agreement by:

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

a. Failing to maintain a sales force capable selling the Tantaros Show to advertisers and potential advertisers as required by section 4.J of the Host Agreement;

b. Failing to nationally syndicate the Tantaros Show as required by section 4.A of the Host Agreement;

c. Failing to facilitate relationships the Tantaros Show's affiliates as required by section 4.B of the Host Agreement;

d. Failing to advertise and market the Tantaros Show as required by section 4.J of the Host Agreement;

e. Effectively precluding Plaintiff ASTERO's ability to achieve revenue participation above its annually guaranteed sum that it was entitled to under Section 5.C of the Host Agreement;

f. Failing to support the full responsibilities of the mobile App for the Tantaros Show and further failing to maintain the Tantaros Show's website, as required by Section 4.K of the Host Agreement;

g. Failing to maintain an affiliate division, as required by section 4.B of the Host Agreement;

h. Failing to provide a "National Syndication Quality" production for the Tantaros Show as required by section 4.F of the Host Agreement, and

i. Failing to provide Plaintiffs with the documents/information requested in the September 24th Notice of Breach as alleged hereinabove;

j. Failing to pay Plaintiffs' fixed annual salary plus a percentage of all annual net revenue related to the Tantaros Show and a percentage of annual user fees with certain guaranteed annual sums for both the net revenue and user fee participation;

k. Engaging in self dealing and advertising the products of the Foundation or other companies controlled by the Masters Family on the Tantaros

---

**20**

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

show and that it would not pay for that advertising time or not pay the fair market value for it, and

l. Failing to disclose to Plaintiffs that months before the execution of the Host Agreement, Defendant TRN, and related entities, had filed a lawsuit against one of its largest advertising sales syndicators and sources of revenue related to the shows on its radio network, Dial Global, Inc., and various related entities, who purportedly controlled "(95%) of the advertising revenues for syndicated radio talk shows," such as the show it was touting to Plaintiff TANTAROS, as being the vehicle which would elevate her career.

In doing this, Defendant TRN, and Does 1 through 10, inclusive, and each of them, engaged in arbitrary and unfair acts and practices that disadvantage and unfairly took advantage of Plaintiffs.

55. As a proximate result of the wrongful conduct of Defendant TRN, and Does 1 through 10, inclusive, and each of them, Plaintiffs have been injured and suffered monetary damages as a result of Defendant TRN, and Does 1 through 10, inclusive, and each of their wrongful conduct in a sum according to proof at time of trial.

56. The aforementioned conduct of Defendant TRN, and Does 1 through 10, inclusive, and each of them, was done with the specific intention on the part of Defendant TRN, and Does 1 through 10, inclusive, and each of them, of thereby depriving Plaintiffs of receiving the benefit of their legal and equitable rights, and otherwise causing them injury, and was despicable conduct that subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, so as to justify an award of exemplary and punitive damages.

////

////

////

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

**FOURTH CAUSE OF ACTION**

**(For Fraud in the Inducement against Defendant TRN, and Does 1 through 10, inclusive)**

57.    Plaintiffs repeat, re-plead and re-allege the allegations contained in Paragraphs 1 through 56, inclusive, above and incorporate the same herein in full.

58.    As detailed herein, Plaintiffs allege that in or about the fall of 2012, Defendant TRN, and Does 1 through 10, inclusive, and each of them, through its agent Mr. Masters, made false promises in writing and orally, in person and via telephone, that harmed Plaintiffs with false information during the course of wooing Plaintiffs to host a morning radio show on its radio network in order to induce Plaintiffs to enter into the Guaranty and Host Agreement whereby Plaintiff ASTERO, as lender, would provide Defendant TRN, as radio network, with the services of Plaintiff TANTAROS, as a host on the Tantaros Show.  These promises and representations include, but are not limited to, promises:

      a.   That the previous host of the prime morning timeslot, Laura Ingraham, was a nightmare, difficult to deal with, and an impossible and unfair negotiator and that is why Defendant TRN was planning to part ways with Ms. Ingraham and her coveted time slot would be available;

      b.   That Plaintiff TANTAROS, due to her status as a member of The Five and her ascending national renown, would be a perfect replacement for Ms. Ingraham and Defendant TRN would guarantee, vis-à-vis allocation of marketing dollars, to catapult her to the very top of the radio world, and correspondingly, she would receive substantial revenue sharing;

      c.   That Defendant TRN was very well capitalized and possessed the capacity to spend "millions" of dollars to market Plaintiff TANTAROS' show and in the process make Plaintiff TANTAROS a radio star and reward her financially through revenue sharing;

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

d.  That Defendant TRN had a "robust" sales force in place "to maximize advertising revenue" for the proposed show which would ensure that Plaintiff TANTAROS received the maximum revenue participation possible under the deal that Defendant TRN was proposing to offer Plaintiffs;

e.  That Defendant TRN had syndication deals in place with approximately 300 local stations who would carry Plaintiff TANTAROS' proposed show throughout the country;

f.  That Defendant TRN had solid existing relationships with its affiliates, and

g.  That Defendant TRN had solid existing relationship with its advertising sales syndicators and advertising sales representative firms.

59.    These promises and representations were material to the transaction and Plaintiffs would not have agreed to enter into the Guaranty and into the Host Agreement, whereby Plaintiff ASTERO, as lender, would provide Defendant TRN, as radio network, with the services of Plaintiff TANTAROS, as a host on the Tantaros Show, if these promises had not been made.  Thus, Plaintiffs were induced to enter into the Guaranty and into the Host Agreement, whereby Plaintiff ASTERO, as lender, would provide Defendant TRN, as radio network, with the services of Plaintiff TANTAROS, as a host on the Tantaros Show by these promises and representations.

60.    Defendant TRN, and Does 1 through 10, inclusive, and each of them, did not intend to perform these promises when they made them.  Defendant TRN, and Does 1 through 10, inclusive, and each of them, knew that these representations were false when they made them.

61.    Defendant TRN, and Does 1 through 10, inclusive, and each of them, intended that Plaintiffs rely on its promises and representations, and Plaintiffs did in fact reasonably rely and justifiably rely on these promises and representations.

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

62.    Plaintiffs' reliance on the representations of Defendant TRN, and Does 1 through 10, inclusive, and each of them, was justified because Defendant TRN, and Does 1 through 10, inclusive, and each of them, had the longest running and most widely known talk radio shows in the country, if not the world, and Plaintiffs did not have any reason or cause to suspect that the representations of Defendant TRN, and Does 1 through 10, inclusive, and each of them, were not true.

63.    Plaintiffs' reliance on Defendant TRN, and Does 1 through 10, inclusive, and each of their promises and representations was a substantial factor in the harm caused to Plaintiffs.

64.    Defendant TRN, and Does 1 through 10, inclusive, and each of them, failed to perform its promises by engaging in acts including, but not limited to:

    a.  Failing to maintain a sales force capable selling the Tantaros Show to advertisers and potential advertisers as required by section 4.J of the Host Agreement;

    b.  Failing to nationally syndicate the Tantaros Show as required by section 4.A of the Host Agreement;

    c.  Failing to facilitate relationships the Tantaros Show's affiliates as required by section 4.B of the Host Agreement;

    d.  Failing to advertise and market the Tantaros Show as required by section 4.J of the Host Agreement;

    e.  Effectively precluding Plaintiff ASTERO's ability to achieve revenue participation above its annually guaranteed sum that it was entitled to under Section 5.C of the Host Agreement;

    f.  Failing to support the full responsibilities of the mobile App for the Tantaros Show and further failing to maintain the Tantaros Show's website, as required by Section 4.K of the Host Agreement;

    g.  Failing to maintain an affiliate division, as required by section 4.B of the Host Agreement;

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

h.  Failing to provide a "National Syndication Quality" production for the Tantaros Show as required by section 4.F of the Host Agreement, and

i.  Failing to provide Plaintiffs with the documents/information requested in the September 24th Notice of Breach as alleged hereinabove;

j.  Failing to pay Plaintiffs' fixed annual salary plus a percentage of all annual net revenue related to the Tantaros Show and a percentage of annual user fees with certain guaranteed annual sums for both the net revenue and user fee participation, and

k.  Failing to disclose to Plaintiffs during the negotiation stage that months before the execution of the Host Agreement, Defendant TRN, and related entities, had filed a lawsuit against one of its largest advertising sales syndicators and sources of revenue related to the shows on its radio network, Dial Global, Inc., and various related entities, who purportedly controlled "(95%) of the advertising revenues for syndicated radio talk shows," such as the show it was touting to Plaintiff TANTAROS, as being the vehicle which would elevate her career.

65.   Plaintiffs have been injured and suffered monetary damages as a result of Defendant TRN, and Does 1 through 10, inclusive, and each of their misrepresentations and failure to perform their promises in a sum according to proof at time of trial.

66.   The aforementioned conduct of Defendant TRN, and Does 1 through 10, inclusive, and each of them, was done with the specific intention on the part of Defendant TRN, and Does 1 through 10, inclusive, and each of them, of thereby depriving Plaintiffs of receiving the benefit of their legal and equitable rights, and otherwise causing them injury, and was despicable conduct that subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, so as to justify an award of exemplary and punitive damages.

