TIMOTHY J. McILWAIN
ATTORNEY AT LAW, LLC
Attorney@McIlwainLaw.com
89 River Street #1538
Hoboken, New Jersey 07030
Tel: (877) 375-9599
Fax: (609) 450-7017

CHRISTIAN S. MOLNAR, ESQ. (CA State Bar No. 177665)
christian@christiansmolnarlaw.com
*(Pro Hac Vice)*
12400 Wilshire Boulevard, Suite 1180
Los Angeles, California 90025
Tel: (310) 820-9900
Fax: (310) 919-1950

Attorneys for Plaintiffs ASTERO, LLC, a New Jersey limited liability company, and ANDREA K. TANTAROS, an individual

# THE UNITED STATES DISTRICT COURT,

# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASTERO, LLC,  a New Jersey limited liability company; ANDREA K. TANTAROS, an individual,<br><br>             Plaintiffs,<br><br>        vs.<br><br>TALK RADIO NETWORK ENTERTAINMENT, INC., an Oregon corporation, MARK MASTERS, an individual, and Does 1 through 10, inclusive,<br><br>             Defendants. | Case No.:  1:13-cv-06005-NLH-JS<br><br>**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS' TO DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF CHRISTIAN S. MOLNAR, ESQ., AND JOSEPH C. CANE, JR., ESQ., IN SUPPORT THEREOF** |

---

**1**

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

Plaintiff ASTERO, LLC, a New Jersey limited liability company, (hereinafter "Plaintiff ASTERO") and Plaintiff ANDREA K. TANTAROS, an individual, (hereinafter "Plaintiff TANTAROS") (collectively "Plaintiffs"), through counsel, hereby respond to and formally oppose Defendant TALK RADIO NETWORK ENTERTAINMENT, INC., an Oregon corporation's (hereinafter "Defendant TALK RADIO") and Defendant MARK MASTERS, an individual's (hereinafter "Defendant MASTERS") (collectively "Defendants"), Motion to Vacate Entry of Default (hereinafter "Defendants' Motion").  Plaintiffs submit that Defendants' Motion is without merit and thereby respectfully request that the Court deny the Defendants' Motion in its entirety.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

1    Specifically, each of the reasons Defendants give, in their Motion, as to why the

2    default entered against them should be vacated is false, contrary to the law, and without

3    merit.  First, both Defendants were properly served, in accordance with the Federal

4    Rules of Civil Procedure, and the Oregon Rules of Civil Procedure, and further had

5    actual notice of the pending claims against them.  Simply, service of process was

6    effective and proper as to both Defendants, and consequently, the Request for Entry of

7    Default as entered against Defendants is valid and should be allowed to stand.  Second,

8    Defendants do not have any meritorious defense to the causes of action asserted in

9    Plaintiffs' complaint, as the claims of Plaintiffs are not subject to mandatory

10   arbitration, and instead must be adjudicated by this court; Third, Defendants are

11   culpable, and completely at fault in causing their default to be taken, as they

12   purposefully failed to respond to the complaint despite knowing that such claims had

13   been filed against them, as part of a calculated litigation strategy to avoid their

14   responsibilities to Plaintiffs,' and as an attempt to avoid liability in this action; Fourth,

15   vacating the entry of default against Defendant TALK RADIO and Defendant

16   MASTERS would prejudice Plaintiffs in this case, and is therefore improper.

17   Dated: March 3, 2014                    **TIMOTHY J. McILWAIN**

18

19                                           /s/Timothy J. McIlwain

20                                           Timothy J. McIlwain, counsel for
                                             Plaintiffs ASTERO, LLC, a New Jersey
21                                           limited liability company and ANDREA
                                             TANTAROS, an individual
22

23

24

25

26

27

28

---

**3**

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO
DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

# TABLE OF CONTENTS

I.   **INTRODUCTION AND STATEMENT OF FACTS**…………………………..1

II.  **LEGAL DISCUSSION**………………………………………………………...5

    A.   **Defendants were properly served Pursuant to FRCP 4(E)(2)**………..5

        1.   **The Federal Rules of Civil Procedure Allow for Service to be Effectuated Under the Rules of the State in Which Service is Made**………………………………………………5

        2.   **Defendant Talk Radio Was Properly Served Under the Rules of Oregon, the State in Which Service Was Made**………6

        3.   **Defendant Masters Was Properly Served Under the Rules of Oregon, the State in Which Service Was Made**………………8

    B.   **Good Cause Does Not Exist to Vacate the Default Pursuant to FRCP 55(c)**………………………………………………………...10

        1.   **Defendant Has No Meritorious Defense Against Plaintiffs' Claims**………………………………………………………10

            a.   Defendants Assert No Substantive Defense to Plaintiffs' Claims…………………………………………………12

            b.   No Arbitration Clause Exists in this Case………………...12

            c.   Plaintiffs' Claims are Outside the Scope of the Purported Arbitration Clause…………………………………………12

            d.   The Issue of Whether the Action is Subject to Arbitration is a Question for the Court, Not the Arbitrator……………...14

        2.   **Defendants Purposefully Ignored the Complaint and Summons in this Case, and are Culpable in the Resulting Entry of Default**………………………………………………15

        3.   **Vacating the Entry of Default Would Result in Prejudice to Plaintiffs**………………………………………………………16

i

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

**III.** **CONCLUSION**.................................................................17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO
DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

# TABLE OF AUTHORITIES

## Cases

*Abbotts v. Bacon*

     133 Or. App. 315, 320 (1995)................................................................... 6, 7

*AT&T Technologies, Inc.  v. Communications Workers of America*

     475 U.S. 643, 651 (1986)..................................................................... 14

*Bouriez v. Carnegie Mellon Univ.*

     359 F.3d 292, 292 (3d. Cir. 2004) ..................................................... 13

*Century Indem. Co. v. Certain Underwriters at Lloyd's London*

     854 F.3d. 513, 523 (3d. Cir. 2009). ............................................... 12, 13

*Duber v. Zeitler*

     118 Or.App. 597, 601, (1993)............................................................. 8, 9

*First Options of Chi., Inc. v. Kaplan*

     514 U.S. 938 (1995)...................................................................... 13, 14

*Ford v. NYLCare Health Plans of Gulf Coast Inc.,*

     141 F3d. 243 246 (5th Cir. 1998) ............................................. 13, 14

*Gallogly v. Calhoon*

     126 Or.App 366, 370-01 (1994) ..................................................... 9, 10

*Hoeck v. Schwabe, Williamson & Wyatt*

     149 Or. App. 607, 615 (1997)..................................................... 8, 9, 10

*Hritz v. Woma Corp.*

     732 F.2d 1178, 1181 (3d Cir. 1984). .................................. 11, 12, 17

*Matter of Marriage of Boyd*

     131 Or.App. 194, 199-200, (1994) ........................................... 8, 9, 10

*Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.,*

     247 F.3d. 44, (3d Cir. 2001). ....................................................... 13

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO
DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*PaineWeber, Inc. v. Hartmann,*

    921 F.2d 507, 511 (3d. Cir. 1995) ................................................................. .13

**<u>Statutes</u>**

Federal <u>Rules of Civil Procedure</u> 55(c) .............................................................. 5, 10

Federal <u>Rules of Civil Procedure</u> 4(e) ................................................................. 5, 6

Oregon <u>Rules of Civil Procedure</u> 7(D)(3)(b) ........................................................ 6

Oregon <u>Rules of Civil Procedure</u> 7(D)(1) ............................................................ 8

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO
DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION AND STATEMENT OF FACTS

This dispute arises out of an employment agreement between Plaintiff ANDREA TANTAROS, an individual (hereinafter "Plaintiff TANTAROS") and her loan-out company, Defendant ASTERO, LLC, an New Jersey limited liability company (hereinafter "Plaintiff ASTERO) (collectively "Plaintiffs"), on the one hand, and Defendant TALK RADIO NETWORK ENTERTAINMENT, INC., (hereinafter "Defendant TALK RADIO") and Defendant MARK MASTERS, an individual, (hereinafter "Defendant MASTERS") (collectively "Defendants"), on the other hand, in which Plaintiffs agreed to provide Defendants the services of Plaintiff TANTAROS as a host on Defendant TALK RADIO's morning radio program entitled "The Andrea Tantaros Show" (hereinafter the "Show") in exchange for Plaintiff TANTAROS receiving certain compensation, including  a percentage of the annual net revenue, annual "user fees" received by the show, and a base salary.

Approximately three (3) months following commencement of her employment, Defendant TALK RADIO started to pay Plaintiff TANTAROS' salary late, and over the course of the next several months, laid off a large number of integral and necessary employees, such as the show's executive producer and, importantly, most of the "sales" team which orchestrated much of the Show's revenue stream.  By so doing, Defendant TALK RADIO breached the employment agreement by, among other things, failing to provide Plaintiff TANTAROS with the contracted for resources necessary to perform her hosting duties.  Plaintiffs' additionally allege that Defendants were aware that they would be unable to perform, as promised, and were, at all times herein relevant, intending to breach the employment agreement.  As a result of these, and many other breaches, on or about October 10, 2013, Plaintiffs filed a complaint, in the United States District Court for the District of New Jersey against Defendant TALK RADIO and Defendant MASTERS, relating to Defendants' failure and refusal to perform in

---

**1**

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

accordance with the employment agreement, as well as for various improper and wrongful conduct on the part of Defendants, including fraud, intentional misrepresentation and improper employment discrimination in violation of New Jersey state law.  On or about October 21, 2013, and again on or about November 8, 2013, Plaintiffs filed their first and second amended complaints, respectively, to cure various procedural deficiencies in their pleadings, and to make more clear the basis of jurisdiction within the U.S. District Court for the District of New Jersey over the entity defendant, but making no major substantive changes to their causes of action.  Each subsequent complaint was filed electronically, and as admitted by Defendants, actually received by them and their legal counsel.  *See* Defendants' Motion to Vacate Entry of Default, Declaration of Ron Severaid, Paragraph 8; *see also* Declaration of Joseph C. Cane, Jr., Esq., at **Exhibit "A and C."**  For instance, on October 21, 2013, Defendant TALK RADIO sent a letter to Plaintiffs' counsel, Joseph Cane, Jr. Esq., stating that Defendant TALK RADIO had received notice of Plaintiffs' complaint, the *day the complaint was filed.*  *See* Declaration of Joseph C. Cane, Jr., Esq., at **Exhibit "C,"** (Defendants confirming the wiring of past-due funds into Plaintiff TANTAROS' account, and stating that such funds were wired "prior to hearing late that afternoon [of October 10, 2013] of the improper commencement of a legal action on behalf of [Plaintiffs.]")  Further, such correspondence was not sent in isolation – to the contrary, such letter was sent in response to a demand letter from Plaintiffs' counsel (one of many) which was sent to Defendants and put them on notice of the fact that Plaintiffs would be filing this action.  *See* Declaration of Joseph C. Cane, Jr., Esq. at **Exhibit "C".**  Additionally, the Plaintiffs' filed lawsuit was national news, reported on several well-known news networks, who in turn reached out to Plaintiffs' counsel's office, as well as to both Defendants for comment.  *See* Declaration of Joseph C. Cane, Jr., Esq., at **Exhibit "A."**  Defendants further responded to such news reports, giving statements to the press regarding their intent to respond to Plaintiffs' case.  *See* Declaration of

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

1    Joseph C. Cane, Jr., Esq., at **Exhibit "A."**

2        On or about November 8, 2013, a summons was issued by the United States

3    District Court for the District of New Jersey as to Defendant TALK RADIO and

4    Defendant MASTERS with regard to Plaintiffs' second amended complaint (hereinafter

5    "Complaint.")  *See* Docket Number 12.  Soon thereafter, on or about November 21,

6    2013, copies of the summons and Complaint were served, by and through the reputable

7    process service agency ABC Legal, who also happen to be the U.S. Department of

8    Justice's process servers, on Defendants MASTERS and TALK RADIO, at

9    MASTERS' business address, and the address of the registered agent for service of

10   process of Defendant TALK RADIO, respectively, which are both located at Defendant

11   TALK RADIO's headquarters in Grants Pass, Oregon.  *See* Declaration of Christian S.

12   Molnar, Esq., at **Exhibit "A."**  Such service was performed in full compliance with the

13   Oregon <u>Rules of Civil Procedure</u> respecting service of summons, as further set forth,

14   *infra*.  As Defendants' admit in their Motion, both Defendants, and their legal counsel,

15   additionally actually received said summons and Complaint, and were aware of service

16   of the same at their Grants Pass office location.  *See* Defendant's Motion to Vacate

17   Default, Declaration of Ron Severaid, at Paragraph 8.

18       Contrary to Defendants' platitudes regarding their inability to understand the

19   documents left for them at their registered business locations, and their purported

20   failure to realize that they were required to respond to Plaintiffs' Complaint**,**

21   **Defendant TALK RADIO and Defendant MASTERS are sophisticated business**

22   **persons, who have been, and/or currently are, involved in literally dozens of legal**

23   **disputes with individuals and entities nation-wide**.  *See* Declaration of Christian S.

24   Molnar, Esq., at **Exhibit "B."**  In fact, a material and fundamental aspect of this case

25   involves Defendant TALK RADIO's protracted and complex litigation in federal court

26   with a distribution company, non-party Dial Global, Inc.  *See* Declaration of Christian

27   S. Molnar, Esq., at **Exhibit "C."**

28

---

**3**

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO
DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

1        As experienced and sophisticated litigants, Defendant TALK RADIO and

2  Defendant MASTERS have full-time in-house legal counsel, Ron Severaid, Esq., who

3  is charged with monitoring pleadings, motions, and legal filings that affect Defendant

4  TALK RADIO, and responding accordingly.  As admitted in their Motion to Vacate

5  Entry of Default (hereinafter "Defendants Motion"), Defendants were aware of both the

6  original complaint and the currently operative, second amended complaint, within a

7  few days of their respective electronic filings, and were additionally aware of the fact

8  that service had been made upon them with regard to the second amended complaint.

9  See Defendants' Motion, at Declaration of Ron Severaid at Paragraph 8; Defendants'

10  Motion, at Declaration of Mark Masters, at Paragraph 4.  Knowing that Plaintiffs'

11  Complaint was filed, and knowing that service had been made, or at the very least,

12  attempted, the proper legal avenue to challenge that service would have been to file a

13  motion to quash service.  Instead, Defendants simply sat on their hands, waiting

14  months, without action, until a default had been taken against them, and only then

15  argue they were improperly served.  Even if service had not been proper, doing nothing

16  when a party knows that service was attempted is clearly not a proper legal method by

17  which to object to service – a fact that both Defendants, who are serial litigants, and

18  their counsel, who is a sophisticated litigator, clearly knew was improper behavior.

19        This court certainly should not reward Defendants for ignoring Plaintiffs

20  complaint for months, and then looking to this Court to "bail them out" of a default that

21  could have easily been avoided, but for Defendants' purposeful failure to timely reply.

22  Should Defendants have actually believed that service of process was insufficient in

23  this case, the correct course of action was to file a motion to quash, or, at the very least,

24  meet and confer with Plaintiffs' counsel to determine whether any additional action is

25  necessary or required to move the case forward – not ignore Plaintiffs' Complaint as a

26  legal strategy and hope that their problem would just go away.  Defendants should not

27  be rewarded for their calculated indifference in shrugging off their legal obligation to

28

---

**4**

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO
DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

respond to Plaintiffs' properly served Complaint; but rather, they should be made to live with their intentional choice to ignore the pleading, and suffer the consequences of their negligent behavior.

## II.   LEGAL DISCUSSION

### A.   Defendants were properly served Pursuant to FRCP 4(E)(2).

Defendants argue that the default entered against them should be vacated pursuant to Federal Rules of Civil Procedure 55(c) because neither Defendant TALK RADIO nor Defendant MASTERS was properly served with the summons and complaint as required by the Federal Rules of Civil Procedure. (See Docket Number 17.) However, Defendant's argument is premised on a complete mis-reading, or purposeful omission, of critical portions of the Federal Rules of Civil Procedure and the Oregon Rules of Civil Procedure. Because Defendants' argument completely fails to grasp the critical portions of the applicable rules, their argument lacks merit and is fatally defective.

### 1.   The Federal Rules of Civil Procedure Allow for Service to be Effectuated Under the Rules of the State in Which Service is Made.

Federal Rule of Civil Procedure 4(e) provides that "an individual . . . may be served in a judicial district of the United States by: (1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made. . ." Thus, to properly serve an individual like Defendant MASTERS in a Judicial District of the United States, the serving party has a choice – it may comply with *either* the rules regarding service of process in the state in which the district court is located (here, New Jersey,) *or* the state in which service is made (here, Oregon.) Compliance with either set of rules will constitute proper and adequate service in any Judicial District Court of the United States. Similarly, Federal Rule of Civil Procedure Rule 4(e) states "a domestic or

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

foreign corporation, or a partnership or other unincorporated association that is subject to suit under a common name, must be served: (1) in a judicial district of the United States: (A) in the manner prescribed by Rule 4(e)(1) for serving an individual. . ." Thus, to properly serve a corporate entity, like Defendant TALK RADIO, the same choice is available -- the serving party may serve the corporation under either the rules of the state in which the district court is located, or the state in which service is made.

### 2.   Defendant Talk Radio Was Properly Served Under the Rules of Oregon, the State in Which Service Was Made.

The Oregon <u>Rules of Civil Procedure</u> proscribe that the "Primary Service Method" for serving a corporation is "[b]y personal service or office service upon a registered agent, officer, or director of the corporation; **or by personal service upon any clerk on duty in the office of a registered agent**. Oregon <u>Rules of Civil Procedure</u> 7(D)(3)(b). In defining which persons qualify as "clerks" within the scope of this rule, the Oregon has interpreted the term broadly, to encompass nearly all persons employed in the same office location as the registered agent for service of process who is available to, and interacts with, the public and has some contact with the registered agent. *Abbotts v. Bacon*, 133 Or. App. 315, 320 (1995)(defining "clerk" as "encompass[ing] those employees in the registered agent's office who interact with the public, have regular contact with the registered agent, and for whom there is some obligation to pass along documents to the registered agent.") Exemplifying how extremely broad the term "clerk" is under this rule, the court found, in <u>Abbots v. Bacon</u>, a bartender who worked in the same building as the registered agent for service of process to be a "clerk" capable of accepting service on behalf of the agent. There, the court concisely summarized all that was required under the Oregon rule: "The process server went to defendant's registered agent's office, verified that the agent in fact worked at the immediate location, and then proceeded to serve the bartender on duty there. . . On these facts, we conclude that the bartender plaintiff served was a

---

**6**

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

"clerk" in defendant's registered agent's office and that service was effected in accordance with [the rule]"  *Abbotts v. Bacon,* 133 Or. App. 315, 321(1995).

In this case, Ms. Erin Terry, a person whom Defendants admit "works at the site of [Defendant TALK RADIO]," and is employed at the same location, and presumably in the same offices as, as Defendant TALK RADIO's registered agent for service of process, Mr. Ron Severaid, and has regular contact with Mr. Severaid.  *See* Defendant's Motion, at Declaration of Erin Terry, paragraph 3 and 7; *see also* Declaration of Christian S. Molnar, Esq, at **Exhibit "D."**  As such, she satisfies all the requirements, as set forth by the court, of a "clerk on duty in the office of a registered agent" and thus may properly be served with papers on behalf of Defendant TALK RADIO.  Ms. Terry, a fellow employee in the same office space as Mr. Severaid, certainly has a greater nexus to him, is a more proper person to accept service, than the bartender in *Abbotts*, *supra*, who was deemed by the court to be a proper person on which service may be made.

Defendants devote much space in their brief to complain that Ms. Terry is not an officer or director of Defendant TALK RADIO, is not directly employed by Defendant TALK RADIO or Defendant MASTERS, and is not "in charge" of Defendants' office. Setting aside for the moment that Plaintiffs' process server has no way of knowing any of this, and the fact that Ms. Terry willingly accepted the documents, none of the facts Defendants' assert are lacking are required before Defendants can be served at this address – as case law makes clear – <u>any</u> person, employed at the registered address, and who has regular contact with the registered agent, may be served.  Ms. Terry clearly fits the bill.  Defendants' attempt to distract this Court with extraneous and inapplicable facts is simply beside the point – the service of process on Defendant TALK RADIO was in full compliance with the liberal standards set forth in the Oregon <u>Rules of Civil Procedure</u>, and effective to satisfy service of process of the District Court for the

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

District of New Jersey.  Thus, Defendants' entire argument, premised on their alleged "improper service," collapses.

### 3.   Defendant Masters Was Properly Served Under the <u>Rules</u> of Oregon, the State in Which Service Was Made.

Similarly, Defendant MASTERS was properly served under the Oregon <u>Rules of Civil Procedure</u>.  Consistent with the liberal requirements established by the Oregon Rules, the Oregon court allows for service by any of the specific methods laid out in Rule 7(D)(3) <u>or</u> by any other method reasonably calculated, under all the circumstances, to apprise the defendant of the existence and pendency of the action and to afford a reasonable opportunity to appear and defend."  Oregon <u>Rules of Civil Procedure</u> 7(D)(1); *Hoeck v. Schwabe, Williamson & Wyatt*, 149 Or. App. 607, 615 (1997) (The Oregon "Supreme Court articulated a two-part test for determining the adequacy of service under ORCP 7.  First, . . . determine whether the method used was permitted by ORCP 7 D(3)… If those requirements are not met, then we must determine whether service otherwise is adequate under the reasonable notice standard set forth in ORCP 7 D(1).")  The Oregon Court has held that service on an individual like Defendant MASTERS is adequate under Rule7 D(1) if the process server has reason to believe that the person with whom the summons and complaint have been left has regular, frequent and predictable contact with the defendant.  *Hoeck v. Schwabe, Williamson & Wyatt,* 149 Or. App. 607, 617 (1997).  Likewise, service was determined to be adequate where service was made on the Defendant's ex-wife, the Defendant's book-keeper, and even the Defendant's lawyer's grandmother, where the facts show that the Defendant has frequent and regular contact with that person, and would thus likely receive notice of the documents served.  *See  Duber v. Zeitler,* 118 Or.App. 597, 601, (1993)(service upon the Defendant's ex-wife was proper, where the Defendant regularly saw her for the purposes of picking up mail and vising his children); *Matter of Marriage of Boyd*, 131 Or.App. 194, 199-200, (1994)(Service on Defendants book

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

1  keeper was valid where process service established that bookkeeper maintained more

2  than infrequent and unpredictable contact with the defendant);  *Gallogly v. Calhoon,*

3  126 Or.App 366, 370-01 (1994)(Service on a defendant lawyer's grandmother, at her

4  home was adequate under the Oregon Rules because the defendant had designated that

5  address as the place to receive professional correspondence.)

6  In fact, in a case remarkably similar to the facts presented here, in *Hoeck v.*

7  *Schwabe, Williamson & Wyatt*, the court was required to determine whether service

8  was adequate on an individual where the process server left the summons and

9  complaint with a receptionist at the office where the Defendant worked, and where

10 Defendant was frequently present, and then followed-up that notice by mailing a copy

11 of the summons and complaint to Defendant at the same address.  In finding service to

12 be adequate and proper, the court analyzed the above precedent in holding:

> Under the circumstances, we conclude that the service satisfied the reasonable notice requirements of ORCP 7 D(1). Certainly, the contact between a lawyer and a receptionist on his or her floor entails more than the once-a-week visits that we found adequate in *Duber.*  Like the defendant's relationship with his bookkeeper in *Boyd,* [Defendants]'s relationship with the receptionist on his floor—and her particular knowledge of his whereabouts and schedule—implies that his contacts with her were regular, frequent and predictable. **Particularly in the light of the fact that service was made at the address designated by [Defendant] as the place to receive professional correspondence, and that plaintiff followed that service with service by mail, as in *Gallogly,* plaintiffs had good reason to believe that [Defendant] would be apprised of the existence and pendency of the action against him.**

*Hoeck v. Schwabe, Williamson & Wyatt*, 149 Or. App. 607, 618 (1997).  Defendant's

contention that the process server was required to affirmatively ascertain that the

person on whom papers were served, Ms. Terry, was actually a "boss" or "person in

---

**9**

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

charge" of the office location, or, alternatively, was a person authorized to accept service on behalf of Defendant MASTERS is simply erroneous, and was expressly rejected in *Boyd, supra*. Under the Oregon rule, much less is required. *See Gallogly v. Calhoon,* 126 Or.App. at 370–71, 869 P.2d 346; *Hoeck v. Schwabe, Williamson & Wyatt*, 149 Or. App. 607, 618 (1997).

Here, as in the above cases, Plaintiff served Defendant MASTERS by leaving at his office location, a place with which Defendant MASTERS has frequent, regular, and predictable contact, and which is also the address designated by Defendant MASTERS as the place in which he receives professional correspondence, a copy of the summons and complaint. *See* Declaration of Christian S. Molnar at **Exhibit "D."** Additionally, as admitted by Defendant MASTERS in his declaration attached to Defendant's Motion, the same documents were mailed to Defendant MASTERS, and actually received by him, at the same location. *See* Defendant's Motion at Declaration of Mark Masters, Paragraph 4. The Oregon court has, time and time again, affirmed the rule that leaving a copy of the summons and complaint at the Defendant's business address and place of work, followed-up by mailing the same to the Defendant, constitutes proper service. *See Gallogly v. Calhoon,* 126 Or.App. at 370–71, 869 P.2d 346; *Hoeck v. Schwabe, Williamson & Wyatt*, 149 Or. App. 607, 618 (1997). This is exactly the process, to the letter, that was taken in serving Defendant MASTERS. Thus, Defendant MASTERS cannot plausibly assert that he was improperly served under the Oregon Rules.

**B.**  **Good Cause Does Not Exist to Vacate the Default Pursuant to FRCP 55(c).**

**1.**  **Defendant Has No Meritorious Defense Against Plaintiffs' Claims.**

A threshold issue in opening a default judgment is whether a meritorious defense has been asserted. Where the Defendants do not, or cannot, assert a meritorious

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

1    defense to the causes of action contained in Plaintiffs' Complaint, then the default must

2    stand, as entered.  *Hritz v. Woma Corp.,* 732 F.2d 1178, 1181 (3d Cir. 1984).  A

3    "meritorious defense" as used in this context, is a stringent standard – the Defendants

4    must establish that "the allegations of defendant's answer, if established on trial would

5    constitute a complete defense to the action."  *Hritz v. Woma Corp.,* 732 F.2d 1178,

6    1181 (3d Cir. 1984).  Defendants have not met this standard for at least four reasons:

7        First, Defendants "defense" is only a complaint as to the forum in which

8    Plaintiffs' claims have been brought, and does nothing to counter the substantive

9    aspects of Plaintiffs' Complaint.  Second, even should Defendants' defense of

10   arbitration be considered a substantive, true "defense" to the claims asserted by

11   Plaintiffs,' it is of no help to Defendants,' as there is no valid arbitration clause in this

12   case.  The "arbitration clause" that Defendants' allude to was contained in Plaintiff

13   TANTAROS's employment contract, which was for a limited duration, and which was

14   terminated several months ago.  Defendants want to have it both ways.  They assert that

15   the arbitration clause in the employment agreement should be considered operative and

16   a basis for justifying their failure to timely answer the Complaint, while they

17   concurrently ignore the fact that they intentionally and repeatedly breached the very

18   agreement upon which they now seek to rely.  As a consequence of Defendants'

19   repeated and uncured material breaches of its terms, the contract containing the

20   arbitration clause is no longer operative, it has no force or effect in this action.  Third,

21   even if, *arguendo*, Plaintiff TANTAROS's employment contract was still operative and

22   binding on the parties, which it is not, many of Plaintiffs' causes of action are outside

23   the scope of the employment agreement, and therefore would not be governed by its

24   terms, in any event.  For example, Plaintiffs' claims regarding intentional fraud and

25   fraud in the inducement, as well as Plaintiffs' cause of action seeking declaratory relief,

26   are outside the scope of Plaintiff TANTAROS's employment agreement.  Fourth,

27   where there is any doubt, ambiguity or argument as to whether Plaintiffs' case is

28

---

**11**

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO
DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

subject to mandatory arbitration, it is a question that must be decided by the court, it is error to assign such a decision to the arbitrator.  As such, Defendants cannot escape the jurisdiction of this court so easily – until the court has determined, definitively and as a matter of law, that each and every one of Plaintiffs' claims are subject to mandatory arbitration, Defendants are required to answer to this court.

a.  <u>Defendants Assert No Substantive Defense to Plaintiffs' Claims.</u>

Defendants' so-called "meritorious defense" to Plaintiffs' claims is that the action is governed by a mandatory arbitration clause within Plaintiff TANTAROS's employment contract.  However, asserting that the case is not subject to adjudication by this Court is not a substantive, direct defense to the claims asserted, but merely a complaint as to the venue in which the claims are filed – a procedural defect, at most. As Defendants assert no substantive defense as to the merits of Plaintiffs' claims, Plaintiffs can only assume that none such defense exists.  As the existence of a substantive defense is a "threshold issue" when determining whether an entry of default should be vacated, then this defect alone should cause Defendants' Motion to be denied.  *See Hritz v. Woma Corp.,* 732 F.2d 1178, 1181 (3d Cir. 1984).

b.  <u>No Arbitration Clause Exists in this Case.</u>

Where there is no valid contract to arbitrate, a petition to compel arbitration must be denied.  *See Century Indem. Co. v. Certain Underwriters at Lloyd's London*, 854 F.3d. 513, 523 (3d. Cir. 2009).  Here, the only contract which might subject the parties to arbitration is Plaintiffs' employment agreement – a contract which was terminated some months ago, and which is no longer operative.  Because the contract at issue is no longer operative, there is no basis by which to enforce arbitration.

c.  <u>Plaintiffs' Claims are Outside the Scope of the Purported Arbitration Clause</u>.

Arbitration may only be compelled if a particular case falls **entirely** within the scope of the arbitration clause.  *Century Indem. Co. v. Certain Underwriters at*

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

*Lloyd's London*, 854 F.3d. 513, 523 (3d. Cir. 2009).  A reviewing court may not "override the will of the parties by giving the arbitration clause greater coverage then the parties intended." *PaineWeber, Inc. v. Hartmann*, 921 F.2d 507, 511 (3d. Cir. 1995).  Similarly, a court cannot "force a party to arbitrate their disputes unless the party agreed to such arbitration." *Bouriez v. Carnegie Mellon Univ.,* 359 F.3d 292, 292 (3d. Cir. 2004).  As argued more fully, *infra*, the scope of the arbitration clause is a question for the court, as a matter of law, based on the prevailing rules of contract interpretation, and not a question for the arbitrator. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938 (1995).

In this case, the arbitration clause is narrowly drawn, applying only as to "disputes between the parties relating to this agreement and/or the obligations and/or entitlements of any Party under this agreement."  *See* Declaration of Joseph C. Cane, Jr., Esq., **Exhibit "D,"** Employment Agreement, Section 24, pg. 24.  The plain-meaning of this arbitration clause is that it only governs disputes arising out of the contract itself, or the obligations and rights assigned pursuant to its terms – it does <u>not</u> cover conduct or actions taken before the contract was entered into, nor does it cover actions that are outside the scope of the employment at issue, such as claims of harassment, discrimination, and the like, which are completely absent, in any form, from the employment agreement.

To determine whether a "particular claim falls within the scope of an arbitration agreement, the focus is on the factual underpinning of the claim rather than the legal theory alleged in the complaint" *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d. 44, (3d Cir 2001).  Moreover, a claim is considered to "arise under" a contract only where its resolution requires resort to the language of the contract. *Ford v. NYLCare Health Plans of Gulf Coast Inc.,* 141 F3d. 243 246 (5th Cir. 1998).  The real test is "not….whether the facts in support of the action will generally implicate the agreement as an item of evidence" or whether the agreement is mentioned

---

**13**

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO
DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

1   in the complaint, by whether or not the facts that must be proven to seek relief from the

2   injuries alleged are based on the contract. *Ford v. NYLCare Health Plans of Gulf*

3   *Coast Inc.*, 141 F3d. 243 246 (5th Cir. 1998). Many of Plaintiffs claims are beyond the

4   scope of the arbitration clause because the employment agreement is completely

5   irrelevant to the factual underpinnings of those claims. For example, Plaintiff's claims

6   regarding employment discrimination under New Jersey state law have nothing to do

7   with the terms or obligations arising from the employment agreement -- or contract law

8   at all – and are entirely a creature of state and/or federal statutory law. Similarly,

9   Plaintiffs' claims regarding intentional fraud and fraud in the inducement have nothing

10  to do with the parties' rights and/or obligations arising under the employment

11  agreement, but rather relate to the parties' conduct leading up to the creation of the

12  agreement itself. Actions that precede the contract containing the arbitration agreement

13  are quite simply not governed by the terms of the subsequent agreement.

        d.  <u>The Issue of Whether the Action is Subject to Arbitration is a</u>

14

15              <u>Question for the Court, Not the Arbitrator</u>.