////

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

1

2

3

# FIFTH CAUSE OF ACTION

## (For Fraud (Intentional Misrepresentation) against Defendant TRN, and Does 1 through 10, inclusive)

4

5

67.     Plaintiffs repeat, re-plead and re-allege the allegations contained in Paragraphs 1 through 66, inclusive, above and incorporate the same herein in full.

6

7

8

68.     Defendant TRN, and Does 1 through 10, inclusive, and each of them, made material misrepresentations to Plaintiffs, in writing and orally, in person and via telephone, including, but not limited to:

9

10

11

12

    a.  That the previous host of the prime morning timeslot, Laura Ingraham, was a nightmare, difficult to deal with, and an impossible and unfair negotiator and that is why Defendant TRN was planning to part ways with Ms. Ingraham and her coveted time slot would be available;

13

14

15

16

17

18

    b.  That Plaintiff TANTAROS, due to her status as a member of The Five and her ascending national renown, would be a perfect replacement for Ms. Ingraham and Defendant TRN would guarantee, vis-à-vis allocation of marketing dollars, to catapult her to the very top of the radio world, and correspondingly, she would receive substantial revenue sharing;

19

20

21

22

    c.  That Defendant TRN was very well capitalized and possessed the capacity to spend "millions" of dollars to market Plaintiff TANTAROS' show and in the process make Plaintiff TANTAROS a radio star and reward her financially through revenue sharing;

23

24

25

26

27

    d.  That Defendant TRN had a "robust" sales force in place "to maximize advertising revenue" for the proposed show which would ensure that Plaintiff TANTAROS received the maximum revenue participation possible under the deal that Defendant TRN was proposing to offer Plaintiffs;

28

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

e.   That Defendant TRN had syndication deals in place with approximately 300 local stations who would carry Plaintiff TANTAROS' proposed show throughout the country;

f.   That Defendant TRN had solid existing relationships with its affiliates, and

g.   That Defendant TRN had solid existing relationship with its advertising sales syndicators and advertising sales representative firms.

69.   The representations made by Defendant TRN, and Does 1 through 10, inclusive, and each of them, were in fact false and/or misleading.  The true facts were that:

a.   Defendant TRN was not very well capitalized and did not possess the capacity to spend "millions" of dollars to market Plaintiff TANTAROS' show and in the process make Plaintiff TANTAROS a radio star and reward her financially through revenue sharing;

b.   Defendant TRN did not have a "robust" sales force in place "to maximize advertising revenue" for the proposed show which would ensure that Plaintiff TANTAROS received the maximum revenue participation possible under the deal that Defendant TRN was proposing to offer Plaintiffs;

c.   Defendant TRN did not have syndication deals in place with approximately 300 local stations who would carry Plaintiff TANTAROS' proposed show throughout the country;

d.   Defendant TRN did not have solid existing relationships with its affiliates;

e.   Defendant TRN did not have solid existing relationship with its advertising sales syndicators and advertising sales representative firms;

f.   Defendant TRN had filed a lawsuit against Dial Global, the largest source of advertising revenue for the proposed show;

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

g. Dial Global, the largest source of advertising revenue for the proposed show, had not paid Defendant TRN any monies for advertising for several months prior to Plaintiffs agreeing to host the Tantaros Show and enter into the Host Agreement and Guaranty, and

h. Defendant TRN engaged in self dealing and intended to advertise the products of the Foundation or other companies controlled by the Masters Family on the Tantaros show and that it would not pay for that advertising time or not pay the fair market value for it.

70.     Defendant TRN, and Does 1 through 10, inclusive, and each of them, made these representations knowing them to be false and further made these misrepresentations with the intent to deceive and defraud Plaintiffs and to induce them to act in reliance on these misrepresentations in the manner hereafter alleged, or with the expectation that they would so act.

71.     Plaintiffs at the time these misrepresentations were made by Defendant TRN, and Does 1 through 10, inclusive, and each of them, and at the time that Plaintiffs took the actions, or did not take action, all as herein alleged, were ignorant of the falsity of these representations and believed them to be true.

72.     In reliance on these misrepresentations, Plaintiffs were induced to, and did rely upon the representations of Defendant TRN, and Does 1 through 10, inclusive, and each of them, to enter into the Guaranty and Host Agreement whereby Plaintiff ASTERO, as lender, would provide Defendant TRN, as radio network, with the services of Plaintiff TANTAROS, as a host on the Tantaros Show.

73.     Plaintiffs' reliance on the misrepresentations of Defendant TRN, and Does 1 through 10, inclusive, and each of them, was justified, because Defendant TRN, and Does 1 through 10, inclusive, and each of them, had the longest running and most widely known talk radio shows in the country, if not the world, and Plaintiffs did not have any reason or cause to suspect that the representations were not true.

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

74.     As a proximate result of the fraudulent conduct of Defendant TRN, and Does 1 through 10, inclusive, and each of them, Plaintiffs have been injured and suffered monetary damages as a result of Defendant TRN, and Does 1 through 10, inclusive, and each of their wrongful conduct in a sum according to proof at time of trial.

75.     The aforementioned conduct of Defendant TRN, and Does 1 through 10, inclusive, and each of them, was done with the specific intention on the part of Defendant TRN, and Does 1 through 10, inclusive, and each of them, of thereby depriving Plaintiffs of receiving the benefit of their legal and equitable rights, and otherwise causing them injury, and was despicable conduct that subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, so as to justify an award of exemplary and punitive damages.

## SIXTH CAUSE OF ACTION

### (For Fraud (Negligent Misrepresentation) against Defendant TRN, and Does 1 through 10, inclusive)

76.     Plaintiffs repeat, re-plead and re-allege the allegations contained in Paragraphs 1 through 75, inclusive, above and incorporate the same herein in full.

77.     When Defendant TRN, and Does 1 through 10, inclusive, and each of them, made the material misrepresentations described herein to Plaintiffs, it had no reasonable ground for believing them to be true in that Defendant TRN, and Does 1 through 10, inclusive, and each of them, should have known or knew that:

        a. Defendant TRN was not very well capitalized and did not possess the capacity to spend "millions" of dollars to market Plaintiff TANTAROS' show and in the process make Plaintiff TANTAROS a radio star and reward her financially through revenue sharing;

        b. Defendant TRN did not have a "robust" sales force in place "to maximize advertising revenue" for the proposed show which would ensure that Plaintiff TANTAROS received the maximum revenue

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

participation possible under the deal that Defendant TRN was proposing to offer Plaintiffs;

c.  Defendant TRN did not have syndication deals in place with approximately 300 local stations who would carry Plaintiff TANTAROS' proposed show throughout the country;

d.  Defendant TRN did not have solid existing relationships with its affiliates;

e.  Defendant TRN did not have solid existing relationship with its advertising sales syndicators and advertising sales representative firms;

f.  Defendant TRN had filed a lawsuit against Dial Global, the largest source of advertising revenue for the proposed show;

g.  Dial Global, the largest source of advertising revenue for the proposed show, had not paid Defendant TRN any monies for advertising for several months prior to Plaintiffs agreeing to host the Tantaros Show and enter into the Host Agreement and Guaranty, and

h.  Defendant TRN engaged in self dealing and intended to advertise the products of the Foundation or other companies controlled by the Masters Family on the Tantaros show and that it would not pay for that advertising time or not pay the fair market value for it.

78.    Defendant TRN, and Does 1 through 10, inclusive, and each of them, made the above-stated misrepresentations with the intention that Plaintiffs would rely upon them, and expecting that Plaintiffs would do so, in order to induce Plaintiff ASTERO to enter into the Guaranty and Host Agreement whereby Plaintiff ASTERO, as lender, would provide Defendant TRN, as radio network, with the services of Plaintiff TANTAROS, as a host on the Tantaros Show.

79.    At the time Defendant TRN, and Does 1 through 10, inclusive, and each of them, made the above-referenced misrepresentations and warranties to Plaintiffs, which misrepresentations and warranties were a substantial factor in Plaintiffs decision to host

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

the Tantaros Show and enter into the Host Agreement and Guaranty, Plaintiffs believed the representations of Defendant TRN, and Does 1 through 10, inclusive, and each of them, to be true and correct, and reasonably relied on them when they agreed to enter into the Host Agreement, whereby Plaintiff ASTERO, as lender, would provide Defendant TRN, as radio network, with the services of Plaintiff TANTAROS, as a host on the Tantaros Show.

80.     Had Plaintiffs known all the facts, they would not have agreed to enter into the Host Agreement, whereby Plaintiff ASTERO, as lender, would provide Defendant TRN, as radio network, with the services of Plaintiff TANTAROS, as a host on the Tantaros Show.

81.     As a direct and proximate result of Defendant TRN, and Does 1 through 10, inclusive, and each of their unreasonable actions, and Plaintiffs' good-faith and justifiable reliance thereon, Plaintiff has incurred special and general damages in an amount to be proven at the time of trial.

### SEVENTH CAUSE OF ACTION

### (For Intentional Interference with Prospective Economic Advantage against Defendant TRN, and Does 1 through 10, inclusive)

82.     Plaintiffs repeat, re-plead and re-allege the allegations contained in Paragraphs 1 through 81, inclusive, above and incorporate the same herein in full.