16        United States Courts have consistently recognized that the arbitrability of a

17  dispute is a determination for the courts not an arbitrator. Unless the parties clearly and

18  unmistakably provide otherwise, the question whether they agreed to arbitrate the

19  particular dispute is to be decided by the court, not the arbitrator. *First Options of*

20  *Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 944. The rationale for this is that the

21  willingness of parties to enter into arbitration agreements "would be 'drastically

22  reduced'… [if an] arbitrator has the 'power to determine his own jurisdiction'" *AT&T*

23  *Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 651 (1986).

24  Defendants' entire argument as to why this matter should be arbitrated is based on the

25  fallacious assumption that BOTH of the following, completely unestablished facts are

26  in fact, true: (1) that Plaintiff TANTAROS's employment agreement is still operative,

27  despite the fact that its term has ended, and Plaintiff TANTAROS is no longer

28

---

**14**

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO**
**DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

1    employed by Defendant TALK RADIO, and (2) that each and every one of Plaintiffs'
2    causes of action fall within the scope of the employment agreement – an assertion that
3    is easily discounted simply by looking at the causes of action asserted here, such as
4    intentional fraud and fraud in the inducement.   On Defendants' best day, there is a
5    serious question as to whether Plaintiffs' claims are subject to arbitration.

6              **2.     Defendants Purposefully Ignored the Complaint and Summons**
7              **in this Case, and are Culpable in the Resulting Entry of Default.**

8              Despite Defendants' excuses regarding their purported inability to understand
9    the documents left for them at their registered business locations, and their purported
10   failure to realize that they were required to respond to Plaintiffs' Complaint, Defendant
11   TALK RADIO and Defendant MASTERS are sophisticated business persons well
12   capable of understanding and responding to legal documents.   In fact, **both Defendant**
13   **MASTERS and Defendant TALK RADIO who have been, and/or currently are,**
14   **involved in literally dozens of legal disputes with individuals and entities nation-**
15   **wide regarding issues very similar to those raised in this case**.

16             As admitted in their Motion to Vacate Entry of Default (hereinafter "Defendants'
17   Motion"), Defendants were aware of both the original complaint and the currently
18   operative, second amended complaint, within a few days of their respective electronic
19   filings, and were additionally aware of the fact that service had been made upon them
20   with regard to the second amended complaint.  Further, Defendant TALK RADIO and
21   Defendant MASTERS have full-time in house legal counsel, Ron Severaid, Esq., who
22   is charged with monitoring pleadings, motions, and legal filings that affect Defendant
23   TALK RADIO, advising and counseling Defendants as to the same, and responding
24   appropriately.  Knowing that Plaintiffs' Complaint was filed, and knowing that service
25   had been made, or at the very least, attempted, the proper legal avenue was for
26   Defendants to file a motion to quash service.  Waiting months, without action, until a
27   default had been taken against them and only then argue they were improperly served is
28

---

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO**
**DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

1   the improper legal method by which to object to service – a fact that both Defendants
2   and their counsel are clearly aware.

3          Defendants should not be rewarded for ignoring Plaintiffs complaint for months,
4   and then requesting the court to "bail them out" of a default that was avoidable, but for
5   Defendants' purposeful failure to timely reply.  Should Defendants have believed that
6   service of process was insufficient in this case, the correct legal response would have
7   been to file a motion to quash, or, at the very least, seek to meet and confer with
8   Plaintiffs' counsel to determine whether any additional action is necessary or required
9   to move the case forward – not ignore Plaintiffs' Complaint as a legal strategy and
10  hope that their problem simply resolves itself.  Defendants should not be rewarded for
11  their calculated indifference and irresponsibility in completely shrugging off their legal
12  obligation to respond to Plaintiffs' properly served Complaint; rather, they should be
13  made to live with their intentional choice to ignore the pleading, and realize
14  consequences of their behavior – accepting the default that was entered due to their
15  failure to respond.

          **3.     Vacating the Entry of Default Would Result in Prejudice to
                   Plaintiffs.**

16
17

18         Defendants cavalierly disregard the prejudice to Plaintiffs' caused by their
19  irresponsible failure to respond to Plaintiffs' pleading by stating that, because only
20  months have passed since the entry of default, no prejudice could have possibly arisen.
21  This is simply not-true, and over-looks and discounts the harm incurred, and continued
22  to be incurred, by Plaintiffs' as a direct result of Defendants' complete disregard for
23  Plaintiffs' rights.

24         As a preliminary matter, in deciding the issue of prejudice, Defendants take an
25  arbitrary and myopic view in what constitutes prejudice – looking only to the time
26  frame between the entry of Defendant's default and the filing of Defendants' Motion –
27  completely disregarding the context in which Defendants' Motion arose, or the history

28

---

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO
DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

of this case.  The court has concluded that a longer outlook must be taken when deciding the issue of prejudice; one that takes into consideration all the facts and circumstances of the case.  *Hritz v. Woma Corp.,* 732 F.2d 1178, 1182 (3d Cir. 1984)(Defendants "failure to answer the complaint must be viewed in the context of its failure over an extended period of time to answer any claim or correspondence from the plaintiffs.")

Viewed in context of the entire case, Defendants' failure to respond resulted in extreme prejudice to Plaintiffs – Defendants have, to date, never responded to Plaintiffs' myriad requests for information relating to her unpaid contingent compensation, resulting in a severe loss of income and forcing Plaintiffs' to expend additional monies to hire legal counsel on their behalf.  Further, by not responding to Plaintiffs' Complaint, Defendants completely barred Plaintiff from conducting any discovery – a tactic which effectively precludes Plaintiffs from ever definitively knowing just how much contingent compensation they are owed by Defendants.  By continuing to purposefully ignore Plaintiffs' demands, Defendants have only further damaged Plaintiffs, and prejudiced their ability to recover for their damages, and further forced them to wait still longer for monies to which they are entitled.  Viewed in this light, Defendants have inflicted severe prejudice on Plaintiffs by defaulting in this action, which would only be compounded should such default be vacated.  As such, Defendants should not be allowed to vacate such default.

## III.   **CONCLUSION**

Plaintiffs' respectfully request that the Defendants' Motion to Vacate Entry of Default be denied, as Defendants state no valid reason why the default should be vacated.  Rather, each of the reasons Defendants give as to why the default entered against them should be vacated is contrary to the law, based on unfounded or unsupported statements of fact, and without merit.  First: both Defendants were properly served with copies of the summons and Complaint, in full compliance with the

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

Federal <u>Rules of Civil Procedure</u> and the Oregon <u>Rules of Civil Procedure</u>, and further had actual notice of the pending claims against them.  Simply, service of process was effective and proper as to both Defendants, and consequently, the Request for Entry of Default as entered against Defendants is valid and should be allowed to stand. Additionally, Defendants do not have any meritorious defense to the causes of action asserted in Plaintiffs' complaint; as such, vacating the entry of default would be futile. Plaintiffs' claims are not subject to arbitration, and instead must be adjudicated by this court.  Moreover, Defendants are completely at fault in causing their default to be taken, and could have avoided the same, had they wished, as Defendants were aware of both the filing of Plaintiffs' complaint, and of service of the same at their registered business address.  Instead of filing a responsive pleading, or a motion to quash service, as is appropriate, Defendants instead chose to ignore Plaintiffs' complaint as part of a calculated litigation strategy, and in the hopes of avoiding their liability to Plaintiff in this action.  Finally, Defendants have engaged in a continuous and wrongful pattern of behavior in which they fail to timely pay, or indeed, even respond, to Plaintiffs' request for information, financial data, or payments arising under their agreement.

Such actions have substantially hindered plaintiffs' ability to recover in this case, and caused extensive and avoidable delays in recovery of the sums owed.  Vacating Plaintiffs default would only cause further delay and further prejudice to Plaintiffs. Defendants should not be allowed to benefit from their calculated delays in this case. Instead, Defendants should be made to suffer the consequences of purposefully failing to respond to a properly served pleading –default judgment.

Dated: March 3, 2014            **TIMOTHY J. McILWAIN**


                                /s/Timothy J. McIlwain
                                Timothy J. McIlwain, counsel for
                                Plaintiffs ASTERO, LLC, a New Jersey
                                limited liability company and ANDREA
                                TANTAROS, an individual

---

**18**

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

## DECLARATION OF CHRISTIAN S. MOLNAR, ESQ.

I, CHRISTIAN S. MOLNAR, Esq., hereby declare that

1.      I am one of the attorneys of record for Plaintiffs ANDREA TANTAROS, an individual, and ASTERO, LLC, a New Jersey limited liability company (hereinafter "Plaintiff TANTAROS" and "Plaintiff ASTERO".)  I have personal knowledge of the matters set forth in this declaration and, if called as a witness, I could and would testify competently as to the matters stated below.

2.      I am making this Declaration in support of Plaintiff ASTERO and Plaintiff TANTAROS's Opposition to Defendant's Motion to Vacate Entry of Default.

3.      On or about November 21, 2013, copies of the summons and Plaintiffs' second amended complaint were served, by and through the reputable process service agency ABC Legal, who are the U.S. Department of Justice's process servers, on Defendant MARK MASTERS, an individual's (hereinafter "Defendant MASTERS") and Defendant TALK RADIO NETWORK, ENTERTAINMENT, INC., an Oregon corporation's (hereinafter "Defendant TALK RADIO") at Defendant MASTERS' registered business address, and the address of the registered agent for service of process of Defendant TALK RADIO, respectively, which are both located at Defendant TALK RADIO's headquarters in Grants Pass, Oregon.

4.      A true and correct copy of the Proofs of Service of Process filed in this case, confirming substituted service on Defendant MASTERS and Defendant TALK RADIO, is attached hereto as **Exhibit "A."**

5.      I directed the process server to serve Defendant MASTERS and Defendant TALK RADIO at their registered business addresses.  The Oregon Secretary of State's registered address for Defendant MASTERS and Defendant TALK RADIO is attached hereto as **Exhibit "D."**

5.      Defendant TALK RADIO and Defendant MASTERS are, and have been, involved in literally dozens of legal disputes with individuals and entities nation-wide.

---

**1**

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

The "PACER" reports for Defendant TALK RADIO and its affiliated entities, as well as for Defendant MASTERS and Their counsel, Mr. Ron Severaid, are attached hereto as **Exhibit "B."**

      6.    In fact, a material and fundamental aspect of this case involves Defendant TALK RADIO's protracted and complex litigation in federal court with a distribution company, non-party Dial Global, Inc.  Plaintiff TALK RADIO's second amended complaint against Dial Global, Inc., is attached hereto as **Exhibit "C."**

      I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Dated: March 3, 2014            **CHRISTIAN S. MOLNAR**


                       /s/Christian S. Molnar
                       Christian S. Molnar, Esq., counsel for Plaintiffs ASTERO, LLC, a New Jersey limited liability company and ANDREA TANTAROS, an individual

---

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

# Exhibit "A"

TIMOTHY J. McILWAIN
ATTORNEY AT LAW, LLC
89 River Street #1538
Hoboken, New Jersey 07030
Tel: (877) 375-9599
Fax: (609) 450-7017
Email:  Attorney@McIlwainLaw.com

JOSEPH C. CANE, JR., ESQ. (CA State Bar No. 173861)
*(Pro Hac Vice Application pending)*
jcane@businesslpc.com
CHRISTIAN S. MOLNAR, ESQ. (CA State Bar No. 177665)
christian@christiansmolnarlaw.com
*(Pro Hac Vice Application approved)*
12400 Wilshire Boulevard, Suite 1180
Los Angeles, California 90025
Tel: (310) 820-9900
Fax: (310) 919-1950

Attorneys for Plaintiffs ASTERO, LLC, a New Jersey limited liability company, and
ANDREA K. TANTAROS, an individual

# THE UNITED STATES DISTRICT COURT,

## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ASTERO, LLC,  a New Jersey limited liability company; ANDREA K. TANTAROS, an individual, | Case No.:  1:13-cv-06005-NLH-JS |
| Plaintiffs, | **FILING OF PROOF OF SERVICE OF SUMMONS AND COMPLAINT ON DEFENDANTS** |
| vs. | |
| TALK RADIO NETWORK ENTERTAINMENT, INC., an Oregon corporation, MARK MASTERS, an individual, and Does 1 through 10, inclusive, | |
| Defendants. | |

**FILING OF PROOF OF SERVICE OF
SUMMONS AND COMPLAINT ON DEFENDANTS**

1    Being filed herewith are the Proofs of Service of Summons and Complaint on

2  Defendants Talk Radio Network, Inc. and Mark Masters.

3                                               **Respectfully submitted,**

4                                               **TIMOTHY J. McILWAIN**

5                                               **ATTORNEY AT LAW, LLC**

6

7  Dated: December 9, 2013          By:     /s/ Timothy J. McIlwain

8                                               Timothy J. McIlwain,
                                                 Joseph C. Cane, Esq.
9                                               Christian S. Molnar, Esq.

10
                                                 Attorneys for Plaintiffs
11                                              ASTERO, LLC, and
                                                 ANDREA TANTAROS
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FILING OF PROOF OF SERVICE OF**
**SUMMONS AND COMPLAINT ON DEFENDANTS**

IN THE UNITED STATES DISTRICT COURT, DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ASTERO, LLC** | Hearing Date: |
| Plaintiff/Petitioner | CASE NO:<br>**1:13-CV-06005-NLH-JS** |
| vs. | AFFIDAVIT OF SERVICE OF: |
| **TALK RADIO NETWORK ENTERTAINMENT, INC.** | **SUMMONS ON AMENDED COMPLAINT; SECOND AMENDED COMPLAINT** |
| Defendant/Respondent | |

The undersigned, being first duly sworn, on oath deposes and says: That s(he) is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen, not an officer of a plaintiff corporation, not a party to nor interested in the above entitled action, has the authority to serve pleadings in the State named below, and is competent to be a witness therein.

On the **15th day of November, 2013**, at **3:37 PM**, at the address of **225 NE HILLCREST Drive**, **GRANTS PASS**, **Josephine** County, **OR 97526**; this affiant served the above described documents upon **TALK RADIO NETWORK ENTERTAINMENT, INC., AN OREGON CORPORATION** by then and there personally delivering **1** true and correct copy(ies) thereof, by then presenting to and leaving the same with **Erin Terry, BOSS, PERSON IN CHARGE, who accepted service, with identity confirmed by id check, a white female approx. 35-45 years of age, 5'6"-5'8" tall, weighing 180-200 lbs with blonde hair.**.

No Information was provided or discovered that indicates that the subjects served are members of the U.S. military.

I, **Jesse Douglas**, hereby state under penalty of perjury under the laws of the State of New Jersey that at the time of service, I was a competent adult, over the age of 18, and did not have a direct interest in the litigation. I declare that the above is true and correct.

DATED this _21_ day of _NOV_, 20_13_

_____

**Jesse Douglas, JACKSON, OR**
ABC Legal Services, Inc., 633 Yesler Way, Seattle, WA 98104

SUBSCRIBED AND SWORN to before me this _21_ day of _Nov_, 20_13_

_____

NOTARY PUBLIC in and for the State of **Oregon**
Residing at: _____
My Commission Expires: _____

FOR: **Law Offices of Christian S. Molnar**
REF: **1:13-CV-06005-NLH-JS**

ORIGINAL AFFIDAVIT OF SERVICE

Tracking #: **7877752** LAX FIL

OFFICIAL SEAL
**BRUCE W ARCHER**
NOTARY PUBLIC - OREGON
COMMISSION NO. 448026
MY COMMISSION EXPIRES APRIL 04, 2014

IN THE UNITED STATES DISTRICT COURT, DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ASTERO, LLC**<br><br>                                        Plaintiff/Petitioner<br><br>vs.<br><br>**TALK RADIO NETWORK ENTERTAINMENT, INC.**<br><br>                                        Defendant/Respondent | Hearing Date:<br><br>CASE NO:<br>**1:13-CV-06005-NLH-JS**<br><br>AFFIDAVIT OF SERVICE OF:<br>**SUMMONS ON AMENDED COMPLAINT; SECOND AMENDED COMPLAINT** |

The undersigned, being first duly sworn, on oath deposes and says: That s(he) is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen, not an officer of a plaintiff corporation, not a party to nor interested in the above entitled action, has the authority to serve pleadings in the State named below, and is competent to be a witness therein.

On the **15th day of November, 2013**, at **3:39 PM**, at the address of **225 NE HILLCREST Drive**, **GRANTS PASS**, **Josephine** County, **OR 97526**; this affiant served the above described documents upon **MARK MASTERS, AN INDIVIDUAL** by then and there personally delivering **1** true and correct copy(ies) thereof, by then presenting to and leaving the same with **Erin Terry, BOSS, PERSON IN CHARGE, who accepted service, with identity confirmed by id check, a white female approx. 35-45 years of age, 5'6"-5'8" tall, weighing 180-200 lbs with blonde hair.**.

No Information was provided or discovered that indicates that the subjects served are members of the U.S. military.

I, **Jesse Douglas**, hereby state under penalty of perjury under the laws of the State of New Jersey that at the time of service, I was a competent adult, over the age of 18, and did not have a direct interest in the litigation. I declare that the above is true and correct.

DATED this _21_ day of _NOV_ , 20_13_

_____

**Jesse Douglas, JACKSON, OR**
ABC Legal Services, Inc., 633 Yesler Way, Seattle, WA 98104

SUBSCRIBED AND SWORN to before me this _21_ day of _Nov_ , 20 _13_

_____

NOTARY PUBLIC in and for the State of **Oregon**
Residing at: _____
My Commission Expires: _____



FOR: **Law Offices of Christian S. Molnar**
REF: **1:13-CV-06005-NLH-JS**

ORIGINAL AFFIDAVIT OF SERVICE

Tracking #: **7877751** LAX FIL

OFFICIAL SEAL
**BRUCE W ARCHER**
NOTARY PUBLIC - OREGON
COMMISSION NO. 448026
MY COMMISSION EXPIRES APRIL 04, 2014

## <u>CERTIFICATE OF SERVICE</u>

I am over the age of eighteen (18) years, employed in the County of Los Angeles, and not a party to the above-entitled action.  My business address is 12400 Wilshire Boulevard, Suite 1180, Los Angeles, California 90025.

On December 9, 2013, I served:

### FILING OF PROOF OF SERVICE OF
### SUMMONS AND COMPLAINT ON DEFENDANTS

To be sent First Class United States Mail to the following:

Talk Radio Network, Incorporated, Defendant
225 NE Hillcrest Drive,
Grants Pass, Oregon 97526

Mark Masters, Defendant
225 NE Hillcrest Drive,
Grants Pass, Oregon 97526

I declare, under penalty of perjury under the laws of the United States of America that the foregoing is true and that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

Executed on December 9, 2013, at Los Angeles, California.

/s/ Neelamba J. Molnar
Neelamba J. Molnar

**FILING OF PROOF OF SERVICE OF
SUMMONS AND COMPLAINT ON DEFENDANTS**

# Exhibit "B"



**All Court Types Party Search**
Mon Mar 3 15:59:07 2014
27 records found

**User:** cm5834 P
**Client:** Tantaros v. TRN
**Search:** All Court Types Party Search Name Talk radio network All Courts Page: 1

### Civil Results

| | Party Name ▼ | Court | Case | NOS | Date Filed | Date Closed |
|---|---|---|---|---|---|---|
| 1 | Talk Radio Network Enterprises LLC (pla) | cacdce | 2:2012-cv-07370 | 410 | 08/27/2012 | 05/17/2013 |
| 2 | Talk Radio Network Enterprises LLC (pla) | nysdce | 1:2013-cv-03509 | 410 | 05/24/2013 | |
| 3 | Talk Radio Network Enterprises, LLC (cd) | ordce | 1:2013-cv-00759 | 190 | 05/06/2013 | |
| 4 | Talk Radio Network Enterprises, LLC (pla) | ordce | 1:2013-cv-00759 | 190 | 05/06/2013 | |
| 5 | Talk Radio Network Enterprises, LLC (pla) | ordce | 1:2013-cv-01016 | 190 | 06/17/2013 | |
| 6 | Talk Radio Network Enterprises, LLC (pla) | ordce | 1:2013-cv-01823 | 190 | 10/11/2013 | |
| 7 | Talk Radio Network Entertainment Inc (pla) | cacdce | 2:2012-cv-07370 | 410 | 08/27/2012 | 05/17/2013 |
| 8 | Talk Radio Network Entertainment Inc (pla) | nysdce | 1:2013-cv-03509 | 410 | 05/24/2013 | |
| 9 | TALK RADIO NETWORK ENTERTAINMENT, INC. (dft) | njdce | 1:2013-cv-06005 | 190 | 10/10/2013 | |
| 10 | Talk Radio Network Entertainment, Inc. (pla) | ordce | 1:2013-cv-01823 | 190 | 10/11/2013 | |
| 11 | Talk Radio Network Inc (cd) | cacdce | 2:2000-cv-02261 | 380 | 03/02/2000 | 05/30/2000 |
| 12 | Talk Radio Network Inc (dft) | cacdce | 2:2002-cv-08882 | 190 | 11/19/2002 | 08/19/2005 |
| 13 | Talk Radio Network Inc (dft) | cacdce | 2:2007-cv-02777 | 890 | 04/26/2007 | 07/06/2007 |
| 14 | Talk Radio Network Inc (pla) | cacdce | 2:2000-cv-02261 | 380 | 03/02/2000 | 05/30/2000 |
| 15 | Talk Radio Network Inc (pla) | caedce | 2:1999-cv-01957 | 380 | 10/05/1999 | 02/25/2000 |
| 16 | Talk Radio Network Inc (dft) | candce | 4:2010-cv-05785 | 190 | 12/20/2010 | 06/10/2013 |
| 17 | Talk Radio Network Operations Inc (pla) | cacdce | 2:2012-cv-07370 | 410 | 08/27/2012 | 05/17/2013 |
| 18 | Talk Radio Network Operations Inc (pla) | nysdce | 1:2013-cv-03509 | 410 | 05/24/2013 | |
| 19 | Talk Radio Network, Inc (cc) | ctdce | 3:2001-cv-01954 | 190 | 10/15/2001 | 02/12/2004 |
| 20 | Talk Radio Network, Inc (dft) | ctdce | 3:2001-cv-01954 | 190 | 10/15/2001 | 02/12/2004 |
| 21 | Talk Radio Network, Inc. (dft) | ilndce | 1:2007-cv-04314 | 890 | 08/01/2007 | 11/19/2009 |
| 22 | Talk Radio Network, Inc. (pla) | ilndce | 1:2003-cv-03167 | 190 | 05/12/2003 | 12/17/2003 |
| 23 | TALK RADIO NETWORK, INC. (pla) | ordce | 1:2013-cv-01016 | 190 | 06/17/2013 | |
| 24 | Talk Radio Network-FM Inc (pla) | cacdce | 2:2012-cv-07370 | 410 | 08/27/2012 | 05/17/2013 |
| 25 | Talk Radio Network-FM Inc (pla) | nysdce | 1:2013-cv-03509 | 410 | 05/24/2013 | |
| 26 | Talk Radio Network-FM, Inc. (cd) | ordce | 1:2013-cv-00759 | 190 | 05/06/2013 | |
| 27 | Talk Radio Network-FM, Inc. (pla) | ordce | 1:2013-cv-00759 | 190 | 05/06/2013 | |

**Receipt** 03/03/2014 15:59:07 124316932

**User** cm5834 P
**Client** Tantaros v. TRN
**Description** All Court Types Party Search
Name Talk radio network All Courts Page: 1
**Pages** 1 ($0.10)



**All Court Types Party Search**
Mon Mar 3 16:00:40 2014
29 records found

User: cm5834 P
Client: Tantaros v. TRN
Search: All Court Types Party Search Name talk radio All Courts Page: 1

### Civil Results

| | Party Name ▼ | Court | Case | NOS | Date Filed | Date Closed |
|---|---|---|---|---|---|---|
| 1 | Talk Radio Network Enterprises LLC (pla) | cacdce | 2:2012-cv-07370 | 410 | 08/27/2013 | 05/17/2013 |
| 2 | Talk Radio Network Enterprises LLC (pla) | nysdce | 1:2013-cv-03509 | 410 | 05/24/2013 | |
| 3 | Talk Radio Network Enterprises, LLC (cd) | ordce | 1:2013-cv-00759 | 190 | 05/06/2013 | |
| 4 | Talk Radio Network Enterprises, LLC (pla) | ordce | 1:2013-cv-00759 | 190 | 05/06/2013 | |
| 5 | Talk Radio Network Enterprises, LLC (pla) | ordce | 1:2013-cv-01016 | 190 | 06/17/2013 | |
| 6 | Talk Radio Network Enterprises, LLC (pla) | ordce | 1:2013-cv-01823 | 190 | 10/11/2013 | |
| 7 | Talk Radio Network Entertainment Inc (pla) | cacdce | 2:2012-cv-07370 | 410 | 08/27/2012 | 05/17/2013 |
| 8 | Talk Radio Network Entertainment Inc (pla) | nysdce | 1:2013-cv-03509 | 410 | 05/24/2013 | |
| 9 | TALK RADIO NETWORK ENTERTAINMENT, INC. (dft) | njdce | 1:2013-cv-06005 | 190 | 10/10/2013 | |
| 10 | Talk Radio Network Entertainment, Inc. (pla) | ordce | 1:2013-cv-01823 | 190 | 10/11/2013 | |
| 11 | Talk Radio Network Inc (cd) | cacdce | 2:2000-cv-02261 | 380 | 03/02/2000 | 05/30/2000 |
| 12 | Talk Radio Network Inc (dft) | cacdce | 2:2002-cv-08882 | 190 | 11/19/2002 | 08/19/2005 |
| 13 | Talk Radio Network Inc (dft) | cacdce | 2:2007-cv-02777 | 890 | 04/26/2007 | 07/06/2007 |
| 14 | Talk Radio Network Inc (pla) | cacdce | 2:2000-cv-02261 | 380 | 03/02/2000 | 05/30/2000 |
| 15 | Talk Radio Network Inc (pla) | caedce | 2:1999-cv-01957 | 380 | 10/05/1999 | 02/25/2000 |
| 16 | Talk Radio Network Inc (dft) | candce | 4:2010-cv-05785 | 190 | 12/20/2010 | 06/10/2013 |
| 17 | Talk Radio Network Operations Inc (pla) | cacdce | 2:2012-cv-07370 | 410 | 08/27/2012 | 05/17/2013 |
| 18 | Talk Radio Network Operations Inc (pla) | nysdce | 1:2013-cv-03509 | 410 | 05/24/2013 | |
| 19 | Talk Radio Network, Inc (cc) | ctdce | 3:2001-cv-01954 | 190 | 10/15/2001 | 02/12/2004 |
| 20 | Talk Radio Network, Inc (dft) | ctdce | 3:2001-cv-01954 | 190 | 10/15/2001 | 02/12/2004 |
| 21 | Talk Radio Network, Inc. (dft) | ilndce | 1:2007-cv-04314 | 890 | 08/01/2007 | 11/19/2009 |
| 22 | Talk Radio Network, Inc. (pla) | ilndce | 1:2003-cv-03167 | 190 | 05/12/2003 | 12/17/2003 |
| 23 | TALK RADIO NETWORK, INC. (pla) | ordce | 1:2013-cv-01016 | 190 | 06/17/2013 | |
| 24 | Talk Radio Network-FM Inc (pla) | cacdce | 2:2012-cv-07370 | 410 | 08/27/2012 | 05/17/2013 |
| 25 | Talk Radio Network-FM Inc (pla) | nysdce | 1:2013-cv-03509 | 410 | 05/24/2013 | |
| 26 | Talk Radio Network-FM, Inc. (cd) | ordce | 1:2013-cv-00759 | 190 | 05/06/2013 | |
| 27 | Talk Radio Network-FM, Inc. (pla) | ordce | 1:2013-cv-00759 | 190 | 05/06/2013 | |
| 28 | Talk Radio Newtork Entertainment, Inc. (cd) | ordce | 1:2013-cv-00759 | 190 | 05/06/2013 | |
| 29 | Talk Radio Newtork Entertainment, Inc. (pla) | ordce | 1:2013-cv-00759 | 190 | 05/06/2013 | |

| | |
|---|---|
| | Receipt 03/03/2014 16:00:41 124317376 |
| User | cm5834 P |
| Client | Tantaros v. TRN |
| Description | All Court Types Party Search |
| | Name talk radio All Courts Page: 1 |
| Pages | 1 ($0.10) |



**PACER**
Case Locator

Civil Party Search
Mon Mar 3 16:27:05 2014
2 records found

User: cm5834 P
Client:
Search: Civil Party Search Name The original talk radio network All Courts Page: 1

| Party Name ▼ | Court | Case | NOS | Date Filed | Date Closed |
|---|---|---|---|---|---|
| 1 The Original Talk Radio Network, Inc. (cd) | ordce | 1:2013-cv-00759 | 190 | 05/06/2013 | |
| 2 The Original Talk Radio Network, Inc. (pla) | ordce | 1:2013-cv-00759 | 190 | 05/06/2013 | |

Receipt 03/03/2014 16:27:06 124323712

User cm5834 P
Client
Description Civil Party Search
Name The original talk radio network All Courts Page: 1
Pages 1 ($0.10)



**PACER**
Case Locator

**Civil Party Search**
Mon Mar 3 16:27:33 2014
4 records found

**User:** cm5834 P
**Client:**
**Search:** Civil Party Search Name Talk Radio Network Entertainment All Courts Page: 1

| Party Name ▼ | Court | Case | NOS | Date Filed | Date Closed |
|---|---|---|---|---|---|
| 1 Talk Radio Network Entertainment Inc (pla) | cacdce | 2:2012-cv-07370 | 410 | 08/27/2012 | 05/17/2013 |
| 2 Talk Radio Network Entertainment Inc (pla) | nysdce | 1:2013-cv-03509 | 410 | 05/24/2013 | |
| 3 TALK RADIO NETWORK ENTERTAINMENT, INC. (dft) | njdce | 1:2013-cv-06005 | 190 | 10/10/2013 | |
| 4 Talk Radio Network Entertainment, Inc. (pla) | ordce | 1:2013-cv-01823 | 190 | 10/11/2013 | |

**Receipt** 03/03/2014 16:27:33 124323815
**User** cm5834 P
**Client**
**Description** Civil Party Search
Name Talk Radio Network Entertainment All Courts Page: 1
**Pages** 1 ($0.10)

1 of 1                                                                                          3/3/2014 3:27 PM



**All Court Types Party Search**
Mon Mar 3 16:07:14 2014
2 records found

**User:** cm5834 P
**Client:** Tantaros v. TRN
**Search:** All Court Types Party Search Name america's radio news network All Courts Page: 1

### Civil Results

| Party Name ▼ | Court | Case | NOS | Date Filed | Date Closed |
|---|---|---|---|---|---|
| 1 America's Radio News Network, Inc. (cd) | ordce | 1:2013-cv-00759 | 190 | 05/06/2013 | |
| 2 America's Radio News Network, Inc. (pla) | ordce | 1:2013-cv-00759 | 190 | 05/06/2013 | |

| | |
|---|---|
| | Receipt 03/03/2014 16:07:14 124318970 |
| **User** | cm5834 P |
| **Client** | Tantaros v. TRN |
| **Description** | All Court Types Party Search |
| | Name america's radio news network All Courts Page: 1 |
| **Pages** | 1 ($0.10) |



**PACER**
Case Locator

**Civil Party Search**
Mon Mar 3 16:35:43 2014
12 records found

**User:** cm5834 P
**Client:** Tantaros v. TRN
**Search:** Civil Party Search Name severaid, ron All Courts Page: 1

| Party Name ▼ | Court | Case | NOS | Date Filed | Date Closed |
|---|---|---|---|---|---|
| 1 Severaid, Ronald H (aty) | ordce | 3:1988-cv-01010 | 470 | 09/06/1988 | 01/24/1989 |
| 2 Severaid, Ronald Harold (aty) | cacdce | 2:2000-cv-02261 | 380 | 03/02/2000 | 05/30/2000 |
| 3 Severaid, Ronald Harold (aty) | cacdce | 2:2007-cv-02777 | 890 | 04/26/2007 | 07/06/2007 |
| 4 Severaid, Ronald Harold (aty) | cacdce | 2:2012-cv-07370 | 410 | 08/27/2012 | 05/17/2013 |
| 5 Severaid, Ronald Harold (aty) | caedce | 1:1995-cv-05296 | 470 | 04/21/1995 | 08/26/1999 |
| 6 Severaid, Ronald Harold (aty) | caedce | 2:1990-cv-00934 | 440 | 07/19/1990 | 12/02/1991 |
| 7 Severaid, Ronald Harold (aty) | caedce | 2:1992-cv-01908 | 190 | 11/17/1992 | 06/04/1993 |
| 8 Severaid, Ronald Harold (aty) | caedce | 2:1995-cv-01532 | 791 | 08/23/1995 | 06/25/1996 |
| 9 Severaid, Ronald Harold (aty) | caedce | 2:1999-cv-01957 | 380 | 10/05/1999 | 02/25/2000 |
| 10 Severaid, Ronald Harold (aty) | candce | 3:2008-cv-04703 | 820 | 10/10/2008 | 09/15/2009 |
| 11 Severaid, Ronald Harold (aty) | ilndce | 1:2007-cv-04314 | 890 | 08/01/2007 | 11/19/2009 |
| 12 Severaid, Ronald Harold (aty) | nysdce | 1:2013-cv-03509 | 410 | 05/24/2013 | |