83.     Plaintiff TANTAROS is a nationally recognized celebrity, political contributor who currently has a valid and existing business relationship with Fox News Networks as a co-host of a television program entitled "The Five" on the Fox News Channel and as described hereinabove.  In addition, Plaintiff TANTAROS has valid and existing business relationships and/or prospective relationships from which she stood to derive economic benefits therefrom, including, as a book author, newspaper columnist, radio personality and public speaker.  As further described hereinabove Plaintiff TANTAROS has carefully cultivated her celebrity status, her brand and professional reputation in order to maximize the potential to monetize her brand and elevate her

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

celebrity status.  Essentially, the status of Plaintiff TANTAROS' brand, professional reputation and public image is directly correlated with her ability to pursue other professional opportunities and to gain the maximum monetization those opportunities.

84.    Defendant TRN, and Does 1 through 10, inclusive, and each of them, knew of the relationships between Plaintiffs and Fox News Networks, the relationships and/or prospective relationships from which she stood to derive economic benefits therefrom, including, as a book author, newspaper columnist, radio personality and public speaker, and further knew of Plaintiff TANTAROS' carefully cultivated celebrity status, professional reputation, brand and public image, which was likely the primary reason that Defendant TRN, and Does 1 through 10, inclusive, solicited Plaintiff TANTAROS to host the Tantaros Show and enter into the Host Agreement and Guaranty.

85.    As further alleged hereinabove, Defendant TRN, and Does 1 through 10, inclusive, and each of them, intentionally disrupted the business relationships between Plaintiffs and the Fox News Network and other entities and damaged Plaintiff TANTAROS ascendant star status, public image and brand by putting Plaintiff TANTAROS in a rapidly deteriorating situation wherein she no longer had a competent executive producer, a full-time call screener, a paid assistant, or a sound effects manager, and further, had either no guests or only decidedly "C-list" guests, was provided with no research for the third-rate guests that were booked for the Tantaros Show, a lack of sufficient research for the topics at hand, provided with no editorial guidance, and she was expected by Defendant TRN to basically produce her own show.

86.    As a direct result of the intentional acts of Defendant TRN, and Does 1 through 10, inclusive, and each of them, in failing and refusing to honor the terms of the Host Agreement and Guaranty, the above-described business relationships were disrupted in that Fox News Network and other entities with which she has relationships or prospective relationships, have expressed concern regarding Plaintiffs' involvement with Defendant TRN, and Does 1 through 10, inclusive, and Plaintiff TANTAROS' ascendant star status, public image, professional reputation and brand have been

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

damaged and reduced her ability to maximize the monetization of the same or pursue other professional opportunities, and as such have suffered, and continue to suffer, damages in a sum according to proof at the time of trial.

87.     Defendant TRN, and Does 1 through 10, inclusive, and each of their interference with the business relationships between Plaintiffs and Fox News Network, other entities and business opportunities as well as other actions which damaged Plaintiff TANTAROS ascendant star status, public image, professional reputation and brand has resulted in damages to Plaintiffs in a sum according to proof at the time of trial.

88.     The aforementioned conduct of Defendant TRN, and Does 1 through 10, inclusive, and each of them, was done with the specific intention on the part of Defendant TRN, and Does 1 through 10, inclusive, and each of them, of thereby depriving Plaintiffs of receiving the benefit of their legal rights, and otherwise causing them injury, and was despicable conduct that subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, so as to justify an award of exemplary and punitive damages.

## EIGHTH CAUSE OF ACTION

### (For Negligent Interference with Prospective Economic Advantage against Defendant TRN, and Does 1 through 10, inclusive)

89.     Plaintiffs repeat, re-plead and re-allege the allegations contained in Paragraphs 1 through 88, inclusive, above and incorporate the same herein in full.

90.     Plaintiff TANTAROS is a nationally recognized celebrity, political contributor who currently has a valid and existing business relationship with Fox News Networks as a co-host of a television program entitled "The Five" on the Fox News Channel and as described hereinabove.  In addition, Plaintiff TANTAROS has valid and existing business relationships and/or prospective relationships from which she stood to derive economic benefits therefrom, including, as a book author, newspaper columnist, radio personality and public speaker.  As further described hereinabove Plaintiff

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

TANTAROS has carefully cultivated her celebrity status, her brand and professional reputation in order to maximize the potential to monetize her brand and elevate her celebrity status.  Essentially, the status of Plaintiff TANTAROS' brand, professional reputation and public image is directly correlated with her ability to pursue other professional opportunities and to gain the maximum monetization of those opportunities.

91.     Defendant TRN, and Does 1 through 10, inclusive, and each of them, were informed and/or knew or should have known of the relationships between Plaintiffs and Fox News Networks, the relationships and/or prospective relationships from which she stood to derive economic benefits therefrom, including, as a book author, newspaper columnist, radio personality and public speaker,  and further were informed and/or knew or should have known of Plaintiff TANTAROS' carefully cultivated celebrity status, professional reputation, brand and public image, which was likely the primary reason that Defendant TRN, and Does 1 through 10, inclusive, solicited Plaintiff TANTAROS to host the Tantaros Show and enter into the Host Agreement and Guaranty.

92.     Defendant TRN, and Does 1 through 10, inclusive, and each of them, negligently disrupted the business relationships between Plaintiffs and the Fox News Network and other entities and damaged Plaintiff TANTAROS ascendant star status, public image and brand by putting Plaintiff TANTAROS in a rapidly deteriorating situation wherein she no longer had a competent executive producer, a full-time call screener, a paid assistant, or a sound effects manager, and further, had either no guests or only decidedly "C-list" guests, was provided with no research for the third-rate guests that were booked for the Tantaros Show, a lack of sufficient research for the topics at hand, provided with no editorial guidance, and she was expected by Defendant TRN to basically produce her own show.

93.     As a direct result of the negligent acts of Defendant TRN, and Does 1 through 10, inclusive, and each of them, in failing and refusing to honor the terms of the

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

1  Host Agreement and Guaranty, the above-described business relationships were

2  disrupted in that Fox News Network and other entities have expressed concern

3  regarding Plaintiffs' involvement with Defendant TRN, and Does 1 through 10,

4  inclusive, and Plaintiff TANTAROS' ascendant star status, public image, professional

5  reputation and brand have been damaged and reduced her ability to maximize the

6  monetization of the same or pursue other professional opportunities, and as such have

7  suffered, and continue to suffer, damages in a sum according to proof at the time of

8  trial.

9  94.    Defendant TRN, and Does 1 through 10, inclusive, and each of their

10  interference with the business relationships between Plaintiffs and the Fox News

11  Network, other entities and business opportunities has resulted in damages to Plaintiffs

12  in a sum according to proof at the time of trial.

13  ### NINTH CAUSE OF ACTION

14  **(For An Accounting against Defendant TRN, and Does 1 through 10, inclusive)**

15  95.    Plaintiffs repeat, re-plead and re-allege the allegations contained in

16  Paragraphs 1 through 94, inclusive, above and incorporate the same herein in full.

17  96.    On multiple occasions within the last four (4) years, Plaintiffs have made

18  lawful demands to Defendant TRN, and Does 1 through 10, inclusive, and each of them,

19  from at least September 24, 2013, to the present, for an accounting of the sums due and

20  owing to Plaintiffs pursuant to the Host Agreement, including, but not limited to, its

21  fixed annual salary, its percentage of all annual net revenue related to the Tantaros

22  Show and its percentage of annual user fees.

23  97.    Defendant TRN, and Does 1 through 10, inclusive, and each of them,

24  failed and refused, and continue to fail and refuse to provide Plaintiffs with an

25  accounting of the sums due and owing to Plaintiffs pursuant to the Host Agreement,

26  including, but not limited to, its fixed annual salary, its percentage of all annual net

27  revenue related to the Tantaros Show and its percentage of annual user fees.

28

---

**35**

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

98.     Plaintiffs do not know the true sums of the sums due and owing to Plaintiffs for its fixed annual salary, its percentage of all annual net revenue related to the Tantaros Show and its percentage of annual user fees pursuant to the Host Agreement and an accounting is necessary to determine these sums given that only Defendant TRN, and Does 1 through 10, inclusive, and each of them, have access to the records documenting the sums of the annual net revenue related to the Tantaros show and user participation fees and, Plaintiffs, without the requested accounting, cannot independently determine the sums due and owing to Plaintiffs pursuant to the Host Agreement, including, but not limited to, its fixed annual salary, its percentage of all annual net revenue related to the Tantaros Show and its percentage of annual user fees.

## TENTH CAUSE OF ACTION

### (For Retaliation in Violation of New Jersey Law Against Discrimination (N.J. Stat. Ann. §10-5-1 et seq.) against Defendant TRN)

99.     Plaintiffs repeat, re-plead and re-allege the allegations contained in Paragraphs 1 through 98, inclusive, above and incorporate the same herein in full.

100.    Despite any provisions of the Host Agreement and the Guaranty to the contrary, Plaintiff TANTAROS is, at a bare minimum, an employee-in-fact of Defendant TRN.

101.    On or about September 18, 2013, Plaintiff TANTAROS presented Defendant TRN with a Doctor's note excusing her for a couple of days from her work for Defendant TRN for medical reasons--relating to stress she was experiencing due to the recent loss of her younger brother--that are protected under federal and state discrimination laws.