**Receipt** 03/03/2014 16:35:43 124325708
**User** cm5834 P
**Client** Tantaros v. TRN
**Description** Civil Party Search
Name severaid, ron All Courts Page: 1
**Pages** 1 ($0.10)



**All Court Types Party Search**
Mon Mar 3 15:59:47 2014
66 records found

**User:** cm5834 P
**Client:** Tantaros v. TRN
**Search:** All Court Types Party Search Name masters, mark All Courts Page: 1

---

## Bankruptcy Results

| | Party Name ▼ | Court | Case | Ch | Date Filed | Date Closed | Disposition |
|---|---|---|---|---|---|---|---|
| 1 | Masters, Mark (db) | caebke | 2:01-bk-32883 | 7 | 11/06/2001 | 02/12/2002 | Standard Discharge 02/07/2002 |
| 2 | Masters, Mark (db) | caebke | 9:01-bk-94754 | 7 | 12/19/2001 | 04/02/2002 | Standard Discharge 03/28/2002 |
| 3 | Masters, Mark (dft) | casbke | 3:91-ap-90693 | | 10/15/1991 | 04/17/1996 | |
| 4 | Masters, Mark (db) | innbke | 3:03-bk-32455 | 13 | 04/29/2003 | 12/17/2007 | Standard Discharge 11/15/2007 |
| 5 | Masters, Mark (cr) | wvnbke | 1:01-bk-13140 | 7 | 10/01/2001 | 06/14/2006 | Discharge Not Applicable 01/15/2002 |
| 6 | Masters, Mark A (db) | ilnbke | 3:99-bk-51288 | 7 | 04/22/1999 | 08/13/1999 | Standard Discharge |
| 7 | Masters, Mark A. (db) | wawbke | 2:87-bk-03603 | 7 | 05/06/1987 | 10/20/1987 | Standard Discharge 09/09/1987 |
| 8 | Masters, Mark Amold (db) | wvsbke | 5:89-bk-50356 | 7 | 11/03/1989 | 08/29/1990 | Standard Discharge 03/14/1990 |
| 9 | Masters, Mark D (db) | ncebke | 8:00-bk-02162 | 7 | 04/20/2000 | 08/03/2000 | Standard Discharge 08/03/2000 |
| 10 | Masters, Mark Douglas (db) | kyebke | 6:01-bk-60987 | 7 | 07/20/2001 | 10/24/2001 | Standard Discharge 10/24/2001 |
| 11 | Masters, Mark Douglas (db) | kyebke | 6:94-bk-60287 | 7 | 07/07/1994 | 02/21/1995 | Standard Discharge 01/17/1995 |
| 12 | Masters, Mark (aty) | miebke | 2:96-bk-41106 | 7 | 01/29/1996 | 04/02/1998 | Standard Discharge 04/04/1997 |
| 13 | Masters, Mark (aty) | miebke | 2:05-ap-05738 | | 09/28/2005 | 12/20/2005 | Dismissed or Settled Without Entry of Judgment 12/19/2005 |
| 14 | Masters, Mark R (db) | ohsbke | 2:02-bk-51459 | 7 | 02/07/2002 | 11/07/2003 | Standard Discharge 05/28/2002 |
| 15 | Masters, Mark Randall (db) | iasbke | 4:12-bk-01435 | 7 | 07/25/2012 | 08/07/2012 | Standard Discharge 08/07/2012 |
| 16 | Masters, Mark W. (cr) | wvnbke | 3:13-bk-00421 | 13 | 03/30/2013 | | |
| 17 | Masters, Mark Wayne (db) | lawbke | 5:94-bk-11481 | 13 | 10/18/1994 | 06/17/1997 | Standard Discharge 04/25/1997 |
| 18 | Masters, Mark William (db) | miebke | 2:99-bk-41554 | 7 | 02/02/1999 | 07/26/1999 | Standard Discharge 05/06/1999 |

## Civil Results

| | Party Name ▼ | Court | Case | NOS | Date Filed | Date Closed |
|---|---|---|---|---|---|---|
| 19 | Masters, Mark (dft) | cacdce | 2:2002-cv-08882 | 190 | 11/19/2002 | 08/19/2005 |
| 20 | Masters, Mark (3pp) | flmdce | 3:2006-cv-00333 | 350 | 04/12/2006 | 06/05/2007 |
| 21 | Masters, Mark (cd) | flmdce | 3:2006-cv-00333 | 350 | 04/12/2006 | 06/05/2007 |
| 22 | Masters, Mark (crc) | flmdce | 3:2006-cv-00333 | 350 | 04/12/2006 | 06/05/2007 |
| 23 | Masters, Mark (dft) | flmdce | 3:2006-cv-00333 | 350 | 04/12/2006 | 06/05/2007 |
| 24 | Masters, Mark (dft) | ilcdce | 4:2011-cv-04005 | 550 | 01/27/2011 | 11/09/2011 |
| 25 | MASTERS, MARK (dft) | njdce | 1:2013-cv-06005 | 190 | 10/10/2013 | |
| 26 | Masters, Mark (cd) | ordce | 1:2013-cv-00759 | 190 | 05/06/2013 | |
| 27 | Masters, Mark (pla) | ordce | 3:1989-cv-00258 | 440 | 03/09/1989 | 12/24/1991 |
| 28 | Masters, Mark (pla) | ordce | 6:1989-cv-06196 | 190 | 05/26/1989 | 01/22/1991 |
| 29 | Masters, Mark (pla) | wawdce | 2:1988-cv-01465 | 440 | 11/22/1988 | 11/30/1988 |
| 30 | Masters, Mark (pla) | wawdce | 3:1998-cv-05618 | 340 | 11/16/1998 | 06/16/2000 |
| 31 | Masters, Mark (pla) | wvndce | 2:1999-cv-00049 | 550 | 06/18/1999 | 03/31/2003 |
| 32 | Masters, Mark (pla) | wvndce | 2:1999-cv-00080 | 550 | 07/09/1999 | 04/04/2000 |
| 33 | Masters, Mark Adin (pla) | waedce | 2:2012-cv-05077 | 864 | 06/08/2012 | 12/19/2013 |
| 34 | Masters, Mark D (dft) | okndce | 4:2013-cv-00743 | 190 | 11/13/2013 | |
| 35 | Masters, Mark F. (aty) | miedce | 2:2000-cv-71066 | 350 | 02/28/2000 | 09/27/2002 |
| 36 | Masters, Mark F. (aty) | miedce | 2:2001-cv-70957 | 440 | 03/09/2001 | 05/24/2001 |
| 37 | Masters, Mark F. (aty) | miedce | 2:2003-cv-70926 | 440 | 03/26/2003 | 08/29/2003 |
| 38 | Masters, Mark F. (aty) | miedce | 2:1998-cv-71344 | 110 | 03/26/1998 | 08/03/1998 |
| 39 | Masters, Mark F. (aty) | miedce | 2:1999-cv-70349 | 350 | 01/28/1999 | 07/24/2000 |
| 40 | Masters, Mark F. (aty) | miedce | 2:1999-cv-70350 | 350 | 01/28/1999 | 07/24/2000 |
| 41 | Masters, Mark F. (aty) | miedce | 2:2004-cv-72137 | 360 | 06/08/2004 | 06/13/2006 |
| 42 | Masters, Mark F. (aty) | miedce | 2:2006-cv-14085 | 110 | 09/18/2006 | 02/23/2007 |
| 43 | Masters, Mark F. (aty) | miedce | 2:2008-cv-12620 | 360 | 06/19/2008 | 03/16/2009 |
| 44 | Masters, Mark F. (aty) | miedce | 2:2008-cv-15137 | 190 | 12/12/2008 | 06/25/2010 |
| 45 | Masters, Mark F. (aty) | miedce | 2:2009-cv-10843 | 360 | 03/06/2009 | 09/30/2009 |
| 46 | Masters, Mark F. (aty) | miedce | 2:2009-cv-12097 | 365 | 06/01/2009 | 01/25/2010 |
| 47 | Masters, Mark F. (aty) | miedce | 2:2009-cv-12685 | 360 | 07/08/2009 | 07/28/2010 |
| 48 | Masters, Mark F. (aty) | miedce | 2:2009-cv-14018 | 190 | 10/09/2009 | 11/06/2009 |
| 49 | Masters, Mark F. (aty) | miedce | 2:2010-cv-11885 | 360 | 05/10/2010 | 10/05/2011 |
| 50 | Masters, Mark F. (aty) | miedce | 2:2010-cv-13500 | 110 | 09/02/2010 | 10/12/2010 |
| 51 | Masters, Mark F. (aty) | miedce | 2:2011-cv-10336 | 442 | 01/28/2011 | 10/31/2012 |
| 52 | Masters, Mark F. (aty) | miedce | 2:2011-cv-11279 | 360 | 03/30/2011 | 07/06/2011 |
| 53 | Masters, Mark F. (aty) | miedce | 5:2011-cv-14833 | 360 | 11/02/2011 | |
| 54 | Masters, Mark F. (aty) | miedce | 2:2012-cv-10455 | 442 | 02/02/2012 | 05/15/2012 |

**Receipt 03/03/2014 15:59:47 124317137**

**User** cm5834 P

**Client** Tantaros v. TRN

**Description** All Court Types Party Search
Name masters, mark All Courts Page: 1

**Pages** 1 ($0.10)

# Exhibit "C"

COPY

FILED

2013 JAN 23 PM 3: 51

CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF
LOS ANGELES
BY: _____

1 | Peter K. Stris (SBN 216226)
      peter.stris@strismaher.com
2 | Victor O'Connell (SBN 288094)
      victor.oconnell@strismaher.com
3 | STRIS & MAHER LLP
   | 19210 S. Vermont Ave.
4 | Building E
   | Gardena, CA 90248
5 | Telephone: (424) 212-7090
   | Facsimile: (424) 212-7001
6 |
   | Joshua D. Wolson (*pro hac vice*)
7 |    jwolson@dilworthlaw.com
   | Jordan M. Rand (*pro hac vice*)
8 |    jrand@dilworthlaw.com
   | DILWORTH PAXSON LLP
9 | 1500 Market St., Suite 3500E
   | Philadelphia, PA 19102
10 | Telephone: (215) 575-7000
   | Facsimile: (215) 575-7200
11 |
12 | Attorneys for Plaintiffs The Original
   | Talk Radio Network, Inc.; Talk Radio
13 | Network Enterprises, LLC; Talk Radio
   | Network-FM, Inc.; Talk Radio Network
14 | Entertainment, Inc.; America's Radio
   | News Network; and Talk Radio Network
15 | Operations, Inc.

16 | UNITED STATES DISTRICT COURT

17 | FOR THE CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| 18 THE ORIGINAL TALK RADIO NETWORK, INC., et al., | Case No. CV 12-7370-JFW |
| 19 | |
| 20     Plaintiffs, | |
| 21   v. | **SECOND AMENDED COMPLAINT FOR ANTITRUST VIOLATIONS, UNFAIR COMPETITION, BREACH OF CONTRACT, TORTIOUS INTERFERENCE WITH CONTRACT AND PROSPECTIVE ADVANTAGE, AND OTHER STATE LAW CLAIMS** |
| 22 DIAL GLOBAL, INC., et al., | |
| 23     Defendants. | |
| 24 | |
| 25 | **JURY TRIAL DEMANDED** |
| 26 | |
| 27 | |
| 28 | |

1

SECOND AMENDED COMPLAINT FOR ANTITRUST VIOLATIONS, UNFAIR COMPETITION, BREACH OF CONTRACT,
TORTIOUS INTERFERENCE WITH CONTRACT AND PROSPECTIVE ADVANTAGE, AND OTHER STATE LAW CLAIMS

**INTRODUCTION**

1.     This is an action arising out of mergers and agreements through which Defendants have taken control of, gained market power in, or benefitted from control of two markets: the "Independent Ad Rep Market," which consists of the market for services as an advertising representative for news radio and talk radio programming that is produced or syndicated by a company that does not also own radio stations and is not an affiliate of any such owner (an "Independent Ad Rep"); and the "Satellite Services Market," which consists of the market for transmission of radio programming by satellite signal from a producer or syndicator which does not own radio stations and is not an affiliate of any such owner to a radio station, which then broadcasts the programming in its local market.

2.     At the same time that they have engaged in this unlawful, anticompetitive conduct, certain Defendants have also routinely ignored binding contractual commitments not to engage in the production or syndication of programming on their own or through affiliates. Those commitments were made to ensure that those Defendants could not have a conflict of interest in their performance of services as an Independent Ad Rep. Those Defendants have disregarded their obligations, however.

3.     In addition to violating their promises not to develop a conflict of interest by producing and syndicating programming, the same Defendants have violated contractual commitments not to pursue Plaintiffs' talent. Those promises were made to avoid creating a situation in which those Defendants were in a position to or had an incentive to use their position as Independent Ad Reps, with resulting levels of access to confidential knowledge concerning certain Plaintiffs' hosts and/or programs, to lure hosts from those Plaintiffs to themselves or their affiliates for their own gain or otherwise to injure Plaintiffs. Despite having made contractual commitments that they would not interfere with those Plaintiffs' relationships with hosts, those Defendants have made numerous efforts to lure

2

SECOND AMENDED COMPLAINT FOR ANTITRUST VIOLATIONS, UNFAIR COMPETITION, BREACH OF CONTRACT, TORTIOUS INTERFERENCE WITH CONTRACT AND PROSPECTIVE ADVANTAGE, AND OTHER STATE LAW CLAIMS

1 away talent with whom certain Plaintiffs have existing contractual relationships.

2 Those Defendants' conduct would not have been profitable, or likely even

3 possible, but for their monopoly control over the Independent Ad Rep Market.

4     4.    In addition to violating federal and state statutes and common law,

5 Defendants' conduct poses a significant risk to free speech under the First

6 Amendment because it holds the prospect of eliminating or substantially reducing

7 the number of independent talk radio producers and limiting the news radio

8 broadcasts available. As a consequence of that conduct, the diversity of voices and

9 viewpoints produced on talk radio is likely to decline.

10 **PARTIES**

11     5.    Plaintiff The Original Talk Radio Network, Inc. ("OTRN") is an

12 Oregon corporation with its principal place of business at 225 NE Hillcrest Drive,

13 Grants Pass, Oregon 97526.

14     6.    Plaintiff Talk Radio Network Enterprises, LLC ("TRNE") is an

15 Oregon limited liability company with its principal place of business at 225 NE

16 Hillcrest Drive, Grants Pass, Oregon 97526.

17     7.    Plaintiff Talk Radio Network – FM, Inc. ("TRN-FM") is a Delaware

18 corporation with its principal place of business at 225 NE Hillcrest Drive, Grants

19 Pass, Oregon 97526.

20     8.    Plaintiff Talk Radio Network Entertainment, Inc. ("TRN-ENT") is an

21 Oregon corporation with its principal place of business at 225 NE Hillcrest Drive,

22 Grants Pass, Oregon 97526.

23     9.    Plaintiff America's Radio News Network ("ARNN") is a Nevada

24 corporation with its principal place of business at 377 S. Nevada Street, Carson

25 City, Nevada 89703.

26     10.    Plaintiff Talk Radio Network Operations, Inc. ("TRNO") is an

27 Oregon corporation with its principal place of business at 225 NE Hillcrest Drive,

28 Grants Pass, Oregon 97526.

SECOND AMENDED COMPLAINT FOR ANTITRUST VIOLATIONS, UNFAIR COMPETITION, BREACH OF CONTRACT,
TORTIOUS INTERFERENCE WITH CONTRACT AND PROSPECTIVE ADVANTAGE, AND OTHER STATE LAW CLAIMS

11.     Defendant Dial Global, Inc. ("Dial Global") is a Delaware corporation with its principal place of business at 220 West 42nd Street, New York, New York 10036.

12.     Defendant Dial Communications – Global Media, Inc. ("Dial Communications") is a Delaware corporation with its principal place of business at 220 West 42nd Street, New York, New York 10036.

13.     Defendant Dial Communications Global Media LLC ("Dial LLC") is a Delaware limited liability company with its principal place of business at 220 West 42nd Street, New York, New York 10036.

14.     Defendant Excelsior Radio Networks LLC ("Excelsior") is a Delaware limited liability company doing business as "Triton Radio Networks" with its principal place of business at 220 West 42nd Street, New York, New York 10036.

15.     Defendant Triton Radio Networks, Inc. ("Triton Radio") is a Delaware corporation with its principal place of business at 220 West 42nd Street, New York, New York 10036.

16.     Defendant Triton Media Group, LLC ("Triton Group") is a California limited liability company with its principal place of business at 15303 Ventura Blvd., Suite 1500, Sherman Oaks, California 91403.

17.     Defendant Triton Media, LLC ("Triton Media") is a California limited liability company with its principal place of business at 15303 Ventura Blvd., Suite 1500, Sherman Oaks, California 91403.

18.     Defendant Verge Media Companies, Inc. ("Verge, Inc.") is a Delaware corporation with its principal place of business at 15303 Ventura Blvd., Suite 1500, Sherman Oaks, California 91403.

19.     Defendant Verge Media Companies, LLC ("Verge LLC") is a Delaware limited liability company with its principal place of business at 15303 Ventura Blvd., Suite 1500, Sherman Oaks, California 91403.  Verge LLC was

4

SECOND AMENDED COMPLAINT FOR ANTITRUST VIOLATIONS, UNFAIR COMPETITION, BREACH OF CONTRACT, TORTIOUS INTERFERENCE WITH CONTRACT AND PROSPECTIVE ADVANTAGE, AND OTHER STATE LAW CLAIMS

formerly known as "Radio Network Holdings, LLC" and is a wholly owned subsidiary of Dial Global.

20.     Defendant Compass Media Networks LLC ("Compass Media") is a New York limited liability company with its principal place of business at 32 Elm Place, Suite 3N, Rye, New York 10580.

21.     Defendant Compass Media Marketing, LLC ("Compass Marketing") is a Delaware limited liability company with its principal place of business at 32 Elm Place, Suite 3N, Rye, New York 10580.

22.     Defendant WYD Media Management LLC ("WYD") is a Connecticut limited liability company with its principal place of business at 31 Hemlock Ridge Road, Weston, Connecticut 06883.

23.     Defendant WYM Media Management LLC ("WYM") is a Connecticut limited liability company with its principal place of business at 31 Hemlock Ridge Road, Weston, Connecticut 06883.

24.     Defendant Courtside, LLC ("Courtside") is a Delaware limited liability company with its principal places of business at 335 North Maple Drive, Suite 127, Beverly Hills, California 90210 and 817 Broadway, Fifth Floor, New York, New York 10003.  Upon information and belief, Courtside does business under the trade name Courtside Entertainment Group.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because one or more claims arises under the laws of the United States, pursuant to 15 U.S.C. § 15 and 28 U.S.C. § 1337 because one or more claims is asserted under the Clayton Act, 15 U.S.C. §§ 12-27, and pursuant to 28 U.S.C. § 1367 because the claims arising under state law are related to the claims within the Court's original jurisdiction.

26.     Venue is proper pursuant to 15 U.S.C. § 22 because Defendants transact business in this District.

5

## FACTUAL BACKGROUND

27.     OTRN, TRNE, TRN-FM, TRN-ENT, and ARNN (collectively, the "Syndication Plaintiffs") are engaged in the production and national syndication of non-music, non-sports, spoken word radio programming, including both news and talk radio programming ("Spoken Word Syndication").  In particular, OTRN has at relevant times produced and syndicated The Michael Savage Show, among others; TRNE produces and syndicates The Jerry Doyle Show and has at relevant times produced and syndicated The Laura Ingraham Show, among others; TRN-FM produces and syndicates The Mancow Experience and The Phil Hendrie Show; TRN-ENT produces and syndicates America's Morning News, among others; and ARNN produces and syndicates four separate three-hour daily weekday news programs, and has at all relevant times produced and syndicated top- and bottom-of-the-hour news reports on a 24-hour per day, 7-day per week basis.

28.     As set forth in more detail below, for more than a decade, the Syndication Plaintiffs have retained Dial Global and/or its predecessors (collectively, "Dial") to sell advertising on the shows that the Syndication Plaintiffs produce and/or syndicate.  The Syndication Plaintiffs' decision to retain Dial was based, in significant part, on Dial's repeated assurances that it would not engage in the market for Spoken Word Syndication because doing so would create a conflict of interest for Dial.  That was crucial for the Syndication Plaintiffs because a syndicator or producer must share a significant amount of confidential, proprietary information with its Independent Ad Rep and because an Independent Ad Rep that also produces or syndicates shows of its own – whether directly or indirectly – has a significant conflict of interest.  For purposes of this complaint, programming that an Independent Ad Rep produces or syndicates, whether on its own or through affiliates, is referred to as "conflict-of-interest programming."

29.     Dial (including its predecessors) has repeatedly broken these assurances, promises, and commitments, however.  Moreover, during the time that

6

the Syndication Plaintiffs have had a relationship with Dial, Dial has engaged in a series of mergers and other corporate transactions that have left it as the only meaningful alternative for independent producers or syndicators such as the Syndication Plaintiffs to hire to sell certain types of advertising on their shows. Dial's broken promises and its monopoly power have enabled it to control the market and enrich itself at the expense of the Syndication Plaintiffs and other independent producers and syndicators.

### A.     The Market for Independent Ad Rep Services

30.     Radio programming can be produced by a station owner (whether directly or through an affiliated entity) or by an independent producer such as the Syndication Plaintiffs.  When a station owner produces a show, whether talk radio or some other format, it can place the show on its own stations and sell advertising time on those stations to air during that show.  Such vertically integrated entities, which are not directly at issue in this case, are referred to as "integrated networks." Those stations may or may not license programming from independent producers such as the Syndication Plaintiffs.

31.     Clear Channel Communications is an example of a company that operates an integrated network.  Clear Channel owns Premiere Networks, Inc., which syndicates approximately 20 programs of Spoken Word Syndication, such as The Rush Limbaugh Show and The Sean Hannity Show, as well as numerous other programs in other genres (*e.g.*, sports programming).  At the same time, Clear Channel owns radio stations throughout the country.  Indeed, just in Los Angeles, Clear Channel owns eight separate radio stations, including KTLK-AM 1150 and KFI-AM 640.

32.     In contrast to an integrated network, the Syndication Plaintiffs and other independent producers or syndicators offer shows that are produced independently.  After a show is produced, it is syndicated across a series of radio station affiliates throughout a relevant geographic area.  In the Syndication

7

Plaintiffs' case, their shows are syndicated nationally, in as many markets as the Syndication Plaintiffs can find affiliate stations.

33.     The Syndication Plaintiffs engage in a barter-type exchange with radio stations pursuant to which the Syndication Plaintiffs provide the stations with content in exchange for the Syndication Plaintiffs' right to sell advertising, some of which is during the Syndication Plaintiffs' programs and some of which might be at other specified times throughout the day.  The Syndication Plaintiffs generate revenue by selling commercials on the advertising time that they obtain through that barter exchange.

34.     The Syndication Plaintiffs sell advertising inventory in two different ways:  direct response advertising and institutional advertising.

35.     Direct response advertising is advertising from companies that seek to make a direct connection with the listener.  Such advertising often asks the listener to contact the company directly through a website, an e-mail address, or a toll-free phone number and typically tracks those contacts to measure the response to the advertisements.  Direct response advertisers generally purchase advertising on a specific show for a specific cost, generally for one minute of air time.  The Syndication Plaintiffs sell direct response advertising both through an affiliated company and through Dial.

36.     In contrast to direct response advertising, institutional advertising comes from companies that seek to market a brand image for a product, service, or store and generally do not seek to track the response to specific advertisements via a website, e-mail, or toll-free phone number.  Solely by way of example, institutional advertising can include car brands such as Ford, consumer brands such as Tide or Skippy, appliance manufacturers such as Maytag, or national retail chains such as Sears.

37.     Companies purchasing air time for institutional advertising generally do so through an agency and do not buy time for a specific show.  Instead, they pay

8

to reach a certain estimated number of listeners within a relevant demographic. For example, the principal demographic for national institutional radio advertising is persons between the ages of 25-54. Institutional advertisers generally therefore buy time on a bundle of shows packaged together to provide the estimated number of listeners that they want to reach. The cost of the purchase generally is based on a single price for the totality of the programming in the bundle of programs that is subject to the buy.

38.     The programs of the Syndication Plaintiffs and other independent syndicators, taken separately, do not reach an audience sufficient for institutional advertising. Thus, as a rule, they cannot sell institutional advertising directly to agencies. Instead, they must use the services of an Independent Ad Rep, which pulls together programs from multiple syndicators to offer an agency a bundle of programs having a sufficient number of estimated listeners. This market dynamic creates a nationwide market for the services of Independent Ad Reps – the Independent Ad Rep Market.

39.     Independent Ad Reps generally sell agencies a bundle of shows at an agreed-upon cost and then distribute the net proceeds of that sale to the various syndicators whose shows comprised the bundle. Pursuant both to contracts and to industry custom and practice, the Independent Ad Rep should do so in proportion to the audience sizes that those syndicators' shows contributed to the bundle (but, as explained below, Dial does not). The gross amount of the sale generally is reduced by two commissions before it is distributed to the syndicators. First, the agency that is purchasing the advertising on behalf of a national brand takes a commission, generally referred to as an "agency fee." Then, the Independent Ad Rep takes a percentage commission (which is generally referred to as a "sales commission" or a "sales rep commission") out of the remaining money. Only then are the remaining proceeds distributed to the syndicators.

40.     By way of example, if an agency were to buy advertising from Dial at a cost of $1 million for a specified audience size, Dial would, in turn, assemble a bundle of shows that provides the requisite estimated audience size, potentially including one or more shows syndicated by the Syndication Plaintiffs.  Of the total $1 million buy, the buyer's agency generally would take a 15% agency fee off the top, leaving $850,000 in proceeds.  Dial would then take its agreed-upon sales rep commissions, often 25%, out of the remaining $850,000.  That would leave $637,500 for distribution to the independent syndicators.  If the Syndication Plaintiffs' shows contributed 50% of the listeners to the overall bundle, then Plaintiffs should receive 50% of the net proceeds, or a total of $318,750.

41.     In order for this system to work, the Independent Ad Rep has to be honest about the various aspects of this transaction, including the amount that the advertiser paid for the bundle and the share of listeners that any particular syndicator provided for the bundle.  If it is not forthcoming or honest about that, then the opportunity exists for substantial mischief.  As explained below, Defendants have taken advantage of that opportunity to enrich themselves through a series of anticompetitive tactics.

**B.     The Satellite Services Market**

42.     After an independent producer or syndicator, such as the Syndication Plaintiffs, signs an agreement with a radio station for the station to carry the syndicator's shows, the syndicator must find a way to deliver its content to the radio station.  Typically, that is done via a satellite transmission.

43.     In a typical transmission, a syndicator will sign an agreement with a satellite provider for access to one or more channels which the satellite provider has on a satellite.  In order to receive a broadcast, a radio station must have a receiver for that particular satellite services provider.

44.     For example, under the Dial LLC satellite services system, when one of the Syndication Plaintiffs signs an agreement with a radio station for that station

10

SECOND AMENDED COMPLAINT FOR ANTITRUST VIOLATIONS, UNFAIR COMPETITION, BREACH OF CONTRACT,<br>TORTIOUS INTERFERENCE WITH CONTRACT AND PROSPECTIVE ADVANTAGE, AND OTHER STATE LAW CLAIMS

to carry one of its shows, it transmits the show to that station by satellite transmission obtained by TRNO, which provides various facilities and services to various entities, including the Syndication Plaintiffs.  TRNO, in turn, contracts with Dial LLC to secure satellite channel access from Dial LLC.  To receive the applicable show, the station must have the necessary Dial LLC receiver to receive the satellite signals by which the show is transmitted.  If the radio station does not have a Dial LLC receiver, then it must acquire one.

45.     On information and belief, there are currently only two companies in the Satellite Services Market that provide satellite services to independent producers and/or syndicators such as the Syndication Plaintiffs:  Dial LLC and Cumulus.  Although other integrated networks such as Clear Channel may also have their own satellite access for delivery of content to their stations, those other integrated networks generally do not sell their satellite space to independent content producers such as the Syndication Plaintiffs.

46.     Upon information and belief, Dial LLC and Cumulus each controls approximately 50% of the Satellite Services Market, and each exercises market power in that market.

47.     There are substantial barriers to a new entrant in the Satellite Services Market, including acquisition of satellite space and signing a sufficient number of clients to overcome fixed costs and other barriers.

### C.    Dial's Monopolization of the Market for Independent Ad Rep Services Through Mergers and Collusive Agreements

48.     Dial is a product of several mergers and acquisitions.  Its predecessors include Dial Communications, Excelsior, Triton Group, Triton Radio Networks, Verge, Inc., and Verge LLC.  Of particular note here are two mergers that contributed to the entity that is now Dial.

49.     In or about June 2008, Dial acquired Jones Media Group and its operating companies, Jones Media America, Jones Radio Networks, and JonesTM,

11

1   from Jones International Ltd. (the "Dial/Jones Merger"). Through that acquisition,
2   Dial eliminated its major competitor in the Independent Ad Rep Market.

3       50.   In August 2011, Dial announced an agreement to merge with
4   Westwood One, Inc. (the "Dial/Westwood Merger"). The Dial/Westwood Merger
5   was consummated on or about October 21, 2011.

6       51.   Prior to the Dial/Westwood Merger, Westwood One and Dial
7   competed in the Satellite Services Market. As part of the Dial/Westwood Merger,
8   however, Dial was able to combine its satellite services business with Westwood
9   One's satellite services business, thus eliminating one of its two competitors and
10  creating a combined entity with a market share of approximately 50%, if not more,
11  and imbuing that entity with market power in the Satellite Services Market.

12      52.   Since its merger with Jones Media, Dial has faced no meaningful
13  competition in the market for Independent Ad Rep Services. Indeed, Dial now has
14  an overwhelming share of that market, which upon information and belief
15  Plaintiffs allege to be over 90%.

16      53.   There are substantial barriers to entry to the Independent Ad Rep
17  Market, due at least in part to significant network effects in that market. In
18  particular, any Independent Ad Rep must have a stable of clients whose shows can
19  be packaged together into bundles of sufficient size to attract larger institutional
20  advertising buys. It also must have requisite relationships with the four major
21  agencies that buy institutional advertising. Indeed, the major agencies have a
22  strong preference for dealing with Independent Ad Reps with which they have a
23  relationship, rather than new market entrants.

24      54.   Although it has a dominant position in the Independent Ad Rep
25  Market, Dial has attempted to create the false appearance of competition in that
26  market.

27      55.   Compass Marketing was formed in late 2011 or early 2012 as an
28  Independent Ad Rep. Although the company ostensibly competes with Dial, Dial

SECOND AMENDED COMPLAINT FOR ANTITRUST VIOLATIONS, UNFAIR COMPETITION, BREACH OF CONTRACT, TORTIOUS INTERFERENCE WITH CONTRACT AND PROSPECTIVE ADVANTAGE, AND OTHER STATE LAW CLAIMS

owns 50% of Compass Marketing, and on information and belief, Compass Media (or its affiliates) also owns a significant stake. Dial provides Compass Marketing with support systems and marketing services. In fact, even though Compass Marketing is partly owned by Compass Media (or its affiliates), Compass Media uses Dial as its Independent Ad Rep, rather than its own affiliated Independent Ad Rep company.

56. Plaintiffs were not aware of Dial's relationships with Compass Marketing until the first quarter of 2012.

57. Once Plaintiffs challenged the apparent connections among Dial, Compass Media, and Compass Marketing, Plaintiffs began to notice indications of connections among Dial and WYD and WYM.

58. WYD produces and syndicates Spoken Word Syndication programming. WYD's founder and owner Ron Hartenbaum worked for Jones Media prior to the Dial/Jones Merger, and the company maintains significant connections with Dial, including involvement with conflict-of-interest programming in which Dial had and apparently maintains an interest. In particular, WYD handles various aspects of: (a) the Michael Smerconish Show, a show that Dial acquired the right to syndicate shortly after the Dial/Jones Merger; (b) the Tom Hartmann Show, a show that Dial initially acquired the right to syndicate in violation of its covenants not to engage in further conflict-of-interest programming; and (c) other shows that are or were affiliated with Dial.

59. Upon information and belief, the transfer of conflict-of-interest programming from Dial to WYD was effected, at least in part, to conceal Dial's interest in conflict-of-interest programming, which violated Dial covenants not to engage in further conflict-of-interest programming.

60. WYM is an affiliate of WYD that serves as an Independent Ad Rep and offers "affiliate relations" services (*i.e.*, assisting syndicators to find radio stations to carry a show and to handle customer relations with those stations once

13

1   they do).  Upon information and belief, WYM was established to conceal actions
2   taken by Dial in violation of its non-inurement covenants and its covenants not to
3   engage in further conflict-of-interest programming.

4       61.    Courtside produces and syndicates Spoken Word Syndication
5   programs, among other things.  Courtside was founded by Norm Pattiz, who also
6   founded Westwood One.  Among other things, Courtside has engaged in joint
7   efforts with Dial to interfere with the Syndication Plaintiffs' relationships with
8   hosts, including Michael Savage and Laura Ingraham.  On information and belief,
9   Courtside is a vehicle through which Dial seeks to conceal that it engages in
10  conflict-of-interest programming in violation of its covenants to the Syndication
11  Plaintiffs.