102.    Defendant TRN was at all times, and is, well aware that Plaintiff TANTAROS recently lost her special needs younger brother, who died tragically and unexpectedly at 31 years of age.  Further, Plaintiff TANTAROS had not taken off more than a week of work since working for Defendant TRN other than for reasons specified in the Host Agreement related to priority work for Fox News Channel.

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

103.    Regardless of the Federal and State Discrimination laws, Plaintiff TANTAROS was contractually permitted sick and/or personal days and she had not exceeded the number of days permitted by Host Agreement.

104.    With no medical basis, on September 24, 2013, Defendant TRN stated in a writing questioning the basis of her medically excused absence from work for them, "despite the quality of [Andrea Tantaros] Show and her performance that morning [the date she tendered her doctor's note], and her continued, and quality, performance on The Five during the period she was reported to be medically unable to perform her hosting duties for us" and further questioned the veracity of the doctor's note from a prestigious licensed health care provider.

105.    In retaliation for Plaintiff TANTAROS' medical issues that required a couple days off work for Defendant TRN, Defendant TRN withheld payment of Plaintiff's salary and payment to her assistant.

106.    Prior to the withholding of funds in retaliation for her seeking medical care, Defendant TRN assured Plaintiff TANTAROS the prior missed payments were not because of an inability to pay but rather a mistake.

107.    Additionally, Defendant TRN assured Plaintiff TANTAROS that the downsizing was what all companies do on occasion and there was an ability to pay. The import of Defendant TRN's statements to Plaintiff TANTAROS is that the withholding of funds after being presented with a medical note for a couple days off of work violates the provisions of the New Jersey Law Against Discrimination ("NJLAD") pursuant to N.J. Stat. Ann. §10:5-1 *et seq.*

108.    As a direct and proximate result of Defendants, and Does through 10, inclusive, and each of their, unlawful retaliation against Plaintiff TANTAROS, she has suffered, and will continue to suffer, the loss of compensation, the loss of significant wages and benefits, as well as substantial emotional distress damages.

109.    The aforementioned conduct of Defendant TRN, and Does 1 through 10, inclusive, and each of them, was done with the specific intention on the part of

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

Defendant TRN, and Does 1 through 10, inclusive, and each of them, of thereby depriving Plaintiff TANTAROS of receiving the benefit of her legal and equitable rights, and otherwise causing her injury, and was despicable conduct that subjected Plaintiff TANTAROS to cruel and unjust hardship in conscious disregard of her rights, so as to justify an award of exemplary and punitive damages.

## ELEVENTH CAUSE OF ACTION

### (For Private Defamation against Defendant TRN, and Defendant Mark Masters)

110.   Plaintiffs repeat, re-plead and re-allege the allegations contained in Paragraphs 1 through 109, inclusive, above and incorporate the same herein in full.

111.   Defendant TRN, through its CEO and authorized agent, Defendant MASTERS, defamed Plaintiff TANTAROS by speaking and/or writing words to the effect that Plaintiff TANTAROS and third parties are in a conspiracy, in violation of RICO laws, to move to a new radio network and/or to receive better terms for her radio show, which false statements were delivered to, and re-published and broadcasted by third-parties in private and to the general public.  Defendants knew said information to be false, but circulated it, willfully, and in reckless disregard for the negative impact on Plaintiff TANTAROS' reputation and brand, and/or did so with the motive to dissuade any potential new partner, radio network and/or investors to invest in her radio career, as well as with the motive to tarnish her future negotiations with television networks.

112.   Defendant TRN authorized, directed and approved of the actions of Defendant MASTERS, as its agent and CEO and/or ratified this defamatory conduct.

113.   Defendant TRN, through its CEO and authorized agent Defendant MASTERS, communicated the maliciously false and defamatory statements of fact described above to persons other than Plaintiff TANTAROS, with the actual knowledge that these statements were indeed false, thereby causing serious damages to Plaintiff TANTAROS's reputation.

## TWELFTH CAUSE OF ACTION

### (For Libel against Defendant TRN, and Defendant Mark Masters)

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

114.   Plaintiffs repeat, re-plead and re-allege the allegations contained in Paragraphs 1 through 113, inclusive, above and incorporate the same herein in full.

115.   On or about September 24, 2013, Defendant TRN and Defendant MASTERS contributed false and misleading information to the media thereby causing that false and misleading information to be published by the media through libelous statements about Plaintiff TANTAROS.

116.   The allegations against Plaintiff TANTAROS contained in the statements to the media are false as they pertain to Plaintiff TANTAROS.

117.   The false and misleading statements made by Defendant TRN through its CEO and agent, Defendant MARK MASTERS, are libelous on their face.

118.   The false and misleading statements exposed, and continue to expose, Plaintiff TANTAROS to hatred, contempt, ridicule, and obloquy because it falsely alleges facts asserting that Plaintiff TANTAROS is engaged in the conspiracy described hereinabove.

119.   The false and misleading statements to the media were seen and read by, among others, Plaintiff TANTORS's friends, family, and prospective employers.

120.   As a proximate result of the above-described publication, Plaintiff TANTAROS has suffered harm to her reputation, and shame and mortification, contributing to her general damages in an amount to be determined at trial.

121.   The above-described publication of false and misleading statements was caused to be published by Defendants TRN and MASTERS with malice in that Defendants provided false and misleading information to the media entitling Plaintiff TANTAROS to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendant TRN, Defendant MASTERS, and Does 1 through 10, inclusive, and each of them, as follows:

## As to All Causes of Action

1.   For appropriate injunctive relief.

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

### As to the First Cause of Action

1.    For a judgment declaring the respective rights, duties and responsibilities of the parties as described hereinabove;

2.    For costs of suit incurred herein, and

3.    For such other and further relief as the Court deems just and proper.

### As to the Second, Sixth and Eighth Causes of Action

1.    For general, compensatory and consequential damages according to proof;

2.    For costs of suit incurred herein;

3.    For pre and post-judgment interest according to proof, and

4.    For such other and further relief as the Court deems just and proper.

### As to the Third, Fourth, Fifth and Seventh Causes of Action

1.    For general, compensatory and consequential damages according to proof;

2.    For costs of suit incurred herein;

3.    For pre and post-judgment interest according to proof;

4.    For exemplary and punitive damages, and

5.    For such other and further relief as the Court deems just and proper.

### As to the Ninth Cause of Action

1.    For an accounting;

2.    For costs of suit incurred herein, and

3.    For such other and further relief as the Court deems just and proper.

### As to the Tenth Cause of Action

1.    For an order that Defendants and Does 1 through 10, inclusive, and each of them, make Plaintiff TANTAROS whole for all of the losses she has suffered, and will suffer in terms of lost compensation, lost wages, benefits, insurance and pension coverage, and any fringe benefits of her employment;

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

2.    For an award of compensatory damages for the injuries, including, but not limited to, emotional distress, suffered as result of the Defendants and each of their retaliation against Plaintiff;

3.    For exemplary and punitive damages;

4.    For reasonable attorneys' fees and costs incurred in the litigation of this matter, including an enhancement of those fees as permitted by law, and further including all time incurred in an effort to resolve this matter pre-litigation, and

5.    For such other and further relief as the Court deems just and proper.

### As to the Eleventh Cause of Action

1.    For compensatory, exemplary and punitive damages for slander per se;

2.    For compensatory, exemplary and punitive damages for economic losses suffered by Plaintiff TANTAROS as the proximate result of the injury to Plaintiff TANTAROS's reputation, and

3.    For compensatory, exemplary and punitive damages for emotional suffering due to the injury to Plaintiff TANTAROS's reputation.

4.    For attorneys' fees and the costs of suit incurred herein, and

5.    For such other and further relief as the Court deems just and proper.

### As to the Twelfth Cause of Action

1.    For special damages;

2.    For loss of earning and future earnings;

3.    For exemplary and punitive damages, and

4.    For such other and further relief as the Court deems just and appropriate.

////
////
////
////
////

---

**41**

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

## <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by Jury on all claims at issue.

Dated: October 20, 2013          **TIMOTHY J. McILWAIN**

/s/Timothy J. McIlwain
Timothy J. McIlwain, counsel for Plaintiffs
ASTERO, LLC, a New Jersey limited
liability company and ANDREA
TANTAROS, an individual

---

**42**

**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY, EQUITABLE AND INJUNCTIVE RELIEF**

program for one year, within any geographical area in the United States where the broadcast of the Show was available to the general public through radio broadcast. Lender specifically acknowledges that this provision is reasonable in time and geographic limitations.

B. <u>Termination for Health</u>. If the reason for early termination of this Agreement is the health of Host, and Host later returns to Host's broadcasting career, Network shall retain the option to reinstate this Agreement for the time equivalent to the remainder of the Term as of the date of termination.

C. <u>"Equity" Equivalents</u>. Lender acknowledges that Network will expend substantial sums in promoting Host as a national radio personality, and that Host's utilization of Network's goodwill and marketing efforts on behalf of another network or syndicator would not be readily compensable to Network. In executing this Agreement, Lender agrees that the Revenue Participation specified in subparagraph 5.C above and User Fee Participation payments under subparagraph 5.D above provide a form of equity interest in the Show to Lender and are being paid to Lender as compensation for Network's right to be the sole syndicator and broadcast distributor of any radio show hosted, and/or co-hosted, and/or guest hosted, by Host for the duration of the Term.