12      62.    Dial's arrangements with WYD, WYM, and Courtside are also
13  designed to facilitate efforts by Dial to evade its non-inurement covenants with the
14  Syndication Plaintiffs.

15      **D.    Dial's Relationship with Plaintiffs**
16      63.    OTRN became a client of Dial in 2000.  At the time, a significant part
17  of OTRN's selection of Dial as its Independent Ad Rep was Dial's representation
18  that it did not have a financial interest in any spoken word radio shows and
19  therefore did not have a conflict of interest in marketing OTRN's programming.
20  Dial expressly advised OTRN of the dangers of contracting with an Independent
21  Ad Rep that had a direct or indirect interest in conflict-of-interest programming
22  and warranted to OTRN that Dial would not engage in Spoken Word Syndication.
23  OTRN chose Dial as its Independent Ad Rep, rather than another firm, based on
24  Dial's promise that it would never engage in conflict-of-interest programming.

25      64.    TRNE became a client of Dial shortly after TRNE's formation in
26  2003.  At that time, Dial again represented and warranted that Dial did not and
27  would not engage in conflict-of-interest programming.

28

SECOND AMENDED COMPLAINT FOR ANTITRUST VIOLATIONS, UNFAIR COMPETITION, BREACH OF CONTRACT,
TORTIOUS INTERFERENCE WITH CONTRACT AND PROSPECTIVE ADVANTAGE, AND OTHER STATE LAW CLAIMS

65.     TRN-FM became a client of Dial shortly after TRN-FM's formation in 2004.  At that time, Dial again represented and warranted that Dial did not and would not engage in conflict-of-interest programming.

66.     TRN-ENT became a client of Dial in 2006, shortly after its formation. At that time, Dial again represented and warranted that Dial did not and would not engage in conflict-of-interest programming.

67.     ARNN became a client of Dial in 2010, shortly after its formation. At the time, Dial further represented and warranted that Dial would not engage in any conflict-of-interest programming other than the specific Spoken Word Syndication programming to which OTRN, TRNE, TRN-FM, and TRN-ENT consented in the wake of the Dial/Jones Merger.  Notably, Dial's representation to that effect was consistent with contractual commitments it had made to some of the other Syndication Plaintiffs and was important to ARNN.

68.     In September 2006, Dial and OTRN entered into a Sales Representation Agreement for The Rusty Humphries Show (the "Humphries Rep Agreement"), pursuant to which OTRN engaged Dial as its sales representative for The Rusty Humphries Show throughout the United States.  Under the Humphries Rep Agreement, OTRN agrees to pay Dial a sales rep commission and Dial agrees to try to sell advertising on The Rusty Humphries Show.  In addition, Dial agrees not to hire OTRN's employees, hosts, or agents (all of whom had contact with Dial in connection with its role as OTRN's sales agent) for a set period of time.  The Humphries Rep Agreement also gives OTRN the right to examine Dial's books and records.

69.     On the same day that OTRN and Dial entered into the Humphries Rep Agreement, OTRN and Dial also entered into a Sales Representation Agreement for The Michael Savage Show (the "Savage Rep Agreement").  The Savage Rep Agreement is substantially similar to the Humphries Rep Agreement, including all of the provisions set forth in paragraph 68, above.

15

1         70.    On the same day that OTRN and Dial entered into the Humphries Rep

2  Agreement, TRNE and Dial entered into a Sales Representation Agreement for

3  The Jerry Doyle Show (the "Doyle Rep Agreement").  The Doyle Rep Agreement

4  is substantially similar to the Humphries Rep Agreement, including all of the

5  provisions set forth in paragraph 68, above.

6         71.    On the same day that OTRN and Dial entered into the Humphries Rep

7  Agreement, TRN-FM and Dial entered into a Sales Representation Agreement for

8  Mancow's Morning Madhouse (the "Mancow Rep Agreement").  The Mancow

9  Rep Agreement is substantially similar to the Humphries Rep Agreement,

10  including all of the provisions set forth in paragraph 68, above.

11         72.    On the same day that OTRN and Dial entered into the Humphries Rep

12  Agreement, TRNE and Dial also entered into a Sales Representation Agreement

13  for The Laura Ingraham Show (the "Ingraham Rep Agreement").  The Ingraham

14  Rep Agreement is substantially similar to the Humphries Rep Agreement,

15  including all of the provisions set forth in paragraph 68, above.

16         73.    On October 22, 2007, Dial agreed with OTRN, TRNE, and TRN-FM,

17  as appropriate, to modify each of the Humphries Rep Agreement, the Savage Rep

18  Agreement, the Doyle Rep Agreement, the Mancow Rep Agreement, and the

19  Ingraham Rep Agreement (collectively, the "Rep Agreements") to expand the non-

20  inurement covenants in the Rep Agreements.

21         74.    After the execution of the Rep Agreements, Dial continued to promise

22  that it would not engage in conflict-of-interest programming.

23         75.    However, despite its repeated representations and contractual

24  commitments to Plaintiffs, Dial did not and has not stayed out of the Spoken Word

25  Syndication business.

26         76.    When it acquired Jones Media, Dial acquired Spoken Word

27  Syndication programming that presented direct conflicts of interest for Dial in

28

SECOND AMENDED COMPLAINT FOR ANTITRUST VIOLATIONS, UNFAIR COMPETITION, BREACH OF CONTRACT,
TORTIOUS INTERFERENCE WITH CONTRACT AND PROSPECTIVE ADVANTAGE, AND OTHER STATE LAW CLAIMS

placing the Syndication Plaintiffs' programs in program bundles and in properly allocating the sales proceeds of such program bundles.

77. The Syndication Plaintiffs voiced concern to Dial about the fact that Dial was now engaged in conflict-of-interest programming.

78. As a result of the Syndication Plaintiffs' concerns, on or about December 15, 2008, Dial agreed with OTRN, TRNE, and TRN-FM to a second addendum to each of the Rep Agreements that extends their terms and expressly sets forth Dial's promise not to engage in conflict-of-interest programming, with certain limited exceptions. In addition, both Excelsior and Triton Media executed an Agreement to be Bound, pursuant to which each of those entities agrees that they and any of their entities will be bound by the Second Addenda to the Rep Agreements.

79. In addition to the shows covered by the Rep Agreements, the Syndication Plaintiffs have engaged Dial as an Independent Ad Rep for numerous other shows that they produce and/or syndicate, including but not limited to The Phil Hendrie Show, Science Fantastic, America's Morning News, The Monica Crowley Show, The Barry Farber Show, Bottom Line On Your Health, Motor News Weekly, and all ARNN programming (including 3-hour news broadcasts and top- and bottom-of-the-hour newscasts, while applicable). Indeed, Dial serves, and, subject to nominal exceptions, has served at all relevant times as the sole Independent Ad Rep for institutional advertising for shows that the Syndication Plaintiffs produce and/or syndicate. Although Dial's work with respect to those shows is not governed by a written contract, Dial's role is the same: it sells advertising time on those shows, primarily to institutional advertisers.

80. During the course of their relationships, the Syndication Plaintiffs have provided to Dial confidential business information, including business models, business plans, and financial information. The Syndication Plaintiffs have

provided this information to Dial specifically to allow Dial to fulfill its role as the Syndication Plaintiffs' Independent Ad Rep.

81.  In or about July 2010, TRNO and Dial LLC entered into a Satellite Services Agreement (the "Satellite Services Agreement"), pursuant to which Dial LLC provides to TRNO access to satellite communications channels through which TRNO can transmit radio broadcasts that are produced and/or syndicated by OTRN, TRNE, TRN-FM, TRN-ENT, and/or ARNN to radio stations.

82.  There is an industry practice that satellite services providers such as Dial LLC maintain a "wall" between satellite services operations and competition between the satellite provider's affiliates and their customers.  That wall is necessary because a customer must provide a satellite service operator such as Dial LLC with confidential information as to affiliates' programming arrangements in order to make the relationship work.

83.  Dial LLC was provided with necessary confidential information about the Syndication Plaintiffs' syndication operations, including advance notice of new affiliate contracts and new affiliate start dates, including those start dates that would replace Dial's conflict-of-interest programming, as well as programming of other Defendants such as Compass Media, Courtside, and/or WYD.

### D.  Dial's Anticompetitive Conduct, Breach of Its Contracts with, and Tortious Conduct Directed Towards Plaintiffs

84.  Dial has used its power in the Independent Ad Rep Market to enrich itself at the expense of the Syndication Plaintiffs and other independent producers and/or syndicators.

85.  As described above, after Dial sells advertising time to institutional advertisers, it should allocate the resulting revenues in proportion to the estimated audience size generated by each show in an advertising bundle.

86.  Dial has not been transparent in its allocations.  It does not tell the Syndication Plaintiffs or, to Plaintiffs' knowledge, other producers or syndicators

1  whose shows are included in an advertising bundle what the relative share of

2  listeners generated by any particular show in the bundle is.  Nor does it tell the

3  Syndication Plaintiffs or other producers or syndicators whose shows are included

4  in particular bundles or what the advertiser actually paid.  Because Dial conceals

5  this information from the Syndication Plaintiffs and other producers or syndicators,

6  Dial has the opportunity to manipulate ultimate payments made to the participants

7  in a particular bundle.

8      87.    Dial has taken advantage of its opportunity to manipulate the

9  allocation process by enriching itself.  In particular, as Dial has increasingly

10  pushed into the market for Spoken Word Syndication, it has included in advertising

11  bundles programs that it or its affiliates at Compass Media, WYD and/or Courtside

12  produce and/or syndicate.  Then, Dial steers outsized shares of the net advertising

13  revenue from institutional advertisers to itself and its affiliates, at the expense of

14  the Syndication Plaintiffs and other independent producers and/or syndicators.

15      88.    Dial is able to steer outsized shares of net advertising revenue to itself

16  because it fails to state the amounts that institutional advertisers have paid or the

17  audience size of each show in the bundle.  Dial then either retains the excess for

18  itself or it credits it to a show that it owns, produces, and/or syndicates and that

19  was included in the same advertising bundle.  In doing so, Dial also effectively

20  misrepresents to the Syndication Plaintiffs the amounts that the advertiser is paying

21  for the Syndication Plaintiffs' programming.  It is able to do this because it refuses

22  to disclose to the Syndication Plaintiffs or other producers or syndicators the

23  specifics of shows in any particular bundle and, more specifically, the percentage

24  of the audience represented by each show, the separate allocations to each show, or

25  the total amount paid.  By misrepresenting the amounts paid for the syndicators'

26  advertising, Dial is able to reduce the disclosed allocation of revenue that it owes

27  to shows that are owned, produced, or syndicated by anyone but Dial and its

28

19

affiliates.  Dial then claims an outsized share of the revenue for itself or its affiliates.

89.  Dial would not be able to engage in this conduct but for its monopoly power in the Independent Ad Rep Market.  If Dial did not have a monopoly, but rather faced meaningful competition in the Independent Ad Rep Market, Dial would face competitive pressure to be transparent in handling bundles of programs.  However, Dial faces no such competitive pressure and therefore has no need to be transparent in its dealings with the Syndication Plaintiffs or any other independent producers or syndicators.

90.  In addition to manipulating the allocations, Dial uses its monopoly power in the Independent Ad Rep Market to advantage its own shows at the expense of shows of other independent producers and/or syndicators, including but not limited to the Syndication Plaintiffs.  In particular, Dial includes its shows in more bundles and/or more profitable bundles of shows, at the expense of shows produced and/or syndicated by the Syndication Plaintiffs and other independent producers and/or syndicators.

91.  Dial could not engage in such conduct but for its monopoly power in the Independent Ad Rep Market.  In particular, if Dial faced any meaningful constraint on its market power, it would be forced to include shows from other producers, even at the expense of its own shows.

92.  Dial's results, as reported to the Syndication Plaintiffs, for 2012 illustrate the effect of Dial's manipulation, as Dial claims that its institutional sales in that year for the Syndication Plaintiffs' programs have decreased so substantially as to be strikingly suspicious.

93.  Pursuant to their rights under the Rep Agreements, the Syndication Plaintiffs have sought access to Dial's books and records relating to the sale of advertising on the Syndication Plaintiffs' shows, but Dial has refused to permit the Syndication Plaintiffs to conduct any such audit.  The Syndication Plaintiffs have

20

1    therefore been unable to determine the exact amount by which they have been

2    underpaid.

3          94.    Dial's conduct, all of which is a product of its power in the

4    Independent Ad Rep Market, has a significant effect on consumers and consumer

5    welfare, in several respects.

6                a.    Producers and syndicators, who are the consumers of Dial's

7    services as an Independent Ad Rep, must pay what amounts to a higher price to

8    Dial for Dial's services because each of them must accept that its shows will

9    receive a smaller share of the revenue than shows that Dial or its affiliates control.

10   The net effect of that conduct is the same as if Dial were to use its market power to

11   raise its commission rates – syndicators and producers receive less than they

12   otherwise would because Dial has market power.

13               b.    Because producers and syndicators receive less revenue from

14   Dial, they produce fewer shows.  Relatedly, as Dial consolidates shows to its own

15   account or the account of its affiliates, it becomes increasingly able to exclude

16   other producers and syndicators from its bundles entirely.  As a result, those

17   producers and syndicators cannot sell advertising time to institutional advertisers,

18   and many therefore are forced to stop producing or syndicating shows.  As a result

19   of all of this, there are fewer shows produced in total, and the listening public has

20   fewer options from which to choose.  As described in more detail below, CNN

21   Radio and ARNN's short form, top-of-the-hour newscasts are examples of

22   products that Dial's anticompetitive conduct have driven from the market, thus

23   diminishing total output and reducing consumer choice.

24               c.    Just as listeners have fewer shows from which to choose, so too

25   do advertisers, which is another form of the consuming public here.

26         95.    Contrary to their representations and contractual commitments, Dial,

27   Excelsior, and Triton Media have not refrained from engaging in further conflict-

28   of-interest programming in the market for Spoken Word Syndication.  To the

                                      21

contrary, as a result of the Dial/Westwood Merger, and other activities, Dial has confirmed that it now has an interest in several programs in the Spoken Word Syndication market, which directly breach and violate its agreements with and commitments to the Syndication Plaintiffs, both directly and via its arrangements with Courtside, Compass Media, and WYD, among others.

96.     Dial and its affiliates have used the Syndication Plaintiffs' proprietary business models, plans, and information to develop the strategies for expanding the Defendants' business activities into the intellectual rights ownership inherent in the production and ownership of programming content in the Independent Spoken Word Syndication market.

97.     Dial LLC has not maintained the requisite separation between its operations and the operations of Dial and its affiliates.  To the contrary, Dial LLC has sought to use Plaintiffs' orders for satellite services, which are confidential and provided to Dial LLC only to implement the Satellite Services Agreement, to permit Dial and other Defendants to promote shows that one or more Defendants owns, produces, and/or syndicates and/or to interfere with or delay the placement of the Syndication Plaintiffs' programming with certain radio affiliates.

98.     Dial LLC has failed to use its best efforts to address satellite services issues for the Syndication Plaintiffs' programs in order to harm the Syndication Plaintiffs.  In particular, Dial LLC has either refused or delayed responding to requests by radio stations and by the Syndication Plaintiffs to transmit to the stations programs that are syndicated by the Syndication Plaintiffs.  In many of those cases, the station in question was seeking to replace one of Dial's conflict-of-interest programs with one of the Syndication Plaintiffs' programs.  Thus, Dial LLC's conduct caused harm to the Syndication Plaintiffs and advantaged Dial. Dial LLC's conduct is at odds with its obligations under the Satellite Services Agreement.

SECOND AMENDED COMPLAINT FOR ANTITRUST VIOLATIONS, UNFAIR COMPETITION, BREACH OF CONTRACT, TORTIOUS INTERFERENCE WITH CONTRACT AND PROSPECTIVE ADVANTAGE, AND OTHER STATE LAW CLAIMS

99.     In addition, Dial LLC has, at times, informed radio stations that wanted to receive one or more of the Syndication Plaintiffs' programs that Dial LLC would not change the satellite feed delivered to that radio station unless the station either first obtained permission from a business person within Dial or the station also agreed to carry one or more of Dial's conflict-of-interest programs such as The Neal Boortz Show.

100.     Dial LLC's conduct would not be possible but for the market power that it maintains in the Satellite Services Market because it would face significant competitive pressure to adhere to industry custom and keep its operations separate from other entities or divisions within Dial that engage in conflict-of-interest programming.

101.     Some Defendants have on multiple occasions interacted improperly with some of the hosts with whom Plaintiffs have ongoing contractual relationships, notably including Michael Savage and Laura Ingraham.  In particular, Dial and Courtside jointly interfered with OTRN's agreements with Savage and Ingraham in multiple respects.

102.     In November 2010, Courtside sent to Savage a proposed term sheet that purported to set forth the material terms of an agreement between Courtside and Savage.  OTRN had a contractual right to match Courtside's offer sheet, and Savage therefore conveyed the term sheet to OTRN on or about November 17, 2010.  On November 30, 2010, OTRN matched Courtside's term sheet.  Savage challenged whether OTRN had in fact matched, and an arbitration panel ultimately ruled in OTRN's favor.

103.     On December 1, 2010, OTRN advised Courtside by letter of its decision to match the term sheet for Savage and to advise Courtside that OTRN therefore had an exclusive relationship with Savage.  On December 14, 2010, OTRN again advised Courtside of its decision to match Courtside's term sheet for Savage and explained that there was a binding and enforceable contract between

23

OTRN and Savage. OTRN explained to Courtside that, at that point, any effort by Courtside to secure Savage's services would be inconsistent with, and interfere with, OTRN's relationship with Savage.

104.   Despite its knowledge of Savage's contractual commitment to OTRN, Courtside did not cease its efforts to recruit Savage. To the contrary, it persisted in its efforts. Among other things, even after OTRN matched Courtside's term sheet, Courtside continued to spread knowingly false rumors at industry conferences that Savage would soon be under contract with Courtside. Indeed, as late as August 2011, Courtside was spreading such rumors.

105.   On information and belief, Dial joined in Courtside's efforts to recruit Savage, including its efforts to interfere with OTRN's agreement with Savage. Dial enlisted Courtside in this effort to avoid breaching its own contractual commitments to OTRN. However, Courtside's term sheet for Savage's services expressly contemplated that Dial would provide both affiliate and advertising sales services (i.e., serve as an ad rep). Moreover, the term sheet contemplated that, if Savage moved to Courtside, then Courtside would exercise control over Dial in various respects, including by "causing Dial to agree" that Savage's show would be distributed on regularly-scheduled basis and ensuring that there was no "pay-or-play" alternative.

106.   Upon information and belief, both Dial and Courtside maintained direct contact with Savage even after OTRN exercised its right to match the term sheet. For example, Savage's arbitration claims with OTRN were conducted confidentially. Yet shortly after the decision affirming OTRN's match was rendered, and without OTRN informing anyone of the decision, a representative of Dial made reference to the decision at an industry conference in September 2011. Because OTRN did not tell Dial (or anyone else) about that ruling, Dial could only have learned about it directly from Savage or indirectly through Courtside. Either way, it is evidence of improper contact that Dial and/or Courtside had with Savage.

107.   On information and belief, Dial and/or Courtside continued to interfere with the relationship between Savage and OTRN even after the arbitration ruling, in an effort to lure Savage to Courtside and/or Dial, ultimately giving rise to the end of the relationship between Savage and OTRN.  OTRN has been damaged as a result.

108.   Dial and Courtside engaged in similar efforts with respect to Laura Ingraham, ultimately resulting in the end of that relationship, as well.  Within a month of the end of that relationship – a notably short period of time in the industry – Ingraham and Courtside announced a new show to be hosted by Ingraham for Courtside, which began broadcasting on January 2, 2013.  On information and belief, Dial serves as an ad rep for that show, despite its commitment in the Ingraham Ad Rep Agreement not to do so.

109.   Dial has used its power in the Satellite Services Market to aid Courtside's launch of Courtside's show with Ingraham.  In particular, because TRNE syndicated its show with Ingraham, radio station affiliates that received the show did so on a satellite channel that TRNO rents from Dial LLC.  When Courtside launched its new show with Ingraham, Dial LLC immediately switched various stations' receivers to receive the new Ingraham show distributed by Courtside.  Dial's actions evidence Dial's interest in the success of Courtside's new show hosted by Ingraham.

110.   On information and belief, Dial and Courtside were negotiating with Ingraham on the parameters of a contract even before the end of her contract with TRNE.  This is evidenced by the fact that Ingraham asked TRNE for detailed information about the TRNE show hosted by Ingraham – including financial information, sponsorship information, and specific affiliate agreement terms – during the final months of the TRNE/Ingraham relationship.  It is further evidenced by the speed with which Courtside and Dial were able to launch her show.

SECOND AMENDED COMPLAINT FOR ANTITRUST VIOLATIONS, UNFAIR COMPETITION, BREACH OF CONTRACT, TORTIOUS INTERFERENCE WITH CONTRACT AND PROSPECTIVE ADVANTAGE, AND OTHER STATE LAW CLAIMS

111.   The effect of Dial's market power in the Satellite Services Market coupled with its market power in the Independent Ad Rep Market is clearly illustrated by Dial's ability to drive CNN Radio and ARNN from the market for top- and bottom-of-the-hour newscasts.

112.   For approximately 25 years, CNN Radio was an independent producer and syndicator of CNN-branded newscasts.  CNN used Dial as its Independent Ad Rep at all relevant times, and Dial also provided CNN with other services, such as affiliate relations.  However, in early 2012, Dial informed CNN that Dial was terminating all of the services that it provided to CNN Radio, including services as an Independent Ad Rep.  Dial confirmed that fact in writing in a letter dated on or about March 1, 2012, which provided 30-days notice of Dial's termination of services to CNN.  Because Dial terminated its services as an Independent Ad Rep to CNN, CNN had no avenue through which it could sell institutional advertising on its newscasts.  As a result, there was no economically viable way for CNN Radio to continue to remain in the market, and it therefore terminated its radio newscasts on or about April 1, 2012, only 7 months before a Presidential election.

113.   Dial had a significant economic incentive to drive CNN Radio out of the market because Dial has a licensing arrangement with NBC Radio pursuant to which Dial pays a set licensing fee to use the NBC Radio name for newscasts.  Dial produces and syndicates those NBC Radio-branded newscasts, and it sells advertising on them.  It also serves as the Independent Ad Rep for them.  Thus, if Dial can place and then sell advertisements on NBC Radio-branded newscasts, it can earn substantial profits of its own.

114.   After Dial drove CNN Radio from the market, it continued to take advantage of its market dominance.  When CNN Radio announced that it was withdrawing from the market, ARNN introduced a new, short-form top-of-the-hour newscast to the market as a replacement for CNN Radio.  ARNN then began contacting former CNN Radio-affiliated radio stations to solicit those stations as

SECOND AMENDED COMPLAINT FOR ANTITRUST VIOLATIONS, UNFAIR COMPETITION, BREACH OF CONTRACT,
TORTIOUS INTERFERENCE WITH CONTRACT AND PROSPECTIVE ADVANTAGE, AND OTHER STATE LAW CLAIMS

1  potential affiliates for ARNN's new newscast.  While those solicitations were
2  going on, Armed Forces Radio Network chose ARNN's newscast for its own
3  network, thus indicating its quality and reach.

4      115.   Dial, however, prevented former CNN affiliates from selecting
5  ARNN's newscast.  In particular, Dial LLC refused to permit numerous radio
6  stations to change the channel on their satellite receiver to receive ARNN's
7  newscast.  Instead, on information and belief, Dial informed those stations that
8  they were "deemed" to be affiliates of NBC Radio, even though the stations had no
9  affiliation agreement with NBC Radio.  Dial then announced to the market that
10  NBC Radio had more than 700 affiliates for newscasts, even though the vast
11  majority of those stations had not signed affiliation agreements for NBC Radio
12  newscasts.  By issuing that press release, Dial created the false impression that
13  NBC Radio newscasts were widely accepted, when in fact they were not.  Dial also
14  falsely claimed difficulties in providing ARNN's newscasts via Dial LLC's
15  satellite channels, which the Syndication Plaintiffs were entitled to use, and failed
16  to provide proper Independent Ad Rep Services for the sale of advertising on
17  ARNN's top- and bottom-of-the-hour newscasts.

18      116.   Dial's actions prevented numerous radio stations from affiliating with
19  ARNN for its newscasts and materially depressed ARNN's revenue stream for the
20  newscasts.  As a result, ARNN was forced to cease its short-form top-of-the-hour
21  newscasts as of December 31, 2012.  Thus, Dial's actions forced at least two
22  potential competitors from the market – CNN Radio and ARNN – to clear the way
23  for Dial's own NBC Radio-branded newscasts.

24      117.   ARNN has been injured as a result of Dial's conduct, which would
25  not have been possible but for Dial's market power in both the Independent Ad
26  Rep Market and the Satellite Services Market.

27
28

# FIRST CAUSE OF ACTION
## (Monopolization of the Independent Ad Rep Market)
### (Syndication Plaintiffs vs. Dial)

118.    Plaintiffs incorporate by reference the allegations in paragraphs 1 - 117, above.

119.    The Independent Ad Rep Market is a discrete, nationwide product market for the services of an Independent Ad Rep – *i.e.*, a company that can bundle shows produced by independent syndicators and/or producers and sell advertising on those shows to institutional advertisers.

120.    Dial has monopoly power in the Independent Ad Rep Market by virtue of its 90% market share in that market.

121.    Dial willfully acquired and maintained its monopoly in the Independent Ad Rep Market by its acts and practices described above, including its conduct with respect to allocation of advertising revenues to independent producers such as the Syndication Plaintiffs, all in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

122.    The goal, purpose, and/or effect of Defendants' scheme was to reduce payments made to independent syndicators such as the Syndication Plaintiffs by steering money to Dial and/or its affiliates via improper allocations and other improper practices.

123.    The Syndication Plaintiffs have been injured in their business and property by reason of Defendants' unlawful conduct.  In particular, as a result of Dial's violations, Dial's payments to the Syndication Plaintiffs and to other independent producers have been lower than they otherwise would have been.

124.    Dial's conduct affected both the Syndication Plaintiffs and most, if not all, other consumers of Dial's services (*i.e.*, independent producers and syndicators).  It also eliminates shows from the market, with CNN Radio being one

such example.  It therefore diminishes consumer choice and damages consumer welfare.

125.   This unlawful conduct threatens continuing loss and damage to the Syndication Plaintiffs if not enjoined by this Court.

**SECOND CAUSE OF ACTION**
**(Attempted Monopolization of the Independent Ad Rep Market)**
(Syndication Plaintiffs vs. Dial)

126.   Plaintiffs incorporate by reference the allegations in paragraphs 1 - 125, above.

127.   If Dial does not already have monopoly power, then Dial has a dangerous probability of success in achieving monopoly power in the Independent Ad Rep Market.

128.   With the specific intent to achieve a monopoly, Dial, by its acts and practices described herein, including its conduct with respect to allocation of advertising revenues to independent producers such as the Syndication Plaintiffs, has attempted to monopolize the Independent Ad Rep Market, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

129.   The goal, purpose, and/or effect of Defendants' scheme was to reduce payments made to independent syndicators such as Plaintiffs by steering money to Defendants and/or their affiliates.

130.   The Syndication Plaintiffs have been injured in their business and property by reason of Defendants' unlawful conduct.  In particular, as a result of Dial's violations, Dial's payments to the Syndication Plaintiffs and to other independent producers have been lower than they otherwise would have been.

131.   This unlawful conduct threatens continuing loss and damage to Plaintiffs and to competition in the market more generally if not enjoined by this Court.

29

# THIRD CAUSE OF ACTION
## (Conspiracy to Monopolize the Independent Ad Rep Market)
(Syndication Plaintiffs vs. Dial, Compass Media, Compass Marketing and WYM)

132.   Plaintiffs incorporate by reference the allegations in paragraphs 1 - 131, above.

133.   Defendants shared a conscious commitment to a common scheme designed to achieve the unlawful objective of the monopolization of the Independent Ad Rep Market.

134.   At the time of the agreement, Dial, Compass Media, and WYM were actual and/or potential competitors in the Independent Ad Rep Market.

135.   Defendants conspired with the specific intent, knowledge, and purpose that their anticompetitive agreement would result in Dial willfully acquiring and maintaining a monopoly in the Independent Ad Rep Market.

136.   Compass Media and WYM knew that the natural and probable consequences of their agreements with Dial would be the monopolization of the relevant market by Dial.

137.   Defendants have committed overt acts in furtherance of their conspiracy.  For example, Compass Media entered into an agreement with Dial to set up Compass Marketing, and Compass Media and Compass Marketing have continued to present Compass Marketing as an independent competitor to Dial, when it in fact it is not.  Similarly, on information and belief, WYM has engaged in marketing for conflict-of-interest programming in an effort to avoid evidence of Dial's involvement.  Thus, Defendants have entered into, complied with, and implemented agreements relating to allocation of advertising revenues in the Independent Ad Rep Market, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

138.   But for the Defendants' conspiracy to monopolize, Defendants or their competitors would have honestly allocated revenues generated by shows within an

1 advertising bundle, and the Syndication Plaintiffs and other independent

2 syndicators would have been paid more as a result.

3   139. The Syndication Plaintiffs have been injured in their business and

4 property by reason of Defendants' unlawful conduct.  During the relevant period,

5 Defendants sold significant numbers of advertisement bundles including the

6 Syndication Plaintiffs' shows, and, as a result of the illegal conduct alleged herein,

7 the Syndication Plaintiffs were not paid a market rate for the advertising time on

8 the shows that they produce.

9   140. This unlawful conduct threatens continuing loss and damage to

10 Plaintiffs if not enjoined by this Court.

**FOURTH CAUSE OF ACTION**
**(Unlawful Agreement in Restraint of Trade)**
(Syndication Plaintiffs vs. Dial, Compass Marketing, Compass Media,
WYD, and WYM)

14   141. Plaintiffs incorporate by reference the allegations in paragraphs 1 -

15 140 of the Complaint.

16   142. Dial, Compass Marketing, and WYM were, ostensibly, actual

17 competitors in the Independent Ad Rep Market.

18   143. Those Defendants, Compass Media, and WYD engaged in a

19 continuing illegal contract, combination, and conspiracy in restraint of trade, the

20 purpose and effect of which was to create the false appearance of competition in

21 the Independent Ad Rep Market, allocate the Independent Ad Rep Market between

22 them, and fix and/or misallocate amounts that Independent Ad Reps would have to

23 pay independent producers such as the Syndication Plaintiffs.

24   144. Defendants shared a conscious commitment to a common scheme

25 designed to achieve the unlawful objective of controlling and/or dividing the

26 Independent Ad Rep Market.

27   145. By entering into such unlawful agreements, Defendants have

28 unlawfully conspired in restraint of trade and violated Section 1 of the Sherman

31

Act, 15 U.S.C. § 1.  Defendants' agreements constitute a horizontal market allocation and price-fixing agreement between actual or potential competitors, and this is a *per se* violation of Section 1.

146.   In the alternative, Defendants' agreements are an unreasonable restraint of trade in violation of Section 1 under either a "quick look" or a "rule of reason" analysis.  There are no precompetitive justifications for the agreements between Dial and the other Defendants.  On the other hand, there are significant anticompetitive effects as a result of those agreements.

147.   But for this unlawful agreement, the Defendants would have competed in the Independent Ad Rep Market, and as a result, Defendants would have paid more to independent producers such as the Syndication Plaintiffs.

148.   The Syndication Plaintiffs have been injured in their business and property by reason of the unlawful contract, combination, and/or conspiracy. During the relevant period, Defendants sold significant numbers of advertisement bundles including the Syndication Plaintiffs' shows, and, as a result of the illegal conduct alleged herein, the Syndication Plaintiffs were not paid a market rate for the advertising time on the shows that they produce.

149.   This unlawful conduct threatens continuing loss and damage to Plaintiffs if not enjoined by the Court.

## FIFTH CAUSE OF ACTION
### (Violation of Clayton Act § 7 – Dial/Jones Merger)
(Syndication Plaintiffs vs. Dial)

150.   Plaintiffs incorporate by reference the allegations in paragraphs 1 - 149 of the Complaint.

151.   Dial directly or indirectly acquired assets of its competitor Jones Media, the effect of which was likely to reduce competition or to create a monopoly in the Independent Ad Rep Market, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

32

152.    As a result of Dial's acquisition and the anticompetitive conduct enabled thereby as set forth herein, Plaintiffs have been injured in their business or property in the form of receiving lower advertising revenues than they would have received but for the merger.

## SIXTH CAUSE OF ACTION
### (Violation of Clayton Act § 7 – Dial/Compass Agreement)
(Syndication Plaintiffs vs. Dial, Compass Marketing, and Compass Media)

153.    Plaintiffs incorporate by reference the allegations in paragraphs 1 - 152 of the Complaint.

154.    Dial directly or indirectly acquired assets of its competitor Compass Media, the effect of which was likely to reduce competition or to create a monopoly in the Independent Ad Rep Market, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

155.    As a result of Dial's acquisition and the anticompetitive conduct enabled thereby as set forth herein, Plaintiffs have been injured in their business or property in the form of receiving lower advertising revenues than they would have received but for the merger.