D. <u>Post-Termination Payments</u>. In the event of any termination pursuant to Paragraph 18 above and/or the expiration of the Term: (i) Base Fees and Guaranteed Compensation will be prorated through the date of termination and/or expiration and paid to Lender (except in the case of any Discretionary Termination in accordance with Paragraph 18.D above, with respect to which Network shall be obligated to pay Base Fees and Guaranteed Compensation for a period of six (6) months post date of termination); (ii) any Revenue Participation specified in subparagraph 5.C above, and/or payments based on User Fees under subparagraph 5.D above, resulting from revenues received by Network after the date of termination and/or expiration shall continue to be paid to Lender according to the provisions of subparagraphs 6.B, 6.C and 6.J above; (iii) Lender shall not be entitled to any other compensation or benefits which would otherwise be payable or deemed to be earned after the date of termination; and (iv) neither Lender nor Network shall have any further obligation to the other, except for those obligations which survive the expiration or termination of this Agreement pursuant to the provisions of subparagraph 19.E below.

E. <u>Continuing Effect</u>. Notwithstanding any termination or expiration of this Agreement, those provisions of this Agreement that reasonably and/or expressly would survive termination shall continue in effect following any such termination or expiration, including without limitation the terms of Paragraphs 9, 12, 19, 21, 23, 24, 26, 30 and 31 of this Agreement.

20. <u>Payola</u>: Lender has been advised of the provisions of Sections 317 and 508 of the Federal Communications Act, and/or the regulations adopted by the FCC implementing these sections. Lender warrants and represents to Network that, in connection with any services or materials furnished to Network, Host has not accepted or agreed to accept, or paid or agreed to pay, any money, service or other valuable consideration for the inclusion

in any Program of any matter contemplated by such sections and regulations.  Lender further warrants and represents to Network that Host has not accepted, and will not accept or agree to accept, or paid or agree to pay, any money, service or other valuable consideration for the inclusion of any such matter in the Programs, and Host shall give to Network forthwith any information Host acquires which might alert Network that an announcement was required pursuant to the above statutes and/or regulations.  In addition, Lender represents and warrants to Network that Host (and/or Host's immediate family) do not have, and will not acquire, a hidden financial interest in the sale to the public of any service or commodity which is subject to the above statutes and regulations.  If Host (and/or Host's immediate family) do acquire any such hidden financial interest, Lender represents and warrants to Network that Host will immediately give Network notice of any information to that effect so that an appropriate announcement may be made.

21.   <u>Indemnification</u>:

A.  <u>Lender Indemnity.</u>  Lender shall indemnify and hold harmless Network and all other Protected Parties from and against any and all actual loss, liability, claims, damage, penalty and other expense, including without limitation reasonable attorneys' fees, in excess of, or not covered by, Network's Big Mouth Policy, resulting from an adverse final judgment, order, decree, or other adverse final determination of any court of competent jurisdiction finding liability arising from: (i) any performance or utterance (ad lib or otherwise) made by Host in or in connection with any Program which is found to be the result of actual tortious or otherwise legally actionable conduct on the part of Host; or (ii) the use of any other material furnished by Host hereunder; or (iii) the uncured, material breach of any term or condition of this Agreement by Host or Lender; or (iv) the uncured, material breach of any representation, warranty or covenant of Lender under this Agreement; or (v) the uncured, material breach of any representation, warranty, covenant or agreement of Host in that certain Inducement Letter and Guaranty agreement relating to this Agreement, of even date herewith, by and between Network and Host.  Network's approval of any material furnished by Host shall not constitute a waiver of Host's indemnity with regard thereto.

B.  <u>Network Indemnity.</u>  Network will similarly indemnify and hold harmless Host from and against any and all actual loss, liability, claims, damage, penalty and other expense, including reasonable attorney's fees, caused by or arising out of (i) the Show and/or Host's broadcasting any material supplied by Network (which includes news received from wire services) and/or arising from or relating to (ii) the performance by Network of its duties under this Agreement (other than matters as to which Lender's indemnity under subparagraph 21.A above applies) or (iii) Network's breach of any representation, warranty or covenant of Network contained in this Agreement; provided, however, that Lender shall promptly notify Network of any such claim or threatened litigation.  Network will assume the defense of any such claim or litigation.

C.  <u>Continuing Effect.</u>  The expiration or termination of this Agreement will not affect these continuing indemnity obligations.

22.     [Reserved].

23.     <u>Remedies</u>:  Host's Services, and the rights to the results and proceeds of Host's Services granted to Network, are of a special, unique, unusual, extraordinary and intellectual character, which gives them a peculiar value, the loss of which would cause Network irreparable injury and damage, and Lender acknowledges that it would be difficult to determine and measure the damages suffered by Network in the event of a breach by Lender resulting from Host's undertaking the obligations of a live on-air radio host for any third party in violation of the provisions of this Agreement.  Accordingly, injunctive and other equitable relief against Lender any will be an appropriate remedy to enforce Network's rights under this Agreement.  This does not, however, in any way constitute a waiver by Network of its right to seek damages or other remedies, and Network shall retain the right to seek an action for specific performance and/or injunctive relief to enforce Lender's obligations under this Agreement, in addition to any other remedies at law or in equity which are otherwise appropriate.

24.     <u>Dispute Resolution</u>:  In the event of any dispute between the Parties relating to this Agreement and/or the obligations and/or entitlements of any Party under this Agreement, the Parties shall continue with and complete all undisputed performance capable of completion prior to resolution of the dispute, and the dispute and/or disputes shall be subject thereafter to resolution by mediation and/or arbitration and/or civil litigation, as follows:

   a.   <u>Meet and Confer</u>.  The Parties shall endeavor in good faith to meet and confer with each other on a confidential basis in an effort to resolve any such dispute or disputes.

   b.   <u>Mediation</u>.  At the request of any Party following unsuccessful good faith efforts of such Party to resolve their claim(s) through direct meet and confer efforts, the Parties shall endeavor to mediate any such claim(s) confidentially and in good faith.  If the Parties are unable to agree on the specific mediation procedures to be used, at the written request of any Party, the mediation shall proceed on a confidential basis in accordance with the commercial mediation rules of the Judicial Arbitration and Mediation Service ("**JAMS**") currently in effect, with Network and Lender each advancing one-half of any filing, administrative and/or mediator fees, and with the mediation to occur at a location selected by the mediator(s) in New York County, New York unless the Parties agree on another location, at a date and time selected by the mediator(s) if not otherwise agreed to by the Parties.

   c.   <u>Arbitration</u>.  If the Parties are unable to resolve the dispute(s) by mediation after good faith participation in not less than one full mediation session, then, upon the written request of any Party, such dispute(s) shall be subject to non-binding and confidential arbitration.  If the Parties are unable to agree on the specific arbitration rules and procedures to be used, the arbitration shall be conducted on a confidential basis in accordance with the commercial arbitration rules of JAMS then in effect, including without limitation all rules as to payment of filing, administrative and/or arbitrator fees. Unless the Parties shall otherwise agree, the arbitration shall occur in Oregon, at a location, date and

time specified by the arbitrator(s).  Unless any Party shall reject, in a writing delivered to the other Parties and the arbitrator(s), any arbitration award requiring payment of any money or performance of any action as to the substantive issue(s) in dispute between the Parties, within twenty (20) days after the date such award is duly served upon the Parties, such arbitration award shall be binding on the Parties and duly enforceable.  Arbitration awards concerning procedural issues relating to payment of fees and/or costs of the arbitration, and/or relating to the procedural aspects of the arbitration, shall be binding and enforceable between the Parties, subject to any procedural rules in effect in such arbitration for reconsideration of any such rulings by the arbitrator(s).

d.  <u>Litigation</u>.   If any of the Parties shall timely reject any substantive arbitration award as specified in subparagraph 24.c above, the arbitration process shall terminate, and the dispute(s) shall then be subject to resolution by civil action, in Oregon.  In addition, and notwithstanding any provision to the contrary in this Paragraph 24, Network, at Network's sole discretion, may proceed immediately to civil action, in Oregon, without first pursuing either mediation or arbitration, in the event of any actual or claimed violation of any provisions of subparagraph 8.A or Paragraphs 3, 9, 30 or 31 of this Agreement, should Network seek to obtain a restraining order, a preliminary or permanent injunction, declaratory relief and/or other equitable relief whatsoever, whether exclusively and/or in combination with any other request for relief, with respect to any such claimed violation of the provisions of subparagraph 8.A or Paragraphs 3, 9, 30 or 31 of this Agreement.

e.  <u>All Current Claims At Issue</u>.   In order to minimize the prospect for a multiplicity of proceedings, any demand for mediation and/or arbitration, and any complaint and/or other pleading commencing any civil litigation, by any Party pursuant to this Paragraph 24, shall specify and include all claims asserted and/or assertable by the Party initiating such action, to the point of initiating such action, and any counterclaims then asserted and/or assertable by the other Party or Parties shall be asserted as cross-claims in any such mediation, arbitration and/or civil litigation, or shall thereafter be barred.

f.  <u>Applicable Laws</u>.  Except, if at all, as expressly altered by the provisions of this Agreement, any such mediation, arbitration and/or civil action shall be subject to all applicable laws of Oregon, without regard to Oregon's choice of law principles.

g.  <u>General Provisions</u>.  The final ruling, award, order and/or judgment in any such proceeding ("**Determination**") shall establish the specific obligation and/or performance required to comply with this Agreement, and/or resolve any ambiguity or other question arising or asserted with respect to this Agreement, and the Parties shall then each perform their respective obligations under this Agreement in accordance with such Determination. However, in no event shall any such Determination result in termination of this Agreement, and termination of this Agreement shall not be available as a remedy in any such proceeding.