## SEVENTH CAUSE OF ACTION
### (Violation of Clayton Act § 7 – Dial/Westwood Merger)
(Plaintiffs vs. Dial and Dial LLC)

156.    Plaintiffs incorporate by reference the allegations in paragraphs 1 - 155 of the Complaint.

157.    Dial directly or indirectly acquired assets of Westwood One, the effect of which was likely to reduce competition or to create a monopoly in the Independent Ad Rep Market and/or the Satellite Services Market, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

SECOND AMENDED COMPLAINT FOR ANTITRUST VIOLATIONS, UNFAIR COMPETITION, BREACH OF CONTRACT, TORTIOUS INTERFERENCE WITH CONTRACT AND PROSPECTIVE ADVANTAGE, AND OTHER STATE LAW CLAIMS

158.   As a result of Dial's acquisition and the anticompetitive conduct enabled thereby as set forth herein, Plaintiffs have been injured in their business or property in the form of receiving advertising revenues than they would have received but for the merger.

## EIGHTH CAUSE OF ACTION
### (Monopolization of the Satellite Services Market)
(Plaintiffs vs. Dial and Dial LLC)

159.   Plaintiffs incorporate by reference the allegations in paragraphs 1 - 158, above.

160.   Dial has monopoly power in the Satellite Services Market.

161.   Dial willfully acquired and maintained its monopoly in the Satellite Services Market by its acts and practices described above, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

162.   The goal, purpose, and/or effect of Dial's scheme was to reduce the opportunities for distribution of shows by the Syndication Plaintiffs and other independent producers and/or syndicators.

163.   The Syndication Plaintiffs have been injured in their business and property by reason of Defendants' unlawful conduct.

164.   This unlawful conduct threatens continuing loss and damage to the Plaintiffs if not enjoined by this Court.

## NINTH CAUSE OF ACTION
### (Attempted Monopolization of the Satellite Services Market)
(Plaintiffs vs. Dial and Dial LLC)

165.   Plaintiffs incorporate by reference the allegations in paragraphs 1 - 164, above.

166.   If Dial does not already have monopoly power, then Dial has a dangerous probability of success in achieving monopoly power in the Satellite Services Market.

SECOND AMENDED COMPLAINT FOR ANTITRUST VIOLATIONS, UNFAIR COMPETITION, BREACH OF CONTRACT, TORTIOUS INTERFERENCE WITH CONTRACT AND PROSPECTIVE ADVANTAGE, AND OTHER STATE LAW CLAIMS

167. With the specific intent to achieve a monopoly, Dial, by its acts and practices described herein, has attempted to monopolize the Satellite Services Market, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

168. The goal, purpose, and/or effect of Dial's scheme was to reduce the opportunities for distribution of shows by the Syndication Plaintiffs and other independent producers and/or syndicators.

169. The Syndication Plaintiffs have been injured in their business and property by reason of Defendants' unlawful conduct.

170. This unlawful conduct threatens continuing loss and damage to Plaintiffs if not enjoined by this Court.

### TENTH CAUSE OF ACTION
### (Breach of Contract – Ad Rep Agreements)
(Syndication Plaintiffs vs. Dial)

171. Plaintiffs incorporate by reference paragraphs 1 - 170 of the Complaint, above.

172. The Syndication Plaintiffs have entered into several contracts with Dial, both written and unwritten. The written contracts are the Ad Rep Agreements described above. Pursuant to the unwritten contracts, the Syndication Plaintiffs have hired Dial as an Independent Ad Rep for all of their shows not covered by the Ad Rep Agreements.

173. Dial has violated one or more obligations that it owes to the Syndication Plaintiffs under each of the contracts described above. Dial's contractual violations include the misuse of confidential information provided to it pursuant to the Agreements, underpayment of advertising revenues earned, the failure to include the Syndication Plaintiffs' shows in appropriate advertising bundles, failure to represent the Syndication Plaintiffs to the best of Dial's ability, the inclusion of the Syndication Plaintiffs' shows only in less favorable bundles, the acquisition and/or maintenance of conflict-of-interest programming, improper

35

contacts or other inducements with the Syndication Plaintiffs' hosts and/or refusal to permit the Syndication Plaintiffs access to Dial's books and accounting records.

174.    Plaintiffs have been damaged as a result of Dial's conduct.

175.    The accounts of Dial's sales of bundles are so complicated that calculating an ordinary fixed sum as a measure of damages is likely impracticable.

## ELEVENTH CAUSE OF ACTION
### (Breach of Contract – Satellite Services Agreement)
(Plaintiffs vs. Dial LLC)

176.    Plaintiffs incorporate by reference the allegations in paragraphs 1 - 175 of the Complaint.

177.    The Satellite Services Agreement is a valid, existing contract between TRNO and Dial LLC.

178.    The Syndication Plaintiffs are intended third party beneficiaries of the Satellite Services Agreement because the Satellite Services Agreement is intended to provide a means to distribute their shows to affiliate stations to broadcast in their respective local areas.

179.    Dial LLC has breached its obligations under the Satellite Services Agreement, including but not limited to its obligation to keep confidential the proprietary materials that have been provided to it as necessary to execute the Satellite Services Agreement and the obligation to provide satellite services as directed.

180.    Plaintiffs have been damaged as a result of Dial LLC's breach of the Satellite Services Agreement.

## TWELFTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)
(Syndication Plaintiffs vs. Dial)

181.    Plaintiffs incorporate by reference the allegations in paragraphs 1 - 180 of the Complaint.

36

182.   The Syndication Plaintiffs and Dial were parties to a fiduciary relationship because, when Dial acts as an Independent Ad Rep on the Syndication Plaintiffs' behalf, it is acting as the Syndication Plaintiffs' agent.

183.   Dial breached its fiduciary relationship with the Syndication Plaintiffs by using the Syndication Plaintiffs' confidential and proprietary business information, which the Syndication Plaintiffs provided to Dial only because Dial was acting as their agent, to facilitate Defendants' own conflict-of-interest programming to the Syndication Plaintiffs' detriment and/or to the advantage of Dial's conflict-of-interest programming.  Dial therefore violated its obligations to the Syndication Plaintiffs.

184.   Plaintiffs have been damaged as a result of Dial's actions.

### THIRTEENTH CAUSE OF ACTION
### (Tortious Interference with Contractual Relations and Conspiracy to Tortiously Interfere with Contractual Relations)
(Syndication Plaintiffs vs. Dial, Courtside, WYD, and Compass Media)

185.   Plaintiffs incorporate by reference the allegations in paragraphs 1 - 184 of the Complaint.

186.   The Syndication Plaintiffs have or have had contracts with numerous hosts, including but not limited to Michael Savage and Laura Ingraham.

187.   Dial, WYD, Compass Media, and Courtside were aware of the Syndication Plaintiffs' relationships with their hosts.  Those Defendants formed a conspiracy designed to rupture one or more of those relationships.

188.   One or more of those Defendants has taken an intentional, overt act to induce one or more hosts, including Michael Savage and Laura Ingraham, to breach their contracts with the Syndication Plaintiffs or otherwise to disrupt the Syndication Plaintiffs' contractual relationships with those hosts.

SECOND AMENDED COMPLAINT FOR ANTITRUST VIOLATIONS, UNFAIR COMPETITION, BREACH OF CONTRACT, TORTIOUS INTERFERENCE WITH CONTRACT AND PROSPECTIVE ADVANTAGE, AND OTHER STATE LAW CLAIMS

189.   There has been an actual breach or disruption of the Syndication Plaintiffs' contractual relations with Michael Savage and Laura Ingraham as a result of that conduct.

190.   The Syndication Plaintiffs have been damaged as a result of that conduct.

## FOURTEENTH CAUSE OF ACTION
**(Tortious Interference with Prospective Contractual Relations)**
(Syndication Plaintiffs vs. Dial and Dial LLC)

191.   Plaintiffs incorporate by reference the allegations in paragraphs 1 - 190 of the Complaint.

192.   Plaintiffs have economic relationships with affiliate stations, and they have a probability of economic benefit from those relationships.

193.   Dial and Dial LLC are aware of Plaintiffs' relationships with affiliate stations.

194.   Dial and Dial LLC have acted to disrupt the Syndication Plaintiffs' relationships with affiliate stations by delaying implementation of satellite service orders and otherwise interfering with affiliate relations between the Syndication Plaintiffs and their affiliate stations relating to providing the Syndication Plaintiffs' programming via satellite to their radio station affiliates.

195.   Dial's and Dial LLC's conduct has disrupted the Syndication Plaintiffs' relationships with affiliate stations.

196.   Dial's and Dial LLC's actions have proximately caused economic harm to Plaintiffs.

38

# FIFTEENTH CAUSE OF ACTION
## (Violation of Cartwright Act)
### (Syndication Plaintiffs vs. Dial, Compass Marketing, and WYM)

197.   Plaintiffs incorporate by reference the allegations in paragraphs 1 - 196 of the Complaint.

198.   Dial, Compass Marketing and WYM have agreed and/or conspired to combine their resources for the purpose of restraining commerce and preventing competition in the market for Independent Ad Rep Services.

199.   Those Defendants have taken illegal actions in furtherance of their agreement.

200.   Those Defendants conduct violates the Cartwright Act, Cal Bus. and Prof. Code § 16700 *et seq.*

201.   Plaintiffs have suffered economic damage as a proximate result of those acts.

# SIXTEENTH CAUSE OF ACTION
## (Violation of Cal. Bus. and Prof. Code § 17200)
### (Plaintiffs vs. Defendants)

202.   Plaintiffs incorporate by reference the allegations in paragraphs 1 - 201 of the Complaint.

203.   Each of the Defendants has engaged in unfair competition by virtue of an unlawful act, as follows:

a.      Dial and Dial LLC have unlawfully monopolized or attempted to monopolize the Independent Ad Rep and Satellite Services Markets, and they have lessened competition in those markets through the Dial/Jones Merger, the Dial/Compass Agreement, and the Dial/Westwood Merger;

b.     Dial and Dial LLC acted unlawfully when they required radio stations to carry one or more of Dial's conflict-of-interest programs if those stations wanted to receive one or more of the Syndication Plaintiffs' programs;

c.     Dial, Compass Media, Compass Marketing, WYD, and WYM have conspired to monopolize the Independent Ad Rep Market, to create the false impression of competition in that market, and to misallocate revenues from advertising bundles;

d.     Dial and Courtside have interfered with the Syndication Plaintiffs' contractual relationships with hosts, including Michael Savage and Laura Ingraham.

204.     Dial, Compass Media, and Compass Marketing have engaged in unfair competition by virtue of a fraudulent act, as follows:

a.     Dial, Compass Media, and Compass Marketing misrepresented that Compass Marketing is a competitor to Dial in the Independent Ad Rep Market, and the public was likely to be deceived by those representations into thinking that Compass Marketing was a competitor to Dial in that market;

b.     Dial falsely claimed that it was an honest broker in the Independent Ad Rep Market when in fact it was manipulating payments from advertising bundles in favor of itself and its affiliates; and

c.     Dial falsely claimed that it had hundreds of NBC Radio affiliates after it forced CNN Radio from the market.

205.     Each Defendant has engaged in unfair competition by virtue of an unfair act, as follows:

a.     Dial acted unfairly when it concealed the composition of and revenues earned from its bundles and when it misallocated revenues from those bundles to favor its own account;

b.     Dial and Dial LLC acted unfairly when they leveraged their control over the Satellite Services Market to refuse or delay responding to

directions from Plaintiffs as to the radio stations to receive the Syndication Plaintiffs' shows;

        c.    Dial and Courtside acted unfairly when they spread rumors about and otherwise acted to interfere with the Syndication Plaintiffs' relationships with their hosts, including Michael Savage and Laura Ingraham;

        d.    Dial, Compass Marketing, and Compass Media acted unfairly when they falsely created the impression of competition in the Independent Ad Rep Market;

        e.    Dial and Dial LLC acted unfairly when they deemed former CNN Radio affiliates to be affiliates of NBC Radio and interfered with switching those stations to ARNN newscasts; and

        f.    Dial and Dial LLC acted unfairly when they unilaterally switched radio stations' satellite channel to Courtside's show hosted by Laura Ingraham without notice to any Plaintiffs, directly contrary to the position taken by Dial and Dial LLC on receipt of instructions from Plaintiffs with respect to starting programming from the Syndication Plaintiffs to replace conflict-of-interest programming of Dial and/or Compass Media and, upon information and belief, programming of Courtside and/or WYD.

206.   Plaintiffs have been damaged as a result of Defendants' conduct.

## SEVENTEENTH CAUSE OF ACTION
### (Unjust Enrichment (Oregon Law) – Alternative to Breach of Contract)
(Syndication Plaintiffs vs. Dial)

207.   Plaintiffs incorporate by reference the allegations in paragraphs 1 - 206 of the Complaint.

208.   The Syndication Plaintiffs conferred a benefit upon Dial by permitting Dial to sell advertising time on the Syndication Plaintiffs' shows and by paying Dial a commission for that service.

209.   Dial was aware that it received those benefits.

41

210.   Under the circumstances, it would be unjust to allow Dial to receive those benefits without paying the Syndication Plaintiffs for them, in full.

211.   By engaging in the conduct described above, Defendants have been unjustly enriched at the expense of the Syndication Plaintiffs and they are required, in equity and good conscience, to disgorge and pay their ill-gotten gains to the Syndication Plaintiffs.

**PRAYER FOR RELIEF**

WHEREFORE, for the reasons stated herein, Plaintiffs pray for judgment against Defendants and for the following relief:

A.   A judgment for three times the damages actually sustained by Plaintiffs, as determined by a jury;

B.   A declaration that Defendants have violated the antitrust laws, committed the torts described above, and/or breached their contracts with and fiduciary duties to Plaintiffs;

C.   Permanent injunctive relief, which enjoins Defendants from entering into any further illegal agreements and requires them to take affirmative steps to dissipate the anticompetitive effects of their prior violations, including but not limited to divestment of their merger with Jones Media and/or Westwood One, as well as a requirement that Dial continue to represent the Syndication Plaintiffs properly and to the best of its ability until the divestment is complete and/or competitive balance is restored to the Independent Ad Rep Market;

D.   An accounting;

E.   The costs of this suit, including an award of attorneys' fees; and

F.   Such other and further relief as the Court deems just and proper.

42

# DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial as to all issues so triable.

Dated: January 23, 2013

STRIS & MAHER LLP

By: _____

Peter K. Stris (SBN 216226)
   peter.stris@strismaher.com
Victor O'Connell (SBN 288094)
   victor.oconnell@strismaher.com
STRIS & MAHER LLP
19210 S. Vermont Ave.
Building E
Gardena, CA 90248
Telephone: (424) 212-7090
Facsimile: (424) 212-7001

Joshua D. Wolson (*pro hac vice*)
   jwolson@dilworthlaw.com
Jordan M. Rand (*pro hac vice*)
   jrand@dilworthlaw.com
DILWORTH PAXSON LLP
1500 Market St., Suite 3500E
Philadelphia, PA 19103
Telephone: (215) 575-7000
Facsimile: (215) 575-7200

Attorneys for Plaintiffs The Original Talk Radio Network, Inc.; Talk Radio Network Enterprises, LLC; Talk Radio Network-FM, Inc.; Talk Radio Network Entertainment, Inc.; America's Radio News Network; and Talk Radio Network Operations, Inc.

43

# PROOF OF SERVICE

I am over the age of 18 years and not a party to this action. My business address is 19210 S. Vermont Ave., Building E, Gardena, CA 90248. My office number is (657) 464-0464, and my facsimile number is (424) 212-7001.

On January 23, 2012, I caused to be served the document entitled: **SECOND AMENDED COMPLAINT FOR ANTITRUST VIOLATIONS, UNFAIR COMPETITION, BREACH OF CONTRACT, TORTIOUS INTERFERENCE WITH CONTRACT AND PROSPECTIVE ADVANTAGE, AND OTHER STATE LAW CLAIMS** on all the parties to this action addressed as stated on the attached service list:

[ ]  **OFFICE MAIL:** By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices. I am readily familiar with this firm's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

[X]  **PERSONAL DEPOSIT IN MAIL:** By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service. Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

[ ]  **EXPRESS U.S. MAIL:** Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

[ ]  **HAND DELIVERY:** I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

[ ]  **FEDERAL EXPRESS:** By placing in sealed envelope(s) designated by Federal Express with delivery fees paid or provided for, which I deposited in a facility regularly maintained by Federal Express or delivered to a Federal Express courier, at Los Angeles, California.

[X]  **ELECTRONIC MAIL:** By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

[ ]  **FAX:** By transmitting the document by facsimile transmission. The transmission was reported as complete and without error.

[X]  **(Federal)** I declare under penalty of perjury that I am a member of the bar of this Court and that the foregoing is true and correct.

Dated: January 23, 2013

/s/ Victor O'Connell
Victor O'Connell

10563923_1

## SERVICE LIST

Christopher Tayback
Quinn, Emanuel, Urquhart & Sullivan, LLP
865 S Figueroa Street 10th Floor
Los Angeles, CA 90017-2543
Email: christayback@quinnemanuel.com
***Attorney for Dial Global Inc.; Dial Communications-Global Media Inc.; Dial Communications Global Media LLC; Excelsior Radio Networks LLC; Triton Media Group LLC; Verge Media Companies Inc.; Verge Media Companies LLC; Triton Radio Networks, Inc.; Triton Media Companies, Inc.***

Michael J. Kump
Kinsella, Weitzman, Iser, Kump & Aldisert
808 Wilshire Boulevard, 3rd Floor
Santa Monica, CA 90401
Email: mkump@kwikalaw.com
***Attorney for Dial Global Inc.; Dial Communications-Global Media Inc.; Dial Communications Global Media LLC; Excelsior Radio Networks LLC; Triton Media Group LLC; Verge Media Companies Inc.; Verge Media Companies LLC; Courtside LLC; Compass Media Networks LLC; Compass Media Marketing; Triton Radio Networks, Inc.; Triton Media Companies, Inc.***

Peter F. Flaxman
Flaxman & Blakely
591 Redwood Hwy., Suite 2375
Mill Valley, CA 94941
Email: pf@peterflaxman.com
***Attorney for Courtside LLC***

Laura E. McSwiggin
Epport, Richman & Robbins
1875 Century Park East Suite 800
Los Angeles, CA 90067-2512
Email: LMcSwiggin@erlaw.com
***Attorney for Compass Media Networks LLC, Compass Media Marketing***

David N. Lake, Esq.
Law Offices of David N. Lake,
A Professional Corporation
16130 Ventura Boulevard, Suite 650
Encino, California 91436
david@lakelawpc.com
***Attorney for WYM Media Marketing LLC; WYM Media Management LLC***

# Exhibit "D"

# Business Registry Business Name Search

## Business Entity Data

New Search

03-03-2014
12:43

| Registry Nbr | Entity Type | Entity Status | Jurisdiction | Registry Date | Next Renewal Date | Renewal Due? |
|---|---|---|---|---|---|---|
| 332201-95 | DBC | ACT | OREGON | 01-05-2006 | 01-05-2014 | **YES** |

| Entity Name | TALK RADIO NETWORK ENTERTAINMENT, INC. |
|---|---|
| Foreign Name | |

**Online Renewal:**

Renew Online

## Associated Names

New Search

| Type | PPB | PRINCIPAL PLACE OF BUSINESS | | |
|---|---|---|---|---|
| Addr 1 | 225 NE HILLCREST DR | | | |
| Addr 2 | | | | |

| CSZ | GRANTS PASS | OR | 97526 | | Country | UNITED STATES OF AMERICA |
|---|---|---|---|---|---|---|

*Please click here for general information about registered agents and service of process.*

| Type | AGT | REGISTERED AGENT | | Start Date | 03-14-2006 | Resign Date | |
|---|---|---|---|---|---|---|---|
| Of Record | 315546-94 | RAMBLING ROGUE ENTERPRISES, INC. | | | | | |
| Addr 1 | 225 NE HILLCREST DR | | | | | | |
| Addr 2 | | | | | | | |

| CSZ | GRANTS PASS | OR | 97526 | | Country | UNITED STATES OF AMERICA |
|---|---|---|---|---|---|---|

| Type | PRE | PRESIDENT | | | Resign Date | |
|---|---|---|---|---|---|---|
| Name | MARK | | MASTERS | | | |
| Addr 1 | 225 NE HILLCREST DR | | | | | |
| Addr 2 | | | | | | |

| CSZ | GRANTS PASS | OR | 97526 | | Country | UNITED STATES OF AMERICA |
|---|---|---|---|---|---|---|

| Type | SEC | SECRETARY | | | Resign Date | |
|---|---|---|---|---|---|---|
| Name | RONALD | H | SEVERAID | | | |
| Addr 1 | 225 NE HILLCREST DR | | | | | |
| Addr 2 | | | | | | |

| CSZ | GRANTS PASS | OR | 97526 | | Country | UNITED STATES OF AMERICA |
|---|---|---|---|---|---|---|

**New Search**

# Name History

| Business Entity Name | Name Type | Name Status | Start Date | End Date |
|---|---|---|---|---|
| TALK RADIO NETWORK ENTERTAINMENT, INC. | EN | CUR | 01-05-2006 | |

Please read before ordering Copies.

**New Search**

# Summary History

| Image Available | Action | Transaction Date | Effective Date | Status | Name/Agent Change | Dissolved By |
|---|---|---|---|---|---|---|
| | NOTICE LATE ANNUAL | 01-10-2014 | | SYS | | |
| | ANNUAL REPORT | 03-04-2013 | | FI | | |
| | NOTICE LATE ANNUAL | 01-11-2013 | | SYS | | |
| | ANNUAL REPORT | 02-15-2012 | | FI | | |
| | NOTICE LATE ANNUAL | 01-06-2012 | | SYS | | |
| | ANNUAL REPORT PAYMENT | 01-11-2011 | | SYS | | |
| | NOTICE LATE ANNUAL | 01-07-2011 | | SYS | | |
| | ANNUAL REPORT PAYMENT | 12-22-2009 | | SYS | | |
| | ANNUAL REPORT PAYMENT | 12-09-2008 | | SYS | | |
| | ANNUAL REPORT PAYMENT | 12-05-2007 | | SYS | | |
| | REINSTATEMENT AMENDED | 05-04-2007 | | FI | | |
| | ADMINISTRATIVE DISSOLUTION | 03-09-2007 | | SYS | | |
| | NOTICE LATE ANNUAL | 01-12-2007 | | SYS | | |
| | CHANGE OF REGISTERED AGENT/ADDRESS | 03-14-2006 | | FI | Agent | |
| | ARTICLES OF INCORPORATION | 01-05-2006 | | FI | Agent | |

© 2014 Oregon Secretary of State. All Rights Reserved.

## **DECLARATION OF JOSEPH C. CANE, JR., ESQ.**

1      I, JOSEPH C. CANE, Jr., Esq., hereby declare that

2      1.      I am one of the attorneys of record for Plaintiffs ANDREA TANTAROS,

3   an individual, and ASTERO, LLC, a New Jersey limited liability company (hereinafter

4   "Plaintiff TANTAROS" and "Plaintiff ASTERO".)  I have personal knowledge of the

5   matters set forth in this declaration and, if called as a witness, I could and would testify

6   competently as to the matters stated below.

7      2.      I am making this Declaration in support of Plaintiff ASTERO and Plaintiff

8   TANTAROS's Opposition to Defendant's Motion to Vacate Entry of Default.

9      3.      Plaintiff TANTAROS and Plaintiff ASTERO entered into an Employment

10  Agreement with Defendants, which is dated December 13, 2012.  A true and correct of

11  the Parties' "HOST AGREEMENT" is attached hereto as **Exhibit "D."**

12     4.      I have been in email contact with Defendant TALK RADIO's and

13  Defendant MASTERS' legal counsel, both before and after the filing of Plaintiffs

14  second amended complaint, and Defendants' counsel, and Defendants personally, were

15  aware of Plaintiffs' second amended complaint.  For example, on September 24, 2013,

16  I sent a letter to Defendants counsel, Mr. Ron Severaid, stating that, because Defendant

17  TALK RADIO was delinquent in payments due and owing under the HOST

18  AGREEMENT, Plaintiff would be examining her legal options.  A true and correct

19  copy of Plaintiff TANTAROS' letter of September 24, 2013, is attached hereto as

20  **Exhibit "B."**

21     4.      On October 21, 2013, Defendant TALK RADIO responded to Plaintiff

22  TANTAROS' letter of September 24, 2013, and stated that some of the past-due funds

23  had been wired into Plaintiff TANTAROS' account on October 10, 2013.  Importantly,

24  Defendant's counsel states that such funds were wired "prior to hearing late that

25  afternoon of the improper commencement of a legal action on behalf of [Plaintiffs.]"

26  Thus, Defendants were aware of Plaintiffs' complaint *the day such complaint was filed.*

1

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO
DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

A true and correct copy of Defendant TALK RADIO's October 21, 2013 letter to Plaintiffs is attached hereto as **Exhibit "C."**

4.      Subsequently to the filing of Plaintiffs' second amended complaint, Plaintiffs' claims became the topic of national radio news, and was reported on several major radio news networks.  Further, I became aware that such news reports contacted this office as well as both Defendants for comment on the pending suit.  Such news reports further contain statements from Defendants, who commented on the status of the case, and particular facts regarding Plaintiffs' causes of action.  A true and correct copy of several of these news reports, incorporating Defendants' comments to Plaintiffs claims, are attached hereto as **Exhibit "A."**

I declare, under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: March 3, 2014                    **JOSEPH C. CANE, JR.**


/s/Joseph C. Cane, Jr.
Joseph C. Cane, Jr., Esq., counsel for Plaintiffs ASTERO, LLC, a New Jersey limited liability company and ANDREA TANTAROS, an individual

---

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**

# Exhibit "A"

# Masters won't give Tantaros up without a fight

By cmarcucci on Oct, 14 2013 with Comments 0

Share1 Tweet2 Share0 Share0 Share6

Five days after Fox News' "The Five" host Andrea Tantaros sued Talk Radio Network, the home of her syndicated morning talker, accusing it of fraud and breach of contract—and terminating her employment agreement—TRN CEO Mark Masters has issued another statement that pretty much says they are digging in in this battle. He can't physically make her come back to work, but because of her contract with TRN to do a show, he notes she legally can't work for anyone else in radio. He claims they have done everything according to contract and Tantaros is breaching that contract when she doesn't get behind the mic. He also addresses the competitor that is trying to sign her away:

"It is a testament to the quality of Andrea's performance, and to TRN Entertainment's investment, efforts and expertise, that a competitor could offer her and her advisers a "big enough payday" if she could be convinced to try to break her contract with us – which she cannot do.

Though we continue to believe that Andrea is a victim of those who would offer her enough money to take extreme actions, we are saddened for her and our entire team as a result of her falling to this temptation.

Andrea's advisers would have been much better served to simply call and ask if we would be willing to sell the Show and her contract to the competitor which seeks them.  An ethical competitor would do this, but there are certain unethical competitors who would seek to harm us and falsely induce Andrea to harm us as a method of trying to "cut us out" of any sale of the contract for her radio host services.

Quite simply, this is the 20th anniversary of the founding of the initial TRN company.  We have had many similar situations to this arise in the last twenty years – but none have been public or this aggressive.  Simply put, the various false and misleading statements put out in public, apparently on Andrea's behalf, are a smokescreen for non- public attempts to steal our investment under the guise of a contract dispute. Therefore, we need to make the following extremely clear – Andrea cannot unilaterally break her contract, and we are in full compliance with the agreement.  Any statements to the contrary from her attorneys or anyone else are just bluster to attempt to hide the "payday" strategy.

For the record, as TRN Entertainment understands the contention asserted to date as to a claimed termination notice issued on Wednesday, October 9, 2013, it was that TRN Entertainment did not respond to a letter issued on Friday, September 13, 2013 within 20 business days thereafter, and that, as a result, a termination notice could be issued.  However, that claim is facially absurd.  The 20 business day period extended through Friday, October 11, 2013, and TRN Entertainment timely issued its response, as it had scheduled internally, one day early, on Thursday, October 10, 2013. Contrary to reports circulating from whatever sources, TRN

Entertainment is also current on all of its payment obligations under the agreement, and there were no payment delinquencies which had to be cured as of the Friday, October 11th date in any event.

Less than a year ago, Andrea was not in radio at all.  Our skill, hard work, reputation and investment in her and the Show, combined with her brilliant on air performance, have led to her catching the attention of unethical individuals in the radio business, at a time when she is virtually new to the radio business.  Those who have influenced her and put her into this embarrassing position have damaged TRN Entertainment, and we will pursue them for their greed and other malevolent motives, so that this will be a cautionary tale, not to be repeated.

We continue to believe in Andrea's brilliance on air and believe that she is at heart a decent person who will eventually see the error in her current course and correct it to our mutual benefit.  I believe in her and continue to look forward to a long term relationship with her, in accordance with our existing contract which remains in full force and effect, once we sort the current manufactured intrigues out.

We also like a good fight when it is for the right reasons, and this is for all of the right reasons.

We are not vindictive, but we do look forward to catching the rats and finishing what they started."


Read more at http://rbr.com/masters-wont-give-tantaros-up-without-a-fight/#AD3gsmVQF52SUR7B.99



From: ▮▮▮▮▮▮▮▮▮▮▮▮
Sent: Mon 10/14/13 9:14 AM
To: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- **The ANDREA TANTAROS lawsuit against TALK RADIO NETWORK has drawn yet another response from the syndicator**

# ALL ACCESS MUSIC

## TRN Publicly Replies -- Again -- To Tantaros Suit

October 14, 2013 at 4:45 AM (PT

Reacts Again

- The ANDREA TANTAROS lawsuit against TALK RADIO NETWORK has drawn yet another response from the syndicator, which sent out another statement issued by CEO MARK MASTERS forwarding an email from the company's RON SEVARAID continuing to blame unnamed third parties for prompting TANTAROS' suit and attempting to spirit the show away from TRN.

The statement starts with the allegation that "It is a testament to the quality of ANDREA's performance, and to TRN ENTERTAINMENT's investment, efforts and expertise, that a competitor could offer her and her advisers a 'big enough payday' if she could be convinced to try to break her contract with us - which she cannot do. Though we continue to believe that ANDREA is a victim of those who would offer her enough money to take extreme actions, we are saddened for her and our entire team as a result of her falling to this temptation."

Going on to suggest that TANTAROS' advisers should have called to ask if TRN would be willing to sell the show to a competitor, the statement credited to SEVARAID again blames "certain unethical competitors who would seek to harm us and falsely induce ANDREA to harm us as a method of trying to 'cut us out; of any sale of the contract for her radio host services." The statement calls TANTAROS' suit "a smokescreen for non- public attempts to steal our investment under the guise of a contract dispute. Therefore, we need to make the following extremely clear - ANDREA cannot unilaterally break her contract, and we are in full compliance with the agreement. Any statements to the contrary from her attorneys or anyone else are just bluster to attempt to hide the 'payday' strategy."

The statement claims that TRN is current on its payment obligations to TANTAROS, whose suit says she

was not paid on time, and that it responded to TANTAROS' letter claiming breach in a timely manner, invalidating TANTAROS' subsequent termination notice.

MASTERS and SEVARAID's statement threatens the third parties, who he said "inluenced (TANTAROS) and put her into this embarrassing position," that TRN will "pursue them for their greed and other malevolent motives, so that this will be a cautionary tale, not to be repeated," insisting that "We also like a good fight when it is for the right reasons, and this is for all of the right reasons.  We are not vindictive, but we do look forward to catching the rats and finishing what they started."

# Fwd: Fw: Andrea Tantaros: TRN Entertainment's Official Response to Her Actions



From: ████████████████ ███████@█████.com)

Sent:  Fri 10/11/13 9:01 AM

To:  j███████@█████.█████, ████████████ (████@████.com), ███████ S. █████ ████████@████████.com)

████████████████████████████████████████████

---------- Forwarded message ----------
From: E█████████████@█████.com
Date: Fri, Oct 11, 2013 at 9:49 AM
Subject: Re: F███████████████████████████████████
To: A███████████████████████

████████████████████████████████████████████

Ed Ryan
Editor
Radio Ink Magazine
████████████
████████
█████████@████.com

----- Original Message -----
████████████
Sent: Friday, October 11, 2013 9:02 AM
Subject: Re: Fw: Andrea Tantaros: TRN Entertainment's Official Response to Her Actions

████████████████████████████████████████████
████████████████████████████████████████████

On Fri, Oct 11, 2013 at 3:38 AM, E██████████████████████

        Ed Ryan
        Editor
        Radio Ink Magazine

www.radioink.com
239-247-5869

----- Original Message -----
**From:** Mark Masters
**Sent:** Friday, October 11, 2013 3:01 AM
**Subject:** Andrea Tantaros: TRN Entertainment's Official Response to Her Actions

Mark Masters, CEO of Talk Radio Network Entertainment, Inc., has released the following Statement on its behalf:

"Our relationship with Andrea has been wonderful. She is a brilliant host and a talented person. Until very recently, we had an excellent relationship with her.