25.   Assignment/Sale:

A.   Host.  Because this Agreement involves Host's personal services, Lender may not assign and/or delegate Host's obligations under this Agreement at any time, and the rights of Lender under this Agreement may not be assigned and/or delegated to any other person or entity; provided, however, that the rights of Lender to receipt of compensation under this Agreement may be assigned, with Host's consent, to any entity owned by Host, and/or in which Host actively serves as a principal officer, member and/or manager, and which shall have the right to contract for the personal services of Host.

B.   Network.  Network may assign its rights and/or delegate its duties hereunder at any time to any person, firm or corporation that acquires all or a substantial part of Network's syndication business, and/or to any parent or subsidiary of Network, or any entity under common ownership with Network, and this Agreement may be so assigned and/or delegated by any such assignee; provided, however, that any such assignment and/or delegation will relieve the assignor and/or delegator of liability only for obligations arising after the date of assignment and only if such obligations are assumed by the assignee and/or delegee.

26.   Governing Law: This Agreement shall be construed according to the laws of Oregon applicable to agreements which are executed and fully performed within said State, and without giving effect to Oregon's choice of law principles.

27.   Representation by Counsel: This Agreement has been prepared by counsel for Network, who in connection therewith is representing only Network. Lender acknowledges that: (i) the Host Group has been advised to seek Lender's own counsel in connection with the negotiation and preparation of this Agreement and the consequences of the transactions contemplated by this Agreement; and (ii) Lender has either been so advised by Lender's own separate counsel or has waived such rights.  In no event is Lender relying on Network's counsel to protect Host's rights, or to advise Host as to any conclusion of law or fact. Notwithstanding the foregoing, all Parties acknowledge that the provisions of this Agreement have been fully negotiated, and that no provision shall be construed against any Party because that Party has prepared such provision.

28.   General: If any provision of this Agreement is held to be invalid, illegal, overbroad or unenforceable in any respect, such provision shall be construed and interpreted in such manner as to give effect to and/or restrict such provision to render it valid, legal and enforceable to the extent a valid, legal and enforceable construction is possible, and to exclude any interpretation or construction which would render such provision invalid, illegal, overbroad or unenforceable.  To the extent that any provision or clause of this Agreement cannot be construed in such a manner as to render it legal, valid and enforceable, this Agreement shall be construed as if such invalid, illegal or unenforceable provision or clause had never been contained in this Agreement, and such provision or clause shall not affect any other provision or clause of this Agreement. A waiver by any Party of any of the terms and conditions of this Agreement in any one case shall not constitute a waiver of such term or

condition for the future, or as to any subsequent breach. All remedies, rights, undertakings, obligations, and agreements with respect to this Agreement, the Show and/or Host's Services shall be cumulative, and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement any Party. This Agreement sets forth the entire agreement of the Parties with respect to the subject matter of this Agreement, and replaces and supersedes all prior agreements, representations and/or understandings, whether written or oral, by and between the Parties. Any amendment to this Agreement must be in writing and be signed by each Party in order to be effective. This Agreement may be executed in counterparts, and signatures transmitted via e-mail and/or facsimile shall be given the same effect as original signatures.

29.   Notices:  Any notice which any Party desires, or is  required, to issue pursuant to this Agreement must be issued in writing and delivered either personally, by US Mail certified with return receipt, by commercial overnight delivery service (e.g. Federal Express), or via facsimile or e-mail with confirming copy delivered within 48 business hours by US mail (either first class or certified) or commercial overnight delivery service, to the other Party at the respective addresses/facsimile numbers set forth below, or to such other address/number as any such Party may designate by such written.

If to Lender:            Astero, LLC
                         2020 New Road
                         Linwood, NJ 08221
                         E-mail: atantaros@gmail.com


with a copy (which shall not constitute notice) to:

                         Business Law Professional Corporation
                         9300 Wilshire Blvd., Suite 508
                         Los Angeles, CA 90212
                         Facsimile:     (310) 919-1950
                         Attention:     Joseph C. Cane, Jr.
                         E-mail: jcane@businesslpc.com

If to Network:           Talk Radio Network Entertainment, Inc.
                         225 NE Hillcrest Dr.
                         Grants Pass, OR 97526
                          Attn: Business Affairs
                         Facsimile: (541) 471-1663

Notice issued by certified mail or commercial overnight delivery service shall be deemed issued on the date of mailing, or on the date of delivery to the delivery service, as applicable. Notices issued by facsimile or e-mail and confirming mail or overnight delivery shall be deemed issued on the date such telefax or e-mail has been sent, provided that the notice is deposited in the United States mail or with the overnight carrier, for delivery, within 48 business hours. Any charges are to be billed to and/or paid in advance by the sender.

30.    Confidentiality/Non-Disclosure:

    A.    This Agreement. No party to this Agreement (as well as Host) shall disclose the terms and conditions of this Agreement, or cause such terms and conditions to be disclosed, to any person or persons other than Lender's, Host's and Network's respective agents, employees, attorneys and/or accountants who have a need to know, and who are legally required to refrain from further disclosing, the terms and conditions of this Agreement.

    B.    Generally.  No party to this Agreement (as well as Host) shall disclose, or cause to be disseminated, to any person or persons other than Lender's, Host's and Network's respective agents, employees, attorneys and/or accountants who have a need to know, and who are legally required to refrain from further disclosing, the terms and conditions of this Agreement and/or the particulars of communications by and between Lender and/or Host, on the one hand, and Network, on the other hand, and/or other personal, financial, business and/or professional information which Lender and/or Host may learn, prepare or otherwise be privy to concerning the Show and/or Network and/or any other Protected Parties, except as specifically required by law.  Lender acknowledges and agrees that all such information, including without limitation any and all work product of Host with respect to the Show and/or Network ("**Work Product**"), constitutes confidential and/or proprietary business information and/or proprietary intellectual property of Network and/or other of the Protected Parties ("**Proprietary Information**"), and may be damaging to and/or harm the professional reputations and/or careers and/or businesses of the Protected Parties, and/or certain of the Protected Parties, and could cause substantial damages to the Protected Parties, or certain of them, if disclosed.

    C.    Right to Contest. Prior to making any such disclosure required by law, Lender shall notify Network of, and shall provide to Network copies, and any additional specifics, of any disclosure demand purportedly issued under color of law, and shall afford Network a reasonable opportunity to contest, or to obtain a protective order with respect to, any such disclosure.

    D.    [Reserved].

    E.    Obligations on Termination. Upon any termination of this Agreement, Host shall not retain any Work Product or other Proprietary Information, or copies thereof, in any form, and Host shall deliver any and all such Work Product or other Proprietary Information, or copies thereof, under the possession, custody or control of Host to Network immediately upon any such termination.  In addition, for a period of one (1) year following any termination or expiration of this Agreement, Host shall not hire, retain, solicit or otherwise contact any other persons or entities with access to any Proprietary Information of Network, including without limitation any of the Protected Parties, any employees, hosts, producers, vendors, subcontractors, officers, directors, managers, executives or other agents or representatives of Network and/or any other Protected Parties, including

without limitation any vendors which provide services with respect to Network's production of the Show, whether as contractors and/or subcontractors for Network, and shall refrain from causing any such persons or entities to terminate or otherwise alter their business relationship with Network, or any of the rest of the Protected Parties, unless Network shall first provide written confirmation to Host that any such intended action, as expressly described in writing by Host to Network, shall not jeopardize any Proprietary Information.

31. <u>Non-Disparagement</u>:  Lender and Host shall not disparage any of the Protected Parties, and/or any of the radio programming or other activities, hosts, co-hosts, other on-air personalities, personnel or vendors of Network and/or any other Protected Parties, and Network shall not disparage Lender or Host.  Lender shall secure the advance consent of Network with respect to any press releases or other statements by Lender and/or Host to the press, reporters or other media personnel concerning Network and/or the Show.

32. <u>Conflict/Approval</u>.   The Parties acknowledge that, subject to a mutually agreeable nondisclosure agreement, the Fox Network shall be entitled to review and approve the terms of this Agreement relevant to Host's obligations to the Fox Network, provided its approval thereof shall not be unreasonably withheld, conditioned or delayed.

33. <u>Initial Press Release</u>.  Lender and Network shall jointly approve the press release announcing the launch of the Show and Host's retention as the principal host.  Given the importance of timely issuance of such release, Lender will use best efforts, subject only to Host's existing obligations to the Fox Network, to respond immediately to any proposed press release submitted by Network, and will be deemed to have approved the terms of a proposed release if Lender fails to provide Lender's response to a proposed press release within four (4) working hours of submission by Network.