We are now concerned that a third party is misleading her to their own direct benefit. This is not an uncommon problem when the host of a successful syndicated radio show has achieved such early success in our industry.

In any event, we look forward to the prompt resolution of the matter in our favor, and to moving forward on a positive and mutually rewarding basis with Andrea for many years to come.

In the approximately nine months that Andrea has been in syndication with TRN Entertainment, the combination of our investment of our radio expertise, training, coaching, support, promotion, affiliate relations, time, effort and substantial dollars into the development of the Show and of Andrea as a radio personality, combined with Andrea's growth as a radio personality, has built the Show from start-up status to the seventh largest talk radio show in the *Talkers'* rankings, and has landed Andrea on the cover of the October talk radio issue of *Radio Ink*. To our knowledge, this has never been done before. It is a testament to the mutually successful collaboration between Andrea and our team.

Regardless of this temporary intrigue, there is no legal basis for Andrea to terminate our contract (to the benefit of a predatory competitor), and we will require, and fully expect, her to abide by its terms. Contrary to certain reports we have heard, we are in full compliance with our obligations under the contract, and are prepared to enforce our rights."

POWERGRID    THE GRILL    AWARDS & FOREIGN SCREENING SERIES    INDIE SCREENING SERIES    JOBS



## THE WRAP
Covering Hollywood

HOME    MOVIES    TV    MEDIA    AWARDS    CULTURE    REVIEWS    VIDEOS    PHOTOS    HOLLYBLOGS    EVENTS        Search

# Fox News' 'Five' Co-Host Andrea Tantaros Hits Her Talk Radio Employers With Lawsuit

MEDIA | By Sara Morrison on October 10, 2013 @ 3:16 pm                    Follow @saramorrison

g+1  0                                                    Email    Print



**Lawsuit claims Talk Radio Network defrauded and breached its contract with its morning show star**

Fox News' "The Five" host Andrea Tantaros has sued Talk Radio Network, the home of her morning talk show, accusing the company of fraud and breaching its contract with the conservative media star, leaving her with a nearly staff-less show that could only book "'C-list' quality guests."

Tantaros, who is currently featured on the cover of "Radio Ink," was not so hot on her (now former) radio bosses when she filed a lawsuit against them on Thursday. She also sent a letter to TRN terminating her employment agreement on Wednesday, the suit said.

**RELATED**



Megyn Kelly Spanks Piers Morgan in Total Viewers -- But Rachel Maddow Wins Demo



Fox News' Megyn Kelly, Shepard Smith Debuts

"This is a situation entirely of TRN's own making," Tantaros' lawyer, Joseph Cane, told TheWrap. "TRN's dire financial troubles have unfortunately affected its ability to uphold multiple contact responsibilities to Ms. Tantaros. Andrea loves doing radio, values her affiliates and has fulfilled the duties of her contract for the past two months while TRN has kept her in the dark, fired her staff, and the staff at TRN necessary to sell the show to advertisers."

**Also read: Fox News' Megyn Kelly, Shepard Smith Debuts Feature Giant iPads, Ted Cruz and Bob Beckel's Sex Life**

In the suit, Tantaros said that TRN's president and CEO Mark Masters made several false statements to recruit her for a radio show, including that Laura Ingraham, whose show Tantaros replaced, "was a nightmare, difficult to deal with, and an impossible and unfair negotiator and that is why Defendant TRN was planning to part ways with Ms. Ingraham and why her coveted time slot would be

# MEDIA ALLEY



Media Alley looks at the media landscape from print to digital, legacy media to new media.

Want to win a Roku 3?! CLICK HERE!

**LATEST MEDIA ALLEY POSTS**

February 27, 2014 | 4 days ago
**CNN's Carol Costello Skeezed Out By Sexy Jesus In 'Son Of God' (Video)**

February 26, 2014 | 5 days ago
**Ronan Farrow NY Post Story Disputed by Event Organizer: 'Ronan and His Team Did Not Request Any Restrictions' (Updated)**

February 26, 2014 | 5 days ago
**PBS Science Correspondent Miles O'Brien Loses Arm in Freak TV-Equipment Accident**

February 26, 2014 | 5 days ago
**Philip Seymour Hoffman's Friend Breaks Silence Over False National Enquirer Story (Video)**

MORE ⌄

THE WRAP FEATURED VIDEO



**Feature Giant iPads, Ted Cruz and Bob Beckel's Sex Life**

**Fox News Slapped With Another Lawsuit Over Live Suicide Airing**

available."

TRN also promised to invest millions of dollars into promoting Tantaros' new show to the approximately 300 local stations with which it had syndication deals. Tantaros' decision to enter into a contract with TRN was based on those statements; as her salary was determined by a combination of a fixed rate ($300,000) and a percentage of revenue, TRN's ability to earn that revenue was important.

Tantaros signed the contract in December, only to later discover that TRN had sued one of its biggest syndicators (which TRN itself claimed in its lawsuit controlled 95 percent of advertising revenues for syndicated radio talk shows like Tantaros') several months earlier, which she said was not disclosed to her.

"TRN induced Andrea into the contract based on a set of material misrepresentations of fact," Cane said.

According to the lawsuit: "At the time Defendant TRN's CEO, Mr. Masters, was wooing and soliciting Plaintiffs to enter into the Host Agreement and the Guaranty with it for the Tantaros Show, Defendant TRN did not disclose the existence of the Dial Global lawsuit to Plaintiffs and further did not disclose that it was in a dispute with one of the largest advertising sales syndicators in the United States."

**Also read: Geraldo Rivera Sued by Former Agency WME**

Making matters worse, the suit says, TRN "laid off most of its staff and many others simultaneously 'resigned' from their positions, including, and critically, most of Defendant TRN's sales team." Some of those staffers worked on Tantaros' show and were replaced by members of Mark Masters' family.

"Plaintiff Tantaros found herself in a situation wherein she no longer had a competent executive producer, a full-time call screener, a paid assistant, or a sound effects manager, and further, had either no guests or only decidedly 'C-list' quality guests, was provided with no research for the third-rate guests that were booked for the Tantaros Show, a lack of sufficient research for the topics at hand, provided with no editorial guidance, and she was expected by Defendant TRN to basically produce her own show," the suit said.

"In addition, there no longer was any meaningful sales force to sell her program to advertisers or potential advertisers and there was no affiliate relations staff at Defendant TRN to service the needs or the requests of the Tantaros Show's affiliates."

**Also read: Fox News Slapped With Another Lawsuit Over Live Suicide Airing**

TRN's "implosion," the suit said, has caused Tantaros' own brand and reputation to suffer. Her Fox News employer has "repeatedly expressed its concern at the implosion of Defendant TRN."

Tantaros said she is still owed "several" salary payments; those complaints echo a Talkers Magazine report in September about the shuttering of its America's Radio News Network, in which several former employees complained that TRN owed them money.

"Rather than attempting to facilitate a solution to the many issues at hand, TRN would prefer to do nothing, including not pay its talent," Cane said. "This is indeed unfortunate … although Andrea wanted to continue to be a loyal trooper, TRN left her with no choice but to leave to mitigate damage."

TRN has lost several prominent hosts recently, including Laura Ingraham and Michael Savage in 2012 and Phil Hendrie in 2013. With Tantaros out, TRN will lose the seventh-rated talk radio show in the country.

Tantaros is asking for an unspecified punitive damages.

*Pamela Chelin contributed to this reported.*



0:00 / 1:48

March 1, 2014 By **Wrap Staff**

**'American Hustle' Costume Designer Michael Wilkinson Teases New Wonder Woman Costume (Video)** PLAY

The Oscar-nominated designer talks about current project "Batman vs....

MOST POPULAR   MOST SHARED   MOST COMMENTED



**Harold Ramis and Bill Murray: Inside The 'Groundhog Day' Duo's Decade-Long Feud**
24493 Views



**Oscars: Ellen DeGeneres Wasn't Kidding About That Selfie (Photo) – Updated**
22950 Views



**'Captain Phillips' Oscar Nominee Barkhad Abdi Is Broke**
20653 Views



**Jimmy Kimmel Mocks Los Angeles TV Reporters' Ridiculous Reaction to Rain (Video)**
14422 Views



**Ellen DeGeneres' Epic Selfie With Meryl Streep, Jennifer Lawrence And More Breaks Retweet Record (Photo)**
11239 Views



**Ellen DeGeneres' Oscars Monologue Pokes Fun At Jennifer Lawrence, Liza Minnelli (Video)**
11024 Views



**Oscars: The Complete Winners List**
10781 Views

ANDREA TANTAROS    FOX NEWS    LAWSUIT    TALK RADIO NETWORK



g+1  0

Email    Print

**← PREVIOUS STORY**

'REAL HOUSEWIVES,' BRAVO SLAPPED WITH LAWSUIT OVER NEW JERSEY BRAWL: REAL OR STAGED?

**NEXT STORY →**

BEN AFFLECK-MATT DAMON COMEDY LANDS AT CBS

## YOU MAY LIKE...



**What Celebs Would Look Like if They were Just Average People will SHOCK You**
(Rant Lifestyle)



**Kathie Lee Calls Her 'Today' Predecessor's Show 'Boring,' 'Crap'**



**'Storage Wars' Star Brandi Passante Files Lawsuit Over Porn Video**



**Liam Neeson's 'Non-Stop' Edges Surging 'Son of God' at Box Office Friday**







# Exhibit "B"

# BUSINESS LAW PROFESSIONAL CORPORATION

9300 Wilshire Boulevard, Suite 550
Beverly Hills, California 90212
Telephone (310) 470-8855
Fax (310) 919-1950

---

**Direct Dial:** Joseph C. Cane, Jr.
         (310) 470-8855 x. 205

**Email:**  jcane@businesslpc.com

---

September 24, 2013

CONFIDENTIAL COMMUNICATION
VIA E-MAIL AND U.S. MAIL

Ron Severaid, Esq.
Executive Vice President & General Counsel
Talk Radio Network Entertainment, Inc.
225 N.E. Hillcrest Drive
Grand Pass, Oregon 97526

        Re:    Andrea Tantaros Medical Leave

Dear Ron:

I am sending this letter to you in reference to further events which continue to adversely affect my client, Ms. Andrea Tantaros ("Andrea" or "my client")  and also constitute further breaches of that certain Host Agreement between Talk Radio Network Entertainment, Inc. ("TRN")  and my client, dated as of December 13, 2012 (the "Host Agreement").  To be clear, we view the items referenced herein, to be supplemental to the breaches referenced in my September 13th letter to you.  (Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Host Agreement).

As an initial matter, my client has yet to receive payment of her Base Fees which were due on Friday, September 20th, in accordance with Section 5.A of the Host Agreement.  As you know, in the past, we accommodated TRN when it was late in tendering payment for Base Fees and Guaranteed Compensation, in accordance with Sections 5.A and 5.F of the Host Agreement, respectively.  Due to TRN's failure to rectify the breaches outlined in my September 13th letter and the additional breaches reflected herein, we will no longer be making any such accommodations, and strongly encourage you to immediately tender payment to Andrea for all outstanding Base Fees.

Likewise, it is our understanding that Andrea's personal assistant, C.J., has also not been paid in violation of Section 4.P of the Host Agreement.

In addition, we were very disheartened to learn, despite the contents of my September 18th letter to you and the stress we indicated that the current situation at TRN has been causing Andrea, that upon Andrea's return to work this morning, (i) no guests were booked for the Show, (ii) no research had been provided to her, (iii) there was no in-studio producer or production team working (apart from 1 person) and (iii) an David Ruben, who we were told by Marcel Corona a

week ago, was being added to the Show as its Sr. Producer (in violation of Section 3(h) of the Host Agreement), showed up approximately 8 minutes before the Show and blamed his tardiness on the fact that "we didn't expect you to show up," despite my letter to you of September 18th, indicating that Andrea would be out <u>until</u> September 24th, and proposed to "recycle" guests who had appeared on the Show over the past few days.  As you know, instead of proceeding with the Show under the circumstances, Mr. Ruben suggested that TRN run a "Best of" show, rather than proceeding with the Show in a wholly-owned prepared manner.

Additionally, last week TRN made no efforts to book guests for the Show, sound clips for the Show were minimal and of poor quality, there appeared to be few advertisers apart from those with affiliations to Mark Master's family, and Andrea was given insufficient preparation, feedback and editorial guidance from Mr. Ruben.  In sum, we felt the overall production quality of the Show last week was well beneath the standards Andrea has been accustomed to prior to our letter of September 13th and certainly not commensurate with "National Syndication Quality," as is required pursuant to §4.F of the Host Agreement.

Although I wish I did not have to remind you, Section 3(h) of the Host Agreement provides that TRN may not " materially deviate from the approved concept, Show Title or the approved creative elements without Lender's prior written approval..."  Suffice it to say that that neither Andrea, nor Lender approves of any of the aforementioned production changes to the Show.  Further, we are a total loss as to how TRN still reasonably expects Andrea to host the Show, given the lack of overall resources available to her, without causing further serious damage to her brand and reputation.

Concerning this last point, I truly hope TRN changes course and really seriously considers the adverse implications producing and delivering the Show in the manner that has transpired in recent days is having and will continue to have on my client, her brand and her reputation.  To this end, we request that you promptly rectify the aforementioned breaches, as well as, those referenced in my September 13th letter, and in particular, immediately remit all outstanding compensation owed to Andrea.

Alternatively, if TRN does not realistically believe it will be able to overcome its current business and financial problems in the short-term, so that it will be able to rectify the aforementioned breaches and put the Show back on solid footing, we would ask that the parties simply agree to part ways on a date certain.  In the interim, this letter confirms that Andrea does intend to work tomorrow and for the foreseeable future, despite TRN's ongoing breaches and the associated risk to her brand and reputation.

Lastly, prior to discussing any alternatives to the foregoing, we would like TRN to pay all outstanding amounts due to Andrea and her assistant, as well as, immediately furnish the following documents/information (as previously requested):

1. List of station affiliates currently carrying the Show and any other available syndication metrics;
2. List of markets for the Show and any related clearance metrics;
3. List of current advertisers for the Show;
4. Total Ad Sales for the Show from 1/1/13 to present;
5. Total New Show Revenue from 1/1/13 to present;
6. Total Cash Compensation received by TRN concerning the Show from 1/1/13 to the present;
7. Total Miscellaneous Revenues received by TRN concerning the Show from 1/1/13 to the present;

8. Total User Fees received by TRN concerning the Show from 1/1/13 to the present; and

9. Copies of all Revenue Reports required to be delivered to Lender on a monthly basis, per Section 6.D of the Host Agreement.

We look forward to your immediate courtesy and cooperation regarding the foregoing.

Very truly yours,


Joseph C. Cane, Jr.

cc:     Andrea Tantaros
        Timothy J. McIlwain, Esq.

# Exhibit "C"

October 21, 2013

VIA EMAIL, TELEFAX AND FEDERAL EXPRESS

Joseph C. Cane Jr., Esq.                    Astero, LLC                 Andrea Tantaros
Business Law Professional Corporation       154 W 70th, 6E   154 W 70th, 6E
12400 Wilshire Blvd, Suite 1180             New York, NY 10023          New York, NY 10023
Beverly Hills, CA 90025                                                 atantaros@gmail.com
atantaros@gmail.com  jcane@businesslpc.com

Business Law Professional Corporation       Astero, LLC
12400 Wilshire Blvd, Suite 1180             2020 New Road
Beverly Hills, CA 90025                     Linwood, NJ 08221
jcane@businesslpc.com                       atantaros@gmail.com

Re: Talk Radio Network Entertainment/Andrea Tantaros

Dear Joe and Andrea and Astero, LLC:

This letter is being sent to each of you by Talk Radio Network Entertainment, Inc. ("**TRN-E**"), in accordance with the notice provisions of Section 29 of the Host Agreement, dated December 13, 2012, by and between TRN-E, Astero, LLC and Andrea Tantaros (the "**Host Agreement**"), to respond, from an abundance of caution, to the letter dated September 24, 2013 from Joseph C. Cane, Jr. to Ron Severaid (the "**Letter**" or your "**Letter**").

As a preliminary point, TRN-E expressly denies that the Letter constituted a formal notice issued in accordance with Section 29 of the Host Agreement, and, accordingly, expressly challenges the propriety of the Letter if and to the extent that it is alleged or determined to be or contain a breach notice under subparagraph 18.A of the Host Agreement.

Nonetheless, from an abundance of caution, TRN-E hereby formally replies to the Letter and expressly challenges each and every purported breach of the Host Agreement which is purportedly cited in the Letter ("**Cited Breach**"), as well as each purported action, if any, alleged in the Letter to be required to cure a Cited Breach ("**Cited Cure**").

The Letter is not clear as to what, if anything, is claimed to be a Cited Breach, and what is simply commentary. Frankly, while the Letter appears to contain multiple gripes and

Joseph C. Cane, Jr., Esq.                                              Page 2

Astero, LLC

Andrea Tantaros

October 21, 2013

complaints, it does not appear to set forth any Cited Breach, or to meet the requirements of a proper breach notice under subparagraph 18.a of the Host Agreement, or for the issuance of a Breach Notice under Section 29 of the Host Agreement.. Accordingly, TRN-E challenges the propriety of the Letter as a Breach Notice should the Letter be claimed, or be determined or construed to contain, a Breach Notice.

The second paragraph of the Letter does contain what appears to be a reminder with respect to the "Base Fees which were due on Friday, September 20th",  followed by strong encouragement "to immediately tender payment to Andrea for all outstanding Base Fees."  If and to the extent that this reminder and encouragement were claimed or deemed to constitute a Cited Breach,  TRN-E challenges the existence of any such claimed Cited Breach.

However, the significance and meaning of this paragraph is moot in any event.  As you are no doubt aware, the September 20, 2013 Base Fee, together with the October 5, 2013 Base Fee and the guaranteed threshold compensation payable under the Host Agreement on September 30, 2013 (which were not mentioned in the Letter in any event), were duly wired on October 10, 2013 (in good faith, prior to hearing late that afternoon of the improper commencement of a legal action on behalf of your clients), and have been paid in full in any event, such that any claimed payment delinquencies have been duly and timely cured in the utmost of good faith.

With respect to the complaints/criticisms in the Letter concerning the morning of September 24, 2013, it is true that the production staff had been somewhat confused as to the return intentions of Andrea.  However, TRN-E submits that this was the result of lack of advance communication from Andrea.  Nevertheless, TRN-E had a team in place ready to proceed and it is TRN-E's understanding that it was Andrea who chose not to proceed, resulting in the indication that a "Best Of" was available for use in that event.

Joseph C. Cane, Jr., Esq.                                    Page 3

Astero, LLC

Andrea Tantaros

October 21, 2013

With respect to the generic complaints set forth in the second paragraph of the Letter, TRN-E challenges such contentions and believes that they are based on a desire to articulate subjective opinions for the purpose of creating artificial disputes in an effort to support agendas, such as the agenda that is evidenced by your subsequent letter dated October 9, 2013, which was issued without any factual, contractual or legal basis whatsoever.

TRN-E clearly disputes your characterization of "the overall production quality of the Show" during the week of September 16, 2013.  In any event, TRN-E has met all applicable contract standards  in those areas, and clearly met and exceeded TRN-E's commitment under subparagraph 4.F of the Agreement to provide "such . . . production support for the Show . . . as [TRN-E] in its business judgment determines to be necessary and appropriate to broadcasting the Show at National Syndication Quality."   That is the applicable standard, and TRN-E denies and challenges any claims, however characterized, that TRN-E has failed to meet that standard.

TRN-E does, however, appreciate your acknowledgement in the Letter that, at least through the September 13, 2013 broadcast of the Show, the production standards for the Show meet the production "standards Andrea has been accustomed to".

With respect to the second full paragraph on Page 2 of the Letter, TRN-E expressly denies that it has materially deviated from "the approved concept, Show Title or the approved creative elements" of the Show.  As TRN-E has previously advised you, TRN-E questions the motives behind your clients' stated refusals to consent to David Ruben, who is an award-winning and experienced professional radio producer, and believes that such refusals have more to do with separate agendas, and are in any event unreasonable, and have been further manifested by Ms. Tantaros in the form of wholly unprofessional abuse with respect to Mr. Ruben and unprofessional actions with respect to guests he arranges.  In any event, as you have been

Joseph C. Cane, Jr., Esq.                                         Page 4
Astero, LLC
Andrea Tantaros
October 21, 2013

advised previously, TRN-E respectfully submits that any applicable approvals have been
unreasonably withheld at your end, and notes that, under subparagraph 3.h of the Host
Agreement, where the Parties cannot agree, TRN-E's "decision shall be final."

      With respect to the third full paragraph on page 2 of the Letter, TRN-E expressly denies
and challenges that there are or were any breaches by TRN-E to be rectified at the time (in
contrast to breaches by your clients which will be the subject of separate correspondence),
whether in reference to your letter of September 13, 2013, to the Letter, or otherwise.

      With respect to the fourth full paragraph on Page 2 of the Letter, TRN-E respectfully
submits that the Show is and has always been "on solid footing", with the exception of problems
emanating from the recent change in Andrea's attitude and in her commitment to the Show, from
her absences from the Show claiming incapacity to perform, while later displaying her
considerable talents, without any evidence of incapacity, later the same day on "The Five", and
from her current refusal to perform her duties.   In any event, TRN-E is not willing to simply
release your clients from their contractual obligations to TRN-E.   TRN-E will not walk away
from its contract rights simply because your clients prefer this to occur, and have now elected to
become difficult to work with in an apparent campaign to encourage TRN-E to do so.

      With respect to what you clearly acknowledge to be a "request" at the end of the Letter
for 9 categories of items, TRN-E respectfully declines to comply with this request.  Delivery of
such information is not required under the Host Agreement, and, given the fact that your clients
and their attorneys have already violated the confidentiality and non-disclosure provisions of
Paragraph 30 of the Host Agreement, and the NDA between the parties entered into at the
commencement of their contractual discussions, by, at a minimum, attaching the Host
Agreement and your recent correspondence to me, including the Letter, as exhibits to a publicly

Joseph C. Cane, Esq.                                    Page 5
Astero, LLC
Andre Tantaros
October 21, 2013

available document, TRN-E is reluctant, to put it mildly, to provide confidential and proprietary
information to your clients in order to enable them and their attorneys to make such information
publicly available, or to disclose such information, openly or otherwise, to the third parties your
clients are communicating with, all in violation of their obligations under the Host Agreement
and the NDA.

   With respect to the contention in the Letter, as to Item 9 of the numbered items subject to
your request for  information, that Revenue Reports are "required to be delivered to Lender on a
monthly basis, per section 6.D of the Host Agreement", as you know, that subparagraph does not
require such reports "to be delivered on a monthly basis" as the Letter states, but, rather, only
requires those reports to be issued for months in which participation payments are due.  Given
the $1,000,000 Annual Threshold in Net Show Revenue each year before revenue participation
payments are due, and the $8,333 per month in Guaranteed Compensation advances under
subparagraph 5.F to be recovered by TRN-E before participation payments will be due, TRN-E
respectfully denies that any Revenue Reports have been required to be delivered by TRN-E
through the date of your Letter.

   As noted above, TRN-E respectfully challenges any claim that the Letter is or should be
deemed or determined to be or contain a Breach Notice under Subparagraph 18.A of the Host
Agreement.  However, should the Letter ever be determined to constitute or contain any such
Breach Notice, as to any Cited Breach claimed or determined to be set forth therein, TRN-E, by
this written reply, challenges the existence of any such Cited Breach, as well as any actions cited
in the Letter as being necessary to cure any such Cited Breach, or notes that any such Cited
Breach actually determined to have been asserted therein has now been cured in any event (as is
the case with the Base Fee payment due September 20, 2013, now paid in full, which TRN-E

Joseph C. Cane, Jr., Esq.                                          Page 6

Astero, LLC

Andrea Tantaros

October 21, 2013


submits is the only complaint asserted in the Letter which might arguably be construed or determined to be a Cited Breach).


      For the record, TRN-E also formally reserves all of its rights, remedies, claims and defenses, whether at law or in equity.


                                      Respectfully,


                                        TALK RADIO NETWORK
                                        ENTERTAINMENT, INC.


                                      By _____
                                            Ronald H. Severaid
                                          Executive Vice President


cc:    Joshua D. Wolson, Esq.
        James L. Buchal, Esq.

# Exhibit "D"

HOST AGREEMENT

This HOST AGREEMENT (this "**Agreement**"), dated as of December 13, 2012, is entered into by and between TALK RADIO NETWORK ENTERTAINMENT, INC, an Oregon corporation ("**Network**") and ASTERO, LLC, a New Jersey Limited Liability Company ("**Lender**") for the services of ANDREA K. TANTAROS ("**Host**"), who hereby agree as follows:

1.      Purpose/Representations:

   A.   Purpose.    Pursuant to this Agreement, Network is contracting with Lender, as an independent vendor, to secure the personal services of Host as the host of a radio program having the format of a weekday long-form feature, of three (3) hours in length, which is to be produced and syndicated by Network, currently known as "The Untitled Andrea Tantaros Show with Jason Mattera" (the "**Show**"). Network and Lender on behalf of Host (individually, "**Party**", and, plural or collectively, "**Parties**") desire to have this Agreement supersede all prior and existing written and/or oral agreements by and between the Parties concerning the Show and Host's services in connection therewith, such that any and all agreements by and between the Parties concerning the Show and Host's services in connection therewith shall be exclusively set forth in this Agreement.

   B.   Lender Representations & Warranties.  Lender represents and warrants to Network that:

      i.   Lender is a limited liability company which provides the personal services of Host to various third parties pursuant to separate contracts between Lender and Host (the "Lender/Host Agreements");

      ii.   Pursuant to the Lender/Host Agreements, Lender has the legal right and authority to enter into this Agreement and to contract for Host to provide, and to commit Host to the performance of, the personal services of Host specified in, and the other personal obligations and commitments of Host required by, this Agreement;

      iii.   Host is and shall be compensated for Host's services to Network under this Agreement in accordance with the Lender/Host Agreements, the terms of which are confidential to Lender and Host;

      iv.   The Lender/Host Agreements are bona fide business agreements;

      v.   Payments by Network to Lender pursuant to this Agreement fully satisfy all obligations of Network for the personal services and other commitments and/or requirements of Host pursuant to this Agreement; and

      vi.   Lender shall be solely responsible for, and shall comply with, any federal and state requirements applicable to reporting of income received and/or payments made for the personal services of Host, including without limitation any applicable tax payments and/or withholdings and/or any and all worker's compensation insurance or similar requirements, if and to the extent applicable to services rendered by

Host, and/or payments made to Lender by Network, and/or to Host by Lender, in connection with this Agreement.

2. <u>Term:</u>

    A. <u>Effective Date</u>: This Agreement shall be effective upon the date that this Agreement is fully executed and exchanged by and between the Parties (the "**Effective Date**").

    B. <u>Commencement Date.</u>  The term of this Agreement (the "**Term**") shall commence on Tuesday, December 18, 2012 (the "**Commencement Date**").

    C. <u>Term.</u>  The Term shall consist of a partial month commencing on the Commencement Date and continuing through the end of the calendar month in which the Commencement Date occurs (the "**Partial Month**"), plus the four (4) years immediately following the Partial Month.

    D. <u>First Contract Year.</u>  The first year of the Term (the "**First Contract Year**") shall be deemed to consist of the Partial Month, plus the twelve (12) full calendar months immediately following the Partial Month.

    E. <u>Subsequent Contract Years.</u>  Each subsequent year of the Term ("**Subsequent Contract Year**") shall be deemed to consist of the twelve (12) full calendar months immediately following the First Contract Year or the preceding Subsequent Contract Year, as applicable.

3. <u>Host Services:</u> Network hereby retains Lender to provide the personal services of Host, and as required by this Agreement ("**Host's Services**"), including performing as an on-air personality for, and host, of the Show, as follows:

    a. <u>Broadcast Services.</u>  Host shall provide such personal services to Network, as on-air personality and host for and during live broadcasts of the Show, for three (3) consecutive hours per day, Monday through Friday, during the hours of 9:00 a.m. to 12:00 noon, Eastern Time, or during such other three (3) hour weekday time block, starting no earlier than 9:00 a.m., Eastern Time, and ending no later than 9:00 p.m., Eastern Time, as Network may reasonably specify upon giving no less than ten (10) business days prior written notice to Lender; provided, however, that any such time change shall be subject to Host's professional availability, at the time of such change, recognizing that Host's principal employer is the Fox News Network, LLC (the "**Fox Network**"), pursuant to her employment agreement with the Fox Network, dated as of September 30, 2011 (the "**Fox Agreement**"), and that, in connection therewith, Host shall be unavailable to accept a new time commitment for the Show which conflicts with Host's then existing schedule under the Fox Agreement.

    b. <u>Other Host Services.</u>  Host's Services shall include the following solely in connection with and to promote the Show: Show preparation, announcing, hosting the Show, whether as a

sole host or with the assistance of a supporting co-host, performing and reading commercial advertisements in Host's voice, performing commercial endorsements (subject to Lender's approval rights herein in this Agreement), engaging in programming, production, promotion and conferences, performing a reasonable number of advertiser/affiliate telephone or Internet conferences, or meetings in New York City or other location acceptable to Host, publicity and photographic sessions and press interviews, paperwork, and staff and program meetings, and Network consultations, as Network may reasonably request.  At Network's request, Host shall also participate in commercial announcements for Network and the separate three hour daily installments of the Show (individually, **"Program"**, and, plural or collectively, **"Programs"**), leads into and leads out of commercial announcements and Programs, previews, warm-ups and after-shows.  Host shall not be required to read any live spots without Lender's prior written consent, and Host shall not be required to read any endorsement which, in Lender's reasonable judgment, Lender deems to be unethical or immoral or which Lender reasonably believes would reflect badly on Host's career.  Independent services (in contrast to Host's services to Network in the field of talk radio which are the subject of this Agreement) which Host is entitled to perform for third parties under the terms of this Agreement are not, and shall not be deemed to be, part of the services to be performed by Host for Network under this Agreement. Any promotional services shall be subject to Host's availability.  Host will not be required to travel for promotions or remote purposes without Lender's prior written consent, and any services requiring Host to travel to a location other than a performance location specified in subparagraph 3.c below shall be subject to Lender's prior written approval in each instance, which shall not be unreasonably delayed, conditioned or withheld.  Services by Host outside of the three hour live performance times for the Show shall be scheduled to avoid conflicting with Host's time commitments to the Fox Network pursuant to the Fox Agreement.

c. <u>Personal Appearances</u>.  In connection with the Show, Lender shall cause Host to perform up to a maximum of ten (10) personal appearances, remotes, or advertiser/affiliate meetings each year during the Term at no cost to Network.  Lender shall receive a flat rate of $500 per hour (with a minimum of $1,000 per appearance) after the initial ten (10) appearances.  Network shall be solely responsible for obtaining payments from third parties in relation to these Host Services and otherwise coordinating such appearances and services taking into consideration Host's prior commitments.

d. <u>Performance Location.</u>  On a day to day basis, Host's Services in connection with the Show will be performed in studio facilities erected in Host's personal residence or otherwise provided by Network (**"Network's Facility"**), at a location mutually agreeable to Network and the Lender in the New York, NY metropolitan area (the **"NY Area"**).  Lender shall have prior written approval over any location changes for Host's services.  If Host shall change Host's personal residence during the Term, Network shall relocate such studio facilities to Host's new residence at Network's expense; provided, however, that if Host shall relocate Host's residence more than three (3) times during the Term, Lender shall be responsible for any such relocation costs after the third (3rd) relocation.

e.  <u>Performance Standards.</u>  Lender warrants that Host's Services shall be performed in a competent artistic and professional manner, and in a commercially reasonable manner, and Host shall devote the time reasonably necessary to prepare for and professionally maintain the Show consistent with the terms of this Agreement throughout the Term. Host's Services and the materials (if any) furnished by Host shall materially comply with all of Network's policies and with the rules and regulations of the Federal Communications Commission (the "FCC"), the Federal Trade Commission (the "FTC"), and any other governmental body having jurisdiction. Host's Services with respect to commercial announcements and endorsements shall be performed at broadcast level quality reasonably acceptable to the sponsor and/or other advertiser contracting for such announcement or endorsement.

f.  <u>Autographed Pictures.</u>  Host shall provide up to a maximum of one hundred (100) autographed pictures of Host during each year of the Term, solely as promotional materials to be provided to radio station personnel, and current and/or prospective advertisers and/or sponsors for the Show.

g.  <u>Conferences.</u>  Network shall pay for the costs associated with a maximum of two (2) radio-industry related conferences, to be mutually selected by Network and Lender, for attendance by Host each year of the Term, for the purpose of promoting the Show, Host as the host or primary host of the Show, and Network. Such costs shall include registration fees, first-class hotel accommodations, business class travel (or best class available if business class is not available), mid-sized car rental and $150 cash per diem for meals, entertainment and gas. Lender shall utilize Network's travel agent to make the requisite travel arrangements. Attendance by Host at radio industry conferences pursuant to this subparagraph 3.g shall not be deemed to be, or regarded as, personal appearances, remotes or meetings pursuant to subparagraph 3.c above, regardless of whether Host performs the Show remotely while attending a conference pursuant to this subparagraph 3.g.

h.  <u>Show Approvals.</u>  Lender shall have the right to approve the concept for the Show, co-hosts or other on-air personalities, and key creative elements, Show title (which may have Host's name included, but Lender may not require Network to use Host's name; provided, however, if the name of any talent appears in the Show title, including with respect to distribution of the Show via any format or means in addition to Radio, Host's name shall be featured in first position followed by the word "with"). Once the Show commences production, with respect to any changes to any of the above approved elements: (i) changes to co-hosts and other on air personalities Host will be interacting with on-air will remain subject to Lender's consent; and (ii) choices of producers,  and guest hosts to substitute for Host if Host is off air, shall be subject to the mutual approval of Network and Lender, which approval shall not be unreasonably withheld, conditioned or delayed; provided, however, that if the Parties cannot agree as to a particular issue after a reasonable period of good faith discussion, or if time constraints prior to broadcast time do not allow adequate time for discussion, Network's decision shall be final. Notwithstanding the foregoing, no guest host shall be permitted to substitute for Host more than seven (7)

times per annum without Lender's prior approval, which may be granted or denied in Lender's sole and absolute discretion. Network shall not materially deviate from the approved concept, Show Title or the approved creative elements without Lender's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed.

i.  <u>Photo Approval</u>.  Network shall submit to Lender for Lender's review and approval, all photos of Host that Network proposes to use in connection with the publicity, advertising and/or promotion of the Show.  Lender shall have five (5) business days from receipt of such photos within which to disapprove of such photos; provided, however, that Lender must approve at least fifty percent (50%) of all submitted photos in which Host appears along with any other individual and seventy-five percent (75%) of all photos in which Host appears alone.   Network shall endeavor to submit photos in batches of reasonable numbers.  Once a photo is approved pursuant to the foregoing process, the photo shall be deemed approved for all purposes allowed hereunder.  If the five (5) day period lapses without a response from Lender, all photos submitted shall be deemed approved.

j.  <u>Bloopers, Outtakes & Behind the Scenes Footage</u>.  In the event the Show is distributed in any video format via any mode of transmission, such distributions shall not include Host in any "bloopers", outtakes and/or behind-the-scenes footage in connection with the Show without Host's prior approval.