IN WITNESS WHEREOF, the undersigned have executed this Agreement on the dates specified below.

**TALK RADIO NETWORK**
**ENTERTAINMENT, INC.**
an Oregon corporation

By _____
    Mark Masters, CEO


Date: December 21st, 2012


ASTERO, LLC, a New Jersey
limited liability company

By _____
    ANDREA K. TANTAROS, President


Date: December 17, 2012

# Exhibit "B"

INDUCEMENT LETTER
AND GUARANTY


Dated: December 13, 2012


Talk Radio Network Entertainment, Inc.
225 N.E. Hillcrest Drive
Grants Pass, OR 97526
  Attn: Mark Masters, CEO


Re: <u>Attached Host Agreement</u>

Dear Network:

   As an inducement to Talk Radio Network Entertainment, Inc., an Oregon corporation ("**Network**") to enter into that certain Host Agreement of even date herewith to which this Inducement Letter and Guaranty is attached (the "**Agreement**"), by and between ASTERO, LLC, a New Jersey limited liability company ("**Lender**") and Network, and which is being executed and delivered concurrently herewith, with respect to my services in performing as a talk radio host for that certain talk radio show which is to be produced and syndicated by Network, as is more specifically set forth in the Agreement (the "**Show**"), I hereby represent and warrant to Network, and agree, as follows:

   1.   I have read and understand the Agreement and all terms and conditions of the Agreement requiring that the personal services of Andrea K. Tantaros ("**Host**") be provided to Network and further requiring that Host individually undertake or refrain from taking certain actions, including without limitation confidentiality obligations and the grant of certain rights of exclusive negotiation and rights to match in favor of Network with respect to certain future services of Host (collectively, as to all such commitments and/or obligations, however characterized, "**Host Obligations**"), and I am the officer of Lender who is executing the Agreement on behalf of Lender concurrently with my execution of this Inducement Letter and Guaranty (this "**Inducement and Guaranty**").

Talk Radio Network Entertainment, Inc.
December 13, 2012                                                                Page 3

7.      Network shall be entitled to apply for equitable relief by injunction or other remedies to prevent a breach of the Agreement or of my agreements hereunder.

8.      I will look solely to Lender for all compensation for my services under the Agreement, and Network shall have no obligation to compensate me for any services to be performed by me or for any rights granted to Network thereunder or hereunder, and the sole obligations of Network with respect thereto shall be to pay to Lender the agreed compensation payable to Lender under and pursuant to the Agreement. The foregoing provisions are without prejudice to all rights of Lender to enforce any and all obligations of Network to Lender under the Agreement, or to any defenses of Network with respect to any claims of Lender.

9.      I hereby confirm and join in the grant to Network, under the Agreement, of all rights specified therein, including, but not limited to, all rights granted in and to the results and proceeds of my personal services, the right to use my name and likeness as set forth therein, and all other Host Obligations, and expressly and fully guaranty to Network due and full performance of all obligations and commitments of Lender under the Agreement, including without limitation and in particular the obligation for full and proper performance of the Host Obligations, whether or not the Lender/Host Agreements should expire or be terminated for any reason.

10.     All notices served on Lender in accordance with the provisions of the Agreement shall be deemed to be notices to me of the contents thereof.

11.     I shall indemnify and hold Network harmless from and against all liabilities, penalties, losses or expenses, including reasonable attorneys' fees imposed upon, and/or sustained or incurred by, Network by reason of Network's failure to deduct or withhold from the compensation payable to Lender under the Agreement any amounts required, and/or determined or claimed to be required, to be deducted or withheld by Network under the provisions of any law, regulation or collective bargaining agreement now or hereafter existing.

12.     For purposes of any and all workers' compensation statutes, laws or regulations ("**Workers' Compensation**"), I acknowledge that an employment relationship exists between Lender and me, with Lender being my special employer with respect to the Agreement. Accordingly, I acknowledge that in the event of my injury, illness, disability, or death falling within the purview of Workers' Compensation (and not as a consequence of any gross recklessness or intentionally tortious conduct of Network or its employees, officers, directors or invitees), my rights and remedies (and those of my heirs, executors, administrators, successors, and assigns) against Network or its affiliated companies, and their respective officers, agents, and employees (including,

3

Talk Radio Network Entertainment, Inc.
December 13, 2012 _____ Page 4

without limitation, any other special employee and any corporation or other entity furnishing to Network or an affiliate company the services of any such other special employee) and/or Lender shall be governed by, and limited to, those provided by Workers' Compensation, that I am duly employed by Lender under and pursuant to the Lender/Host Agreements, that I shall look solely to Lender for any such compensation or other remedies, and that I shall indemnify and hold Network harmless pursuant to Paragraph 11 above for any contrary claims, demands or liabilities.

Please sign and return one copy of this Inducement and Guaranty in the signature block below to confirm our agreement with respect to each of the terms and provisions of this Inducement and Guaranty as set forth above.

Very truly yours,

Andrea K. Tantaros

AGREED AND ACCEPTED
THIS 21ˢᵗ DAY OF DECEMBER, 2012:

TALK RADIO NETWORK ENTERTAINMENT, INC.
an Oregon corporation

By_____
Mark Masters, CEO

4

# Exhibit "C"

# BUSINESS LAW PROFESSIONAL CORPORATION

9300 Wilshire Boulevard, Suite 550
Beverly Hills, California 90212
Telephone (310) 470-8855
Fax (310) 919-1950

**Direct Dial:** Joseph C. Cane, Jr.
       (310) 470-8855 x. 205

**Email:** jcane@businesslpc.com

September 13, 2013

<u>VIA E-MAIL AND U.S. MAIL</u>

Ron Severaid, Esq.
Executive Vice President & General Counsel
Talk Radio Network Entertainment, Inc.
225 N.E. Hillcrest Drive
Grand Pass, Oregon 97526

        Re:    <u>Andrea Tantaros Host Agreement</u>

Dear Ron:

I am sending this letter to you in follow-up to the events that have affected my client, Ms. Andrea Tantaros ("Andrea" or "my client"), and have been reported in the media over the past week concerning Talk Radio Network Entertainment, Inc. ("TRN") and the conversations we have had relating thereto.

As an initial matter, while we are relieved to finally receive payment from TRN after over almost two (2) weeks of uncertainty and conflicting accounts from both you and Mark Masters, many questions remain about the ability of TRN to uphold its contractual obligations contained in the Host Agreement between TRN and my client, dated as of December 13, 2012 (the "Host Agreement").

While Andrea has always been and currently remains committed to fulfilling her contractual obligations and being supportive of Mark Masters and TRN, on a macro level, we are very concerned about TRN's current legal battles and related "war-of-words" being waged in the media, and the sudden and seemingly secretive downsizing and restructuring of the company.

In particular, we are concerned about the overall negative impact that these events have been having on TRN's business generally, and are especially concerned about the future viability of Andrea's radio show (the "Show"). Most importantly, we are deeply concerned that Andrea's marquee and nationally-recognized brand and reputation, are being placed in jeopardy by TRN.

In this regard, while we did not elect to formally notice TRN of the first breach of its payment obligations as a courtesy to Mark Masters, we, nonetheless, still remain concerned about the path TRN is headed down, and its ability to sustain the viability of Andrea's Show. Though the three (3) breaches of TRN's payment obligations to my client have been cured, and we are

appreciative that they have been remedied, among other things, given the current status of TRN's affairs, we are especially concerned that:

(1) TRN does not possess a sales force capable of selling the Show to advertisers (we have heard that Bill Crawford has resigned and most (if not all) of the remaining sales staff have been released), and consequently, due to TRN's conduct in this regard, (a) TRN is in violation of its obligation to nationally-syndicate the Show, facilitate relationships with the Show's affiliates and to advertise and market the Show, as set forth in §§ 4.A, 4.B and 4.J, respectively, of the Host Agreement, and (b) Andrea is effectively being precluded from her ability to achieve revenue participation, as she is entitled to receive pursuant to §5.C of the Host Agreement, based upon the "Net Show Revenue" generated from the Show, which is a fundamental tenet of the deal and one of, if not the most important, reasons Andrea agreed to host the Show;

(2) TRN appears now wholly incapable of being able to conduct business with the largest U.S. syndicator, now that Cumulus has acquired Dial Global, due to TRN's pending litigation with Dial Global, which in turn, necessarily means TRN cannot fulfill its obligations to nationally-syndicate the Show pursuant to §§ 4.A and 4.J of the Host Agreement, and of course, less potential market share for the Show, particularly in the top 25 key U.S. markets;

(3) TRN lacks any digital media strategy or capabilities in light of Eric Richey's termination, and is no longer supporting the full responsibilities of the app for the Show or maintaining the Show's website, which of course, is essential for maintaining interconnectivity with the Show's viewers, particularly, key 18-34 year old listeners, which is a requirement of the Host Agreement as set forth in §4.K therein;

(4) TRN is no longer maintaining an affiliate division, as is required by §4.B of the Host Agreement, thereby making it impossible for Andrea to communicate with her affiliates or to respond to, or fulfill their, requests for ad reads and liners, which certainly will impact such relationships to the detriment of TRN, the Show and her brand and reputation;

(5) TRN's production capabilities are currently, virtually non-existence, and are certainly not commensurate with "National Syndication Quality," as is required pursuant to §4.F of the Host Agreement, so that Andrea is now finding it exceedingly difficult, if not impossible, to host the Show - Specifically, (a) there are no commensurate sound effects due to Matt Fox's resignation due to non-payment of his salary; (b) the Show's executive producer, AJ Rice, whose involvement with the Show was a cornerstone of Andrea's agreeing to host, was also terminated (in violation of §3(h) of the Host Agreement) and has yet to be replaced, forcing Andrea effectively to be producing the Show herself; (c) TRN has not furnished Andrea with guests or research over the past several days, which is certainly damaging to the Show's overall flow and entertainment value (not to mention violative of §4.H of the Host Agreement), and (d) the Show's call screener was fired and replaced by Mark Master's son, who with all due respect, is a nice, young gentlemen, but does not possess the requisite skill-set to fulfill this role on a long-term basis.