4.   <u>Network Actions:</u>

A.  <u>National Syndication</u>.  Network shall promote and market the national syndication of the Show throughout the radio industry, and in other media if deemed advisable by Network, in such commercially reasonable manner as Network determines to be appropriate, and consistent with the level of promotion and marketing devoted by Network to Network's other premier weekday programming.

B.  <u>Show Affiliates</u>.  Network will contact radio stations, and may contact prospective affiliates in other media, throughout the United States in an effort to secure their affiliation to the Show, with financial terms based upon, but not limited to: (a) the barter trade of stations or other affiliates  making commercial advertising time available for sale for Network's account in return for the Show ("**Advertising Time**"), which may include, without limitation, advertising inventory to be embedded in the Show by Network ("**Embedded Inventory**"), and/or advertising inventory which is not embedded in the Show ("**Non-Embedded Inventory**"); and/or; (b) cash payments, whether in addition to and/or in lieu of Advertising Time ("**Cash Compensation**"). Any Non-Embedded Inventory procured by Network as consideration for the right of a station or other broadcaster to broadcast the Show may be run, in Network's discretion, in Network's own business judgment: (i) outside of the Show, during other day parts on the stations or other broadcasters authorized to broadcast the Show ("**Show Affiliate**" or "**Show Affiliates**"); (ii) during the Show on the Show Affiliates; or (iii) on a station or other broadcaster which is not then a Show Affiliate.

C. <u>Affiliate Agreements</u>.  Network will enter into separate affiliation agreements for the Show between Network and such Show Affiliates ("**Show Affiliate Agreements**"), to include the financial terms under which such Show Affiliates are authorized to broadcast the Show.

D. <u>Production Costs</u>.  Network will be responsible for all of Network's production costs with respect to the Show (including computers, office equipment, audio and video equipment and research materials and subscriptions), including without limitation production costs incurred by Lender, at Network's request, provided that they have been pre-approved by an authorized officer of Network in writing, which approval shall not be unreasonably withheld, conditioned or delayed.

E. <u>Equipment</u>.  Network will provide, at Network's Facilities, such equipment as Network, in its business judgment, determines to be necessary to allow Host to perform the Show from Network's Facilities at national syndication quality levels ("**National Syndication Quality**"), subject to such substitutions and/or replacements of the Equipment as Network determines to be appropriate.  Network shall provide for all necessary maintenance and/or repair and/or replacement of the Equipment as may be necessary during the Term, at Network's expense, except for such costs, if any, as shall result from intentionally improper handling and/or abuse of the Equipment attributable to Host or Lender (in which event Lender shall be responsible for any resulting costs); provided, however, that Lender shall not in any event be responsible for any repair and/or replacement and/or any other equipment costs resulting from ordinary wear and tear.

F. <u>Technical Support</u>.  Network will provide such engineering and production support for the Show, from such facilities as Network determines to be appropriate, as Network in its business judgment determines to be necessary and appropriate to broadcasting the Show at National Syndication Quality.

G. <u>Telephones.</u>  Network will be responsible for all telephone and ISDN expenses for the Show, through telephone facilities provided by Network, or pursuant to such other arrangements as Network determines to be appropriate.

H. <u>Show Prep Support</u>.  Network will provide access to its national production group, including providing Host with available news articles, sound bites, and assistance in guest bookings.

I. <u>Distribution</u>.  Network will provide national distribution of the Show to Show Affiliates via satellite distribution or other distribution technology or technologies utilized by Network for transmitting its premier weekday programming to Show Affiliates.

J. <u>Advertising</u>.  Network will arrange for the sale of the commercial advertising inventory for the Show and provide production, as Network determines to be necessary, for commercials sold.

K. <u>Show Website</u>.  Network will own and maintain the Internet website for the Show (the "**Show Website**").  Absent Network's contrary consent, the Show Website shall be the sole website for the Show, and for all Internet postings by Host solely with respect to subject matter that solely

concerns the Show. For the purposes of additional clarification, Host shall permitted hereunder to blog, write articles or post content concerning general news and political matters in accordance Host's obligations to the Fox Network, per the Fox Agreement, as well as on her own website located at the URL: www.andreatantaros.com. Network shall have the sole right to sell all advertising for the Show Website ("**Web Inventory**"), and to collect all advertising revenues for Web Inventory, through Network's designated rep firm(s). All revenues, net of bona fide third party agency fees, actually received by Network with respect to the Show Website, however characterized, shall be subject to revenue sharing in accordance with the provisions of Paragraph 5 below.

L.   "Big Mouth" Coverage. Network will cause Host to be named as an additional insured on Network's media special perils liability insurance policy and any successor policy thereto ("**Network's Big Mouth Policy**") during the Term. Network shall provide a copy of Network's Big Mouth Policy and/or the declaration pages for such policy to Lender during the Term.

M.   [Reserved].

N.   [Reserved].

O.   Transportation and Expenses: Lender and Host represent and warrant that Host's place of residence is New York, New York. If Host's services are required by Network at a "Distant Location" more than fifty (50) miles from Host's said place of residence without a case by case agreement on the approved travel costs, then Lender shall be entitled to the following in connection with Host's services at such Distant Location(s):

   a.   Air Transportation. Host shall be furnished with one (1) business class, if available (and if not available, then Host shall be furnished with the best available class), roundtrip transportation for Host to and from the Distant Location and Host's residence, or wherever Host may be at the time, if closer. If Host is required at a Distant Location for fourteen (14) consecutive days or more, if requested, Host shall be furnished with one (1) additional coach class (if available and if used) roundtrip transportation (by air if appropriate and available) to and from Host's residence (or wherever such non-business related companion(s) may be at the time, if closer) and such Distant Location for Host's non-business-related companion.

   b.   Ground Transportation. Host shall be furnished with exclusive (i.e. sole occupancy, not sole use) first class transportation to and from airports, Host's residence, the hotel and the set or location.

   c.   Living Accommodations/Living Allowance. Lender shall be entitled to: (i) reasonable first class (or best available) hotel accommodations for Host's use (provided that if Host is required by Network to render host services at a Distant Location or, at Host's election, Host shall be entitled to receive an all-inclusive housing allowance of Five Thousand Dollars ($5,000) per month [prorated at 1/30th

thereof per day]) if Host is required at a Distant Location for fourteen (14) consecutive days or more; and (ii) solely in connection with host services rendered at a Distant Location for non-production related Network requests (e.g., promotion services rendered outside of the NY Area) an all-inclusive non-accountable allowance in the amount of One Hundred and Fifty Dollars ($150.00) per day to cover all of Host's meals and incidental expenses of Host at such Distant Location(s).

d. <u>General</u>. Except as otherwise expressly provided in this Agreement, Network shall not be responsible for any other travel related expenses or prerequisites of Host. All travel arrangements, including, but not limited to the acquisition of airline tickets, booking of accommodations, etc. shall be made through Network's location or travel department.

P. <u>Personal Assistant</u>.  Network shall provide, at Network's expense, on terms deemed by Network to be commercially reasonable, a personal assistant to serve for approximately four (4) hours per Host live broadcast day to provide miscellaneous personal support services to Host with respect to the Show, as Network determines to be appropriate.  Host shall have final approval as to the selection and continued services of such assistant from candidates acceptable to Network.

5.   <u>Compensation:</u>

A.   <u>Base Fees.</u>  In exchange for the provision of Host's services as contemplated herein, Lender shall receive base fees ("**Base Fees**"), in the amount of Two Hundred Thousand Dollars ($200,000.00) per year, during the Term, commencing on the first day of the first full calendar month of the First Contract Year, plus a pro-rata allocation for the Partial Month, if applicable, at the rate of $547.95 per calendar day ($200,000.00 annualized, divided by 365), payable pro rata in arrears on the 20th day of each calendar month for the 1st through the 15th days of that month, and on the 5th day of the following month, for the 16th through the end of a calendar month.  Base Fees for any partial calendar month during the Term shall be prorated.

B.   <u>Net Show Revenue Defined</u>. For the purposes of this Agreement, the term "**Net Show Revenue**" shall be defined as the amount of revenues derived by Network with respect to the Show by application of the following formula for any applicable calculation period ("**Subject Period**"):

i. <u>Ad Sales</u> - The amounts, net of any third party agency fees actually retained by and/or paid to any third party ad agency for an advertiser, if applicable (not to exceed industry standard agency fee levels, currently fifteen percent of gross revenue), actually received and collected by Network, or any rep firm retained by Network from time to time with respect to the Show, from the sale of Advertising Time, Web Inventory and/or other advertising sales with respect to the Show during the Subject Period (collectively, "**Ad Sales**"); <u>less</u>

ii. <u>Commission Allocation</u> - An amount equal to that percentage of any such Ad Sales equal to the commission rate actually payable to Network's principal rep firm for the Show at the time of the applicable Ad Sales, whether the Ad Sales are made, in whole or in part, by Network directly or by Network's rep firm, not to exceed a maximum of twenty-five percent (25%) of such Ad Sales through the calendar month in which total Ad Sales reach One Million Five Hundred Thousand Dollars ($1,500,000.00) for any Contract Year, and twenty percent (20%) of Ad Sales for each calendar month thereafter (the "**Commission Allocation**"); <u>plus</u>

iii. <u>Cash Compensation</u> - Any amounts actually received by Network for Cash Compensation during such Subject Period; <u>plus</u>

iv. <u>Miscellaneous Revenues.</u> All revenues actually received by Network during such Subject Period from sales of any other products related to the Show and/or other revenues not otherwise specified in this subparagraph 5.A, less all actual and verifiable expenses incurred by Network in the production and generation of any such revenues ("**Miscellaneous Revenues**"); but <u>excluding</u>

v. <u>User Fees.</u> Any amounts actually received by or credited to Network during such Subject Period with respect to the Show for web streaming, Internet membership fees, subscriptions, licensing and/or other forms of revenues generated for Internet access, streaming, podcasting and other forms of actual user fees, including without limitation video streaming, net of any actual and verifiable fees, commissions and/or other charges payable to Internet/Web service providers, or other providers, in the generation of such revenues ("User Fees").

C.    <u>Revenue Participation.</u>  Lender shall receive additional payments in amounts corresponding to the following percentages of the Net Show Revenue ("**Revenue Participation**"), for the First Contract Year and each Subsequent Contract Year (individually, "**Contract Year**" and, plural or collectively, "**Contract Years**"):

i. Zero percent (0.0%) of the Net Show Revenue for such Contract Year through and including $1,000,000.00 (the "**Annual Threshold**").  The Parties expressly confirm that Revenue Participation does not begin for any Contract Year unless and until the Annual Threshold for that Contract Year has been reached.

ii. Twenty-two and one-half percent (22.5%) of the Net Show Revenue for such Contract Year in excess of $1,000,000.00, and not exceeding $2,000,000.00.

iii. Twenty-five percent (25%) of the Net Show Revenue for such Contract Year in excess of $2,000,000.00, and not exceeding $3,000,000.00.

iv. Thirty percent (30%) of the Net Show Revenue for such Contract Year in excess of $3,000,000.00, and not exceeding $4,000,000.00.

    v.  Forty percent (40%) of the Net Show Revenue for such Contract Year in excess of $4,000,000.00, and not exceeding $5,000,000.00.

   vi.  Fifty percent (50%) of the Net Show Revenue for such Contract Year in excess of $5,000,000.00.

To illustrate the application of the foregoing provisions of this subparagraph 5.C (i.e., for example), and solely for purposes of illustration, if, for a specific Contract Year following a Contract Year generating not less than $1,500,000.00 in Ad Sales, Ad Sales total Four Million Dollars ($4,000,000.00), Cash Compensation totals Eighty Thousand Dollars ($80,000.00), and Miscellaneous Revenues were Twenty Thousand Dollars ($20,000.00), then the Net Show Revenue for such Contract Year would be $3,300,000.00, consisting of: (i) the Ad Sales of $4,000,000.00; less (ii) the Commission Allocation of $800,000.00 (20% of the $4,000,000.00 in Ad Sales); plus (iii) the $80,000.00 in Cash Compensation; plus (iv) the $20,000.00 in Miscellaneous Revenues [$4,000,000.00, less $80,000.00, plus $80,000.00, plus $20,000.00]. In such event, based on Net Show Revenue of Three Million Three Hundred Thousand Dollars ($3,300,000.00), Lender would receive Revenue Participation for such Contract Year (over and above Base Fees pursuant to subparagraph 5.A above and User Fee Participation pursuant to subparagraph 5.D below) in the amount of $565,000.00, consisting of: (i) Zero Dollars ($0.00) for the first $1,000,000.00 in Net Show Revenue (i.e., within the Annual Threshold); (ii) 22.5% of the next $1,000,000.00 in Net Show Revenue ($1,000,000.00 x .225 = $225,000.00); (iii) 25% of the next $1,000,000.00 in Net Show Revenue ($1,000,000.00 x .25 = $250,000.00); and 30% of the remaining $300,000.00 in Net Show Revenue ($300,000.00 x .30 = $90,000.00).

     D.   <u>User Fees</u>.  Pursuant to subparagraph 5.B.(v) above, User Fees shall not be included in Net Show Revenue, and shall not be a factor in the calculation of Revenue Participation payments to Lender pursuant to subparagraph 5.C above. Instead, Network shall pay an amount equal to thirty percent (30%) of all User Fees actually collected by Network during each calendar month during the Term to Lender ("**User Fee Participation**"); provided, however, that if it is not possible to determine whether particular revenues constitute User Fees or Net Show Revenue, or to segregate any particular revenue amounts between User Fees and Net Show Revenue, such revenues shall be deemed to be Net Show Revenue, and shall be included in calculations of Net Show Revenue pursuant to subparagraphs 5.B and 5.C above, rather than being included within User Fees, for purposes of this subparagraph 5.D.

     E.   <u>Revenue Based Compensation</u>.  In order to confirm the mutual understandings and agreements of the Parties, all revenues, from any and all sources, whether in cash or in kind, derived by Network with respect to the Show, including without limitation any cash license fees payable by any satellite radio company for the right to broadcast the Show via satellite radio (which shall be deemed to be Cash Compensation pursuant to subparagraphs 4.B and 5.B.iii above), shall be allocated either to Net Show Revenue pursuant to subparagraph 5.B above, for which Revenue Participation is payable pursuant to subparagraph 5.C above, or to User Fees, as defined by subparagraph 5.B.v above, for which User Fee Participation is payable pursuant to subparagraph 5.D above.

F.     Guaranteed Revenue Participation and User Fee Participation.  Lender shall receive guaranteed compensation in the amount of One Hundred Thousand Dollars ($100,000.00) per year through the expiration of the First Contract Year, and Two Hundred Thousand Dollars ($200,000.00) per year for each Subsequent Contract Year thereafter, payable as an advance against Revenue Participation payable pursuant to subparagraph 5.C above and User Fee Participation payable pursuant to subparagraph 5.D above ("**Guaranteed Compensation**"), without any repayment obligation should any portion of such Guaranteed Compensation advances not be fully recoverable from future Revenue Participation and User Fee Participation.   For purposes of clarification, Base Fees pursuant to subparagraph 5.A above are not, and shall not be, recoupable from Revenue Participation payable pursuant to subparagraph 5.C above or User Fee Participation payable pursuant to subparagraph 5.D above.

G.     Signing Bonus.  Network shall pay to Lender a one-time signing bonus of One Thousand Dollars ($1,000.00) within five (5) business days after the Effective Date.

H.     Highest Compensation.  During the Term of this Agreement, Network warrants, covenants and represents that Lender's total compensation for Host's services shall be higher than the total compensation, however characterized, of any vendor for and/or employee of Network providing host and/or producer services for the Show.

I.      Total Compensation.   The compensation payable to Lender in accordance with the provisions of this Paragraph 5 shall be the full and total compensation payable by Network to Lender for all services of Host, and all rights of Network, under this Agreement and/or with respect to the Show.

6.     Supplemental Compensation Provisions:

A.     Sole Payee.  All compensation under this Agreement for Host's Services shall be paid to Lender, as the Party providing Host's Services to Network.

B.     Revenue Participation and User Fee Participation Computations/Payments.  Revenue Participation payments due under subparagraph 5.C above shall be computed monthly, and, once payable for any Contract Year, shall be paid on or before the last day of the following calendar month.  User Fee Participation payments due under subparagraph 5.D above shall be computed monthly and shall be paid on or before the last day of the following calendar month.

C.     Trailing Revenue.  During the Term, all Net Show Revenue shall be allocated to the calendar month and Contract Year in which it is received.  Any Net Show Revenue received after the expiration or other termination of this Agreement shall be allocated to the final Contract Year of the Term for the purpose of determining Revenue Participation payments pursuant to subparagraph 5.C above, but shall be deemed received, for purposes of the timing of Revenue Participation payments pursuant to subparagraph 6.B above, in the calendar month in which the applicable Net Show Revenue is actually collected.

D.    Revenue Reports.  For each month in which Revenue Participation and/or User Fee Participation payments ("**Participation Payment**", and, plural or collectively, "**Participation Payments**") are due to Lender pursuant to subparagraphs 5.C, 5.D and 6.B above, Network shall issue to Lender, on or before the date on which any such Participation Payments are due pursuant to subparagraph 6.B above, a compiled report of revenues received under subparagraphs 5.B, 5.C and 5.D above for the Subject Period, and any Participation Payments payable and paid thereunder ("**Revenue Report**").

E.    Unsold Inventory/In-Kind Sales.  Nothing contained in this Agreement shall prevent or prohibit the use by Network of any unbooked commercial inventory for Network's own use, or that of any of Network's affiliates or their principals, or other third parties selected by Network, without cost to Network, its affiliates or their principals, or any such third parties; provided, however, that Network may not use any commercial inventory for any such purposes without compensation credited to Ad Sales (at the then scheduled rate for such inventory) unless the inventory remains unbooked seventy-two (72) hours before the close of the advertising schedule for the following broadcast week. If Network shall agree to accept any products or services as in-kind consideration, in lieu of cash, for the sale of any commercial inventory ("**In-Kind Sales**"), there shall be allocated to the Ad Sales, for the Contract Year of any such In-Kind Sales, the actual value, as of the dates any such In-Kind Sales are accepted by Network, of the in-kind consideration accepted by Network; provided, however, that the value of such In-Kind Sales shall not exceed one percent (1%) of the Ad Sales for any Contract Year except for advertising inventory sold within seventy-two (72) hours before the close of the advertising schedule for the following broadcast week (i.e., if In-Kind Sales are utilized at all, with rare exceptions, they would be utilized to fill unsold advertising slots which are nearing the point of inserting "fill" to avoid dead air time).

F.    Audits.  Lender shall have the right to audit Network's records pertaining to Net Show Revenue and/or User Fees, for each Contract Year, at Lender's own expense; provided, however, that: (i) such right may not be exercised more than two (2) times in any Contract Year; (ii) Lender must notify Network in writing within six (6) months after the close of a Contract Year of Lender's intention to conduct an audit with respect to the applicable Contract Year which is to be the subject of such audit (the "**Subject Year**"), and shall conclude any such audit prior to the close of the Contract Year following the Subject Year; and (iii) the representative or representatives of Lender conducting any such audit shall sign a confidentiality agreement with Network to limit discussion and/or disclosure of the applicable financial information to Lender and the senior management and professional advisers of Lender participating in a review with respect to the Subject Year who agree to retain the confidentiality of the applicable information.  If any such audit reveals a discrepancy of five percent (5%) or more in the aggregate total of the Annual Net Show Revenue and/or User Fees reported to Lender by Network for the Subject Year, Network shall reimburse Lender for the reasonable costs of the audit, as well as, any underpayment amounts.

G.   Projection of Revenues.  Lender understands and acknowledges that Network makes no representation as to the level of Net Show Revenue and User Fees to be generated with respect to the Show, or as to any future mix or amount of revenue components for the Show.

H.   Annual Threshold:  Lender understands and acknowledges that the Annual Threshold of One Million Dollars ($1,000,000.00) in Net Show Revenue per Contract Year, as specified in subparagraph 5.C above, prior to any Revenue Participation amounts being payable to Lender, is designed to provide to Network an initial annual recovery in recognition that Network is responsible for payment of Base Fees to Lender, as specified in subparagraph 5.A above, as well as amounts payable for producers or other staff for the Show, as well as other annual production, marketing and other expenses for the Show, without regard to the level of Net Show Revenue for any such Contract Year, and without cost to Lender for any such expenses.  It is further understood and acknowledged by each Party that the Annual Threshold shall remain One Million Dollars ($1,000,000.00) in Net Show Revenue per Contract Year, whether Network's expenses under this Agreement for any such Contract Year are more or less than such amount.

I.   Reporting Number/Representations & Indemnities re Compensation:  Lender shall provide to Network, promptly following the Effective Date, the Federal Employer Identification Number or Social Security Number lawfully assigned to, and properly used by, Lender for tax reporting purposes ("Lender's Federal Reporting Number"), on such reporting form as Network may reasonably request, and which shall be duly signed on behalf of Lender to certify the accuracy of such information.  Network shall not be required to pay any amounts to Lender under and/or pursuant to this Agreement prior to the business day following Network's receipt of such information, as specified above in this subparagraph 6.I, and any other tax reporting information which Network is required by law to obtain from Lender.  By execution of this Agreement, Lender represents and warrants to Network that Lender shall be solely responsible for, and will comply with, any federal and state requirements applicable to reporting of income received and/or payments made for the personal services of Lender, including without limitation any applicable tax payments and/or withholdings, and that Lender's Federal Reporting Number and such other tax reporting information as Lender provides to Network under this Agreement and/or applicable law is true and complete. Lender shall indemnify and defend Network against, and shall hold Network harmless from, any and all claims, losses, liabilities, damages, awards, penalty assessments or costs, including without limitation attorneys' fees, paid or incurred by, or assessed or otherwise awarded or imposed against, Network as a result of any claim and/or determination that any of the foregoing representations and warranties in this subparagraph 6.I are, or shall later be, incorrect or untrue in any respect.

J.   Payments Based On User Fees.  If User Fee Participation is payable to Lender under subparagraph 5.D above based upon User Fees collected by Network for any calendar quarter during the Term, such amounts shall be payable to Lender on or before the last day of the calendar month following such calendar quarter, and Network shall deliver

to Lender a compiled report of any User Fees received for such calendar quarter, and the User Fee Participation payable to Lender therefor on or before the last day of the calendar month following such calendar quarter.

K.   <u>Representations & Indemnities re Compensation.</u>  In order to induce Network to enter into this Agreement, and to promote Host and provide the consideration specified in Paragraph 5 of this Agreement to Lender for the services of Host, Lender expressly and specifically represents and warrants to Network that Network is contracting with Lender and its members in their capacity as independent contractors; (ii) Payments by Network to Lender fully satisfy all obligations of Network for the personal services of Host, and all other services and/or obligations of Host pursuant to this Agreement; and (iii)  Lender shall be solely responsible for, and shall comply with, any federal and state requirements applicable to reporting of income received and/or payments made for the personal services of Host, including without limitation any applicable tax payments and/or withholdings.  Lender shall indemnify and defend Network against, and shall hold Network harmless from, any and all claims, losses, liabilities, damages, awards, penalty assessments or costs, including without limitation attorneys' fees, paid or incurred by, or assessed or otherwise awarded or imposed against, Network if any of the foregoing representations and warranties in this subparagraph 6.K are, or shall later be, incorrect or untrue in any respect.

L.   <u>Payment Dates.</u>  If the payment date for any payment ends on a weekend, a holiday, or another non-business or non-banking day, such payment shall be issued on or before the first business day thereafter.

M.   <u>Guaranteed Compensation Payment Deductions.</u>  Guaranteed Compensation payments shall be payable to Lender on a monthly basis, on the last day of each calendar month, as an advance against current or future Participation Payments payable to Company under this Agreement, at the rate of Eight Thousand Three Hundred Thirty Three Dollars and Thirty Three Cents ($8,333.33) per month during the First Contract Year (plus the applicable pro rata allocation for the Partial Month) and Sixteen Thousand Six Hundred Sixty Six Dollars and Sixty Seven Cents ($16,666.67) for each Subsequent Contract Year.  Such Guaranteed Compensation payments shall be fully recoverable by Network from any such current or future Participation Payments, but Network shall have no entitlement or recourse to recoup Guaranteed Compensation paid to Company from any source other than current or future Participation Payments.

7.   [Reserved].

8.   <u>Network's Rights:</u>

   A.   <u>Network's Rights.</u> During the Term, Network shall have the exclusive rights to the services of Host in the area of terrestrial radio and/or subscription-based "satellite talk radio", whether syndicated, national or local (collectively, **"Radio"**).  Host's name, voice or likeness, or any combination of them, shall not be used as a commercial

announcement or endorsement for any product or service distributed via Radio except pursuant to this Agreement. With the exception of Host's services for the Fox Network pursuant to the Fox Agreement, which shall not be restricted by this Agreement beyond Host's obligations to be available to serve as host of the Show during Host's live performance hours for the Show specified in subparagraph 3.b above, Host shall not host, or enter into a contract for Host to host, a television, cable, Internet or other talk show which, in combination with Host's duties under the Fox Agreement, would materially and negatively impact Host's ability to meet the performance standards set forth in subparagraph 3.e above. In no event shall Host render services for anyone else other than the Fox Network that would create an actual or apparent commercial conflict for Network. In addition, Host agrees to use commercially reasonable efforts to ensure that Host's professional commitments to the Fox Network and other professional and/or business interests shall not unreasonably interfere with Host's Services under this Agreement. During the Term, subject to the rights retained by Host pursuant to Paragraph 12 below and to those uses expressly specified below in this subparagraph 8.A which require the mutual consent of Network and Host, or other express provisions of this Agreement, Network shall also have the exclusive rights to the Show, including all copyrights therein, and to the Show Website, including all copyrights therein (except with respect to any articles, blog posts or other written commentary authored by Host which were not specifically prepared by Host for exclusive and primary distribution via the Show Website, in which case Host shall retain all copyrights with respect to such articles, blog posts or other written commentary and they shall not be deemed to be work-for-hire commissioned for the benefit of the Network), and to distribute or otherwise broadcast or publish the Show, whether in audio, video, audiovisual, digital or other form whatsoever, whether now known or hereafter devised, which rights shall extend to simulcasts and/or delayed broadcasts, streaming, videostreaming, podcasting, tapes, cds and Internet streaming, as well as to live broadcasts, rebroadcasts and simulcasts of the Show via terrestrial radio, the Internet, television, cable, subscription-based "satellite radio" and/or any other present or future broadcast technologies whatsoever, whether presently known or unknown.

B. <u>Revenue Allocation</u>. All revenues generated by any broadcasting technologies subject to the provisions of subparagraph 8.A above will be credited (after actual and verifiable costs are deducted) to Net Show Revenue or User Fees, as applicable, for the Contract Year in which such revenues are actually collected by Network, and all such amounts shall be deemed to be part of the Net Show Revenue or User Fees, as applicable, for any such Contract Year, and qualify for Revenue Participation under subparagraph 5.C above, or User Fee Participation under subparagraph 5.D above, for such Contract Year.

C. <u>Host's Independent Activities</u>. Network acknowledges that Host's primary employer is the Fox Network and that Host currently engages in various independent non-radio professional activities, including without limitation appearing as a commentator or panelist on television or cable programming (including on the Fox Network), blogging, and authoring articles and/or books for publication (collectively, the "**Non-Radio Activities**"). Network specifically consents to Host continuing to engage in the Non-

Radio Activities; provided, however, that (except with respect to Host's obligations to Host's primary employer, the Fox Network) Host's other professional and/or business interests shall not unreasonably interfere with Host's Services, and Host shall not render services for any third party (apart from the Fox Network) that would create an actual or apparent commercial conflict for Network.   During the Term Host shall not perform any services for hire in Radio without the express written consent of Network; provided, however, that the foregoing provision shall not preclude Host from making incidental guest appearances in Radio for the purpose of promoting Host's activities for the Fox Network or otherwise performing Host's services for the Fox Network, or for the purpose of promoting Host's publications, the Show, and/or any television or cable show for which Host is an on-air personality.

9.   <u>Negotiation/Right to Match</u>:  During the Term (except with respect to incidental guest appearance services in Radio in connection with Host's obligations to Host's primary employer, the Fox Network), Network shall have the right to negotiate with Lender concerning Host's services as a personality/host in the field of Radio, and Lender shall neither entertain nor accept any proposals for Host's services in Radio from third parties during the period in which Lender is obligated  under this Agreement to provide Host's services in the field of Radio to Network.  From the expiration of the Term onward, Lender may entertain, solicit and negotiate with respect to offers from third parties for Host's services as a personality/host in the field of Radio; provided, however, that, for a period of three (3) months following any expiration and/or termination of this Agreement (the "**Right to Match Period**"), Network shall have the right to match the financial terms and conditions of any third party offers for Host's services as a personality/host in the field of Radio.  Lender shall forward any such offer which Lender is willing to accept that is generated and/or received prior to or during the Right to Match Period to Network, immediately, and Network shall have ten (10) business days from the last to occur of the first day of the Right to Match Period or Network's receipt of any such offer to match the offer, by giving written notice to such effect to Lender.  If Network fails to do so, Lender will have the right to accept the specific offer from a bona fide third party syndicator which Network declined to match and to contract with any such bona fide third party syndicator on financial terms and conditions no less favorable to Lender than those contained in any such offer.  If Network does match any such offer (and subject to any rights the Fox Network possesses pursuant to the Fox Agreement), this Agreement shall be deemed to be amended to incorporate and/or substitute, as applicable, all provisions of any such offer capable of being matched by Network, subject to commercially reasonable equivalents wherever necessary or appropriate, effective as of the date of Network's match, or the expiration of the Term, whichever shall last occur.  The foregoing provisions of this Paragraph 9 shall not be deemed or construed to apply to incidental services by Host as a commentator, or other guest appearances by Host, pursuant to any existing rights of the Fox Network as a result of Host's obligations under the Fox Agreement.

10.   <u>Non-Performance Days</u>:  Lender may designate up to twenty-two (22) days during each Contract Year on which Host may decline to perform Host's on-air duties under this Agreement, in order to enable Host to schedule vacations or other personal business ("**Variable Non-Performance Days**"), plus the six major holidays (Christmas Day, New Years

Day, Fourth of July, Thanksgiving Day, Memorial Day and Labor Day), whenever such days fall on a weekday, plus such additional days, if any, not exceeding six, during any Contract Year in which Host is unable to perform due to bona fide illness and/or family emergency, without reduction or offset from the compensation payable to Host under this Agreement; provided, however, that Host shall consult with Network sufficiently in advance of any such Variable Non-Performance Days and/or holidays, and as soon as Host is aware of any bona fide illness or family emergency which may impact Host's ability to perform as host or co-host of the Show, to allow for scheduling of replacement hosts and/or other replacement programming by Network, and provided, further, that Lender shall refrain from designating Variable Non-Performance Days which Network has reasonably objected to as a result of key ratings periods, special marketing activities or similar factors. Projects sponsored by Network as to which Network has confirmed in writing that the facilities or timing thereof will preclude Host from performing the Show live shall not be counted as Variable Non-Performance Days, and shall not result in any reduction or offset from the compensation payable to Host under this Agreement.