While you should consider this letter to constitute formal, written notice from Lender (as defined in the Host Agreement), in accordance with §29 of the Host Agreement, of multiple breaches of the Host Agreement, each as set forth above, which we hope will be remedied forthwith, you should also know that Andrea remains, at present, committed to fulfilling her contractual obligations to TRN, provided: (1) the aforementioned breaches are immediately

rectified and (2) TRN provides Andrea with clear insight into how it intends put both TRN and the Show back on solid-footing, so that no further harm comes to Andrea's brand or reputation.

Further, although TRN made good yesterday on its commitment to pay Andrea the outstanding payments owed to her pursuant to her Host Agreement, totaling $19,416.66 (representing $8,333.33 for her guarantee payment due on 8/31; $8,333.33 for her base salary payment due on 9/5/13; and $2750.00 for her rent-subsidy payment due on 9/5/13), we still remain extremely concerned as to whether or not TRN will be able to continue making such payments and as to whether the issues detailed hereinabove can be rectified in a timely manner in accordance with TRN's contractual obligations.

To this end, you mentioned, during our call yesterday, that you and Mark are working on a restructuring proposal, whereby the Show and its assets would be "contributed" to a new, to-be-formed, limited liability company, which would be sufficiently capitalized in order to ensure that all of the aforementioned concerns and breaches are rectified. We certainly look forward to receiving the details of such plans, in writing, so that we may assess them, bearing in mind, that depending on the nature of the restructuring you are proposing, certain approvals of the Fox News Network, LLC and the Lender may also be required.

Please also recognize that despite our aforementioned concerns, we do, nonetheless, remain interested in sustaining the Show and, hopefully, having it grow even more successful. That being said, while Andrea has been a "trooper" to date, and intends to continue to be reasonably supportive of Mark, TRN, and her affiliates, despite multiple financial, logistical and public relations hurdles, we do not think it is fair, nor do we feel she signed on to perform services for a network that is wholly incapable of providing adequate resources to produce, market and syndicate a high-quality entertainment product, as appears is currently the situation with TRN. While we hope this situation can be immediately reversed, you should also know that we simply cannot, and will not, allow TRN's current problems to cause unwarranted and irreversible, material damage to Andrea's brand and reputation.

We hope you can understand our position; we do truly look forward to hearing from you in a timely, candid and consistent fashion on these fronts and to cooperating to achieve a positive path forward for all involved stakeholders, in the immediate near term.

Nothing contained herein should be interpreted as waiving any of my client's right and remedies, whether in equity, or at law, all of which are hereby expressly reserved.

Best regards,

Joseph C. Cane, Jr.

cc:     Andrea Tantaros
        Timothy J. McIlwain, Esq.

# Exhibit "D"

# BUSINESS LAW PROFESSIONAL CORPORATION

12400 Wilshire Boulevard, Suite 1180
Los Angeles, California 90025
Telephone (310) 470-8855
Fax (310) 919-1950

**Direct Dial:** Joseph C. Cane, Jr.
              (310) 470-8855 x. 205

**Email:** jcane@businesslpc.com

October 14, 2013

<u>CONFIDENTIAL COMMUNICATION VIA E-MAIL AND U.S. MAIL</u>

Ron Severaid, Esq.
Executive Vice President & General Counsel
Talk Radio Network Entertainment, Inc.
225 N.E. Hillcrest Drive
Grand Pass, Oregon 97526

            Re:      <u>Notice of Termination of Host Agreement</u>

Dear Ron:

I am in receipt of and have reviewed your letter of October 10, 2013. This letter is responsive thereto and supersedes my letter of October 9th.  To be absolutely clear, despite my client's receipt (on October 10, 2013) of payment of certain amounts that had been outstanding for more than a month, our receipt of your letter of October 10th and our review of the assertions you made therein, our position remains that all of TRN's breaches referenced in my letters of September 13th and September 24th (some of which were incurable to begin with), remain uncured.  Further, we note, which parenthetically you conveniently ignored in your October 10th letter, that TRN flatly ignored our requests to produce any documentation concerning Show revenues, carriage, clearance or ad sales, from which we might understand Andrea's contingent compensation, presumably because these metrics are not good and fully support the assertions we have made to date.

As such, this letter confirms that the cure period for the breaches referenced in my letter of September 13th has lapsed, and as a result thereof, in addition to the fact that certain of TRN's existing breaches were incapable of cure, we deem her Host Agreement, in accordance with Section 18A therein, to be terminated.  Further, this letter confirms that Andrea has no intention of returning to TRN in any capacity.

This correspondence is not intended, and shall not be construed, as a full recitations of all facts concerning the subject matter hereof or in any way be deemed to limit, waive or prejudice any rights or remedies which Astero, LLC or Ms. Tantaros may have at law, in equity or otherwise.  Any and all such rights and remedies are expressly reserved.

Very truly yours,

Joseph C. Cane, Jr.
cc:     Andrea Tantaros
        Timothy J. McIlwain, Esq.

# Exhibit "E"

# BUSINESS LAW PROFESSIONAL CORPORATION

9300 Wilshire Boulevard, Suite 550
Beverly Hills, California 90212
Telephone (310) 470-8855
Fax (310) 919-1950

**Direct Dial:** Joseph C. Cane, Jr.
              (310) 470-8855 x. 205

**Email:** jcane@businesslpc.com

October 9, 2013

CONFIDENTIAL COMMUNICATION
VIA E-MAIL AND U.S. MAIL

Ron Severaid, Esq.
Executive Vice President & General Counsel
Talk Radio Network Entertainment, Inc.
225 N.E. Hillcrest Drive
Grand Pass, Oregon 97526

        Re:    Andrea Tantaros

Dear Ron:

This letter comes in follow-up to my letters of September 13th and September 24th, and my e-mails subsequently thereto, none of which have been substantively responded to, in any regard. In particular, TRN has not paid Andrea any Base Fees or Guaranteed Compensation, owed to her in accordance with Sections 5.A and 5.F of her Host Agreement, for more than a month. In fact, the only feed-back we have received from TRN (apart from self-serving comments and pontifications) are e-mails from Jim Watkins, regarding reading copy for an Atlanta affiliate. Interestingly, this matter apparently not initially not to have been properly handled by TRN, and as such, now appears to require Andrea's immediate attention, even though I previously explained her travel commitments and indicated it would be addressed when she returns from Washington, DC.

As you know, on September 20th you sent me an e-mail indicating that you would be circulating a proposal to address the issues between TRN and Andrea and provided an NDA. I advised you that I did not understand why a further NDA was required in this instance, given the existing confidentiality provisions in her Host Agreement and NDA, and requested in a letter of September 24th that prior to prior to discussing any alternatives to her existing Host Agreement, we would like to receive the documents/information listed below, so as to be in a position to make an informed decision.

1. List of station affiliates currently carrying the Show and any other available syndication metrics;
2. List of markets for the Show and any related clearance metrics;

Ron Severaid, Esq.
October 9, 2013

3. List of current advertisers for the Show;
4. Total Ad Sales for the Show from 1/1/13 to present;
5. Total New Show Revenue from 1/1/13 to present;
6. Total Cash Compensation received by TRN concerning the Show from 1/1/13 to the present;
7. Total Miscellaneous Revenues received by TRN concerning the Show from 1/1/13 to the present;
8. Total User Fees received by TRN concerning the Show from 1/1/13 to the present; and
9. Copies of all Revenue Reports required to be delivered to Lender on a monthly basis, per Section 6.D of the Host Agreement.

However, none of the foregoing was provided.  In fact, rather that attempting to facilitate a resolution of the issues at hand, it simply appears that TRN prefers to do nothing, including not pay its talent.  This is indeed unfortunate.

Accordingly, you are hereby notified that that the cure period for the breaches referenced in my letter of September 13th has lapsed, and as a result thereof, we are electing to immediately terminate her Host Agreement, in accordance with Section 18A therein.

Lastly, this correspondence is not intended, and shall not be construed, as a full recitations of all facts concerning the subject matter hereof or in any way be deemed to limit, waive or prejudice any rights or remedies which Astero, LLC or Ms. Tantaros may have at law, in equity or otherwise.  Any and all such rights and remedies are expressly reserved.

Very truly yours,

Joseph C. Cane, Jr.

cc:     Andrea Tantaros
        Timothy J. McIlwain, Esq.