11.   <u>Publications</u>:  In connection with Host's professional activities, or otherwise, Host shall have the right to publish books, pamphlets, articles and/or other commentaries, except to the extent that any such publication would knowingly violate Network's copyright in one or more Programs, or knowingly violate the provisions of Paragraph 30 below, and  provided, however, that if any such books, pamphlets, articles or other commentaries materially relate to the Show and contain substantial and readily identifiable material taken from the Show, or are published by Network, then ten percent (10%) of any and all resulting revenues shall be paid to Network, and shall not be included in Net Show Revenue for purposes of Revenue Participation payments under this Agreement.

12.   <u>Rights to the Show/Programs</u>:  Network is the owner of the Show and shall have the right to change the name of the Show to such name as Network shall select, subject, however, to Lender's prior written consent, which shall not be unreasonably withheld, conditioned or delayed, as to any name including the name of Host. The Show, and all Programs and recordings of Host's performances, including without limitation the copyrights thereto, and all rights therein, shall be the sole and absolute property of Network.  All rights in and to the format of Network and the Show, and all Program titles and pseudonyms used by Host in the course of performing Host's services for Network (other than Host's name), shall be the sole and absolute property of Network; provided, however, that: (i) the foregoing provision shall not preclude Host from using Host's name in Host's other business and/or professional activities; (ii) Network's rights in and to the format of the Show shall not be deemed to restrict Host from fulfilling her duties to the Fox Network pursuant to the Fox Agreement during or after the Term, whether or not any such services rendered to the Fox Network uses the same or similar formats as the Show; and (iii) the provisions of this Paragraph 12 and/or the other provisions of this Agreement shall not extend to the underlying political, philosophical or other opinions of Host on which Host depends in performing services under this Agreement, and Host may refer to Host's working papers and materials prepared by Host in connection with the Show, without restriction, in formulating Host's independent work product (subject solely to Network's copyrights with respect to the recorded elements of the Show).  To the extent, if

any, that Host retains any right, title or interest in or to any of the recorded results of Host's services under or with respect to this Agreement, Host shall, and hereby does, assign all of such right, title and interest to Network.  Network shall have the broadest possible right to cut, edit, change, add to or subtract from any Network recordings or other Network materials which include the results of Host's Services, and to combine one Program with another or other Programs, and Host hereby waives all so-called "author's rights" and rights of "droit moral," solely with respect to any recordation of the Show as contemplated herein.  With respect to any of Host's Non-Radio Activities, including without limitation Host's activities for the Fox Network pursuant to the Fox Agreement, Lender and Host shall collectively retain all rights with respect thereto and specifically reserve all such rights herein.  The exact time placement and airing of pre-feeds and re-feeds of the Show will be at Network's sole discretion.  Network may exploit and turn to its account any and all such rights granted to it, and the Programs and recordings of Host's performances, throughout the universe, in any manner and by any means whatsoever, now or hereafter known or devised, including, but not limited to, by broadcast and/or rebroadcast by and/or through Network and/or any other Host, whether on a sustaining or commercial sponsored basis.  For the purposes of this Agreement, the terms "recording" and "recordings" include any audio, video and/or audio visual recording or recordings made (whether before, during or after broadcast transmission), by tape, digital medium, film, disc or any other similar or dissimilar methods of recording audio and/or visual portions of Programs, whether now or hereafter known or devised.  Network may, at its discretion, record all communications with Host throughout the three (3) hour performance period for Host's broadcast services under subparagraph 3.a above. Network is under no obligation actually to use Host's Services or broadcast any Program, and may fully satisfy its obligations to Lender by paying to Lender the compensation specified in Paragraph 5 above.

13.  Program Content:  Lender shall use commercially reasonable efforts to ensure that neither Host nor any content of the Show shall denigrate or otherwise disparage Network, its management, employees, vendors, business or station affiliates, advertisers, sponsors or other hosts, or any parent or subsidiary entities of Network or other companies under common control with any of the foregoing, the Show, or any programming or hosts, co-hosts or other on-air personalities of any of the foregoing (collectively, "**Protected Parties**"), violate the rules and regulations of the FCC and/or the FTC, and/or any other applicable state or federal laws or regulations, or otherwise create or threaten actual or potential legal liability or financial damage for Network or any other Protected Parties and/or violate any written policies and/or parameters provided to Host by Network concerning acceptable and/or unacceptable on air content.  If Host fails to comply with any such obligations, Network, in its sole discretion, reserves, and shall have, the right to take all measures deemed by Network to be necessary or appropriate regarding content to protect the Show, and/or Network and/or any other Protected Parties, from financial damage or legal liability of any kind.  Any issues where Network reasonably, and in good faith, acts to protect the Show, Network and/or other Protected Parties from legal liability or financial damage will not be considered to be a violation of any commitment or obligation of Network to Lender, whether under this Agreement or otherwise.  Network's assistance to Host in the form of call screening, show prep, audio clip preparation and the standard screening for offensive language (use of

dump/delay equipment during a broadcast) will not be deemed to be a breach of any actual or alleged obligations of Network to Host.

14.  Host's Name and Likeness:  Network, Network's vendors, the sponsors of the Programs, if any, and their advertising agencies, if any, shall have, and may grant to others, including without limitation Network's station affiliates, the right to use Host's name, pseudonyms, approved likeness, and voice, and any approved biographical material concerning Host, for advertising and publicity for, and promotion of, the Show and/or particular Programs, and in connection with the business of Network and the exercise of any rights granted to Network under or pursuant to this Agreement, including, but not limited to, subsidiary rights in Programs, provided that Host's name or likeness shall not be used as an endorsement of any product or service without Lender's consent, which shall not be unreasonably withheld.  Network, Network's vendors, the sponsors of the Programs, if any, and their advertising agencies, if any, shall not use or license others the right to use Host's name, voice and/or approved likeness in connection with the following categories of commercial tie-ins:  firearms, alcoholic beverages, tobacco, personal hygiene products, political products and/or religious items without first obtaining Lender's prior written approval in each instance.  The rights set forth in this Paragraph 14 shall continue during the Term (including all extensions thereof), and for 60 days thereafter, and, in connection with Programs and recordings of Host's performances on the Show, for as long a period as Network has any rights to use any such Programs and recordings.

15.  Correspondence:  Network, advertising sponsors, if any, and their advertising agencies, if any, may open all correspondence intended for Host which any of them receives, and may answer or cause to be answered any correspondence relating to Host's Services, and may affix Host's specimen signature to any such correspondence and to publicity photos of Host. Network shall use commercially reasonable efforts to forward to Lender any mail for Host marked "Personal" that is received by Network.

16.  [Reserved].

17.  Expenses:  Provided that an officer of Network approves of an expense request in writing and in advance (recognizing that any such approval shall not be unreasonably withheld, conditioned or delayed), Network will reimburse Lender for duly approved expenses, including without limitation customary and reasonable travel expenses incurred by Host, including round-trip "business class" (or such other class as may be required above) transportation expenses, while Host is complying on a temporary basis with a request by Network to render Host's Services anywhere outside of the NY Area (or such other area which Host may designate as Host's residence and primary performance location) within thirty (30) days after Lender's submission of proper sustaining vouchers, and in accordance with Network's standard policies.

18.  Termination:

A.  Breach.  This Agreement shall terminate immediately, upon written notice by the Party asserting the existence of a breach (the "**Complaining Party**"), to the Party alleged to be in breach of this Agreement (the "**Challenged Party**"), of an election by the Complaining

Party to terminate this Agreement due to a failure or refusal of the Challenged Party to cure a curable material breach of an express term of this Agreement. For purposes of this Agreement, failure to cure a curable material breach occurs when a written notice identifying both the specifics of an actual material breach of an express term of this Agreement and the specific action(s) legitimately required under the provisions of this Agreement to cure such breach ("**Breach Notice**") is given within twenty (20) business days of the actual  material breach described in such Breach Notice ("**Cited Breach**"), and the Challenged Party fails to cure the Cited Breach within twenty (20) business days thereafter, and provided, further, that, after such twenty (20) business days have expired, the Challenged Party fails to cure the Cited Breach prior to the proper issuance of a written termination notice based upon such Breach Notice by the Complaining Party. For purposes of this Agreement, a business day is a day on which commercial banks are required to be open under the laws of Oregon. A breach which is timely cured is not grounds for termination, and an alleged breach which is not capable of being cured by responsive action upon receipt of a written notice designating the required performance or other action necessary to cure such breach, or is of such a nature as to not be capable of correction by diligent action within twenty (20) business days of receipt of a Breach Notice, may not be the subject of a Breach Notice under this subparagraph 18.A.  If the recipient of a Breach Notice, in response to any such Breach Notice, shall issue a written reply which challenges the existence of any Cited Breach, and/or the specific action(s) required to cure any such Cited Breach, and/or the propriety of any such Breach Notice, and shall perform the specified action or actions, if any, required to resolve any claimed material breach and required cure step(s) asserted in any such proper Breach Notice which is/are not challenged, no termination notice may issue under this subparagraph 18.A unless the existence of any such Cited Breach and/or the required cure action(s) is/are finally decided in an arbitration or judicial proceeding, and the Challenged Party then fails to cure any such adjudicated Cited Breach within twenty (20) business days after receiving the final adjudication establishing the existence and nature of any such Cited Breach and the specific required cure action(s).

B. <u>Other Cause</u>.  This Agreement shall terminate immediately upon written notice from Network to Lender, if, in the commercially reasonable business judgment of Network's management: (i) Host is unable to perform fully all of Host's Services because of any physical or mental disability or other limitation, despite reasonable accommodation, for a period of thirty (30) or more consecutive broadcast days, or forty-five (45) broadcast days in the aggregate during any year (<u>i.e.</u>, any consecutive period of 365 days); (ii) Host commits any act in the course of Host's Services that constitutes fraud or substantial and deliberate dishonesty; (iii) Host engages in a pattern of non-performance of Host's principal duties under this Agreement (<u>e.g.</u>, continues to fail to produce or provide Host's Services, appears significantly late or unprepared to host the Show without reasonable justification  five (5) or more times, or otherwise demonstrates repeated unwillingness to perform in a professional manner); or (iv) Host engages in conduct which results in a public scandal that the Network, in its commercially reasonable business judgment determines reflects unfavorably on Network and has or is

reasonably likely to cause financial harm to the Network; provided, further, however, that the foregoing provisions shall not apply to any reasonable political commentary of any kind or nature.  In lieu of termination of this Agreement, Network may suspend live broadcasts of the Show, as well as payment of compensation to Lender, as a result of the occurrence of any of the events specified above in this subparagraph 18.B, until such time as Network, in the exercise of Network's commercially reasonable business judgment, shall conclude that all problems or other factors giving rise to such events have been resolved and that such events are not likely to recur.

C.  <u>Force Majeure Termination.</u>  This Agreement shall terminate immediately, upon written notice from any Party to the other Party, if Network has been unable to engage in its regular broadcasting activities for a period of sixty (60) or more consecutive days by reason of an act of God, fire, or other casualty, a strike or other labor dispute, government action, order or decree, armed conflict, or other causes outside of Network's control, provided that any such termination notice shall be duly issued before Network shall resume broadcasting activities.

D.  <u>Discretionary Termination By Network.</u>  Notwithstanding any other provision of this Agreement, Network shall have the right to terminate this Agreement, with or without cause, in Network's sole discretion (in such case, a **"Termination for Convenience"**), on giving advance written notice to such effect to Lender, provided that any such notice may be issued by Network solely during the First Contract Year, and provided further that if Network elects to exercise a Termination For Convenience, notwithstanding any other rights Lender or Host may possess under this Agreement, Network shall continue to pay Base Fees and Guaranteed Compensation for a period of six (6) months following the date of any Termination for Convenience.

E.  <u>Death of Host</u>.  Immediately, without notice or other act, upon Host's death.

F.  <u>Lender Threshold Termination</u>.  On or before the last day of the first calendar month following the second Contract Year and the third Contract Year (<u>i.e.</u>, on or before January 31, 2015 and January 31, 2016), Network shall provide to Lender a written report of all Net Show Revenue and all User Fees received by Network during the prior Contract Year (the **"Prior Year Revenues"**).  If the Prior Year Revenues are less than Two Million Dollars ($2,000,000.00), in the aggregate, Lender shall have the right, but not the obligation, for a period of forty-five (45) days following the issuance of Network's written report of the Prior Year Revenues for the applicable Contract Year, to terminate this Agreement by giving thirty (30) days' written notice of termination to Network.

19.   <u>Post-Termination Provisions:</u>

A.  <u>Termination for Cause</u>.  In the event of a termination of this Agreement pursuant to the terms of subparagraphs 18.B(ii), 18.B(iii) or 18.B(iv) above, Host shall not perform for or during, or broadcast or produce, any radio program of any type for a period of ninety (90) days, and shall not perform for or during, or broadcast or produce, any syndicated radio

program for one year, within any geographical area in the United States where the broadcast of the Show was available to the general public through radio broadcast. Lender specifically acknowledges that this provision is reasonable in time and geographic limitations.

B. <u>Termination for Health</u>. If the reason for early termination of this Agreement is the health of Host, and Host later returns to Host's broadcasting career, Network shall retain the option to reinstate this Agreement for the time equivalent to the remainder of the Term as of the date of termination.

C. <u>"Equity" Equivalents</u>. Lender acknowledges that Network will expend substantial sums in promoting Host as a national radio personality, and that Host's utilization of Network's goodwill and marketing efforts on behalf of another network or syndicator would not be readily compensable to Network. In executing this Agreement, Lender agrees that the Revenue Participation specified in subparagraph 5.C above and User Fee Participation payments under subparagraph 5.D above provide a form of equity interest in the Show to Lender and are being paid to Lender as compensation for Network's right to be the sole syndicator and broadcast distributor of any radio show hosted, and/or co-hosted, and/or guest hosted, by Host for the duration of the Term.

D. <u>Post-Termination Payments</u>. In the event of any termination pursuant to Paragraph 18 above and/or the expiration of the Term: (i) Base Fees and Guaranteed Compensation will be prorated through the date of termination and/or expiration and paid to Lender (except in the case of any Discretionary Termination in accordance with Paragraph 18.D above, with respect to which Network shall be obligated to pay Base Fees and Guaranteed Compensation for a period of six (6) months post date of termination); (ii) any Revenue Participation specified in subparagraph 5.C above, and/or payments based on User Fees under subparagraph 5.D above, resulting from revenues received by Network after the date of termination and/or expiration shall continue to be paid to Lender according to the provisions of subparagraphs 6.B, 6.C and 6.J above; (iii) Lender shall not be entitled to any other compensation or benefits which would otherwise be payable or deemed to be earned after the date of termination; and (iv) neither Lender nor Network shall have any further obligation to the other, except for those obligations which survive the expiration or termination of this Agreement pursuant to the provisions of subparagraph 19.E below.

E. <u>Continuing Effect</u>. Notwithstanding any termination or expiration of this Agreement, those provisions of this Agreement that reasonably and/or expressly would survive termination shall continue in effect following any such termination or expiration, including without limitation the terms of Paragraphs 9, 12, 19, 21, 23, 24, 26, 30 and 31 of this Agreement.

20. <u>Payola:</u> Lender has been advised of the provisions of Sections 317 and 508 of the Federal Communications Act, and/or the regulations adopted by the FCC implementing these sections. Lender warrants and represents to Network that, in connection with any services or materials furnished to Network, Host has not accepted or agreed to accept, or paid or agreed to pay, any money, service or other valuable consideration for the inclusion

in any Program of any matter contemplated by such sections and regulations. Lender further warrants and represents to Network that Host has not accepted, and will not accept or agree to accept, or paid or agree to pay, any money, service or other valuable consideration for the inclusion of any such matter in the Programs, and Host shall give to Network forthwith any information Host acquires which might alert Network that an announcement was required pursuant to the above statutes and/or regulations. In addition, Lender represents and warrants to Network that Host (and/or Host's immediate family) do not have, and will not acquire, a hidden financial interest in the sale to the public of any service or commodity which is subject to the above statutes and regulations. If Host (and/or Host's immediate family) do acquire any such hidden financial interest, Lender represents and warrants to Network that Host will immediately give Network notice of any information to that effect so that an appropriate announcement may be made.

21.   Indemnification:

  A.   Lender Indemnity.  Lender shall indemnify and hold harmless Network and all other Protected Parties from and against any and all actual loss, liability, claims, damage, penalty and other expense, including without limitation reasonable attorneys' fees, in excess of, or not covered by, Network's Big Mouth Policy, resulting from an adverse final judgment, order, decree, or other adverse final determination of any court of competent jurisdiction finding liability arising from: (i) any performance or utterance (ad lib or otherwise) made by Host in or in connection with any Program which is found to be the result of actual tortious or otherwise legally actionable conduct on the part of Host; or (ii) the use of any other material furnished by Host hereunder; or (iii) the uncured, material breach of any term or condition of this Agreement by Host or Lender; or (iv) the uncured, material breach of any representation, warranty or covenant of Lender under this Agreement; or (v) the uncured, material breach of any representation, warranty, covenant or agreement of Host in that certain Inducement Letter and Guaranty agreement relating to this Agreement, of even date herewith, by and between Network and Host. Network's approval of any material furnished by Host shall not constitute a waiver of Host's indemnity with regard thereto.

  B.   Network Indemnity.  Network will similarly indemnify and hold harmless Host from and against any and all actual loss, liability, claims, damage, penalty and other expense, including reasonable attorney's fees, caused by or arising out of (i) the Show and/or Host's broadcasting any material supplied by Network (which includes news received from wire services) and/or arising from or relating to (ii) the performance by Network of its duties under this Agreement (other than matters as to which Lender's indemnity under subparagraph 21.A above applies) or (iii) Network's breach of any representation, warranty or covenant of Network contained in this Agreement; provided, however, that Lender shall promptly notify Network of any such claim or threatened litigation. Network will assume the defense of any such claim or litigation.

  C.   Continuing Effect.  The expiration or termination of this Agreement will not affect these continuing indemnity obligations.

22.    [Reserved].

23.    <u>Remedies</u>:  Host's Services, and the rights to the results and proceeds of Host's Services granted to Network, are of a special, unique, unusual, extraordinary and intellectual character, which gives them a peculiar value, the loss of which would cause Network irreparable injury and damage, and Lender acknowledges that it would be difficult to determine and measure the damages suffered by Network in the event of a breach by Lender resulting from Host's undertaking the obligations of a live on-air radio host for any third party in violation of the provisions of this Agreement. Accordingly, injunctive and other equitable relief against Lender any will be an appropriate remedy to enforce Network's rights under this Agreement. This does not, however, in any way constitute a waiver by Network of its right to seek damages or other remedies, and Network shall retain the right to seek an action for specific performance and/or injunctive relief to enforce Lender's obligations under this Agreement, in addition to any other remedies at law or in equity which are otherwise appropriate.

24.    <u>Dispute Resolution</u>:   In the event of any dispute between the Parties relating to this Agreement and/or the obligations and/or entitlements of any Party under this Agreement, the Parties shall continue with and complete all undisputed performance capable of completion prior to resolution of the dispute, and the dispute and/or disputes shall be subject thereafter to resolution by mediation and/or arbitration and/or civil litigation, as follows:

   a.   <u>Meet and Confer</u>.  The Parties shall endeavor in good faith to meet and confer with each other on a confidential basis in an effort to resolve any such dispute or disputes.

   b.   <u>Mediation</u>.  At the request of any Party following unsuccessful good faith efforts of such Party to resolve their claim(s) through direct meet and confer efforts, the Parties shall endeavor to mediate any such claim(s) confidentially and in good faith.  If the Parties are unable to agree on the specific mediation procedures to be used, at the written request of any Party, the mediation shall proceed on a confidential basis in accordance with the commercial mediation rules of the Judicial Arbitration and Mediation Service ("**JAMS**") currently in effect, with Network and Lender each advancing one-half of any filing, administrative and/or mediator fees, and with the mediation to occur at a location selected by the mediator(s) in New York County, New York unless the Parties agree on another location, at a date and time selected by the mediator(s) if not otherwise agreed to by the Parties.

   c.   <u>Arbitration</u>.  If the Parties are unable to resolve the dispute(s) by mediation after good faith participation in not less than one full mediation session, then, upon the written request of any Party, such dispute(s) shall be subject to non-binding and confidential arbitration.  If the Parties are unable to agree on the specific arbitration rules and procedures to be used, the arbitration shall be conducted on a confidential basis in accordance with the commercial arbitration rules of JAMS then in effect, including without limitation all rules as to payment of filing, administrative and/or arbitrator fees. Unless the Parties shall otherwise agree, the arbitration shall occur in Oregon, at a location, date and

time specified by the arbitrator(s).  Unless any Party shall reject, in a writing delivered to the other Parties and the arbitrator(s), any arbitration award requiring payment of any money or performance of any action as to the substantive issue(s) in dispute between the Parties, within twenty (20) days after the date such award is duly served upon the Parties, such arbitration award shall be binding on the Parties and duly enforceable.  Arbitration awards concerning procedural issues relating to payment of fees and/or costs of the arbitration, and/or relating to the procedural aspects of the arbitration, shall be binding and enforceable between the Parties, subject to any procedural rules in effect in such arbitration for reconsideration of any such rulings by the arbitrator(s).

d.  <u>Litigation</u>.   If any of the Parties shall timely reject any substantive arbitration award as specified in subparagraph 24.c above, the arbitration process shall terminate, and the dispute(s) shall then be subject to resolution by civil action, in Oregon.  In addition, and notwithstanding any provision to the contrary in this Paragraph 24, Network, at Network's sole discretion, may proceed immediately to civil action, in Oregon, without first pursuing either mediation or arbitration, in the event of any actual or claimed violation of any provisions of subparagraph 8.A or Paragraphs 3, 9, 30 or 31 of this Agreement, should Network seek to obtain a restraining order, a preliminary or permanent injunction, declaratory relief and/or other equitable relief whatsoever, whether exclusively and/or in combination with any other request for relief, with respect to any such claimed violation of the provisions of subparagraph 8.A or Paragraphs 3, 9, 30 or 31 of this Agreement.

e.  <u>All Current Claims At Issue</u>.   In order to minimize the prospect for a multiplicity of proceedings, any demand for mediation and/or arbitration, and any complaint and/or other pleading commencing any civil litigation, by any Party pursuant to this Paragraph 24, shall specify and include all claims asserted and/or assertable by the Party initiating such action, to the point of initiating such action, and any counterclaims then asserted and/or assertable by the other Party or Parties shall be asserted as cross-claims in any such mediation, arbitration and/or civil litigation, or shall thereafter be barred.

f.  <u>Applicable Laws</u>.  Except, if at all, as expressly altered by the provisions of this Agreement, any such mediation, arbitration and/or civil action shall be subject to all applicable laws of Oregon, without regard to Oregon's choice of law principles.

g.  <u>General Provisions</u>.  The final ruling, award, order and/or judgment in any such proceeding ("**Determination**") shall establish the specific obligation and/or performance required to comply with this Agreement, and/or resolve any ambiguity or other question arising or asserted with respect to this Agreement, and the Parties shall then each perform their respective obligations under this Agreement in accordance with such Determination.  However, in no event shall any such Determination result in termination of this Agreement, and termination of this Agreement shall not be available as a remedy in any such proceeding.

25.    Assignment/Sale:

    A.  Host.  Because this Agreement involves Host's personal services, Lender may not assign and/or delegate Host's obligations under this Agreement at any time, and the rights of Lender under this Agreement may not be assigned and/or delegated to any other person or entity; provided, however, that the rights of Lender to receipt of compensation under this Agreement may be assigned, with Host's consent, to any entity owned by Host, and/or in which Host actively serves as a principal officer, member and/or manager, and which shall have the right to contract for the personal services of Host.

    B.  Network.  Network may assign its rights and/or delegate its duties hereunder at any time to any person, firm or corporation that acquires all or a substantial part of Network's syndication business, and/or to any parent or subsidiary of Network, or any entity under common ownership with Network, and this Agreement may be so assigned and/or delegated by any such assignee; provided, however, that any such assignment and/or delegation will relieve the assignor and/or delegator of liability only for obligations arising after the date of assignment and only if such obligations are assumed by the assignee and/or delegee.

26.    Governing Law: This Agreement shall be construed according to the laws of Oregon applicable to agreements which are executed and fully performed within said State, and without giving effect to Oregon's choice of law principles.

27.    Representation by Counsel: This Agreement has been prepared by counsel for Network, who in connection therewith is representing only Network. Lender acknowledges that: (i) the Host Group has been advised to seek Lender's own counsel in connection with the negotiation and preparation of this Agreement and the consequences of the transactions contemplated by this Agreement; and (ii) Lender has either been so advised by Lender's own separate counsel or has waived such rights.  In no event is Lender relying on Network's counsel to protect Host's rights, or to advise Host as to any conclusion of law or fact. Notwithstanding the foregoing, all Parties acknowledge that the provisions of this Agreement have been fully negotiated, and that no provision shall be construed against any Party because that Party has prepared such provision.

28.    General: If any provision of this Agreement is held to be invalid, illegal, overbroad or unenforceable in any respect, such provision shall be construed and interpreted in such manner as to give effect to and/or restrict such provision to render it valid, legal and enforceable to the extent a valid, legal and enforceable construction is possible, and to exclude any interpretation or construction which would render such provision invalid, illegal, overbroad or unenforceable.  To the extent that any provision or clause of this Agreement cannot be construed in such a manner as to render it legal, valid and enforceable, this Agreement shall be construed as if such invalid, illegal or unenforceable provision or clause had never been contained in this Agreement, and such provision or clause shall not affect any other provision or clause of this Agreement. A waiver by any Party of any of the terms and conditions of this Agreement in any one case shall not constitute a waiver of such term or

condition for the future, or as to any subsequent breach. All remedies, rights, undertakings, obligations, and agreements with respect to this Agreement, the Show and/or Host's Services shall be cumulative, and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement any Party. This Agreement sets forth the entire agreement of the Parties with respect to the subject matter of this Agreement, and replaces and supersedes all prior agreements, representations and/or understandings, whether written or oral, by and between the Parties. Any amendment to this Agreement must be in writing and be signed by each Party in order to be effective. This Agreement may be executed in counterparts, and signatures transmitted via e-mail and/or facsimile shall be given the same effect as original signatures.

29.   <u>Notices:</u>  Any notice which any Party desires, or is  required, to issue pursuant to this Agreement must be issued in writing and delivered either personally, by US Mail certified with return receipt, by commercial overnight delivery service (e.g. Federal Express), or via facsimile or e-mail with confirming copy delivered within 48 business hours by US mail (either first class or certified) or commercial overnight delivery service, to the other Party at the respective addresses/facsimile numbers set forth below, or to such other address/number as any such Party may designate by such written.

If to Lender:            Astero, LLC
                         2020 New Road
                         Linwood, NJ 08221
                         E-mail: <u>atantaros@gmail.com</u>


with a copy (which shall not constitute notice) to:

                         Business Law Professional Corporation
                         9300 Wilshire Blvd., Suite 508
                         Los Angeles, CA 90212
                         Facsimile:    (310) 919-1950
                         Attention:    Joseph C. Cane, Jr.
                         E-mail: jcane@businesslpc.com

If to Network:           Talk Radio Network Entertainment, Inc.
                         225 NE Hillcrest Dr.
                         Grants Pass, OR 97526
                         Attn: Business Affairs
                         Facsimile: (541) 471-1663

Notice issued by certified mail or commercial overnight delivery service shall be deemed issued on the date of mailing, or on the date of delivery to the delivery service, as applicable.  Notices issued by facsimile or e-mail and confirming mail or overnight delivery shall be deemed issued on the date such telefax or e-mail has been sent, provided that the notice is deposited in the United States mail or with the overnight carrier, for delivery, within 48 business hours.  Any charges are to be billed to and/or paid in advance by the sender.

30.   Confidentiality/Non-Disclosure:

A.   This Agreement. No party to this Agreement (as well as Host) shall disclose the terms and conditions of this Agreement, or cause such terms and conditions to be disclosed, to any person or persons other than Lender's, Host's and Network's respective agents, employees, attorneys and/or accountants who have a need to know, and who are legally required to refrain from further disclosing, the terms and conditions of this Agreement.

B.   Generally. No party to this Agreement (as well as Host) shall disclose, or cause to be disseminated, to any person or persons other than Lender's, Host's and Network's respective agents, employees, attorneys and/or accountants who have a need to know, and who are legally required to refrain from further disclosing, the terms and conditions of this Agreement and/or the particulars of communications by and between Lender and/or Host, on the one hand, and Network, on the other hand, and/or other personal, financial, business and/or professional information which Lender and/or Host may learn, prepare or otherwise be privy to concerning the Show and/or Network and/or any other Protected Parties, except as specifically required by law. Lender acknowledges and agrees that all such information, including without limitation any and all work product of Host with respect to the Show and/or Network ("**Work Product**"), constitutes confidential and/or proprietary business information and/or proprietary intellectual property of Network and/or other of the Protected Parties ("**Proprietary Information**"), and may be damaging to and/or harm the professional reputations and/or careers and/or businesses of the Protected Parties, and/or certain of the Protected Parties, and could cause substantial damages to the Protected Parties, or certain of them, if disclosed.

C.   Right to Contest. Prior to making any such disclosure required by law, Lender shall notify Network of, and shall provide to Network copies, and any additional specifics, of any disclosure demand purportedly issued under color of law, and shall afford Network a reasonable opportunity to contest, or to obtain a protective order with respect to, any such disclosure.

D.   [Reserved].

E.   Obligations on Termination. Upon any termination of this Agreement, Host shall not retain any Work Product or other Proprietary Information, or copies thereof, in any form, and Host shall deliver any and all such Work Product or other Proprietary Information, or copies thereof, under the possession, custody or control of Host to Network immediately upon any such termination. In addition, for a period of one (1) year following any termination or expiration of this Agreement, Host shall not hire, retain, solicit or otherwise contact any other persons or entities with access to any Proprietary Information of Network, including without limitation any of the Protected Parties, any employees, hosts, producers, vendors, subcontractors, officers, directors, managers, executives or other agents or representatives of Network and/or any other Protected Parties, including

without limitation any vendors which provide services with respect to Network's production of the Show, whether as contractors and/or subcontractors for Network, and shall refrain from causing any such persons or entities to terminate or otherwise alter their business relationship with Network, or any of the rest of the Protected Parties, unless Network shall first provide written confirmation to Host that any such intended action, as expressly described in writing by Host to Network, shall not jeopardize any Proprietary Information.

31.   Non-Disparagement:  Lender and Host shall not disparage any of the Protected Parties, and/or any of the radio programming or other activities, hosts, co-hosts, other on-air personalities, personnel or vendors of Network and/or any other Protected Parties, and Network shall not disparage Lender or Host.  Lender shall secure the advance consent of Network with respect to any press releases or other statements by Lender and/or Host to the press, reporters or other media personnel concerning Network and/or the Show.

32.   Conflict/Approval.   The Parties acknowledge that, subject to a mutually agreeable nondisclosure agreement, the Fox Network shall be entitled to review and approve the terms of this Agreement relevant to Host's obligations to the Fox Network, provided its approval thereof shall not be unreasonably withheld, conditioned or delayed.

33.   Initial Press Release.  Lender and Network shall jointly approve the press release announcing the launch of the Show and Host's retention as the principal host.  Given the importance of timely issuance of such release, Lender will use best efforts, subject only to Host's existing obligations to the Fox Network, to respond immediately to any proposed press release submitted by Network, and will be deemed to have approved the terms of a proposed release if Lender fails to provide Lender's response to a proposed press release within four (4) working hours of submission by Network.

IN WITNESS WHEREOF, the undersigned have executed this Agreement on the dates specified below.

**TALK RADIO NETWORK
ENTERTAINMENT, INC.**
an Oregon corporation


By _____
Mark Masters, CEO


Date: December 21st, 2012

**ASTERO, LLC**, a New Jersey
limited liability company


By _____
ANDREA K. TANTAROS, President


Date: December 17, 2012

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, District of New Jersey, using the electronic case filing system of the court.

I hereby certify that on March 3, 2014, I caused:

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS' TO DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF CHRISTIAN S. MOLNAR, ESQ., AND JOSEPH C. CANE, JR., ESQ., IN SUPPORT THEREOF**

to be served by first class mail on:

| Defendant Talk Radio Network Entertainment, Incorporated 225 N.E. Hillcrest Drive, Grants Pass, Oregon, 97526 | Defendant Mark Masters 225 N.E. Hillcrest Drive, Grants Pass, Oregon, 97526 |
| --- | --- |

I declare, under penalty of perjury under the laws of the United States of America that the foregoing is true and that I am employed in the office of a member of the Bar of this court at whose direction the service was made.

Executed this 3rd day of March, 2014, at Los Angeles, California.

/s/ Ashley M. Hunt

Ashley M. Hunt

---

1

**NOTICE OF OPPOSITION AND OPPOSITION OF PLAINTIFFS TO DEFENDANTS' MOTION TO VACATE ENTRY OF DEFAULT**